## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DR. KUSUMA NIO, *et al.*, | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action No. 1:17-00998-ESH |
| v. | ) |
| | ) |
| United States Department of Homeland | ) |
| Security, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

## <u>DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUCTION</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ iii

DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUCTION ....................................................1

INTRODUCTION ..........................................................................................................................1

STATUTORY AND REGULATORY BACKGROUND.................................................................2

    A.  Naturalization Process ......................................................................................................2

    B.  8 U.S.C. § 1440.................................................................................................................5

    C.  MAVNI program ..............................................................................................................8

          1.  Security screenings under MAVNI..........................................................................9

          2.  The USCIS Hold .....................................................................................................11

FACTS ...........................................................................................................................................13

STANDARD OF REVIEW ...........................................................................................................16

ARGUMENT .................................................................................................................................17

    I.       The Relief Sought By Plaintiffs Is Inconsistent With Preliminary
            Injunctive Relief..............................................................................................................17

    II.      The Court Lacks Jurisdiction Over This Case ..............................................................18

        A.  The Court does not have jurisdiction over Plaintiffs' claims under
             the Little Tucker Act....................................................................................................18

        B.  The Court does not have jurisdiction over Plaintiffs' claims against DoD .................20

        C.  Plaintiffs' lack standing to challenge USCIS background check policy ....................22

        D.  Because 8 U.S.C. § 1440 does not provide private rights of action, Plaintiffs lack
             standing, and the Court lacks jurisdiction over that claim..........................................24

    III.     Even Assuming Jurisdiction, Plaintiff Cannot Show A Likelihood Of
            Success On The Merits ....................................................................................................28

A.  Plaintiffs have failed to state a claim for unreasonable delay
    against USCIS ............................................................................................................28

B.  Plaintiffs have failed to state a claim against USCIS because USCIS's
    decision not to adjudicate their applications until the completion of their DoD
    background investigations is lawful............................................................................32

IV.  Plaintiffs Do Not Establish Irreparable Harm................................................................37

V.  Hardship To Defendant And The Public Interest Weigh Against Entry Of
    A Preliminary Injunction ...............................................................................................42

CONCLUSION......................................................................................................................43

# TABLE OF AUTHORITIES

## CASES

*Adams v. Vance*,
    570 F.2d 950 (D.C. Cir. 1978) ............................................................................................. 18

*Akinseye v. District of Columbia*,
    339 F.3d 970 (D.C. Cir. 2003) ............................................................................................. 19

*Albrecht v. Comm. on Employee Benefits*,
    357 F.3d 62 (D.C. Cir. 2004) ............................................................................................... 19

*Alexander v. Sandoval*,
    532 U.S. 275 (2001) ...................................................................................................... 24, 25

*Alkenani v. Barrows*,
    356 F. Supp. 2d 652 (N.D. Tex. 2005) ................................................................................ 29

*Alzuraiki v. Heinauer*,
    544 F. Supp. 2d 862 (D. Neb. 2008) ................................................................................... 28

*Amoco Production Co. v. Hodel*,
    815 F.2d 352 (5th Cir. 1987) .............................................................................................. 19

*Antonishin v. Keisler*,
    627 F. Supp. 2d 872 (N.D. Ill. 2007) .................................................................................. 22

*Arpaio v. Obama*,
    27 F. Supp. 3d 185 (D.D.C. 2015) ...................................................................................... 23

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................................ 32

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................................ 32

*\*Beshir v. Holder*,
    10 F. Supp. 3d 165 (D.D.C. 2014) ...................................................................................... 28

*Bill Barrett Corp. v. U.S. Dep't of Interior*,
    601 F. Supp. 2d 331 (D.D.C. 2009) .................................................................................... 37

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988) ............................................................................................................ 20

*Brown v. District of Columbia,*
  888 F. Supp. 2d 28 (D.D.C. 2012) ........................................................................ 37

*C&E Servs., Inc. of Washington v. D.C. Water & Sewer Auth.,*
  310 F.3d 197 (D.C. Cir. 2002) ............................................................................. 22

*California v. Sierra Club,*
  451 U.S. 287 (1981) ............................................................................................. 25

*Cannon v. University of Chicago,*
  441 U.S. 677 (1979) ............................................................................................. 25

*Castracani v. Chertoff,*
  377 F. Supp. 2d 71 (D.D.C. 2005) ................................................................... 27, 30

*Chaplaincy of Full Gospel Churches v. England,*
  454 F.3d 290 (D.C. Cir. 2006) ............................................................................. 38

*\*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
  467 U.S. 837 (1984) ............................................................................................. 34

*City of Arlington v. FCC,*
  133 S. Ct. 1863 (2013) ........................................................................................ 34

*Clapper v. Amnesty Int'l USA,*
  133 S. Ct. 1138 (2013) ........................................................................................ 23

*\*Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo–Mitsubishi Ltd.,*
  15 F. Supp. 2d 1 (D.D.C. 1997) ........................................................................... 18

*Cort v. Ash,*
  422 U.S. 66 (1975) ............................................................................................... 25

*Costa v. Chertoff,*
  No. CIV.A. 07-2467, 2007 WL 4456218 (E.D. Pa. Dec. 11, 2007) ................... 21, 22

*Davis v. Billinton,*
  76 F.Supp.3d 59 (D.D.C. 2014) ........................................................................... 18

*Davis v. Pension Benefit Guar. Corp.,*
  571 F.3d 1288 (D.C. Cir. 2009) ........................................................................... 17

*Dorfmann v. Boozer,*
  414 F.2d 1168 (D.C. Cir. 1969) ........................................................................... 18

*Fedorenko v. United States*,
    449 U.S. 490 (1981) ............................................................................................. 38, 39

*Geneme v. Holder*,
    935 F. Supp. 2d 184 (D.D.C. 2013) ...................................................................... 30, 31

*Giddings v. Chandler*,
    979 F.2d 1104 (5th Cir. 1992) ................................................................................ 20

*Hamandi v. Chertoff*,
    550 F. Supp. 2d 46 (D.D.C. 2008) ............................................................... 20, 21, 22

*Han Cao v. Upchurch*,
    496 F. Supp. 2d 569 (E.D. Pa. 2007) ..................................................................... 20

*Hernandez-Avalos v. I.N.S.*,
    50 F.3d 842 (10th Cir.1995) .................................................................................... 20

*INS v. Miranda*,
    459 U.S. 14 (1982) ................................................................................................. 31

*INS v. Pangilinan*,
    486 U.S. 875 (1988) ........................................................................................... 24, 42

*Jarecki v. United States*,
    590 F.2d 670 (7th Cir. 1979) .................................................................................. 20

*Johnson v. Eisentrager*,
    339 U.S. 763 (1950) ............................................................................................... 39

*Kidwell v. Dep't of the Army*,
    56 F.3d 279 (D.C. Cir. 1995) ................................................................................. 19

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994) ............................................................................................... 18

*Lopez v. Henley*,
    416 F.3d 455 (5th Cir. 2005) ................................................................................... 5

*Martin v. Donley*,
    886 F. Supp. 2d 1 (D.D.C. 2012) ........................................................................... 20

*Mayo Foundation for Medical Educ. & Research v. U.S.*,
    562 U.S. 44 (2011) ................................................................................................. 34

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ............................................................................................... 16

v

*Morgovsky v. Dep't of Homeland Sec.*,
  517 F. Supp. 2d 581 (D. Mass. 2007) ................................................................................ 29

*Munaf v. Green*,
  553 U.S 674 (2008) ............................................................................................................ 32

*New Motor Vehicle Bd. v. Orrin W. Fox Co.*,
  434 U.S. 1345 (1977) ......................................................................................................... 43

*Nine Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the United States v.*
  *Kerry*, 168 F. Supp. 3d 268 (D.D.C. 2016) ................................................................ 24, 28

*Nken v. Holder*,
  556 U.S. 418 (2009) ........................................................................................................... 42

*\*Nolan v. Holmes*,
  334 F.3d 189 (2d Cir. 2003) ...................................................................................... 5, 33, 35

*Northeastern Fla. Chapter of Ass'n of Gen. Contractors v. Jacksonville*,
  896 F.2d 1283 (11th Cir. 1990) ......................................................................................... 17

*Norton v. Southern Utah Wilderness Alliance*,
  542 U.S. 55 (2004) ....................................................................................................... 21, 28

*O'Sullivan v. U.S. Citizenship & Immigration Servs.*,
  453 F.3d 809 (7th Cir. 2006) ...................................................................................... 5, 6, 7

*Pittson Coal Group v. Sebben*,
  488 U.S. 105 (1988) ........................................................................................................... 21

*Sabre, Inc. v. DOT*,
  429 F.3d 1113 (D.C. Cir. 2005) ......................................................................................... 23

*Schwalier v. Hagel*,
  734 F.3d 1218 (D.C. Cir. 2013) ......................................................................................... 19

*Sidhu v. Chertoff*,
  No. 1:07-CV-1188-AWI-SMS, 2008 WL 540685 (E.D. Cal. Feb. 25, 2008) ................... 29

*Stanley v. Univ. of S. Cal.*,
  13 F.3d 1313 (9th Cir. 1994),
  *aff'd*, 159 F.3d 636 (D.C. Cir. 1998) ................................................................................. 18

*Suter v. Artist M.*,
  503 U.S. 347 (1992) ........................................................................................................... 25

*Texas Children's Hosp. v. Burwell,*
    76 F. Supp. 3d 224 (D.D.C. 2014) ...................................................... 17

*Tootle v. Sec'y of the Navy,*
    446 F.3d 167 (D.C. Cir. 2006) ............................................................ 19

*Touche Ross & Co. v. Redington,*
    442 U.S. 560 (1979) ............................................................... 24, 25, 26

*Transamerica Mortgage Advisors, Inc. v. Lewis,*
    444 U.S. 11 (1979) ............................................................................. 25

*United States v. Ginsberg,*
    243 U.S. 472 (1917) ........................................................................... 38

*United States v. Testan,*
    424 U.S. 392 (1976) ........................................................................... 19

*Univ. of Tex. v. Camenisch,*
    451 U.S. 390 (1981) ........................................................................... 17

*Universities Research Ass'n v. Coutu,*
    450 U.S. 754 (1981) ........................................................................... 26

*Vargas v. Meese,*
    682 F. Supp. 591 (D.D.C. 1987) ................................................... 39, 41

*Vartelas v. Holder,*
    566 U.S. 257 (2012) ...................................................................... 39, 41,

*Wayte v. United States,*
    470 U.S. 598 (1985) ........................................................................... 43

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ........................................................................... 42

*Winter v. Natural Res. Def. Council,*
    555 U.S. 7 (2008) .............................................................................. 16

*Wis. Gas Co. v. FERC,*
    758 F.2d 669 (D.C. Cir. 1985) ............................................................ 37

*Yee v. Jewell,*
    No. CV 16-490 (RDM), 2017 WL 78473 (D.D.C. Jan. 9, 2017) ............ 19

*Zaidi v. United States Sentencing Comm'n,*
  115 F. Supp. 3d 80 (D.D.C. 2015) ............................................................ 22

