# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                            )
KUSUMA NIO, *et al.*,                       )
                                            )
                    Plaintiffs,             )
                                            )
        v.                                  )     **Case No. 1:17-cv-00998-ESH**
                                            )
UNITED STATES DEPARTMENT                     )
OF HOMELAND SECURITY, *et al.*,              )
                                            )
                    Defendants.             )
_____)

## REPLY MEMORANDUM IN SUPPORT
## OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Joseph J. LoBue (D.C. Bar No. 484097)
Douglas W. Baruch (D.C. Bar No. 414354)
Jennifer M. Wollenberg (D.C. Bar No. 494895)
Neaha P. Raol (D.C. Bar No. 1005816)
Webster R. M. Beary (D.C. Bar No. 1041653)
Shaun A. Gates (D.C. Bar No. 1034196)
Katherine L. St. Romain (D.C. Bar No. 1035008)
Fried, Frank, Harris, Shriver & Jacobson LLP
801 17th Street, NW
Washington, D.C. 20006
Telephone:  (202) 639-7000
Facsimile:  (202) 639-7003
Email: joseph.lobue@friedfrank.com
Email: douglas.baruch@friedfrank.com
Email: jennifer.wollenberg@friedfrank.com

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ............................................................................................................................... 5

    I.    Plaintiffs Seek Appropriate and Necessary Preliminary Relief .................................... 5

        A.  Plaintiffs' Requested Relief Will Maintain the Status Quo .................................... 7

        B.  Defendants' "National Security" References are Red Herrings ............................. 8

    II.    The Court Has Jurisdiction Over Plaintiffs' Claims .................................................... 10

        A.  The Court Has Jurisdiction Under 28 U.S.C. § 1331 and the APA ...................... 10

        B.  The Court Has Jurisdiction Over Plaintiffs' Claims Against DoD ........................ 13

        C.  Plaintiffs Have Standing ....................................................................................... 15

        D.  Defendants' Private Right of Action Argument Lacks Merit ............................... 16

    III.    Plaintiffs Have Shown a Likelihood of Success on the Merits ................................... 17

        A.  Defendants are Unreasonably Delaying MAVNI Naturalization Processing ........ 18

        B.  Defendants are Unlawfully Interfering with MAVNI Naturalizations .................. 20

    IV.    Plaintiffs Will Suffer Irreparable Injury Absent a Preliminary Injunction ................. 24

    V.    Public Interest And The Balance of Harms Weighs in Favor of Plaintiffs ................. 25

CONCLUSION ......................................................................................................................... 25

<u>**TABLE OF AUTHORITIES**</u>[*]

<u>**PAGE**</u>

**CASES**

*Adams v. Vance*,
   570 F.2d 950 (D.C. Cir. 1978) ........................................................................................10

*Ark Initiative v. Tidwell*,
   895 F. Supp. 2d 230 (D.D.C. 2012) ................................................................................6

*Bennett v. Donovan*,
   4 F. Supp. 3d 5 (D.D.C. 2013) ........................................................................................22

*Bowen v. Georgetown Univ. Hosp.*,
   488 U.S. 204 (1988)........................................................................................................22

*\*Bowen v. Massachusetts*,
   487 U.S. 879 (1988)...........................................................................................12, 14, 23

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
   467 U.S. 837 (1984)........................................................................................................22

*Costa v. Chertoff*,
   No. 07-2467, 2007 WL 4456218 (E.D. Pa. Dec. 11, 2007)............................................18

*\*El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. HHS*,
   300 F. Supp. 2d 32 (D.D.C. 2004)  ..............................................................13, 17, 23, 24

*\*Hamandi v. Chertoff*,
   550 F. Supp. 2d 46 (D.D.C. 2008) ......................................................................... *passim*

*\*Iyengar v. Barnhart*,
   233 F. Supp. 2d 5 (D.D.C. 2012)  ..................................................................................23

*Kidwell v. Dep't of the Army*,
   56 F.3d 279 (D.C. Cir. 1995) ...................................................................................11, 12

*Koren v. Chertoff*,
   No. 3:07cv157 (PCD), 2007 WL 14319848 (D. Conn. May 14, 2007) ..........................18

*Langmead v. Monroe Cnty. Office of the Sheriff*,
   No. 11-CV-6003-CJS, 2013 WL 3759958 (W.D.N.Y. July 15, 2013)..............................6

---

[*]      Asterisks identify those authorities on which Plaintiffs chiefly rely.

*Liu Duan v. Zamberry*,
 Civil Action No. 06-1351, 2007 WL 626116 (W.D. Pa. Feb. 23, 2007) ..........................18

*Martin v. Donley*,
 886 F. Supp. 2d 1 (D.D.C. 2012) ....................................................................................12

*\*McNary v. Haitian Refugee Ctr., Inc.*,
 498 U.S. 479 (1991) ............................................................................................10, 11, 17

*Morris v. District of Columbia*,
 38 F. Supp. 3d 57 (D.D.C. 2014) ......................................................................................6

*Mowlana v. Mukasey*,
 Civil Action No. 08-cv-01769-LTB, 2009 WL 130571, (D. Colo. Jan. 20, 2009) ...........18

*Nine Iraqi Allies Under Serious Threat Because of their Faithful Service
 to the United States v. Kerry*,
 168 F. Supp. 3d 268 (D.D.C. 2016) ...........................................................................15, 16

*Norton v. S. Utah Wilderness Alliance*,
 542 U.S. 55 (2004) ..........................................................................................................14

*Palamarachouk v. Chertoff*,
 568 F. Supp. 2d 460 (D. Del. 2008) ................................................................................18

*\*Superior Fibre Prods. v. United States Dep't of the Treasury*,
156 F. Supp. 3d 54 (D.D.C. 2016) ..........................................................................12, 13, 15, 17

*Teva Pharms. USA Inc. v. FDA*,
 441 F.3d 1 (D.C. Cir. 2006) ..............................................................................................6

*Tiwari v. Mattis*,
 No. 2:17-cv-00242-TSZ (W.D.Wash. May 19, 2017) ....................................................8, 9

*Tom Doherty Assocs. v. Saban Entm't, Inc.*,
 60 F.3d 27 (2d Cir. 1995) ..................................................................................................5

*Tootle v. Secretary of the Navy*,
 446 F.3d 167 (D.C. Cir. 2006) ...................................................................................12, 17

*Trudeau v. Fed. Trade Comm'n*,
 456 F.3d 178 (D.C. Cir. 2006) ...................................................................................12, 15, 17

*United Mine Workers v. Int'l Union, United Mine Workers*,
 412 F.2d 165 (D.C. Cir. 1969) ..........................................................................................7

*Villa v. United States Dep't of Homeland Sec.*,
    607 F. Supp. 2d 359 (N.D.N.Y. 2009) ..................................................................18

*Virginia Dep't of Med. Assistance Servs. v. United States*,
    678 F.3d 918 (D.C. Cir. 2012) .......................................................................22

*Yee v. Jewell*,
    Civil Action No. 2017 WL 78473 (D.D.C. Jan. 9, 2017) ...................................10

**STATUTES**

8 C.F.R. § 329.2(c)(2) ...........................................................................................20

5 U.S.C. § 702 .............................................................................................. *passim*

5 U.S.C. § 703 ..............................................................................................16, 17

5 U.S.C. § 704 ...................................................................................................12

5 U.S.C. § 706 .............................................................................................. *passim*

*8 U.S.C. § 1440 ........................................................................................... *passim*