## STATUTES

5 U.S.C. § 553(b) ....................................................................................... 34

5 U.S.C. § 706(1) ....................................................................................... 30

8 U.S.C. § 1101(a)(17)(H) ......................................................................... 14

8 U.S.C. § 1255 .......................................................................................... 26

8 U.S.C. § 1421(a) ....................................................................................... 2

8 U.S.C. § 1421(c) ................................................................................. 4, 26

8 U.S.C. § 1421(d) ..................................................................................... 42

8 U.S.C. § 1423 .......................................................................................... 33

8 U.S.C. § 1427 .................................................................................. 3, 5, 33

8 U.S.C. § 1427(a) ....................................................................................... 3

8 U.S.C. § 1427(d) ....................................................................................... 3

8 U.S.C. § 1429 ........................................................................................ 3, 5

8 U.S.C. § 1440 ................................................................................... passim

8 U.S.C. § 1440(a) ............................................................................ 5, 12, 13

8 U.S.C. § 1440(b) ............................................................................ 5, 7, 33

8 U.S.C. § 1440f(e)(2) .......................................................................... 6, 32

8 U.S.C. § 1445(a) ..................................................................................... 26

8 U.S.C. § 1446(a) ............................................................................. passim

8 U.S.C. § 1446(b) ............................................................................. passim

8 U.S.C. § 1446(c) ....................................................................................... 2

8 U.S.C. § 1446(d) ..................................................................................... 21

8 U.S.C. § 1447(a) .................................................................................... 2, 4

8 U.S.C. § 1447(b) ................................................................................. 4, 27, 29

8 U.S.C. § 555(b) ...................................................................................... 29

10 U.S.C. § 101(d)(1) .................................................................................. 7

10 U.S.C. § 10143 ....................................................................................... 7

10 U.S.C. § 504(b)(2) .................................................................................. 8

28 U.S.C. § 1346 ....................................................................................... 19

28 U.S.C. § 1346(a)(2) .............................................................................. 19

28 U.S.C. § 1361 ....................................................................................... 20

28 U.S.C. § 1491 ....................................................................................... 19

28 U.S.C. § 2201 ....................................................................................... 22

Dep't of Commerce & Related Agencies Appropriation Act,
    Pub. L. 105-119, 111 Stat. 2440, 2448-49 (Nov. 26, 1997) ............................................. 3, 4, 34

Homeland Securtiy Act of 2002,
    Pub. L. No.107-296, § 1512(d), 116 Stat. 2135, 2310 (Nov. 25, 2002) .................................... 2

The Kendell Frederick Citizenship Assistance Act, Pub. L. No. 110-251 .................................... 6

## REGULATIONS

8 C.F.R. § 316.14(b)(1) ............................................................................. 21

8 C.F.R. § 316.2 ........................................................................................ 33

8 C.F.R. § 329.2(d) .................................................................................. 10

8 C.F.R. § 329.4(b) .................................................................................... 7

8 C.F.R. § 335.1 .................................................................................. passim

8 C.F.R. § 335.2(a) ................................................................................... 21

8 C.F.R. § 335.2(b) ...................................................................... 3, 27, 34, 35

8 C.F.R. § 335.3(a) ................................................................................... 21

8 C.F.R. § 336.2(b) ................................................................................................................. 2

## RULES

Fed. R. Civ. P. 12(b)(1).......................................................................................................... 19

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DR. KUSUMA NIO, *et al.*, | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action No. 1:17-00998-ESH |
| v. | ) |
| | ) |
| United States Department of Homeland | ) |
| Security, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUCTION**

**INTRODUCTION**

This case is about protecting the vital national security interests of the United States, and ensuring that the immense privilege of naturalization is granted only to those who have been properly vetted and demonstrated eligibility.  For this reason, Congress has required appropriate background checks before USCIS naturalizes an individual. This is perhaps especially important for those individuals who are eligible to naturalize due to their military service.  While Congress has found fit to provide a path to naturalization for non-immigrants willing to serve this country, it has not relaxed background checks for a very important reason:  these individuals have not undergone the same rigorous vetting as all other naturalization applicants who must first become LPRs and generally must wait a period of years to apply to naturalize.  Significantly, the Immigration and Nationality Act does not prescribe a time limit for the pace of the investigation. It is important to remember that none of the Plaintiffs in this case have been denied naturalization, all of their cases have been pending for less than a year, and in fact, some

1

Plaintiffs have become U.S. citizens since this lawsuit was filed.  Despite the Plaintiffs'

contentions, the government has no desire or intention to use pre-textual means to delay or deny

citizenship to any individual.  At the same time, the government cannot relax its obligation to

fully investigate a naturalization applicant's eligibility simply because Plaintiffs would prefer

their case to be decided sooner.  For these reasons, Defendants respectfully request that this

Court deny Plaintiffs' preliminary injunction motion because Plaintiffs have no likelihood of

success on the merits; Plaintiffs will suffer no irreparable injury absent preliminary relief; the

balance of hardships does not weigh in Plaintiffs' favor; and the public interest in this matter

weighs heavily against an injunction.  Further, a classwide preliminary injunction granting

Plaintiffs the ultimate relief they request in the Complaint, and which can only be reversed

through individual denaturalization proceedings, would upend the normal course of proceedings

and greatly interfere with the government's ability to succeed in its mission.

## STATUTORY AND REGULATORY BACKGROUND

### A.  Naturalization Process

The Secretary of Homeland Security has "sole authority to naturalize persons as citizens

of the United States."  8 U.S.C. § 1421(a).[1]  Under the Secretary's authority, USCIS adjudicates

naturalization applications, to include investigating applicants, conducting examinations, and

determining whether to grant applications.  8 U.S.C. §§ 1446(a), (c).  If USCIS denies an

application, the applicant may request a hearing before an immigration officer.  8 U.S.C.

§ 1447(a); 8 C.F.R. § 336.2(b).

---

[1] The transfer of the former Immigration and Naturalization Service's ("INS") naturalization
functions to the Department of Homeland Security included the transfer of the authority to
naturalize from the Attorney General to the Secretary of Homeland Security.  *See* Homeland
Security Act of 2002, Pub. L. No.107-296, § 1512(d), 116 Stat. 2135, 2310 (Nov. 25, 2002).

The general statutory requirements for naturalization are described in 8 U.S.C. §§ 1427 and 1429.  The alien must show, *inter alia*, that he or she was lawfully admitted for permanent residence in the United States in accordance with all applicable provisions of the Immigration and Nationality Act ("INA"), resided continuously and was physically present within the United States for specified periods of time, was and still is a person of good moral character, and is attached to the principles of the Constitution.  8 U.S.C. §§ 1427(a), (d), 1429.

As is generally the case with all benefit applications, USCIS conducts security checks of naturalization applicants to enhance national security, public safety, and ensure the integrity of the immigration process.  Ex. 6, Declaration of Daniel Renaud (hereinafter "Renaud Decl."); ¶ 3. These security and background checks serve to screen out aliens who may seek to harm the United States and its citizens or who may be seeking immigration benefits improperly or fraudulently and have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, money laundering, and drug and human trafficking, as well as individuals with known or suspected links to terrorism.  *Id.*

By both statute and regulations, USCIS is required to complete a full background investigation of naturalization applicants, and must thoroughly investigate the background of every naturalization applicant to determine whether the applicant is eligible to naturalize.  *See* 8 U.S.C. § 1446(a), (b); 8 C.F.R. § 335.1 ("The investigation shall consist, *at a minimum*, of a review of all pertinent records, police department checks, and a neighborhood investigation in the vicinities where the applicant has resided and has been employed, or engaged in business, for at least the five years immediately preceding the filing of the application") (emphasis added). USCIS must wait until criminal background checks are completed before scheduling an applicant for his or her naturalization interview.  8 C.F.R. § 335.2(b); Dep't of Commerce & Related

3

Agencies Appropriation Act, 1998, Pub. L. 105-119, title I, 111 Stat. 2440, 2448-49 (Nov. 26, 1997) (beginning with fiscal year 1998, no USCIS funds may be used to complete adjudication of an application for naturalization unless USCIS has received confirmation from the FBI that a full criminal background check has been completed).  In addition to the background check requirements set out above, USCIS must conduct a Defense Clearance Investigative Index (DCII) query with the Department of Defense (DoD) as part of the background check process on any naturalization applicant with military service.  USCIS Policy Manual, Volume 12, Part I, Chapter 6, "Citizenship and Naturalization, Military Members and their Families, Required Background Checks;"[2] Renaud Decl. ¶ 5.  The DCII check ordinarily shows whether the applicant has any derogatory information in his or her military records.  Renaud Decl. ¶ 5.

Once USCIS receives a Form N-400, Application for Naturalization ("Form N-400"), the application is processed in an orderly manner.  *Id*. at ¶ 6.  The average processing time for an Application for Naturalization is nine months from start to finish.  *Id*.  If USCIS does not decide an application within 120 days following the applicant's naturalization interview, the applicant may sue in district court to obtain a determination of the application.  *Id*; 8 U.S.C. § 1447(b).  A naturalization applicant may file a Form N-336, Request for a Hearing on a Decision in Naturalization Proceedings, pursuant to 8 U.S.C. § 1447(a) with USCIS to request a hearing on a denial of naturalization, and if that is denied, then seek *de novo* review in district court.  8 U.S.C. § 1421(c).

---

[2] Available at https://www.uscis.gov/policymanual/HTML/PolicyManual-Volume12.html (last visited July 6, 2017).

**B.  8 U.S.C. § 1440**

Section 1440(a) relaxes the preconditions for naturalization established in Section 1427, for "[a]ny person who, while an alien or a noncitizen national of the United States, has served honorably as a member of the Selected Reserve of the Ready Reserve or in an active-duty status" in the armed forces of the United States during World War I, World War II, Korean hostilities, Vietnam hostilities, or other periods of military hostilities designated by the President of the United States by executive order.[3]

While 8 U.S.C. § 1440(b) sets forth a list of exceptions to the conditions listed in Section 1427, that section specifically provides that "[a] person filing an application under . . . this section *shall* comply in all other respects with the requirements of this subchapter."  8 U.S.C. § 1440(b) (noting that a person filing an application under subsection (a) are exempted from the age, residency and physical presence requirements under § 1429 of this chapter, and applicable fees); *Nolan v. Holmes*, 334 F.3d 189, 198 (2d Cir. 2003) ("Notwithstanding Congress's desire to reward aliens who have served the United States in its Armed Forces, it hardly seems unreasonable for the INS to have inferred that Congress would not have intended to single out persons trained and/or experienced in physical confrontations for elimination of the requirement of good moral character."); s*ee also Lopez v. Henley*, 416 F.3d 455, 457–58 (5th Cir. 2005) (employing *Chevron* deference to find that § 1440 includes a good moral character requirement); *O'Sullivan v. U.S. Citizenship & Immigration Servs.*, 453 F.3d 809, 812–16 (7th Cir. 2006)

---

[3] On July 3, 2002, the President of the United States signed an executive order designating the War on Terrorism as such a period of hostilities, and authorizing noncitizens who served honorably in the U.S. Armed Forces on or after September 11, 2001, to naturalize under the provisions of section 329(a).  E.O. 13269 of July 3, 2002 ("Expedited Naturalization of Aliens and Noncitizen Nationals Serving in an Active-Duty Status During the War on Terrorism").  The authorization related to the War on Terrorism will remain in effect until a date designated by a future executive order.  *Id*.; *see also* Renaud Decl. ¶ 9.

(same).  Because of these relaxed naturalization requirements, naturalization under Section 1440 is often referred to as "expedited naturalization."  Renaud Decl. ¶ 11 (noting that under Section 1440, an applicant does not have to hold lawful permanent resident ("LPR") status or have continuous residence for a number of years preceding a naturalization application).