8 U.S.C. § 1447(b) ...............................................................................................6

28 U.S.C. § 1331 ................................................................................10, 11, 12, 13

**RULES**

Federal Rules of Civil Procedures
    65(a)(2) .........................................................................................................6

**OTHER AUTHORITIES**

Developments in the Law -- Injunctions, 78 Harv. L. Rev. 994, 1058 (1965) ..............................6

Department of Homeland Security, *Annual Report 2017: Citizenship and Immigration Services Ombudsman*, June 29, 2017, at 15, *available at* https://www.dhs.gov/sites/default/files/
publications/DHS%20Annual%20Report%202017_0.pdf ........................................7, 19

USCIS Policy Manual, Vol. 12. Part I, Chapter 6—Citizenship & Naturalization Military Members and Their Families, *available at* www.uscis.gov/policymanual/HTML/PolicyManual-
Volume12-Part1-Chapter6.html ........................................................................23

## PRELIMINARY STATEMENT

Plaintiffs are United States Army soldiers who have sworn an oath to support and defend the Constitution of the United States.  Plaintiffs enlisted in the U.S. Army through DoD's "MAVNI" program after the United States military recruited them, vetted them, and verified that they possess skills deemed "vital" to the national interests of the United States.  Post-enlistment, Army officials from Plaintiffs' respective units certified, in writing, Plaintiffs' "honorable" military service.  With these honorable service certifications, Plaintiffs invoked their rights under 8 U.S.C. § 1440(a) to apply for naturalization.  Yet the evidence shows that Defendants unlawfully are blocking the adjudication of Plaintiffs' naturalization applications and causing Plaintiffs mounting irreparable injury in the process.

Defendants' Opposition ("Opp.") only confirms Plaintiffs' urgent need for and entitlement to preliminary relief, and this Reply explains how and why below.  But, we are compelled at the outset to take a detour and address the straw-man argument around which Defendants have framed their defense.  Defendants contend in their opening sentence that "[t]his case is about protecting the vital national security interests of the United States."  Opp. at 1.  Defendants are wrong and this attempt at misdirection should be rejected.  To be clear, Plaintiffs are not seeking any relief – through the Complaint or this Preliminary Injunction Motion ("Motion") – that would prevent DoD from conducting whatever lawful military background investigation they deem applicable to any given soldier – MAVNI or otherwise.  And Plaintiffs in no way are seeking to preclude the U.S. Army from denying security clearances to any soldier – including MAVNIs – if warranted in the normal course.  What Plaintiffs *are* seeking in this action is to compel DHS to adjudicate their naturalization applications to completion pursuant to 8 U.S.C. § 1440(a) and to do so (1) using only lawful citizenship eligibility criteria and procedures, and (2) without undue delay or other interference.  Therefore, what this case actually is about is whether Defendants are acting

1

unlawfully in their joint action to suspend and "hold" adjudication of Plaintiffs' naturalization applications in order to buy DoD time to decide whether to conduct enhanced military background security screenings on MAVNI Selected Reservists or discharge them from the military and attempt to revoke their "honorable service" certifications in the process.

While the legal question of whether the "hold" is lawful remains to be decided, Defendants' admissions in their Opposition confirm that the Court now can decide this question – at least in terms of likelihood of success on the merits – on a common base of established facts, including that: (1) Plaintiffs' naturalization applications cannot proceed to final adjudication and citizenship due to a "hold" that has been in place for several months, was renewed on July 7, 2017, and has no fixed end date (Renaud Decl. ¶¶ 23-26); and (2) this "hold" is the product of a "mutual" decision and action among the DHS Defendants and the DoD Defendants (*see* Miller Decl. ¶ 18).

While Plaintiffs appreciate that Defendants finally have admitted the existence of the "hold," it is disturbing that they failed to do so earlier. Indeed, prior to filing this Motion, Plaintiffs repeatedly sought these precise admissions from Defendants in an attempt to avoid burdening the Court with unnecessary disputes. On each occasion, Defendants expressly denied knowledge of any such "hold" and affirmatively stated that Plaintiffs' naturalization applications were being processed in the normal course. And even in the phone conference with the Court on June 30, Defendants referred only to a *new* policy – the "contours" of which were still unknown to Defendants' counsel – that had just been put into place that day. No such June 30 policy is even mentioned in Defendants' Opposition. All along, Defendants obviously knew their own policies and the immense hardship they were causing, and they obviously knew that it was false to claim that no "hold" was affecting the processing of MAVNI applications. Rather than be transparent regarding their actual policies, they obfuscated, delayed, and misled Plaintiffs, at a minimum.

Unfortunately, that lack of transparency has continued with Defendants' Opposition.  They suggest repeatedly that the "hold" will be short-lived, and is designed only to allow DoD sufficient time to conduct enhanced background investigations on MAVNI soldiers and share any adverse findings with DHS so that the findings can be considered in the assessment of each soldier's eligibility for naturalization.   In other words, Defendants suggest that if Plaintiffs would stop rocking the boat (by asserting their rights) and just wait for the completion of the enhanced military background investigations, the applications will be processed and they will become citizens.

That story line is fiction.  Defendants' actual plan – which they have failed to acknowledge to the Court – is quite different, and it explains the real reason for the "hold" on naturalizations.  ***That plan – memorialized in a May 2017 DoD "Action Memo" – is to discharge virtually all non-naturalized MAVNIs without ever conducting the supposedly critical military background investigations***.   This memo exposes Defendants' "just wait" policy as a sham.

Defendants' silence on this point is telling, particularly given that Plaintiffs attached the Action Memo to their Motion (*see* Motion at 11-13 and Ex. 8) and it spells out DoD's plans for MAVNI Selected Reservists, including Plaintiffs:

> **Group 3**:  [Selected Reserve MAVNIs] . . .
>
> - Approx. 500 Group 3 MAVNIs have received command endorsement [*i.e.*, N-426 "honorable service" certifications] and applied for naturalization based on having "performed creditable service" in the form of two weekend drills.  These citizenship applications are under review by [USCIS].
>
> - **Action:**  The heightened risk associated with Groups 1/2, and the application of resources needed to mitigate that risk, render it infeasible to continue to process [Group 3] MAVNIs.  **Except for individual cases deemed vital to the national interest, Group 3 will be separated by Secretarial plenary authority.**

Ex. 8 (emphases in original).  Of course, "separated by Secretarial plenary authority" is military-speak for discharge.  This is DoD's *actual* plan, meaning that DoD has no intention of conducting the very background investigations DHS claims as the justification for suspending final

adjudication of Plaintiffs' naturalization applications.  Remarkably, Defendants' DoD declarant is Stephanie Miller, the same person who prepared the Action Memo.  Even though Ms. Miller fails to acknowledge the Action Memo, the Court should take note of the fact that Ms. Miller's declaration carefully avoids any confirmation that DoD is performing or intends to perform these enhanced military background investigations.  Yet, on July 7, 2017 (the same date that it filed its Opposition), DHS issued its field directive to "hold" MAVNI applications pending completion of the "DoD enhanced background investigations" *knowing (from the Action Memo at a minimum) that such investigations would never be performed*.

Accordingly, Defendants' defense theory of a purportedly "legal" USCIS policy is a charade.  The reality is that DoD has convinced DHS to suspend naturalization processing so that DoD (1) has the opportunity to "revoke" the already-issued N-426s, and (2) can implement its plan to discharge non-naturalized MAVNIs from the military.  And, DHS is acquiescing in – if not complicit with – this unlawful conduct.