Military naturalization applications are sometimes eligible for expedited processing, which is different than expedited naturalization.  *Id*.  ¶ 12.  Under the Kendell Frederick Citizenship Assistance Act (Pub. L. No. 110-251), for example, when members of the U.S. Armed Forces are serving abroad on active duty, the Secretary of Homeland Security, the Director of the Federal Bureau of Investigation, and the Director of National Intelligence are required to take appropriate actions to ensure that applications for naturalization filed by such service members, along with all associated background checks, receive expedited processing and are adjudicated within 180 days of the receipt of responses to all background checks.  8 U.S.C. § 1440f(e)(2); Renaud Dec. ¶ 12.

Another context in which expedited processing is available is during what is commonly referred to as Basic Training ("Basic Training"), which goes by several names depending on the branch of the military service.  *Id.* ¶ 13; *see also* https://my.uscis.gov/helpcenter/article/what-is-the-naturalization-at-basic-training-initiative (last visited July 6, 2017).  USCIS established the Naturalization at Basic Training Initiative in August 2009 to give noncitizen enlistees the opportunity to naturalize when they graduate from basic training.  Renaud Dec. ¶ 13.  Under this initiative, USCIS conducts all naturalization processing, including the capture of biometrics, the naturalization interview, and administration of the Oath of Allegiance on the military installation. *Id.*  Every effort is made to complete the adjudication during the period of training, which ranges from six and a half to twelve weeks, but such a rapid adjudication is not possible in all cases.

*Id.*; *see also* Ex. 5, MAVNI Contract, at 4.[4]  Since 2009, USCIS has expanded the initiative to

the Navy, Air Force, and Marine Corps, giving enlistees of these branches equal opportunity to

(in most cases) leave basic training as U.S. citizens.  Renaud Decl. ¶ 13.

Section 1440 also provides that "service in the military, air, or naval forces of the United

States shall be proved by a duly authenticated certification from the executive department under

which the applicant served or is serving," 8 U.S.C. § 1440(b), and USCIS has provided by

regulation that "[t]he applicant's eligibility for naturalization. . . shall be established only by a

certification of honorable service by the executive department under which the applicant served

or is serving." 8 C.F.R. § 329.4(b); Renaud Decl. ¶ 10.  In order to demonstrate that he or she has

served honorably as a member of the Selected Reserve of the Ready Reserve ("SRRR") or in an

active-duty status, an applicant for naturalization under 8 U.S.C. § 1440 must submit a Form N-

426, Request for Certification of Military or Naval Service ("Form N-426"), with his or her

Form N-400.[5]  *Id.*; *see also* ECF No. 17-6 (blank Form N-426).  The Form N-426 must be

completed and certified by the relevant branch of the U.S. Armed Forces, unless an applicant has

already separated from service.  Renaud Decl. ¶ 10.  The submission of this form confirms

whether the applicant served honorably as a member of the SRRR or in an active-duty status.  *Id.*

---

[4] The named Plaintiffs have identical contracts.

[5] The term "active duty" means full-time duty in the active military service of the United States. Such term includes full-time training duty, annual training duty, and attendance, while in the active military service, at a school designated as a service school by law or by the Secretary of the military department concerned. Such term does not include full-time National Guard duty. 10 U.S.C. § 101(d)(1).  They work for the military full time, and can be deployed at any time. Persons in the Selected Reserve of the Ready Reserve are not full-time active duty military personnel, although they can be activated and deployed at any time should the need arise. Selected Reserve of the Ready Reserve Members: (1) participate in at least 48 scheduled drills or training periods during each year and serve on active duty for training at least 14 days a year or (2) participate in training at encampments, maneuvers, outdoor target practice, or other exercises at least 15 days each year.  10 U.S.C. § 10143.  These members can work and go to school while drilling with the SRRR.

### C.  MAVNI program

The Military Accessions Vital to the National Interest ("MAVNI") program is a recruitment tool used by the U.S. Armed Forces to enlist certain foreign nationals with skills considered vital to the national interest of the United States.  *See* 10 U.S.C. § 504(b)(2);  Ex. 7, Declaration of Stephanie Miller (hereinafter "Miller Decl."), ¶ 4.  To qualify for enlistment under MAVNI, a prospective recruit must be maintaining a qualifying nonimmigrant status or must be an asylee, refugee, Temporary Protected Status (TPS) beneficiary, or Deferred Action for Childhood Arrivals (DACA) recipient.  Ex. 1,  Memorandum from Acting Under Secretary of Defense for Personnel and Readiness Memorandum to Secretary of Army, Navy, and Airforce (Sept. 30, 2016) (hereinafter "Sept. 30, 2016 Memo"), at Attachment 1.

The MAVNI program is a DoD program, overseen by the Office of the Undersecretary of Defense for Personnel and Readiness, not a USCIS program.  Miller Decl. ¶ 1; Renaud Decl. ¶ 15.  However, USCIS assists with the MAVNI program by verifying prospective recruits' immigration statuses through the USCIS Systematic Alien Verification for Entitlements (SAVE) program and by adjudicating naturalization applications filed by MAVNI recruits on the basis of their military service.  Renaud Decl. ¶ 15.  As members of the U.S. Armed Forces during a period of hostilities, MAVNI recruits are eligible to apply for naturalization under Section 1440 once they join the military, they begin serving as a member of the SRRR or in an active-duty status.  *Id.*

1.   Security screenings under MAVNI

Like all military recruits, MAVNI soldiers are subject to a military-service determination conducted by DoD (also known as a "suitability-for-service determination").  Miller Decl. ¶ 10. The essential inquiry for this determination is whether the recruit "is suitable under national security criteria for [military service]" and that "there is no reasonable basis for doubting the person's loyalty to the Government of the United States."  *Id*.  While the scope of an investigation for a military-service determination will vary depending on the type of information needed to make the determination, all military recruits must undergo some background investigation.  *Id*. ¶ 10-11.

MAVNI recruits have typically been subject to higher levels of scrutiny for their military service determinations, in light of intelligence reports, concerns about insider threats, and the general lack of information about the recruits due to the fact that, on average, they have spent significant periods of their lives outside of the United States and have had extensive contact with foreign persons.  *Id*. ¶ 10.  DoD has modified the security features of the MAVNI program since its inception.  In 2010, the Deputy Secretary of Defense issued a memorandum requiring that DoD conduct a single-scope background investigation (SSBI) for all MAVNI recruits.  *Id*. ¶ 12. Although SSBIs are commonly used for making security-clearance determinations, DoD determined that they were necessary for all MAVNI recruits in light of reports that standard background investigations of MAVNI soldiers were insufficient to address issues of concern, particularly those involving potential foreign influence and foreign preference.  *Id*. ¶ 14.  Such issues are especially pronounced in the MAVNI program because MAVNI recruits, on average, have spent significantly less time in the United States than other foreign-born recruits such as LPRs.  *Id*. ¶ 13.

On September 30, 2016, DoD issued a memo instituting enhanced background investigation requirements for MAVNI recruits.  Sept. 30, 2016 Memo.  The new background investigation requirements consisted of a Tier 3 or 5 Single Scope Background Investigation ("SSBI"), a National Intelligence Agency Check ("NIAC"), and a Counterintelligence Security (CI-Security) review.  *Id.*, at Attachment 1.  DoD further instructed that until these background investigations were complete, MAVNI recruits subject to them would not be permitted to attend Basic Training or serve in an active-duty status.  *Id.*, at Attachment 3.

The DoD background investigations may lead to the discovery of information about a naturalization applicant that may be relevant to a MAVNI recruit's eligibility for naturalization under Section 1440(a).  *See* Renaud Decl. ¶ 17.  In order to be eligible for naturalization based upon honorable service during a designated period of hostilities, an applicant must demonstrate that he or she has been a person of good moral character, attached to the principles of the U.S Constitution, and well-disposed to the good order and happiness of the United States, for at least one year prior to filing his or her application for naturalization and until he or she is naturalized. 8 C.F.R. § 329.2(d); Renaud Decl. ¶ 17.  DoD background investigations may reveal information about criminal activity impacting USCIS's good moral character assessment or information indicating that an individual is involved in espionage or otherwise poses a threat to national security that may lead to a conclusion that the individual lacks good moral character or is not attached to the principles of the U.S. Constitution and well-disposed to the good order and happiness of the United States.  *See* Miller Decl. ¶ 15-16; Renaud Decl. ¶ 17.  Furthermore, the information obtained by DoD background investigators may result in an applicant's administrative discharge from the Armed Forces under any administrative characterization of

service, including "other than honorable" conditions.[6]  Miller Decl. ¶ 14; Renaud Decl. ¶ 18.  An

"other than honorable" discharge or characterization of service would also render a naturalization

applicant ineligible for naturalization under Section 1440(a).  Renaud Decl. ¶ 18.

      In USCIS's experience, DoD background investigations have led to the early discharge of

applicants from the Armed Forces, as well as to information about criminal activity, such as

money laundering, domestic violence, fraud, and theft of benefits, while a naturalization

application is pending or even after the individual has already naturalized.  *Id.*  ¶ 19.  It is in the

interest of USCIS and the United States to obtain that information, when possible, prior to

naturalization, especially if it could lead to the person's discharge from the military.

      2.  <u>The USCIS Hold</u>

      On October 4, 2016, USCIS headquarters Field Office Directorate ("FOD") personnel

transmitted the DoD September 2016 Memo to the Field.  Renaud Decl. ¶ 20.  In early 2017,

USCIS began noticing a new population of MAVNI recruits filing applications for

naturalization; specifically MAVNI recruits who were drilling with the U.S. Army Reserve on a

voluntary basis as part of the Delayed Training Program ("DTP"), in which the Army permitted

them to take part while their background investigations were pending, before they could attend

Basic Training or serve in an active-duty status under the terms of the September 30, 2016

memo.  *Id.*at ¶ 21.  Prior to the Sept. 30, 2016 Memo, USCIS had received few, if any,

applications from MAVNI recruits who were drilling in the Delayed Training Program.  *Id*.

Instead, the recruits usually attended Basic Training soon after enlisting in the Army and waited

until they attended Basic Training to apply for naturalization.  *Id.*

---

[6] An administrative discharge characterization of service can be "honorable," "general under
honorable conditions," "other than honorable," or uncharacterized. Dishonorable or bad-conduct
discharges are punitive in nature and can only be adjudged as punishment by a court-martial.