Of course, even if Defendants actually intended to perform military background checks on the "500" MAVNIs who already have received their N-426s and submitted their N-400s, that would not render DHS's action lawful or otherwise excuse the delay in the processing of the MAVNI naturalization applications.  DHS is required by law to adjudicate the applicant's naturalization application in accordance with citizenship eligibility criteria established by law. Nothing in that law conditions citizenship eligibility on an applicant's ability to pass enhanced military background screenings usually reserved for high-level security clearances.  And Defendants' repeated claim that Plaintiffs' naturalization applications are within "average" processing time is meaningless and misleading.

Defendants' jurisdictional and standing arguments lack merit as well. The notion that a federal court lacks jurisdiction to interpret a federal statute under these circumstances finds no support in federal jurisprudence, and certainly is not supported by the authorities recited in Defendants' Opposition. Likewise, Defendants' assertion that Plaintiffs lack standing to obtain an injunction from a DoD policy that Defendants admit targets Plaintiffs directly and is preventing the adjudication of their naturalization application is equally unfounded.

## ARGUMENT

### I.   Plaintiffs Seek Appropriate and Necessary Preliminary Relief

In their Opposition, Defendants posit several misstatements and mischaracterizations about Plaintiffs' request for preliminary relief, many of which are condensed and captured in the following assertion: "Further, a classwide preliminary injunction granting Plaintiffs the ultimate relief they request in the Complaint, and which can only be reversed through individual denaturalization proceedings, would upend the normal course of proceedings and greatly interfere with the government's ability to succeed in its mission." Opp. at 2. That statement is flawed in numerous ways. First, the Motion seeks preliminary relief for the eight individually-named plaintiffs identified in the Motion, not the entire class. Second, a simple comparison of the preliminary relief sought in the Motion and the final relief sought in the Complaint shows that they are not mirror images.[1]

---

[1]   Even if the requested preliminary relief were the same as the final relief, that finding would only warrant consideration of a heightened standard, which applies only if the relief is impossible to reverse, such as the immediate live televising of an event or the disclosure of confidential information. *See Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 34-35 (2d Cir. 1995); *Langmead v. Monroe Cnty. Office of the Sheriff*, No. 11-CV-6003-CJS, 2013 WL 3759958, at *2-3 (W.D.N.Y. July 15, 2013). Here, a cessation of Defendants' "hold" on final naturalization adjudications could easily be reversed. And if any of the eight Plaintiffs is naturalized once the hold is lifted, Defendants already have statutory authority to revoke these naturalizations for cause. 8 U.S.C. § 1440(c).

Indeed, Defendants' entire premise is incorrect and unsupported. When movants satisfy all of the requirements for a preliminary injunction, as Plaintiffs do here, "the fact that the plaintiff would get no additional relief if he prevailed at the trial on the merits should not deprive him of his remedy." Developments in the Law -- Injunctions, 78 Harv. L. Rev. 994, 1058 (1965).[2] Third, Defendants' assertion illustrates their ongoing confusion as to whether Plaintiffs are seeking an order of naturalization from this Court as part of their Complaint or their Motion.[3] But, any such questions should have been extinguished long ago. Apart from the multiple pre-Motion conferences during which Plaintiffs dispelled this notion, (1) the Motion states that "nothing in the Complaint or this motion asks this Court to [ ] adjudicate any Plaintiff's naturalization application or grant citizenship to any individual Plaintiff…" (Mot. at 3), and (2) this Court corrected Defendants on this point during the June 30 teleconference.

Rather, for all the reasons laid out in their Motion, Plaintiffs are fully entitled to obtain preliminary relief to stop the present injuries they are suffering due to Defendants' unlawful interference. Indeed, as explained in this Reply, the need for preliminary relief is more compelling

---

[2]     Even if there is overlap between the requested preliminary and final relief, that finding would not warrant Plaintiffs having to suffer continuing injury until final judgment. This Court instead, on this substantial record, could decide the ultimate question of whether Defendants' hold is legal under 8 U.S.C. § 1440 without prejudicing Defendants. *See* Fed. R. Civ. P. 65(a)(2) ("Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing."); *see also, e.g., Teva Pharms. USA Inc. v. FDA*, 441 F.3d 1, 3 (D.C. Cir. 2006) (treating the motion for a preliminary injunction as a summary judgment motion); *Morris v. District of Columbia*, 38 F. Supp. 3d 57, 62-63 (D.D.C. 2014) (exercising the district court's "power to consolidate a hearing for a preliminary injunction into one on the merits"); *Ark Initiative v. Tidwell*, 895 F. Supp. 2d 230, 237 (D.D.C. 2012).

[3]     Defendants also appear confused in advancing their "ripeness" claim as to Plaintiff Wanjing Li. *See* Opp. at 27 n.13, 30 ("any cause of action that she may have under 1447(b) is not ripe"). That assertion is of no moment. No Plaintiff is seeking 8 U.S.C. § 1447(b) relief (*i.e.*, a judicial adjudication of a naturalization application) in this lawsuit. In fact, the Complaint does not even mention that statutory provision, and it does not need to in order for this Court to provide a remedy. *See Hamandi v. Chertoff*, 550 F. Supp. 2d 46, 51 n.4 (D.D.C. 2008) ("The Court rejects defendants' contention…that [1447(b)] provides plaintiff's exclusive remedy.").

now than ever, given the substantial evidence that Defendants are formulating plans to "revoke" N-426s and discharge non-naturalized MAVNIs.

## A. **Plaintiffs' Requested Relief Will Maintain the Status Quo**

Further, should any Plaintiff be naturalized following this Court's grant of the requested preliminary relief, it is inaccurate to contend, as Defendants do, that such a result would "upend the normal course of proceedings." Opp. at 2. To the contrary, per DoD's own admission, the "normal course of proceedings" prior to Defendants' illegal hold on adjudications was that most MAVNIs had their naturalization applications adjudicated (with the grant of citizenship being the result) in 6-½ to 12 weeks. Renaud Decl. ¶ 13.[4] Moreover, DHS itself has publicly reported that, in 2016, it naturalized almost 10,000 MAVNI soldiers without so-called enhanced military background checks/screenings.[5] If granted, the Court's injunction properly would *maintain* – not "upend" – that "normal course" or status quo. *See United Mine Workers v. Int'l Union, United Mine Workers*, 412 F.2d 165, 168 (D.C. Cir. 1969) ("The status quo is the last uncontested status which preceded the pending controversy") (internal citation omitted).[6]

Thus, to maintain the status quo, adjudication of Plaintiffs' naturalization applications should proceed to completion under the lawful adjudication criteria (which does not include enhanced military background screenings). And that status quo also means that (1) each Plaintiff

---

[4] In the "normal course," each of the Plaintiffs would have had their naturalization applications adjudicated by this point, and Plaintiffs have alleged that, in the "normal course," they would have been naturalized as U.S. citizens many months ago. Motion at 7.

[5] Department of Homeland Security, *Annual Report 2017: Citizenship and Immigration Services Ombudsman*, June 29, 2017, at 15, *available at* https://www.dhs.gov/sites/default/files/publications/DHS%20Annual%20Report%202017_0.pdf.