This new population of MAVNI recruits filing applications for naturalization before they had entered Basic Training raised several concerns. First, USCIS questioned whether drilling *with* the SRRR constituted service "as a member of the SRRR," as required for naturalization under Section 1440(a). *Id.* ¶ 22. Second, in light of the DoD Sept. 30, 2016 Memo, USCIS questioned the validity of the Forms N-426 certifying honorable service, which were issued before DoD completed the necessary background checks determining that no derogatory information existed that would lead to characterization of a recruit's service as other than honorable. *Id.* Third, USCIS did not know whether many of the Forms N-426 it was receiving were signed by individuals authorized by the Army to certify service. *Id.*

These concerns led USCIS to institute a national hold on affected naturalization applications. *Id.* ¶ 23. On or about February 28, 2017, USCIS headquarters FOD advised field offices and the National Benefits Center ("NBC") to hold applications filed by MAVNI recruits who were drilling in the SRRR and had no ship date for Basic Training, in anticipation of requesting and receiving guidance from DoD about the definition of honorable service as a member of the SRRR and about who in the Army was authorized to certify honorable service. *Id.* The "hold" was a moratorium on adjudicating applications to completion, but did not prevent USCIS from completing pre-processing and background checks. *Id.*

USCIS raised its concerns to DoD in approximately March 2017 and learned that DoD had not previously been aware that the Army was certifying service for this population of MAVNI recruits. *Id.* ¶ 24. USCIS understood that DoD might act to revoke some of the Forms N-426 that had been submitted and decided to temporarily hold affected naturalization applications until it determined whether these individuals were eligible to naturalize. *Id.*

On or about April 13, 2017, USCIS headquarters FOD issued a written hold on affected naturalization applications. *Id.* ¶ 25. The email putting the hold in place stated that it referred to "all SRRR N-400 case work." *Id.* Later in April and May 2017, USCIS headquarters FOD narrowed the scope of the hold in response to questions from the field. *Id.* On July 7, 2017, USCIS headquarters FOD issued new written guidance to the Field, stating that USCIS has determined that the completion of the DoD background checks is relevant to a MAVNI recruit's eligibility for naturalization. *Id.* ¶ 26. As such, USCIS directed the Field not to complete naturalization adjudications under section 329(a), 8 U.S.C. § 1440(a), for MAVNI recruits until after those checks have been completed. *Id.* The new guidance affects all currently pending and future MAVNI naturalization applicants applying for naturalization under section 329(a), 8 U.S.C. § 1440(a). *Id*

## FACTS

Plaintiffs are ten[7] soldiers who enlisted in the Army through the MAVNI program. Plaintiff Wanjing Li enlisted in the Selected Reserve through the MAVNI program in February 5, 2016, and filed her naturalization application, along with form N-426, on August 19, 2016. ECF No. 1, at ¶ 57; *see* Renaud Decl. ¶ 28. Ms. Li was interviewed in connection with her naturalization application on March 13, 2017, and her application was approved on May 3, 2017. *Id*. Ms. Li was initially scheduled for an oath ceremony on June 23, 2017, but she was de-scheduled from the ceremony after USCIS noticed discrepancies in her record related to her educational history. Renaud Decl. ¶ 28. Although the discrepancies were later resolved, further

---

[7] As noted in Plaintiffs' Motion for a preliminary injunction, Plaintiff Kusuma Nio and Jae Seong Park, have naturalized since the filing of their complaint. *See* ECF No. 24, at 16, n. 5; *see also* Renaud Decl. at ¶¶ 27, 30. Because Nio and Park's claims are now moot, Plaintiffs seek preliminary injunctive relief for the remaining eight Plaintiffs.

processing of Ms. Li's application awaits the completion of her DoD enhanced background investigation.  *Id.*  Government records indicate that Ms. Li withdrew from St. Louis Community College, even though her course of study was not complete, on January 12, 2017, which indicates that she may not be maintaining F-1 non-immigrant status.  Renaud Decl. ¶ 29.

Mr. Haendel Crist Calisto Alves de Almeida enlisted in the Selected Reserve through the MAVNI program on May 26, 2016, and filed his naturalization application, along with Form N-426, on February 6, 2017.  ECF No. 1 ¶ 61; Renaud Decl. ¶ 31.  His background checks coordinated by the NBC were completed on June 20, 2017, although analysis of any results may still be pending.  Renaud Decl. ¶ 31.  Further processing of Mr. Calisto Alves de Almeida's application awaits the completion of his DoD enhanced background investigation.  *Id.*  Government records provide no indication that Mr. Almeida is not maintaining his F-1 nonimmigrant student status, as he is currently enrolled at Bergen Community College.  Renaud Decl. ¶ 32.

Prashanth Batchu enlisted in the Selected Reserve through the MAVNI program on June 7, 2016, and filed his naturalization application, along with Form N-426, on March 23, 2017. ECF No. 1 ¶ 63; Renaud Decl. ¶ 33.  Further processing of this application awaits the completion of all background checks, including the background checks coordinated by the NBC.  Renaud Decl. ¶ 33.  Mr. Batchu is maintaining his status as an H-1B temporary worker in a specialty occupation.[8]  *Id.* His H-1B nonimmigrant status will expire on November 30, 2019, unless he requests and is granted an extension of his stay.  *Id.*

---

[8] The H-1B visa is a non-immigrant visa in the United States under the Immigration and Nationality Act, Section 101(a)(17)(H) [8 U.S.C. § 1101(a)(17)(H)].  It allows U.S. employers to temporarily employ foreign workers in specialty occupations.

Plaintiff Lucas Augusto Calixto enlisted in the Selected Reserve through the MAVNI program March 16, 2016, and filed his naturalization application, along with Form N-426, on March 7, 2017.  ECF No. 1 at ¶ 65; Renaud Decl. ¶ 34.  Further processing of this application awaits the completion of all background checks, including the background checks coordinated by the NBC.  Renaud Decl. ¶ 34.  Mr. Calixto was granted Deferred Action for Childhood Arrivals ("DACA") and is eligible for work authorization.  *Id.*

Plaintiff Ye Liu enlisted in the Selected Reserve through the MAVNI program on March 16, 2016, and filed his naturalization application, along with Form N-426, on September 30, 2016.  ECF No. 1 ¶ 71; Renaud Decl. ¶ 35.  His background checks coordinated by the NBC were completed on March 29, 2017, although analysis of any results may still be pending.  Renaud Decl. ¶ 35.  Further processing of Mr. Liu's application awaits the completion of his DoD enhanced background investigation.  *Id.*  It does not appear that Mr. Liu is maintaining his nonimmigrant student status, however, he was granted deferred action.  *Id.* ¶¶ 35-36.

Plaintiff Shu Cheng enlisted in the Selected Reserve through the MAVNI program on February 23, 2016, and filed her naturalization application, along with Form N-426, on March 2, 2017.  ECF No. 1, ¶ 67; Renaud Decl. ¶ 37.  Her background checks coordinated by the NBC were completed on May 24, 2017, although analysis of any results may still be pending.  Renaud Decl. ¶ 37.  Further processing of Ms. Cheng's application awaits the completion of her DoD enhanced background investigation.  *Id.*  Government records indicate that Ms. Cheng enrolled in Language Systems International on January 5, 2017, and is seeking reinstatement of her F-1 nonimmigrant status.  Renaud Decl. ¶ 38.

Plaintiff Seung Joo Hong enlisted in the Selected Reserve through the MAVNI program on May 13, 2016, and filed his naturalization application, along with Form N-426, on February

28, 2017.  ECF No. 1, ¶ 69, Renaud Decl. ¶ 39.  Mr. Hong's N-400 is pending while USCIS

awaits the completion of all background checks, including the background checks coordinated by

the NBC.  Renaud Decl. ¶ 39.  Government records indicate that Mr. Hong completed his course

of study at Montgomery College and his optional practical training on February 28, 2017.  At

that time, a Designated School Official terminated his record in Student Exchange Visitor

Information System.  Renaud Decl. ¶ 40; *see also* Ex. 8, Declaration of Rachel Canty ¶ 2-3.

Emeka James Udeigwe enlisted in the Selected Reserve through the MAVNI program on

March 17, 2016.  ECF No. 1, ¶ 73.  He filed his naturalization application, along with Form

N-426, on January 13, 2017.  *Id.*; Renaud Decl. ¶ 41.  His background checks coordinated by the

NBC were completed on June 6, 2017, although analysis of any results may still be pending.  *Id.*

Further processing of Mr. Udeigwe's application awaits the completion of his DoD enhanced

background investigation.  *Id.*  Government records indicate that Mr. Udeigwe is enrolled at

Case Western University.  Renaud Decl. ¶ 42

## STANDARD OF REVIEW

A plaintiff seeking a preliminary injunction must establish: (1) a strong likelihood of

success on the merits; (2) that it is likely to suffer irreparable injury absent preliminary relief; (3)

the balance of hardships favors it; and (4) the public interest favors a preliminary injunction.

*Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). It is "an extraordinary and drastic

remedy" and "should not be granted unless the movant, by a clear showing, carries the burden of

persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Critically, a plaintiff's irreparable

injury must be neither remote nor speculative, but actual and imminent.[9] *See Northeastern Fla.*

*Chapter of Ass'n of Gen. Contractors v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990).

## ARGUMENT

I. **The Relief Sought By Plaintiffs Is Inconsistent With Preliminary Injunctive Relief.**

The purpose of a preliminary injunction is merely to "preserve the relative positions of

the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395

(1981). In this case, however, rather than seeking to preserve the status quo to protect the

positions of the parties, Plaintiffs are attempting to obtain the same relief sought by the

complaint in advance of a full trial on the merits of their claims and without giving the

Government the opportunity to fully defend the validity of its actions. *Compare*, ECF No. 1, at

¶¶ 85-105 (seeking an order of declaratory relief that the DoD has no influence into the

naturalization process and requiring that USCIS "grant priority to, and expedite, the processing

of the N-400 applications"), *with* ECF No. 17, Motion at 2 (requesting that this Court enjoin,

"between now and final judgment of the merits, DHS Defendants from complying with any

request or instruction by DoD to hold or otherwise delay final processing of Plaintiffs'

naturalization application. . . and requiring that DHS Defendants expedite any remaining

processing of Plaintiffs' naturalization applications."). When, "a party seeks mandatory

preliminary relief that goes well beyond maintaining the status quo" during litigation, the party is

---

[9] In the D.C. Circuit, the four factors have typically been evaluated on a "sliding scale," so if "the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009). Since *Winter*, "the D.C. Circuit has suggested that a positive showing on all four preliminary injunction factors may be required." *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 237 (D.D.C. 2014).

held to a higher burden of proof.[10]  *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo–*

*Mitsubishi Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997) (internal quotation marks omitted) (*quoting*

*Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1319 (9th Cir. 1994)), *aff'd*, 159 F.3d 636 (D.C. Cir.

1998).  Therefore, "where an injunction is mandatory—that is, where its terms would alter, rather

than preserve, the status quo by commanding some positive act—the moving party must meet a

higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or

that extreme or very serious damage will result from the denial of the injunction."  *Id.* (internal

quotation marks omitted) (emphasis added).  This burden is especially important where

injunctive relief that would "deeply intrude[] into the core concerns of the execution branch" –

such as national security – is as issue.  *Adams v. Vance*, 570 F.2d 950, 954-55 (D.C. Cir.

1978).  In that instance, the preliminary injunction should be awarded only where the plaintiff

"make[s] an extraordinarily strong showing" as to each element.  *Id.*  Plaintiffs cannot meet this

high burden.  As such, the Court should deny the motion for preliminary injunction and instead

permit the parties to litigate the case fully.

## II.     The Court Lacks Jurisdiction Over This Case

### A.     The Court does not have jurisdiction over Plaintiffs' claims under the Little Tucker Act.

Because Plaintiffs are not seeking monetary damages, this Court lacks jurisdiction over

their claims under Section 1346(a)(2).  "Federal courts are courts of limited jurisdiction" and

"[t]hey possess only that power authorized by Constitution and statute."  *Kokkonen v. Guardian*

*Life Ins. Co. of Am.*, 511 U.S.  375, 377 (1994).  "[B]ecause subject-matter jurisdiction is an

---

[10] While this higher burden is consistent with the District of Columbia Circuit's counsel that "'[t]he power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised,'" *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969), the Circuit has yet to adopt or reject it.  *See Davis v. Billinton,* 76 F.Supp.3d 59, 69 n. 15 (D.D.C. 2014) *(*citing cases).