[6] In terms of the status quo, it is worth noting that Defendants represented shortly before this Motion was filed that none of the Plaintiffs were subject to any hold. In other words, the last uncontested status predating this controversy is when the Plaintiffs' naturalization applications were not subject to any kind of hold.

has a duly-certified N-426, without any purported revocation of the certification; (2) each Plaintiff is a member of the Selected Reserve and has not received any notice of discharge/separation; and (3) each Plaintiff is not the subject of deportation/removal proceedings.[7]

### B. Defendants' "National Security" References are Red Herrings

Defendants' bald assertion that the grant of preliminary relief would somehow compromise the "government's mission" is part and parcel of their "national security" straw-man argument addressed in the Preliminary Statement above.  It is worth noting that DoD trotted out these same "national security" justifications to defend against claims in the *Tiwari* lawsuit brought by *already-naturalized* MAVNIs challenging a DoD policy that prohibited first-term MAVNI soldiers from being eligible for security clearances.  *Tiwari v. Mattis*, No. 2:17-cv-00242-TSZ (W.D. Wash. May 19, 2017), ECF No. 23 at 3-4.  Indeed, portions of Ms. Miller's declaration in this case appear to be copied verbatim from a declaration submitted by her DoD colleague, Christopher Arendt, in that separate proceeding (as indicated, for example, by an errant reference to the "Arendt Declaration" on p. 43 of the Opposition).[8]   The so-called "national security" concerns raised by DoD in the *Tiwari* case – including the unsupported contention about heightened risk profiles of MAVNIs versus legal permanent resident soldiers – were fully challenged and rebutted,[9] and DoD has since been forced to "rescind" the unlawful security clearance policy.  Even so, this Court

---

[7]     Defendants admit that even if Plaintiffs asked to change the status quo, this Circuit has yet to adopt a "higher burden" for that situation.  Opp. at 18 n.10.  However, even if a higher burden applied, this Court should award the requested relief based on Plaintiffs' extraordinary showing.

[8]     *See, e.g.*, Arendt Decl., *Tiwari v. Mattis*, No. 2:17-cv-00242-TSZ (W.D. Wash. May 19, 2017), ECF No. 26 ¶ 23, which is identical to Miller Decl. ¶ 16.

[9]     *See, e.g.*, Supplemental Aff. of Margaret Stock, *Tiwari v. Mattis*, No. 2:17-cv-00242-TSZ (W.D. Wash. May 19, 2017), ECF No. 26.

should not lose sight of the fact that the *Tiwari* case *has nothing to do with adjudication of naturalization applications* and DHS is not even a party to that proceeding.

Plaintiffs' case – the one at issue in this Motion – concerns the policies and procedures being applied to the adjudication of their naturalization applications. This case has nothing to do with "entrenching of service members," "access to classified information," or the "management of [military] internal affairs" – which were the "national security" concerns expressed in *Tiwari*. Indeed, to avoid this exact distraction, Plaintiffs confirmed this point in their Motion:

> *To be clear, and to avoid any confusion or uncertainty on this point* as Defendants respond to and the Court considers this motion, nothing in the Complaint or this motion asks this Court to … dictate to the U.S. Army the criteria it may use to determine who may join the military or what military background checks or security clearances may be warranted for individual soldiers.

Motion at 3 (emphasis added). Further, Plaintiffs are not asking USCIS to "relax" any naturalization background checks. If anything, Plaintiffs already have been "vetted" more thoroughly than the average naturalization applicant. As Defendants have admitted, "all MAVNI recruits must have a valid visa status for at least two years immediately prior to the enlistment date, and must not have had any single absence from the United States of more than 90 days during the two-year period immediately preceding the date of enlistment." Miller Decl. ¶ 8.[10] Thus, DHS already vetted these individuals when admitting them to and/or allowing them to stay in the country, and DHS validated status information prior to each MAVNI's enlistment. Further, Plaintiffs *already* are enlisted and serving U.S. soldiers,[11] meaning they *already* have passed the

---

[10]     In fact, as established in their declarations, most Plaintiffs have been in the United States for over five years by now. And, two Plaintiffs have resided in the United States for over ten years, since they were children. Calixto Decl. ¶ 2; Hong Decl. ¶ 2.

[11]     Although Defendants often refer to Plaintiffs and other like-situated soldiers as MAVNI "recruits" (*see, e.g.*, Renaud Decl. ¶¶ 15, 21), that terminology could be misleading.

military's moral conduct and criminal activity screening.  The military has vetted Plaintiffs enough to provide them with military identification cards, uniforms, and access to bases.  Plaintiffs simply want their naturalization applications to be adjudicated under the same eligibility standards applicable to other naturalization applicants, including the thousands of MAVNIs that already have been naturalized pursuant to 8 U.S.C. § 1440.[12]

## II.    The Court Has Jurisdiction Over Plaintiffs' Claims

### A.    The Court Has Jurisdiction Under 28 U.S.C. § 1331 and the APA

In suits against the government, jurisdiction is present when (1) jurisdiction over the subject matter of the dispute has been granted by Congress to the district courts and (2) Congress has waived the United States' sovereign immunity. *Yee v. Jewell*, No. 16-490, 2017 WL 78473, at *3 (D.D.C. Jan. 9, 2017).  The Court has jurisdiction under 28 U.S.C. § 1331 and Section 702 of the Administrative Procedures Act, 5 U.S.C. § 702.

28 U.S.C. § 1331 confers on the district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  Because this case arises under 8 U.S.C. § 1440, the Court has federal question jurisdiction over the subject matter pursuant to 28 U.S.C. § 1331.  There is no question that Section 1331 applies to disputes arising under federal immigration laws, including specifically to actions challenging the policies and procedures of the federal agencies administering such laws.  The Supreme Court's decision in *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479 (1991), is directly on point.  In *McNary*, the plaintiffs

---

[12]    Notably, the one case Defendants cite to claim that a higher burden is "especially important" here because of the supposed national security concerns at issue (Opp. at 18), says absolutely nothing about immigration, naturalization, or even national security.  *See Adams v. Vance*, 570 F.2d 950 (D.C. Cir. 1978).  Rather, it is a case about a district court ordering the Secretary of State to object to the International Whaling Commission's ban on Eskimo hunting of the bowhead whale.  *Id*. at 952.

"sought relief on behalf of a class of alien farmworkers who either had been or would be injured by unlawful practices and policies adopted by the INS in its administration of the SAW program," and the sole question was whether the district court had jurisdiction over plaintiffs' claims challenging the INS policies due to another code section that prohibited judicial review of individual SAW adjustment determinations except in connection with an exclusion or deportation order. *Id*. at 487, 490. The Court held that challenges to the INS policies were not governed by the judicial review provision applicable to individual adjudications, but rather, were subject to the general federal question jurisdiction of the district courts under 28 U.S.C. § 1331. *Id*. at 494.

Plaintiffs' case is indistinguishable from *McNary* in all material respects. As in *McNary*, Plaintiffs' claims arise under federal immigration laws. As in *McNary*, Plaintiffs challenge the policies and procedures employed by the responsible agency in performing their duties relating to status adjustment. Accordingly, as in *McNary*, the Court's "general federal-question jurisdiction under 28 U.S.C. § 1331 to hear this action remains unimpaired." *Id*. Indeed, here, there is an even stronger case for the exercise of general federal question jurisdiction because, unlike the statute at issue in *McNary*, 8 U.S.C. § 1440 contains no limitation on judicial review of any nature.

The second jurisdictional requirement is satisfied by 5 U.S.C. § 702, which expressly waives sovereign immunity for claims seeking judicial review of agency actions:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority *shall not be dismissed nor relief therein be denied on the ground that it is against the United States* or that the United States is an indispensable party. *The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States*.