18

Art[icle] III as well as a statutory requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court. " *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003) (internal quotations omitted).   Thus, a court must dismiss an action pursuant to Rule 12(b)(1) if it lacks subject-matter jurisdiction over the plaintiff's suit.  *See* Fed. R. Civ. P. 12(b)(1).

It is clearly established that the (big) Tucker Act, 28 U.S.C. § 1491, vests exclusive jurisdiction in the Court of Federal Claims over claims against the United States seeking more than $10,000 in monetary relief from the federal government, "if it is essentially a contract action . . . and if the Court of Federal Claims would have jurisdiction over the matter." *Yee v. Jewell*, No. CV 16-490 (RDM), 2017 WL 78473, at *5 (D.D.C. Jan. 9, 2017) (citing *Kidwell v. Dep't of the Army*, 56 F.3d 279, 284 (D.C. Cir. 1995); *Albrecht v. Comm. on Employee Benefits*, 357 F.3d 62, 68 (D.C. Cir. 2004), and *Tootle v. Sec'y of the Navy*, 446 F.3d 167, 176–77 (D.C. Cir. 2006). Additionally, the Little Tucker Act, 28 U.S.C. § 1346, provides an exception, vesting district courts with concurrent jurisdiction for "civil action[s] or claim[s] against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress. . . ." 28 U.S.C. § 1346(a)(2); *Kidwell v. Dep't of the Army*, 56 F.3d 279, 283 (D.C. Cir. 1995) (citing 28 U.S.C. § 1346(a)(2)); *Schwalier v. Hagel*, 734 F.3d 1218, 1220 (D.C. Cir. 2013).  This Section, however, is "only a jurisdiction statute; it does not create any substantive right enforceable against the United States for damages."  *United States v. Testan*, 424 U.S. 392, 398 (1976).  In order to bring a claim under it, a party must assert some substantive right "found in some other source of law, such as 'the Constitution, or any Act of Congress, or any regulation of an executive department.'"  *Amoco Production Co. v. Hodel*, 815 F.2d 352, 360 (5th Cir. 1987).

Here, Plaintiffs are asking for "declaratory and injunction relief," and are asking for an order preventing DOD from interfering in the naturalization process and compelling USCIS to adjudicate Plaintiffs' N-400 applications. Accordingly, because Plaintiffs are not seeking monetary damages, their claims for mandamus and declaratory relief are not cognizable under Section 1346(a)(2), which only provides jurisdiction for certain monetary damages against the United States. *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) ("The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief at issue as money damages."); *Martin v. Donley*, 886 F. Supp. 2d 1, 8–9 (D.D.C. 2012) (noting that the court lacked jurisdiction under the Little Tucker Act because "any financial benefit that the plaintiff may receive would not come from an award of money damages by this Court but from the change in his status that would result from the correction of his military records."). Accordingly, because the Court does not have jurisdiction over Plaintiffs' claims under the Little Tucker Act, the Court should deny Plaintiffs' motion for a preliminary injunction, as they cannot demonstrate likelihood of success on the merits under this statute.

  B. <u>The Court does not have jurisdiction over Plaintiffs' claims against DoD.</u>

Plaintiffs are not entitled to either APA or mandamus relief against the DoD. "Most of the courts that have addressed the issue agree that, for purposes of compelling agency action that has been unreasonably delayed, the mandamus statute and the APA are co-extensive." *Hamandi v. Chertoff*, 550 F. Supp. 2d 46, 53-54 (D.D.C. 2008) (citing *Han Cao v. Upchurch*, 496 F. Supp. 2d 569, 575 (E.D. Pa. 2007)); *Hernandez-Avalos v. I.N.S.*, 50 F.3d 842, 844-45 (10th Cir. 1995); *Giddings v. Chandler*, 979 F.2d 1104, 1108, 1110 (5th Cir. 1992); *Jarecki v. United States*, 590 F.2d 670, 675 (7th Cir. 1979). The Supreme Court has described mandamus relief under 28 U.S.C. § 1361 as an "extraordinary remedy" which "will issue only to compel the performance

of a clear nondiscretionary duty." *Pittson Coal Group v. Sebben*, 488 U.S. 105, 121 (1988).

Similarly, the Supreme Court has held that "the only agency action that can be compelled under

the APA is action legally required."  *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55,

63 (2004). Accordingly, "an agency's delay in acting cannot be unreasonable with respect to

action that is not required."  *Costa v. Chertoff*, No. CIV.A. 07-2467, 2007 WL 4456218, at *3

(E.D. Pa. Dec. 11, 2007) (citing *Norton*, 542 U.S. at 63, n.1).  Thus, a plaintiff may invoke

subject matter jurisdiction under the APA or Mandamus only if the defendant had a duty to

perform a ministerial or nondiscretionary act. Plaintiffs have not and cannot satisfy this standard.

Both the INA and USCIS regulations make clear that USCIS, not DoD, is the agency

responsible for adjudication of naturalization applications.  Specifically, the relevant statutes and

regulations require that after the filing of a naturalization application, USCIS conducts a

background investigation, *see* 8 U.S.C. § 1446(a), 8 C.F.R. § 335.1, and an examination – or

naturalization interview – of the applicant.  8 U.S.C. § 1446(b); 8 C.F.R. § 335.2(a).  Moreover,

USCIS is the agency responsible for determining "as to whether the application should be

granted or denied, with reasons therefor."  8 U.S.C. § 1446(d); *see also* 8 C.F.R. § 316.14(b)(1)

(noting that USCIS "shall determine whether to grant or deny the application, and shall provide

reasons for the determination...."); 8 C.F.R. § 335.3(a) (USCIS "shall grant the application if the

applicant has complied with all requirements for naturalization . . .").

In *Hamandi*, the plaintiff, brought suit against the USCIS and the Federal Bureau of

Investigation ("FBI"), seeking to compel the FBI to conclude its background investigation, and

compel USCIS to adjudicate her N-400 application.  *Hamandi*, 550 F. Supp. 2d at 53-54.  This

Court held that it lacked jurisdiction over Plaintiffs' APA and mandamus claims against the FBI

"because no statute or regulation cited . . . by plaintiff expressly creates a mandatory duty owed

by the FBI to individual naturalization applicants to process background and name checks and forward the results of these checks to the USCIS") (citing *Costa*, 2007 WL 4456218, at *4 (internal quotation marks omitted)).  Although the Court acknowledged that other courts had relied on "a number of Congressional enactments" to impose a mandatory duty on the FBI over naturalization applications, and therefore assert jurisdiction, the Court found the "analysis unpersuasive and agrees with the reasoning of other courts that have refused to infer a mandatory duty owed by the FBI to naturalization applicants." *Hamandi*, 550 F. Supp. at 52 (citing *Antonishin v. Keisler*, 627 F. Supp. 2d 872, 880 (N.D. Ill. 2007)).

Like in *Hamandi*, Plaintiffs here have failed to cite any authority to assert that DoD has a mandatory duty over Plaintiffs' naturalization application.  In fact, Plaintiffs continuously assert that "DoD has only a ministerial role with respect to the processing of Plaintiffs' naturalization applications."  *See* ECF No. 17, at 15; *see also* ECF No. 1, at ¶ 12.  Thus, because DoD has no adjudicative responsibilities with respect to Plaintiffs' N-400 applications, this Court lacks jurisdiction over Plaintiffs' APA and Mandamus claims against DoD seeking to compel USCIS to adjudicate these applications.[11]

 C. Plaintiffs' lack standing to challenge USCIS background check policy.

Plaintiffs' Complaint and motion for preliminary injunction fail to establish Article III standing, therefore, Plaintiffs cannot demonstrate likelihood of success on the merits. "[B]ecause standing is a necessary predicate to any exercise of the Court's jurisdiction, the

---

[11] Moreover, Plaintiffs' request for relief against DOD under the Declaratory Judgment Act 28 U.S.C. § 2201, must be dismissed for lack of subject-matter jurisdiction, as there is no source creating an independent basis for federal-court jurisdiction. *See C&E Servs., Inc. of Washington v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002) (noting that it is a "well-established rule that the Declaratory Judgment Act "is not an independent source of federal jurisdiction."); *Zaidi v. United States Sentencing Comm'n*, 115 F. Supp. 3d 80, 84 (D.D.C. 2015) (same).

plaintiff and his claims have 'no likelihood of success on the merits,' if the plaintiff lacks

standing." *Arpaio v. Obama*, 27 F. Supp. 3d 185, 208 (D.D.C. 2015).  Similarly, an absence of

standing "dooms the plaintiff's ability to show irreparable harm." *Id.*  Accordingly, if Plaintiffs

lack standing, dismissal of this case in the same order denying the motion for injunction for

failure to satisfy the first two requirements of the preliminary injunction standard is required.  *Id.*

Plaintiffs fail to demonstrate standing by a preponderance of the evidence.  A party must

establish that "(1) it has suffered an 'injury in fact,' that is (a) concrete and particularized and (b)

actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the

challenged action of the Department; and (3) a favorable decision on the judicial relief requested

is likely to redress the injury." *Sabre, Inc. v. DOT*, 429 F.3d 1113, 1117 (D.C. Cir. 2005).

Where, as here, standing is premised on a projected future injury, *i.e.* an altering of their

immigration statuses unrelated to the outcome of the naturalization process, Article III demands

not merely a "possible future injury," but a showing that the threatened future injury is "certainly

impending." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (emphasis added).

Plaintiff Nio filed his N-400 application on September 19, 2016, and naturalized on June 9,

2017.  *See* Renaud Decl. ¶ 27.  Similarly, Plaintiff Park submitted his N-400 application on May

11, 2016, and naturalized on June 14, 2017.  *Id.* ¶ 30.  Further, because the immigration status of

the MAVNI recruits is independent of their naturalization application, any change in an

applicant's pre-existing immigration status would not be traceable to DoD or USCIS's conduct

regardless of any delay.[12]  Finally, this Court lacks the power under the APA or Mandamus to

---

[12] MAVNI applicants have been informed that they have the responsibility to maintain a lawful
immigrations status, independent of their naturalization applications. *See* Ex. 5, at 5, MAVNI
Information Paper ("It is highly recommended that all MAVNI Soldiers, regardless of visa
category, maintain a valid immigration status until you ship to Basic Combat Training.  If you do

order DHS to "deem each Plaintiff to have the same immigration status that he or she had at the time of enlistment" so the effects of any change in immigration status would not be redressible by this Court.  *See INS v. Pangilinan,* 486 U.S. 875, 883-884 (1988) (noting that courts "cannot invoke its equitable powers to circumvent the requirements of the immigration laws"); *see also Nine Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the United States v. Kerry*, 168 F. Supp. 3d 268, 282 (D.D.C. 2016) (noting that it would be inappropriate to "construct coercive sanctions" for the Government's failure to process plaintiffs' immigration applications.").  Accordingly, this Court should not grant Plaintiffs' preliminary injunctive relief.

> D. <u>Because 8 U.S.C. § 1440 does not provide private rights of action, Plaintiffs lack standing, and the Court lacks jurisdiction over that claim.</u>

Plaintiffs assert that by "reneg[ing] on the representations made to these soldiers and failing to process their naturalization applications as the law requires," Defendants are violating 8 U.S.C. § 1440.  ECF No. 1 ¶ 4.  However, the Court must ultimately dismiss this claim because Section 1440 does not create a private right of action. Consequently, Plaintiffs lack standing to bring a claim under those sections, and the court lacks jurisdiction over it.  Therefore, this Court should decline to enter a preliminary injunction.