5 U.S.C. § 702 (emphasis added). Thus, it is well-settled that the APA "waives sovereign immunity for actions 'seeking relief other than money damages.'" *Kidwell v. Dep't of the Army*,

56 F.3d 279, 283 (D.C. Cir. 1995); *see also Bowen v. Massachusetts*, 487 U.S. 879, 891-92 (1988) (Section 702 of the APA "was intended to broaden the avenues for judicial review of agency action by eliminating the defense of sovereign immunity").[13]  Moreover, although Plaintiffs specifically have brought this action under the APA (*see* Compl. ¶¶ 97-100), this Court has held that the APA's waiver of sovereign immunity is general in nature and applies to any action that meets its requirements, whether or not that action is specifically brought under the APA.  *Superior Fibre Prods. v. United States Dep't of the Treasury*, 156 F. Supp. 3d 54, 59 n.2 (D.D.C. 2016) ("waiver of sovereign immunity in § 702 of the APA applies to any claim for equitable relief against a federal agency, not just APA claims") (*citing Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 186-87 (D.C. Cir. 2006); *Yee*, 2017 WL 78473, at *4 (same).  Plaintiffs do not seek money damages but rather declaratory judgment (Count I), injunctive relief (Count II), relief pursuant to the APA (Count III) and mandamus (Count IV).  Compl. ¶¶ 85-105.  The APA waiver of sovereign immunity applies.

---

[13]    Defendants' jurisdictional arguments relating to the Tucker Act and so-called "little" Tucker Act (Opp. at 18-20) are inapposite.  These statutes apply only in actions seeking money damages.  Indeed, "the D.C. Circuit has consistently held that an action must be brought under the Tucker Act in the Court of Federal Claims if, 'in whole or in part, it explicitly or 'in essence' seeks more than $10,000 in monetary relief from the federal government,' . . . if it 'is essentially a contract action,' . . . and if the Court of Federal Claims would have jurisdiction over the matter." *Yee*, 2017 WL 78473, at *6 (citations omitted).  Yet, none of the factors is present here.  Plaintiffs do not seek money damages, nor are their claims "essentially" contractual in nature.  Where non-monetary remedies are sought, the APA governs the jurisdiction analysis.  *Martin v. Donley*, 886 F. Supp. 2d 1, 7-8 (D.D.C. 2012) ("Under the APA, a plaintiff may sue the United States 'in the district courts for remedies *other* than money damages arising from an agency's unlawful action.'") (emphasis in original).  Thus, the Tucker Act is irrelevant to this case.  *See id.* at 10; *Tootle v. Sec'y of the Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006) ("Tootle's challenge to the Navy's administrative process is nothing more than a routine APA case—a challenge to the reasonableness of governmental action on the grounds that it was arbitrary, capricious, inadequately explained, and in violation of agency regulations.  The District Court had jurisdiction over this claim under 28 U.S.C. § 1331 (2000), and the complaint states a cause of action under 5 U.S.C. §§ 704 and 706.").

Notably, this Court already decided this very issue in *Hamandi v. Chertoff*, 550 F. Supp. 2d 46, 51 (D.D.C. 2008). In *Hamandi*, the plaintiff filed suit for mandamus and APA relief against USCIS and the FBI seeking an order under Section 706(1) of the APA compelling adjudication of plaintiff's naturalization application. The Court rejected USCIS's jurisdictional defense: "[p]ursuant to the APA, a person adversely affected by agency action is entitled to judicial review" and that "[a]gency action includes the failure to act." *Id.* at 49. The Court further found that "the APA in conjunction with 28 U.S.C. § 1331 (which gives federal district courts federal question jurisdiction) gives the Court jurisdiction to compel unreasonably delayed agency action." *Id.* at 50-51. *See also Superior Fibre Prods.*, 156 F. Supp. 3d at 59 n.2 ("The Court has federal question jurisdiction over claims against a federal agency, *see* 28 U.S.C. § 1331, and section 702 of the [APA] provides the necessary waiver of sovereign immunity."); *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. HHS*, 300 F. Supp. 2d 32, 36 (D.D.C. 2004); ("The government's challenges to the Court's jurisdiction are misguided. There is a presumption in favor of reviewability under the APA . . . [and] power to review *any* agency action exists under 28 U.S.C. § 1331.") (emphasis in original).

### B.   The Court Has Jurisdiction Over Plaintiffs' Claims Against DoD

Defendants argue separately that the Court lacks jurisdiction over the claims against DoD. Opp. at 20-22. Defendants' reliance on *Hamandi* for this proposition is misplaced. As noted above, in *Hamandi*, USCIS and FBI each moved to dismiss the action on jurisdictional grounds. While denying USCIS's motion, the Court concluded that: "In contrast to USCIS's duty under the INA and associated regulations to adjudicate naturalization applications, the FBI has no adjudicative responsibilities with respect to such applications." *Id*. at 52.

*Hamandi* does not support DoD's argument here. It addresses only mandamus relief and orders to compel agency action under Section 706(1) of the APA. Plaintiffs assert no claim against

DoD for an order to compel action, whether by way of mandamus or Section 706(1).  *See, e.g.*, Compl. ¶¶ 101-105 (asserting claim for mandamus solely against DHS).  Rather, Plaintiffs seek to enjoin DoD "from interfering with the processing of the N-400 Applications for Naturalization duly filed by Plaintiffs and the Class."  *Id.* ¶ 95.  This relief is governed by Section 706(2) of the APA, which provides that:  "[T]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law."  5 U.S.C.  § 706(2); *see also Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 61-62 (2004) (explaining that Section 706(1) applies in the case of an agency's "failure to act" when required to act, while Section 706(2) applies to unlawful agency actions).

With respect to the FBI, the *Hamandi* decision deals solely with Section 706(1) of the APA in the context of an agency's failure to act.  It does not address the Court's jurisdiction, pursuant to Section 706(2), to "hold unlawful and set aside" improper action that an agency actually undertakes.  The Supreme Court has confirmed that district courts have the power to do precisely that.  *See Bowen v. Massachusetts*, 487 U.S. 879, 911 (1988) ("It seems perfectly clear that, as 'the reviewing court,' the District Court had the authority to 'hold unlawful and set aside agency action' that it found to be 'not in accordance with law.'").[14]  Moreover, unlike the relationship between

---

[14]    Just by way of illustration, the Complaint alleges and Defendants admit that DoD's role in the naturalization process is limited.  Opp. at 36 ("DoD serves a ministerial role in determining if an individual is serving honorably").  Nevertheless, the Complaint alleges, and Plaintiffs have evidence showing, that senior DoD officials have stated that "[t]he Army does not have any plans of letting a USAR [*i.e.*, U.S. Army Reserve] MAVNI get naturalized" before performing active duty service. Compl. ¶ 51.  Furthermore, DoD's evident intention to revoke existing MAVNI N-426 certifications and then discharge these soldiers in a way to impede or prevent their naturalization is arbitrary, capricious, and contrary to law.  The Court therefore has jurisdiction

USCIS and the FBI in *Hamandi,* the decision to suspend adjudication of Plaintiffs' naturalization applications is the product of "joint" DoD and DHS action.  Miller Decl. ¶ 18 ("DoD and USCIS mutually agreed that USCIS would slow down the Form N-400 adjudications.").  In all events, the Court has power under the "non-statutory review" doctrine to enjoin agency action that is outside the agency's statutory authority.  *Superior Fibre Prods.*, 156 F. Supp. 3d at 59 (the "non-statutory review" doctrine allows judicial review to determine whether an agency has "exceeded its statutory authority") (*citing Trudeau,* 456 F.3d at 190).