"[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001) (quoting *Touche Ross & Co. v. Redington*, 442 U.S. 560, 578 (1979) (the remedies available are those 'that Congress enacted into law')). "[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Touche Ross & Co.*,

---

not maintain a valid visa status, you run the risk of being picked up by Immigration and Customs Enforcement (ICE)."

442 U.S. at 568 (quoting *Cannon v. University of Chicago*, 441 U.S. 677, 688 (1979)) (internal quotations omitted).

"The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Alexander*, 532 U.S. at 286 (*citing Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15 (1979)). Where the statute does not reveal a congressional intent to create a private right of action, the federal courts "may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id; see also Touche Ross & Co*, 442 U.S. at 568 ("our task is limited solely to determining whether Congress intended to create the private right of action asserted"). "[T]he burden is on [the plaintiff] to demonstrate that Congress intended to make a private remedy available." *Suter v. Artist M.*, 503 U.S. 347, 363 (1992).

Here, Plaintiffs have failed to show that Section 1440 expressly creates a private right of action. 8 U.S.C. § 1440, 1427. To determine whether Congress implied a private right of action in a statute that contains no express provision, the Court must consider whether: (1) the plaintiff is of the class for whose especial benefit the statute was enacted; (2) there is any indication of legislative intent to create or exclude a private right of action; (3) it is consistent with the underlying purposes of the legislative scheme to imply a private right of action; and (4) whether the cause of action is traditionally relegated to state law. *Cort v. Ash*, 422 U.S. 66, 78 (1975). A few years after *Cort*, the Supreme Court clarified that "the focus of the inquiry is on whether Congress intended to create a remedy." *California v. Sierra Club*, 451 U.S. 287, 297 (1981).

The Supreme Court also explained that, in considering whether the plaintiff is of a class for whose "especial benefit" the statute was enacted, "[t]he question is not simply who would benefit from the Act, but whether Congress intended to confer federal rights upon those

beneficiaries." *Id*. at 294.  The Court also said that silence on the remedy question serves to confirm that, in enacting the law, Congress was not concerned with private rights.  *Id*. at 296. Additionally, the Supreme Court has held that statutory schemes that provide private rights of action in some situations but not others weigh against inferring a private right of action because "when Congress wished to provide a private damages remedy, it knew how to do so and did so expressly."  *Touche Ross & Co.*, 442 U.S. at 572; *Universities Research Ass'n v. Coutu*, 450 U.S. 754, 773 (1981).

When Section 1440 is examined in light of these principles, the Court must conclude Congress implied no private rights of action of which Plaintiffs might avail themselves. Although Section 1440(a) relaxes the preconditions for naturalization established in Section 1427, the primary purpose of these sections is to establish requirements and criteria that must be met before an alien may become a citizen.  Additionally, there is no indication Congress intended to imply any private right of action to challenge alleged violations beyond those explicitly provided in 8 U.S.C. §§ 1421(c) and 1447(b).  Indeed, Congress' explicit creation of a private right of action in Section 1447(b) for a naturalization applicant who has not received a decision within 120 days following examination on his application strongly suggests Congress did not intend to create a private right of action to challenge the manner in which USCIS processes an application prior to the examination.

Further, inferring a private right of action under Sections 1440 and 1427 would be inconsistent with the statutory scheme of the INA.  An applicant begins the process by submitting an application to USCIS.  8 U.S.C. §§ 1255, 1445(a).  Next, for a naturalization applicant, USCIS must conduct an investigation of the applicant.  8 U.S.C. § 1446(a); 8 C.F.R. § 335.1.  As part of the investigation of the applicant, USCIS requests a full criminal background

investigation on the applicant.  8 C.F.R. § 335.2(b).  The INA does not prescribe a time limit for the pace of the investigation, or the examination required by Section 1446.  Once USCIS interviews an applicant, however, the applicant may petition the district court for a *de novo* determination of his eligibility for naturalization, if the agency does not render a decision within 120 days. 8 U.S.C. § 1447(b).[13]

From this statutory scheme, it is apparent Congress intended that applicants be fully and thoroughly vetted before being granted benefits under the INA, and recognized that the time it would take to adequately investigate applicants and determine eligibility would vary based on individual circumstances.  Accordingly, while Congress provided a private right of action for a naturalization applicant who had not received a decision within 120 days following his examination, it omitted any similar private right of action during the pre-examination, investigation phase of the naturalization process.  The Court should, therefore, conclude that 8 U.S.C. § 1440 does not provide Plaintiffs with private rights of action.  If Section 1440 does not provide private rights of action, then Plaintiffs lack standing, and the Court lacks jurisdiction over that claim.  Accordingly, because Plaintiffs' have no likelihood of success on the merits of this claim, the Court should decline to enter a preliminary injunction, particularly one that grants Plaintiffs the ultimate relief they request in the complaint.

---

[13] Thus, because Plaintiff Wanjing Li was interviewed in connection to her naturalization application on March 13, 2017, any cause of action that she may have under 1447(b) is not ripe. *Castracani v. Chertoff*, 377 F. Supp. 2d 71, 73 (D.D.C. 2005) (noting that "when the [Government] either denies or fails to make a determination on the naturalization application within 120 days of the examination, the applicant may appeal to the appropriate district court for a hearing").

**III.    Even Assuming Jurisdiction, Plaintiff Cannot Show A Likelihood Of Success On The Merits.**

   A.   <u>Plaintiffs have failed to state a claim for unreasonable delay against USCIS.</u>

Plaintiffs further argue that Court intervention is necessary where USCIS has engaged in unreasonable delay in the adjudication of their applications.  However, Plaintiffs have failed to state a claim upon which this Court can grant relief because, absent a congressionally-imposed deadline or timeframe to complete the adjudication of an immigration application, "pace of adjudication is discretionary." *Beshir v. Holder*, 10 F. Supp. 3d 165, 172 (D.D.C. 2014).  While the APA permits a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed, a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." *Norton*, 542 U.S. at 64. Although the INA requires USCIS to conduct a background investigation of naturalization applicants before interviewing them, it does not prescribe a time limit for the pace of the investigation and examination required by § 1446.  *Cf. Nine Iraqi Allies*, 168 F. Supp. 3d at 294 ("Admittedly, *Beshir* takes an expansive view of the Government's power to decide certain immigration applications on its own timeline. . . the *Beshir* court relied on the absence of a congressionally-imposed deadline or timeframe to complete the adjudication of immigrant adjustment of status applications as support  for the conclusion that the pace of adjudication is discretionary and thus not reviewable.") (internal citations and quotations omitted); *Alzuraiki v. Heinauer*, 544 F. Supp. 2d 862, 865–66 (D. Neb. 2008) ("The naturalization statutes and regulations do not prescribe a time limit for the pace of the investigation/examination required by

§ 1446.  The only time limit relates to the USCIS interview which is part of that investigation/examination").[14]

However, even if the Court were to hold that USCIS has a duty to adjudicate Plaintiffs' naturalization application within a reasonable period of time, Plaintiffs have again failed to state a claim upon which this Court can grant relief, as the processing times for each application is well within or close USCIS's average processing time.  And, average processing times are simply that:  more complicated cases may take longer than the average time to adjudicate, depending on the factual circumstances and complexity of each case.  *See Alkenani v. Barrows*, 356 F. Supp. 2d 652, 657 (N.D. Tex. 2005) (15 months delay not unreasonable where background checks still pending); *Morgovsky v. Dep't of Homeland Sec.*, 517 F. Supp. 2d 581, 585 (D. Mass. 2007) (16 months not unreasonable where background checks still pending).

Here, Plaintiffs' N-400 applications are within or close to USCIS average processing time, and Plaintiffs have failed to show that USCIS's processing of these cases is unreasonably delayed.  *See* Renaud Decl. ¶¶ 6, 28, 31-42  (Plaintiff Batchu since March 23, 2017; Plaintiff Almeida since February 6, 2017; Plaintiff Hong since February 28, 2017; Plaintiff Udeigwe since January 13, 2017; Plaintiff Calixto since March 7, 2017; Plaintiff Liu since September 30, 2016, Plaintiff Cheng since March 2, 2017;  Plaintiff Li since August 19, 2016).  Additionally, once USCIS interviews an applicant, the applicant may petition the district court for a *de novo* determination of his eligibility for naturalization, if the agency does not render a decision within 120 days.  8 U.S.C. § 1447(b).  As noted *supra*, because Plaintiff Wanjing Li was interviewed in

---

[14] *But see Sidhu v. Chertoff*, No. 1:07-CV-1188-AWI-SMS, 2008 WL 540685, at *6 (E.D. Cal. Feb. 25, 2008) ("While the court agrees that no immigration statute addresses the pace at which applications are processed, the court believes these courts fail to adequately consider the impact of 8 U.S.C. § 555(b)'s mandate that all agency actions not be unreasonably delayed").

connection to her naturalization application on March 13, 2017, any cause of action that she may have under 1447(b) is not ripe. *Castracani*, 377 F. Supp. 2d at 73 (D.D.C. 2005) (noting that "when the [Government] either denies or fails to make a determination on the naturalization application within 120 days of the examination, the applicant may appeal to the appropriate district court for a hearing").

Given that the statute's conspicuous non-imposition of a time limit within which USCIS must complete such background investigations, and the reality that the agency's ability to conclude a background investigation will necessarily vary with each applicant, Plaintiffs lack a clear right to have their N-400s adjudicated within a specified time. From this statutory scheme, it is apparent Congress intended that naturalization applicants be fully and thoroughly vetted before being interviewed, and recognized that the time it would take to adequately investigate applicants would vary based on individual circumstances.

Even assuming *arguendo* that a claim under 5 U.S.C. § 706(1) for unreasonable delay in the pre-interview adjudication of their naturalization applications were cognizable, Plaintiffs have nevertheless failed to allege sufficient facts to establish that the delay in this case is clearly and indisputably *unreasonable*. This Circuit applies a six-factor test to determine whether agency action has been unreasonably delayed, known as the "TRAC Factors." *Geneme v. Holder*, 935 F. Supp. 184, 192–93 (D.D.C. 2013). The TRAC factors are:

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety

> lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*Id.* (citations and quotation marks omitted).

Thus, *TRAC* factors require an individualized inquiry into the circumstances of that delay and whether it is reasonable under the circumstances. Notably, the *TRAC* factors require the Court to "consider the effect of expediting delayed action on agency activities of a higher or competing priority." *Id*. The federal government has no higher priority than national security, and as DoD has averred, the population of MAVNI applicants poses particular risks that are mitigated by awaiting the results of the enhanced DoD background investigations. *See* Miller Decl. ¶¶ 11-15.