### C.  <u>Plaintiffs Have Standing</u>

There is no legal basis for Defendants' contention that Plaintiffs "lack standing to challenge USCIS background check policy" (Opp. at 22-24).

> In order to establish standing, Plaintiffs must demonstrate (1) that they have suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Nine Iraqi Allies Under Serious Threat Because of Their Faithful Service to the United States v. Kerry*, 168 F. Supp. 3d 268, 281 (D.D.C. 2016) (citations omitted).  Notably, Defendants admit that they have directed "the Field not to complete naturalization applications under 329(a), 8 U.S.C. § 1440(a), for MAVNI recruits" until military Tier 5 security clearance background checks have been completed by the DoD and that this directive "affects all currently pending and future MAVNI naturalization applicants" and is being applied to all of the Plaintiffs in this case.  *See* Opp. at 13.

Plaintiffs have standing to challenge an unlawful policy that is being applied directly to them.  First, Plaintiffs have suffered injuries that are concrete, particularized to Plaintiffs, actual

---

under APA Section 706(2) and the "non-statutory review" doctrine to remedy such unlawful interference.

or imminent, and not conjectural or hypothetical in any way.  Second, Plaintiffs' injuries are fairly

traceable to the challenged agency action; indeed, the injuries are the direct product of Defendants'

unlawful hold.  And third, Plaintiffs' injuries would be redressed by a favorable decision by this

Court.  An order under Section 706(2) "hold[ing] unlawful and set[ting] aside" DHS's policy

and/or enjoining DHS from pursuing that policy would remove the illegal suspension currently

being imposed by DHS on the processing of Plaintiffs' naturalization applications.[15]

### D.  Defendants' Private Right of Action Argument Lacks Merit

Defendants contend that the Court lacks jurisdiction because Section 1440, itself, does not

provide a private right of action.  Opp. at 24-27.  Here, too, Defendants' reasoning is flawed.

Plaintiffs do not need an implied private right of action under Section 1440 because Plaintiffs have

an *express* right of action to seek judicial review of the agency actions under the APA:  "A person

suffering legal wrong because of agency action, or adversely affected or aggrieved by agency

action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. §

702; *see also* 5 U.S.C. § 704.  The APA further provides that the form of action for judicial review

shall be the "special statutory review proceeding relevant to the subject matter in a court specified

---

[15]     The court's decision in *Nine Iraqi Allies* is instructive.  In that case, the plaintiffs – Iraqi and Afghan citizens who served the United States during military operations in Iraq and Afghanistan – commenced an action alleging, among other things, that the Government failed to adjudicate their Special Immigrant Visa (SIV) applications within a reasonable time in accordance with the APA.  The Government argued that the plaintiffs lacked standing to assert such claims. The court rejected that position and found that (a) plaintiffs had "suffered an injury in fact: the failure to receive final decisions on their SIV applications within a reasonable period," (b) the injury was "quite clearly caused by Defendants' conduct (*i.e.*, Defendants' failure to adjudicate the applications)", and (c) an order from the court directing the defendants to adjudicate plaintiffs' applications "would directly redress Plaintiffs' injury caused by the Government's failure."  *Nine Iraqi Allies*, 168 F. Supp. 2d at 282.  In fact, Plaintiffs' injuries here are far more serious than that involved in *Nine Iraqi Allies*.  This is because USCIS has imposed its unlawful hold *knowing that DoD has no intention of performing the "DoD enhanced background investigations" on which DHS purportedly is delaying adjudications*.

by statute or, *in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction*." 5 U.S.C. § 703 (emphasis added).  Thus, the absence of a private right of action in Section 1440 is irrelevant.  The APA provides the pertinent cause and form of action for judicial review where the underlying statute is silent.  *Id.*; *see also Tootle*, 446 F.3d at 176 (holding that the complaint stated "a cause of action" under the APA); *Superior Fibre Prods.*, 156 F. Supp. 3d at 59 ("The recognized routes for obtaining equitable review of an agency action are (1) under the [APA], which 'suppl[ies] a generic cause of action in favor of persons aggrieved by agency action.'") (*citing Trudeau*, 456 F.3d at 188).

Moreover, the Supreme Court has recognized a "strong presumption in favor of judicial review of administrative action."  *McNary*, 498 U.S. at 498; *see also El Rio Santa Cruz Neighborhood Health Ctr., Inc.*, 300 F. Supp. 2d at 36 ("There is a presumption in favor of reviewability under the APA").  Thus, Defendants have the burdens backward.  Parties challenging administrative agency action need not prove a specific right of action in the underlying statute to enable judicial review, because the presumption favors judicial reviewability.  Instead, the administrative agency seeking to avoid review must show that the underlying statute precludes judicial review of the action in question.  *Id.* (it is "well-established" that review of agency action under the APA is barred "*only* when a federal statute specifically precludes review") (emphasis in original).  Defendants have made no such showing, and point instead to a hodgepodge of irrelevant decisions.

### III.   Plaintiffs Have Shown a Likelihood of Success on the Merits

The core of Plaintiffs' claim is that Defendants are acting in violation of 8 U.S.C. § 1440(a) by holding the processing and adjudication of naturalization applications in order to further a military agenda that has no bearing on naturalization eligibility.  Under this "hold" scenario, which

Defendants now admit, Plaintiffs are likely to succeed on the merits of their claim for multiple, independent reasons, including those described in the Motion and below.

### A.   Defendants are Unreasonably Delaying MAVNI Naturalization Processing

The delay resulting from Defendants' hold is unreasonable.  First, the delay is *per se* unreasonable because the hold is unlawful and contrary to both the statute and the intent of Congress as discussed further in Section III.B.  In addition, Defendants' claim of unfettered and unreviewable discretion over the "pace" of adjudication because there is no "congressionally-imposed deadline" is plainly wrong.[16]  Opp. at 28.  In fact, this Court itself has held precisely opposite: "[e]ven though neither the statute nor regulations establish a definitive deadline for scheduling an examination that does not mean that [US]CIS possesses unfettered discretion to relegate aliens to a state of limbo, leaving them to languish there indefinitely."  *Hamandi*, 550 F. Supp. 2d at 51 (internal quotations and citations omitted).[17]

---

[16]    *See, e.g., Villa v. United States Dep't of Homeland Sec*., 607 F. Supp. 2d 359, 366 (N.D.N.Y. 2009) ("[T]he Defendant has the discretionary power to grant or deny applications, but it does not have the discretion as to whether or not to decide at all."); *Mowlana v. Mukasey*, Civil Action No. 08-cv-01769-LTB, 2009 WL 130571, at *9 (D. Colo. Jan. 20, 2009) ("It cannot be doubted that Defendants owe Plaintiff a nondiscretionary duty to adjudicate his naturalization application in a reasonable amount of time."); *Palamarachouk v. Chertoff*, 568 F. Supp. 2d 460, 467 (D. Del. 2008) ("In reading the regulations, it is clear that there is a non-discretionary duty to adjudicate applications."); *Costa v. Chertoff*, No. 07-2467, 2007 WL 4456218, at *4 (E.D. Pa. Dec. 11, 2007) ("USCIS has a mandatory, non-discretionary duty to adjudicate applications for naturalization, such as plaintiff's, within a reasonable period of time—'that neither Congress nor the agency has specified the time frame for doing so makes no difference.'") (citation omitted); *Koren v. Chertoff*, No. 3:07cv157 (PCD), 2007 WL 626116, at *3 (D. Conn. May 14, 2007) ("The question whether to adjudicate an adjustment application, however, is not discretionary, but is governed by section 6 of the APA, which requires CIS to take action on applications presented to it 'within a reasonable time.'") (internal citations omitted); *Liu Duan v. Zamberry*, Civil Action No. 06-1351, 2007 WL 1431948, at *5 (W.D. Pa. Feb. 23, 2007) (noting that it was impermissible to read the APA in a manner that would "render toothless" its timing restraints and doing so "would amount to a grant of permission for inaction, and a purposeful disregard of the potential for abuse thereof, on immigration matters").