As noted above, at the time Plaintiffs filed the complaint, their naturalization applications had been with USCIS for less than one year. Given that USCIS is required to conduct a complete background investigation, 8 U.S.C. § 1446(a), and that the mere passage of time, without more, is inadequate to show unreasonable delay, Plaintiffs have not made any showing that any alleged delay in their case is unreasonable. *INS v. Miranda*, 459 U.S. 14, 18 (1982). Thus, while USCIS strives to complete adjudications of individuals already in Basic Training within by the time they complete their training, which ranges from six and a half to twelve weeks, Plaintiffs in this case are not in Basic Training, and even if they were, such a policy creates no enforceable right.[15] Even for military naturalization applicants who are

---

[15] Plaintiffs' Motion for Preliminary Injunction states, without authority, that USCIS is required to adjudicate Plaintiffs naturalization applications within ten weeks. This is simply not true. Plaintiffs are conflating their situation, with the "Naturalization at Basic Training Initiative," even though they are not part of this Initiative. This Initiative sets a non-mandatory aspirational processing goal for individuals who are already in Basic Training to be naturalized by the conclusion of Basic Training so that they are U.S. citizens when they begin active duty. https://www.uscis.gov/news/fact-sheets/naturalization-through-military-service-fact-sheet (last visited July 7, 2017).

currently serving overseas in active duty, Congress contemplated that the agency would need 180 days *following completion of background checks* to adjudicate the application.  8 U.S.C. § 1440f(e)(2) (emphasis added).  No time limit was set even in these cases for the completion of background checks.  Given this, Plaintiffs fail to establish a likelihood of success on the merits, and this Court should not enter a preliminary injunction before it rules on jurisdiction.  *See generally Munaf v. Green,* 553 U.S 674, 690 (2008) (stating that a Court cannot enter a preliminary injunction based on a question regarding jurisdiction.)

      B.   <u>Plaintiffs have failed to state a claim against USCIS because USCIS's decision not to adjudicate their applications until the completion of their DoD background investigations is lawful.</u>

Plaintiffs cannot demonstrate a likelihood of success on the merits, because they have failed to state a cognizable legal claim.  The crux of this case is that Plaintiffs are incorrect in their allegation that Defendants are *unreasonably* delaying action on Plaintiffs' naturalization application, thereby preventing them from becoming US citizens.  ECF No. 17, at 2 (seeking preliminary injunctive relief to prevent "irreparable harm resulting from Defendants' ongoing, unlawful interference with Plaintiffs' opportunity to become United States citizens.").  However, to survive a motion to dismiss under Federal Rule 12(b)(6), the pleading must contain enough factual allegations to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A complaint is "plausible on its face" when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).  Here, even assuming everything that Plaintiffs allege is true, they have not demonstrated any unlawful action on behalf of either agency.

In Section 1440, Congress permitted USCIS to naturalize a member of the military with relaxed requirements for age, residency, and physical presence.  However, Congress did not relax the background check or investigation process for naturalization applicants applying based on their service. Section 1440(b) provides that "[a] person filing an application under . . . this section shall comply in all other respects with the requirements of this subchapter." 8 U.S.C. § 1440(b).  Thus, the statute provides a number of criteria that an applicant must meet to demonstrate eligibility to naturalize, *see* 8 U.S.C. § 1423-1427; 8 C.F.R. § 316.2, including good moral character.  *See Nolan*, 334 F.3d at 198 (holding that § 1440 is ambiguous and [the Government's] interpretation that § 1440 includes a good-moral-character requirement is reasonable).  Accordingly, Congress has expressly delegated to the Secretary of Homeland Security the broad authority to administer all provisions of the INA with the force of law, and establish regulations of this purpose, which includes, in its discretion, requiring MAVNI recruits who are applying for naturalization under Section 1440 to complete DoD background checks that are required to attend Basic Training because USCIS has determined that these background checks are pertinent to its investigation of the applicant's eligibility for naturalization.  This is especially true given the unique situation of naturalization applicants under Section 1440. All other candidates for naturalization are lawful permanent residents who have been previously vetted, found admissible to the United States, and determined to merit a favorable exercise of discretion to adjust status to that of a lawful permanent resident or be admitted to the United States on an immigrant visa.  In contrast, MAVNI recruits applying for naturalization under Section 1440 are non-immigrants, asylees, refugees, TPS or DACA recipients, or out-of-status, and have received less prior scrutiny.  Therefore, it is reasonable for USCIS to require completed DoD background checks.

The Supreme Court has made clear: "No matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, whether the agency has stayed within the bounds of its statutory authority," and the court will defer to the agency's reasonable interpretation of statutory ambiguities concerning both the scope of its statutory authority and the application of that authority. *City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2013); *see also* 5 U.S.C. § 553(b) (noting that the APA's notice-and-comment requirement does not apply "to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice"); *Mayo Foundation for Medical Educ. & Research v. U.S.*, 562 U.S. 44, 58 (2011) ("satisfaction of notice and comment procedures merely presents "a consideration identified in [the Court's] precedents as a 'significant' sign that a rule merits *Chevron* deference.")

USCIS has discretion to determine which records are pertinent to its investigation of a naturalization applicant, including records from other entities or agencies. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) ("[w]e have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer"). It is proper and ordinary that USCIS considers records of outside agencies in the course of its investigation. For instance, Congress itself has mandated that the FBI have a role in the investigation of an applicant. *Dep't of Commerce & Related Agencies Appropriation Act*, 1998, Pub. L. 105-119, title I, 111 Stat. 2440, 2448-49 (Nov. 26, 1997); 8 C.F.R. § 335.2(b). For naturalization applicants with military service, USCIS has had a longstanding policy to require additional background checks from the DoD in the form of Defense Clearance Investigative Index (DCII) queries. Renaud Decl. ¶ 5; USCIS Policy Manual,

Vol. 12, Part I, Chap. 6.  This query allows USCIS to verify whether the individual has derogatory information in his or her military records.

Here, following DoD's September 2016 Memo, USCIS became aware that there are unique and particular national security risks with certain MAVNI recruits that may affect their eligibility for naturalization, and could lead to other than honorable discharge from the armed forces in the near term.  *See* Renaud Decl. ¶¶ 17-19.  Moreover, because reviews of the MAVNI program in recent years have revealed certain security risks specific to MAVNI soldiers, it would be negligent – even reckless – of USCIS to ignore these concerns, just as DoD does not ignore those concerns in approving continuing service.  *See* Miller Decl. ¶¶ 12, 14-15, 18; *Nolan*, 334 F.3d at 198 ("The potentially conflicting policy concerns here are the specific desire to provide aliens who have served in the United States Armed Forces with benefits in the form of relaxed requirements for naturalization, and the general goal of attempting to ensure that persons admitted to United States citizenship through naturalization be of good moral character.").

Thus, it is reasonable, and within USCIS's discretion, to determine that it should refrain from making a final determination on these recruits' naturalization applications until DoD verifies that the individual has completed the security checks that DoD has recently implemented to ensure that the individual does not present a national security risk to the United States.  As noted *supra*, USCIS regularly consults with other agencies and obtains information from outside entities to vet an individual for benefit eligibility, and as a tool to determine good moral character.  8 C.F.R. § 335.2(b) (requiring FBI criminal background checks); *see* Renaud Decl. ¶ 17 ("The information uncovered by DoD's background checks may be relevant to a MAVNI recruit's eligibility for naturalization under section 329(a)").  USCIS has determined that DOD background checks may be a valuable source of information that directly relates to eligibility for

naturalization, and has discretion to require the results of such checks before MAVNI recruits may be naturalize.  Renaud Decl. ¶¶ 17-19.  In recent experience, USCIS has learned, because of DOD background checks, that individuals have been engaged in money laundering, domestic violence, fraud, and theft of benefits, all of which directly impact USCIS's determinations as to whether these individuals are persons of good moral character.  Renaud Decl. ¶ 19.  In addition, when a DoD background check reveals derogatory information about a MAVNI recruit, the background checks may result in the recruit receiving an other-than-honorable discharge from the military, which is directly relevant to USCIS adjudications because it renders the recruit ineligible for naturalization under § 1440.  Accordingly, because USCIS is acting within its statutory mandate in implementing an additional requirement before MAVNI recruits may be naturalized, USCIS' reasonable interpretation of the INA in this matter warrants *Chevron* deference.

Additionally, Plaintiffs raise a dispute regarding the N-426, regarding honorable service, where none exists.  Defendants *agree* that USCIS should defer to DoD to determine when an individual is serving honorably in the armed services, and the N-426 serves just that purpose.  However, the fact that DoD serves a ministerial role in determining if an individual is serving honorably does not prevent from USCIS using its own judgement to determine that it needs to specific, additional information from DoD in certain circumstances before completing its investigation of a military naturalization applicant, particularly in these circumstances where DoD is in the midst of conducting its background review of the applicant.  Specifically here, the fact that Plaintiffs all have certified N-426s does not require USCIS to ignore that ongoing review or the reality that, once completed, it will provide material information that may affect the individual's eligibility to naturalize.  In that case, that material information is twofold.  First,

USCIS is aware that: 1) DoD has determined that some MAVNI recruits may present serious

national security concerns; and 2) some MAVNI recruits may be discharged from the military

under other-than-honorable circumstances for failure to meet DoD's requirements for service.

Renaud Decl. ¶¶ 16, 18.  For USCIS to ignore these concerns would contradict Congress's intent

for all individuals to be fully vetted before becoming U.S. citizens.  It also does not conflict with

Congress's interest in a streamlined process, as the MAVNI recruits are still receiving a highly

streamlined naturalization process, albeit not one that ignores the critical DoD background

investigation.  Further, it would defy logic to say that USCIS is required to make an individual a

U.S. citizen knowing that information may become available at the completion of DoD's

background checks, which are a component of that person's service in the military and that might

disqualify him from naturalization.  This is particularly so in this instance, where DoD has stated

that some of these individuals may be national security concerns.  Miller Decl. ¶¶ 16-17.

Plaintiffs, therefore, cannot demonstrate the requisite likelihood of success on the merits of this

case to justify a preliminary injunction.

## IV. **Plaintiffs Do Not Establish Irreparable Harm**

In this district, "the standard for establishing irreparable harm sufficient to warrant a

preliminary injunction is quite high."  *Brown v. District of Columbia*, 888 F. Supp. 2d 28

(D.D.C. 2012).  This requires that the impending harm "be both certain and great," and "actual

and not theoretical."  *Id*. (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

Although "the preliminary injunction factors interrelate on a sliding scale . . . the movant must, at

a minimum, demonstrate that irreparable injury is *likely* in the absence of an injunction."  *Bill*

*Barrett Corp. v. U.S. Dep't of Interior*, 601 F. Supp. 2d 331, 334–35 (D.D.C. 2009) (emphasis in

original).  The moving party must show "[t]he injury complained of is of such imminence that

there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ((citations, brackets, and internal quotation marks omitted)).

Plaintiffs incorrectly argue that their statutory right to "expedited naturalization processing" has been denied and, as a result, they are suffering irreparable harm.  ECF No. 17, at 30.  Plaintiffs are receiving a streamlined naturalization process, and there is no such statutory right to anything more expedited.  While 8 U.S.C. § 1440 permits an expedited path to citizenship in that applicants are not required to be LPRs or have any period of continuous residence or physical presence, applicants under the MAVNI program remain subject to USCIS's internal processing times.  *See* Renaud Decl. ¶   Plaintiffs highlight that USCIS was able to fully process and adjudicate some MAVNI applicants within ten weeks, however, those applications were submitted by applicants attending basic combat training.  *See* Ex. 5, MAVNI contract, at 3 ("The Army, along with USCIS has implemented expedited citizenship processing for all non-citizens at each of the Army's Basic Training.").  In this case, none of the Plaintiffs have attended Basic Training.  In fact, they each filed their citizenship applications in contravention to the explicit advisal within their contract not to mail in a citizenship packet before shipping to Basic Training.  *Id*.  Further, even for individuals in Basic Training, processing during the training period is a discretionary goal, but it is not guaranteed and does not create an enforceable right.