[17]    If Defendants' theory were accurate, they could hold the applications of seven of the Plaintiffs indefinitely by never scheduling their interviews.  Notably, Defendants now are

Beyond those fundamental flaws undermining their "no unreasonable delay" defense, Defendants misleadingly seek to justify their position by claiming that the adjudication of Plaintiffs' applications remain within or close to "average" processing times.  Opp. at 29.  For instance, DHS claims a nine-month averaging process time but fails to identify either the time period or applicant population that form the basis for that average.  Renaud Decl. ¶¶ 6, 43.  It is not even clear if MAVNI applications are included in that calculation, and, if so, whether the hold was in effect during the period used for the calculation.  As such, this generalized "average" is unsupported, unreliable and should be accorded no weight for purposes of this Motion.  And any agency reliance on such figure as an administrative matter in processing MAVNI applications is, itself, unreasoned, arbitrary, and capricious.  Indeed, DHS's proffer of this purported nine-month average suggests data "cherry-picking" given that DHS's recently published Annual Report states that "[i]n 2016, USCIS completed a total of 9,822 MAVNI naturalizations with an average processing time of 147 days."[18]  But even that DHS Annual Report overstates the relevant processing time for these purposes.  We know that because Defendants admit – in their Opposition – that *prior* to the hold, DHS typically naturalized MAVNIs within a 6½ to 12 week period.  Renaud Decl. ¶ 13; Miller Decl. ¶ 9.  That is the time period standard by which the reasonableness of Plaintiffs' delays should be measured, assuming that the delays had arisen in the normal course.

Of course, we know now that the delays in the adjudications of Plaintiffs' applications are anything but normal.  Instead, the delays here are due to Defendants' *deliberate suspension* of the

---

foreclosing the processing of naturalization applications at an even earlier stage because DoD is no longer certifying MAVNIs' honorable service (Miller Decl. ¶ 19), thus inhibiting eligible MAVNIs' ability to apply for naturalization.

[18]     Department of Homeland Security, *Annual Report 2017: Citizenship and Immigration Services Ombudsman*, June 29, 2017, at 15, *available at* https://www.dhs.gov/sites/default/files/publications/DHS%20Annual%20Report%202017_0.pdf.

processing of all MAVNI applications.   Moreover, Defendants do not, and cannot, justify the reasonableness of the delay when the hold is in place purportedly to wait for extra information that only "may" be relevant to a naturalization decision (Opp. at 10).   Also, Defendants avoid mention of the fact that DoD recently told a U.S. Representative that the enhanced background checks/screening alone "can take 8-24 months to complete and render a decision" (Ex. 19) – a period that would result in delay well beyond even Defendants' inflated "average" processing time.

But, putting all of this discussion of "average" processing time aside, the reality is that the delay Plaintiffs are experiencing here must be unreasonable because it is perpetual.   That is because DoD's own Action Memo (highlighted in the Preliminary Statement, *supra*) makes clear that *DoD does not have the resources to conduct the enhanced background checks/screening and has no intention of ever completing those checks/screenings.  See* Ex. 8.

## B.   Defendants are Unlawfully Interfering with MAVNI Naturalizations

By virtue of their service, Plaintiffs are entitled to pursue naturalization.   Under the law, Defendants have no authority or discretion to impose *additional* eligibility criteria on Plaintiffs. As established in the Motion, nothing in 8 U.S.C. § 1440 permits DHS to treat MAVNIs or other military applicants with completed N-426s differently from other naturalization applicants.   There is no ambiguity in the statutory language.   And, it is clear that Congress intended to reward MAVNI soldiers for answering the call to service, and not to punish and disadvantage them.   Yet, DHS claims that it has the "discretion" to more deeply question the "good moral character" of MAVNI applicants because they are not lawful permanent residents.   Opp. at 33.   That excuse fails.   First, the regulations implementing 8 U.S.C. § 1440 specifically describe how DHS is to address the lack of legal permanent residency under the statute, by simply confirming that "[at] the time of enlistment or induction, the applicant was physically present in the geographical territory of the United States."   8 C.F.R. § 329.2(c)(2).   Second, DHS has naturalized thousands of

MAVNIs, for over nearly a decade – including nearly 10,000 in 2016 – without requiring enhanced DoD background checks. Defendants' other excuse – that waiting for these enhanced background checks makes sense because otherwise DHS would be "faced with revoking the individual's naturalization" if the MAVNI naturalization applicant is dishonorably discharged due to the results of the reviews (Renaud Decl. ¶ 18-19; *see also* Opp. at 11; Miller Decl. ¶ 14) – is also disproved by the statute itself, which specifically contemplates revocation at 8 U.S.C. § 1440(c).

The clarity of the statute combined with DHS's prior practice dictate a finding that DHS is creating a *post hoc* rationalization for the hold. While Defendants seek to portray this as a *DHS* decision in an attempt to insulate DoD from legal blame because it has no statutory authority over naturalization decisions, the evidence shows that DoD has its fingerprints all over this "hold." *See, e.g.,* Motion at 17-20 (charting statements reflecting DoD "hold" activity).

And DoD now has admitted its complicity in the interference. Indeed, DoD's declarant, Ms. Miller, confirms that:

> [o]n or around April of 2017, senior leaders from [DoD] informed USCIS that it was concerned about the naturalization of individuals whose Office of Personnel Management (OPM) background investigation and DoD counterintelligence security review has not yet been completed…DoD and USCIS mutually agreed that USCIS would slow down the Form N-400 adjudications of [MAVNIs].

Miller Decl. ¶ 18. But DoD's concern with or other involvement in "naturalization" is outside of its purview and statutory authority as a legal matter. And here again, we do not have to guess about the source of DoD's "concern" over the consequences of MAVNI naturalizations. DoD's Action Memo answers that question, too. DoD acknowledges in that Memo that once MAVNI recruits become citizens, it would be unlawful to subject them to enhanced security checks (or mass discharges) not applicable to natural born citizen-soldiers. *See* Ex. 8 at 2.

On this record, it is clear that DHS's "hold" is a pretext to allow DoD time to try to "revoke" the already issued N-426s and to conduct its mass discharge of MAVNIs (and then claim that those MAVNIs' prior honorable service has been "mooted" by uncharacterized discharges for convenience). This pretext further is revealed by the fact that DHS's new July 7 policy – to await the completion of enhanced DoD background checks/screenings before continuing processing of MAVNI naturalization applications – cannot be effectuated because DoD does not have the resources or intent to complete the checks/screenings (Ex. 8).

Under these circumstances, and on this record, Defendants' reliance on *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) (*see* Opp. at 34) is entirely misplaced. Simply put, *Chevron* does not apply here.[19] In addition, DHS is not entitled to any type of deference with regards to its July 7, 2017 "policy," which is not public (and has not been provided to Plaintiffs or the Court), was not subject to any notice or comment period, and is a post hoc rationalization for Defendants' unlawful actions. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988) (holding that deference "to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice" is inappropriate).