Moreover, despite their claims to a prompt determination of eligibility to United States citizenship, "[n]o alien has the slightest right to naturalization unless all statutory requirements are complied with. . . ."  *Fedorenko v. United States*, 449 U.S. 490, 506 (1981) (citing *United States v. Ginsberg*, 243 U.S. 472, 474–475 (1917)).  "This judicial insistence on strict

compliance with the statutory conditions precedent to naturalization is simply an acknowledgment of the fact that Congress alone has the constitutional authority to prescribe rules for naturalization, and the courts' task is to assure compliance with the particular prerequisites to the acquisition of United States citizenship by naturalization legislated to safeguard the integrity of this 'priceless treasure.'" *Id.* at 507 (citing *Johnson v. Eisentrager*, 339 U.S. 763, 791 (1950) (Black, J., dissenting)).  At this time, the Plaintiffs cannot have suffered irreparable injury, as it has not been determined that they have met all of the statutory requirements for naturalization.  *See* 8 C.F.R. § 335.1 (requiring various background checks); 8 U.S.C. § 1446(b) (requiring an interview).  As noted *supra*, Plaintiffs cannot demonstrate irreparable harm because they are not entitled to an adjudication on their naturalization application at this time, and they have failed to show that any delay in the adjudication of their N-400 application is unreasonable.

Plaintiffs argue that they are unable to travel outside of this country or receive work authorization.  These alleged limitations do not constitute irreparable harm that requires this Court to order USCIS not to delay processing their naturalization applications, and to expedite remaining processing.[16]  ECF No. 17, at 32 (citing *Vargas v. Meese*, 682 F. Supp. 591, 594-95 (D.D.C. 1987); *Vartelas v. Holder*, 566 U.S. 257, 268 (2012)).  In the MAVNI contract, the Army warns against the exact issue that Plaintiffs complain of in their motion.  Specifically, the Army Contract states:

> It is highly recommended that all MAVNI Solders, regardless of visa category, maintain a valid immigration status until you ship to [Basic Training].  If you do not maintain a valid status, you run the risk of being picked up by Immigration and Customs Enforcement (ICE).  If you are on a work visa, continue to work until you ship to [Basic Training]. If you plan to return to that job after training,

---

[16]  According to USCIS, at least five of the remaining named Plaintiffs are in status as non-immigrant visa holders or have been granted deferred action.

> you should ask your employer for a leave of absence while you are in training. Do
> not quit your job because you have signed an enlistment contract. If you are an F1
> Student Visa holder the Army strongly recommends that you stay in school and
> therefore in status until you ship to [Basic Training].

Ex. 5, at 4-5.  Therefore, since entering the program, Plaintiffs have known that their

immigration status must be maintained and that they will not achieve citizenship on any specific

timeframe, and that it is incumbent on them to maintain nonimmigrant status.   Plaintiffs signed

service contracts, understanding and agreeing to the terms, and accepting the risk that "that

neither USCIS nor the Army guarantees any Soldier US Citizenship, or that the Soldier will

receive citizenship prior to graduation from Basic Training."  *Id*. at 4.  Plaintiffs are benefitting

from a much faster path to citizenship, than applies to all other immigrants – it does not require

LPR status or five years of presence in the United States – and in exchange they are subject to

the terms of this program, a critical component of which is careful background vetting.  Plaintiffs

have voluntarily selected this course of action, and were on notice that no outcome was

guaranteed nor timeline promised – and that harms that could ensue if they failed to take steps

necessary to maintain a valid immigration status before shipping to Basic Training.

Furthermore, only three of the plaintiffs in this litigation appear to have failed to maintain

their nonimmigrant status, and even in those cases it is speculative to suggest that they face

irreparable harm.  They have presented no proof that they had work authorization and have lost it

(in fact, nonimmigrant student status generally does not permit an individual to work). Moreover,

there has been no determination by ICE, USCIS, or an Immigration Court that they are out of

status.  The fact that their SEVIS records were terminated by designated school officials does not

mean that they are necessarily out of status; it is only an indication that they may be out of status.[17] *See* Ex. 8, ¶ 3.

Plaintiffs' reliance on *Vargas* is misplaced.  In *Vargas*, the government's change in policy would have caused the plaintiffs to lose their ability to apply for naturalization as contemplated by the statute at issue.  *Vargas*, 682 F. Supp. at 595.  Here, Plaintiffs are not precluded from applying for naturalization, and at this time, their applications fall within the normal processing time.  Therefore, the Vargas rationale is inapposite.  Likewise, the Supreme Court's statements in *Vartelas* are also inapplicable.  In that case, the Court reviewed the retroactive effect of a change in the Immigration and Nationality Act on a lawful permanent resident's right to travel, which would have restricted his ability to reenter the country due to a criminal conviction, where previously that restriction had not existed.  *Vartelas*, 566 U.S. at 266-67.  In that case, Vartelas pled guilty to a crime, with the belief that it would not affect his ability to travel due to the law at the time that he was convicted.  *Id.* at 260.  When Congress changed the law, the Supreme Court found that it could not be applied retroactively, because it placed a "new disability" on Vartelas that was not present when he pled guilty.  The Court noted the importance of foreign travel in reaching this finding.  Plaintiffs do not face a similar situation.  Instead, when they signed up for the MAVNI program, they were explicitly warned that should "stay inside the United States between the time that they sign their enlistment contract and their ship date to Basic Combat Training."  Ex. 5, at 2.  Indeed, the Army stated "MAVNIs who travel

---

[17] Plaintiffs argue that MAVNI applicants in student status who receive pay for attending basis training will have their nonimmigrant status terminated.  ECF No. 17, at 22-23 (citing ICE Guidance entitled "F and M Nonimmigrant and MAVNI: A Guide for Designated School Officials.").  At this time, ICE is reviewing this section of its guidance in light of its understanding that recent changes in the MAVNI program have resulted in students performing compensated Reserve duties for extended periods of time prior to attending basic training, while still maintaining a full student course load.  Ex. 8, ¶ 5.

internationally do so at their own risk . . . . The Army cannot assist a MAVNI in getting a visa to return to the United States after foreign travel; there is no US visa category for MAVNI enlistees." *Id.* Accordingly, Plaintiffs' alleged harm, and indeed any administrative consequence, results from Plaintiffs' underlying immigration status, not from any delay by USCIS. To hold otherwise would, essentially, order USCIS to naturalize a class of aliens by estoppel. This the Court cannot do, because Congress has explicitly stated that the procedures prescribed by the INA constitute the "sole procedure" by which a person may become naturalized as a United States citizen. Section 1421(d) Title 8, United States Code, states that "[a] person may only be naturalized as a citizen of the United States in the manner and under the conditions prescribed in this subchapter and not otherwise." 8 U.S.C. § 1421(d); *see Pangilinan*, 486 U.S. at 882. Plaintiffs cannot claim that Defendants actions are causing them irreparable harm when they were put on notice the requirements and risks of the program, and still voluntarily chose to enlist.

## V.     Hardship To Defendant And The Public Interest Weigh Against Entry Of A Preliminary Injunction.

The final two factors required for preliminary injunctive relief – harm to the opposing party and the public interest – merge when the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Additionally, courts should "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982). Here, Plaintiffs make no showing that their alleged "irreparable injury" outweighs the threatened harm that an injunction would cause Defendant, unrepresented third parties, or that it would not "adversely affect [the] public interest[.]" *Id.* This failure is fatal to Plaintiffs' request for the extraordinary remedy of a preliminary injunction.

42

Any order that enjoins a governmental entity from enforcing statutes enacted by the duly elected representatives of the people constitutes an irreparable injury that weighs heavily against the entry of injunctive relief.  *See New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977).  Here, Congress has explicitly charged the DHS with enforcing immigration laws. Additionally, Congress has mandated that USCIS conduct an investigation of the naturalization applicant. 8 U.S.C. § 1446(a); 8 C.F.R. § 335.1.

Moreover, the Supreme Court has stated that "[f]ew interests can be more compelling than a nation's need to ensure its own security."  *Wayte v. United States*, 470 U.S. 598, 611 (1985). Here, an injunction against USCIS would flout this compelling interest by preventing USCIS's ability to address security risks posed by the MAVNI program. Arendt Decl. ¶ 27. Along with its many benefits, the MAVNI program presents unique security threats, and it would be negligent – even reckless – for USCIS to ignore these threats.  Moreover, an injunction would undercut USCIS' ability to fully vet and screen soldiers who are seeking to naturalize. The equities and public interest in this case strongly weigh against issuance of a preliminary injunction.

## CONCLUSION

Because Plaintiffs do not have a likelihood of success on the merits of their claims (both because the court lacks jurisdiction and because USCIS's decision not to adjudicate naturalization applications of alien MAVNI soldiers serving in the United States Army until their DoD background investigations are completed is lawful) this Court should deny plaintiffs' motion for class-wide preliminary injunctive relief that constitutes the full relief plaintiffs seek in their complaint.  Further, Plaintiffs' alleged "irreparable" harm is both speculative and results from their compliance (or lack thereof) with the conditions of their underlying pre-enlistment

immigration statuses, not from any USCIS hold on their naturalization applications.  Finally, and

unquestionably, fully vetting alien soldiers in the United States Army prior to naturalizing them

is in the public interest.  Accordingly, this Court should Deny Plaintiffs' motion for a

preliminary injunction, particularly as Defendants will be filing a motion to dismiss this Case

under Rule 12 later this month.

Dated: July 7, 2017                          Respectfully Submitted

                                             CHAD A. READLER
                                             Acting Assistant Attorney General
                                             Civil Division

                                             WILLIAM C. PEACHEY
                                             Director, Office of Immigration Litigation

                                             COLIN A. KISOR
                                             Deputy Director

                                             *s/ Sarah L. Vuong*
                                             SARAH L. VUONG
                                             Senior Litigation Counsel
                                             U.S. Department of Justice, Civil Division
                                             Office of Immigration Litigation –
                                             District Court Section
                                             P.O. Box 868, Washington, DC 20044
                                             Telephone: 202-532-4281
                                             Facsimile: 202-305-7000
                                             e-Mail: sarah.l.vuong@usdoj.gov

                                             By: */s/ Elianis N. Perez*
                                             ELIANIS N. PEREZ
                                             Senior Litigation Counsel
                                             U.S. Department of Justice, Civil Division
                                             Office of Immigration Litigation –
                                             District Court Section
                                             P.O. Box 868, Washington, DC 20044
                                             Telephone: 202-616-9124
                                             Facsimile: 202-305-7000
                                             e-Mail: elianis.perez@usdoj.gov

                                             ATTORNEYS FOR DEFENDANTS

44

**CERTIFICATE OF SERVICE**
Civil Action No. 1:17-00998-ESH

I HEREBY CERTIFY that on this **7th day of July, 2017**, a true copy of this Notice of

Appearance was filed with the Clerk of the Court using the CM/ECF system which sent

notification of such filing via e-mail to the following:

Joseph J. LoBue
FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
801 17th Street, NW
Washington, DC 20006
(202) 639-7493
(202) 639-7003 (fax)
joseph.lobue@friedfrank.com

ATTORNEY FOR PLAINTIFFS

 */s/ Elianis N. Perez*
 Elianis N. Perez
 Senior Litigation Counsel
 United States Department of Justice

 ATTORNEY FOR DEFENDANTS