Defendants' actions are unlawful and should be enjoined and set aside on numerous independent grounds. First, Defendants admit that "Section 1440(a) relaxes the preconditions for naturalization established in Section 1427 . . ." *See* Opp. at 5. Yet, Defendants through their

---

[19] *See Chevron*, 467 U.S. at 842-43 (finding that when applicable statute is unambiguous and "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress"); *Virginia Dep't of Med. Assistance Servs. v. United States*, 678 F.3d 918, 926 (D.C. Cir. 2012) (declining to provide *Chevron* deference and stating that "Congress has spoken plainly and our function is to give effect to the unambiguously expressed intent of Congress") (internal quotations omitted); *Bennett v. Donovan*, 4 F. Supp. 3d 5, 12 (D.D.C. 2013) (holding that *Chevron* deference was not warranted where neither party took the position that "Congress failed to consider the precise question at hand or where Congress explicitly left a gap for an administrative agency to fill").

unlawful actions have imposed on Plaintiffs one of the most onerous requirements for naturalization that one could imagine — a rigorous investigation for top level security clearance. Defendants' action is "not in accordance with law" and must be set aside on that ground. 5 U.S.C. § 706(2); *Bowen*, 487 U.S. at 911.

Second, on July 7, 2017, DHS issued its field directive to "hold" MAVNI applications pending completion of "DoD enhanced background investigations" *already knowing that such investigations would never be performed*. One can scarcely conceive of a more arbitrary, capricious, and irrational agency action. 5 U.S.C. § 706(2)(A).

Third, DHS has an interpretive rule in its Policy Manual setting forth the specific background checks required for military members that apply for naturalization. That rule required only the background checks required for "all applicants for naturalization" as well as a "Defense Clearance Investigative Index (DCII) query." USCIS Policy Manual, Vol. 12. Part I, Chapter 6— Citizenship & Naturalization Military Members and Their Families, available at www.uscis.gov/policymanual/HTML/PolicyManual-Volume12-Part1-Chapter6.html. USCIS has changed this long-standing rule to include military Tier 5 background checks without providing what this Court has held to be notice and an opportunity to comment to interested parties required by law. *Iyengar v. Barnhart*, 233 F. Supp. 2d 5, 14-15 (D.D.C. 2002) (holding that notice and comment rulemaking is required when an agency makes a change to a longstanding interpretive rule through policy directives). USCIS's interpretive rule change was made "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

Finally, as Defendants acknowledge, many MAVNIs already have been naturalized under the existing USCIS policy manual procedures without the requirement of a military Tier 5 background check. USCIS will apply the procedure only to a portion of the MAVNI population.

Treating similarly situated individuals differently is *prima facie* arbitrary and capricious. *El Rio Santa Cruz Neighborhood Health Ctr., Inc.*, 300 F. Supp. 2d at 42-43.

## IV.     Plaintiffs Will Suffer Irreparable Injury Absent a Preliminary Injunction

The unlawful hold has caused and continues to cause Plaintiffs irreparable harm. Defendants' efforts to discredit Plaintiffs' injuries can be summarized as follows:  (1) Plaintiffs are not being injured because their "applications fall within the normal processing time," (2) Plaintiffs are not being injured because "it has not been determined that they have met all of the statutory requirements for naturalization," and (3) Plaintiffs are to blame for their own injuries because they were aware of certain risks when they enlisted.  Opp. at 38-42.

None of these excuses passes muster.  Defendants' first claim is disproved in Section III.A. Defendants' second claim is circular – Defendants essentially claim that Plaintiffs cannot rightfully allege injury because they have not yet been interviewed or had their enhanced background checks completed, which are some of the very "hold" interferences that are the subject of this litigation.[20] And, regarding the third claim, there is no basis or support, legally or factually, for Defendants' "blame the victim" tactic.

Defendants' statements only serve to heighten Plaintiffs' concerns.  In particular, Defendants skirt around the key injury issues and provide no assurances that (1) the "hold" on Plaintiffs' naturalization applications will ever be lifted; (2) Defendants will not "revoke" Plaintiffs' N-426s;[21] (3) Defendants will not take the position that Plaintiffs have lost their valid

---

[20]     However, Plaintiff Wanjing Li's case is illustrative on this point, as Defendants have admitted that absent the hold and "new" policy, Ms. Li would be a naturalized citizen.  *See* Opp. at 13 ("[Ms. Li's] application was approved on May 3, 2017").

[21]     DoD's only statement related to this is phrased in the past tense: "DoD has not revoked any previously-certified Form N-426 for the named plaintiffs in this lawsuit."  Miller Decl. ¶ 21.

immigration status since (and because) of enlistment/service;[22] (4) Plaintiffs will not be subject to removal/deportation proceedings; and (5) Plaintiffs will not be discharged for convenience, making them even more vulnerable to deportation/removal and opening the door to Defendant attempts to "moot" the Plaintiffs' honorable service certifications.   And, Defendants have not provided any indication that they will refrain from undertaking any of the aforementioned actions while this case is pending.   As a result, absent a preliminary injunction, Plaintiffs face grave risk that any final relief granted when they prevail at trial will be incomplete or ineffective.

## V.   Public Interest And The Balance of Harms Weigh in Favor of Plaintiffs

It is particularly spurious for Defendants to attempt to turn the tables by claiming that *Defendants* will be irreparably injured if they are not permitted to maintain their hold.   They offer no evidence of such injury – we address their "national security" claims in Section I.B. above – and in positing their claim they ignore the fact that (i) Plaintiffs do not seek naturalization itself through their Motion and (ii) in any event, DHS has naturalized thousands of MAVNIs without the enhanced background checks.   For the reasons set forth in the Motion, the public interest and balancing of harm factors weigh in favor of granting Plaintiffs' injunction request.

## CONCLUSION

For these reasons, Plaintiffs request that the Court grant their application for a preliminary injunction.

---

[22]    *See* Opp., Ex. 5 at 5 ("Neither you nor your spouse (if the spouse is an F2) can work or renew your driver's licenses, and you both risk being picked up by ICE and placed into proceedings because you failed to enroll in school").   Defendants refuse to accept any responsibility for their actions which placed soldiers in such precarious positions.   For example, although DoD cancelled basic training ship dates with very little notice, which caused problems for MAVNIs attempting to coordinate school schedules and their basic training orders, Defendants will not acknowledge their role concerning any questioned immigration status.   And, DHS "reviewing" a section of its guidance (Opp. at 41 n.17) provides no comfort to Plaintiffs.

Respectfully submitted,

_____/s/ Joseph L. LoBue_____
Joseph J. LoBue (D.C. Bar No. 484097)
Douglas W. Baruch (D.C. Bar No. 414354)
Jennifer M. Wollenberg (D.C. Bar No. 494895)
Neaha P. Raol (D.C. Bar No. 1005816)
Webster R. M. Beary (D.C. Bar No. 1041653)
Shaun A. Gates (D.C. Bar No. 1034196)
Katherine L. St. Romain (D.C. Bar No. 1035008)
Fried, Frank, Harris, Shriver & Jacobson LLP
801 17th Street, NW
Washington, D.C. 20006
Telephone:  (202) 639-7000
Facsimile:   (202) 639-7003
Email: joseph.lobue@friedfrank.com
Email: douglas.baruch@friedfrank.com
Email: jennifer.wollenberg@friedfrank.com

*Counsel for Plaintiffs*