## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **KUSUMA NIO**, *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 17-998 (ESH)** |
| **UNITED STATES DEPARTMENT OF HOMELAND SECURITY**, *et al.*, | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

Before the Court is plaintiffs' motion for preliminary injunctive relief.[1]  Plaintiffs are non-citizens serving in the United States Army's Selected Reserve of the Ready Reserve who enlisted under the United States Department of Defense's Military Accessions Vital to the National Interest ("MAVNI") program and who have applied for naturalization pursuant to 8 U.S.C. § 1440, which provides an expedited path to citizenship for soldiers who serve during specified periods of armed conflict.  They brought this action against (1) the United States Department of Homeland Security ("DHS") and its Acting Secretary, Elaine C. Duke, the United States Citizen and Immigration Service ("USCIS") and its Acting Director, James McCament (collectively "DHS Defendants"); and (2) the United States Department of Defense ("DOD") and its Secretary, James Mattis (collectively "DOD Defendants").[2]  Plaintiffs bring multiple claims

---

[1] The motion for preliminary injunction applies to eight of the ten named plaintiffs, as the remaining two were naturalized in June 2017.  For the remainder of this Memorandum Opinion, any reference to "plaintiffs" will refer only to these eight plaintiffs.

[2] When this action was filed, James Kelly was the Secretary of Homeland Security and was the named defendant.

under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, challenging (1) USCIS's

decision to put their naturalization applications on hold pending DOD's completion of the

enhanced security screening it now requires for MAVNI enlistees prior to basic training or

active-duty service ("DHS/USCIS Security Screening Requirement"); and (2) DOD's position

that (a) "active duty" service is required for the issuance of USCIS Form N-426 ("Request for

Certification of Military or Naval Service")—a form necessary for a MAVNI's naturalization

application under 8 U.S.C. § 1440—and (b) that it may revoke the N-426 forms it previously

issued certifying plaintiffs' qualifying service ("DOD N-426 Review").  Plaintiffs seek a

preliminary injunction (1) enjoining DHS Defendants from implementing the DHS Security

Screening Requirement and (2) preventing DOD Defendants from undertaking the DOD N-426

Review.  (Pls.' Mot. for a Prelim. Inj. (hereinafter "PI Mot."), June 28, 2017, ECF No. 17.)  For

the reasons stated herein, the motion is denied without prejudice.

## BACKGROUND

## I.      FACTUAL BACKGROUND

### A.      The MAVNI Program

Generally, enlistees in the United States Armed Forces must be either United States

citizens or have legal permanent residence.  *See* 10 U.S.C. § 504(b).  However, under the

MAVNI program, which began in 2009 and is authorized through the end of September 2017,

non-citizens who are not permanent residents, but who are lawfully present in the United States,

may enlist if they have critical foreign language skills or specialized medical training.[3]  *See id.*

§ 504(b)(2); (Miller Decl. ¶ 4, July 7, 2017 ("1st Miller Decl."); Defs.' Mem. of Law in Opp'n to

---

[3] The MAVNI program "was designed to attract two types of recruits: (1) healthcare professionals ('HCPs') and (2) persons who possess critical foreign language skills ('CFLs'), both of whom are necessary to sustain effective military operations."  (1st Miller Decl. ¶ 4.)

Pls.' Mot. for Prelim. Inj. ("Defs.' Opp.") Ex. 5 (United States Army Reserve MAVNI Information Paper), ECF No. 19.)

Over the years of the MAVNI program's existence, DOD has increased the security screening requirements for MAVNI enlistees. (1st Miller Decl. ¶¶ 12–17.) As of September 30, 2016, DOD required that MAVNI enlistees complete an enhanced security screening *before* they can receive a favorable "military-service determination" (also called a "suitability-for-service determination"), qualify for active-duty status or ship to basic training. (PI Mot. Ex. 10; 1st Miller Decl. ¶¶ 10, 14; Miller Decl. at 6–7, July 28, 2017 ("2d Miller Decl.").) According to DOD, its decision to require enhanced security screening for MAVNI enlistees arose out of security concerns regarding the MAVNI program. (1st Miller Decl. ¶¶ 14–18; 2d Miller Decl. at 8–10; Tr. of Prelim. Inj. Hr'g (Day 1) at 21–22, July 19, 2017, ECF No. 34 ("7/19/2017 Tr.").) DOD's enhanced security screening for MAVNI enlistees includes: (1) a Tier 3 or Tier 5 background investigation—formerly known as a Single Scope Background Investigation ("SSBI")[4]; (2) a National Intelligence Agency Check ("NIAC")[5]; (3) a counter-intelligence focused security review ("CI Review"); and (4) an "issue-oriented interview and/or issue-oriented polygraph, if needed to resolve any foreign influences or foreign preference concerns." (1st Miller Decl. ¶ 14; 2d Miller Decl. at 5.) Once the above requirements are completed, DOD conducts a final review and makes a military suitability determination. (Tr. of Prelim. Inj. Hr'g (Day 2) at 7–9, Aug. 23, 2017, ECF No. 37 ("8/23/2017 Tr."))

---

[4] SSBIs involve detailed background checks. (2d Miller Decl. at 2–4.) Outside of MAVNI, Tier 5 investigations normally occur to certify individuals as eligible for top-secret security clearance, and Tier 3 investigations occur to certify individuals as eligible for access to confidential or secret information. (2d Miller Decl. at 2–4.) For MAVNIs, the Tier 5 investigation "has taken on average 422 days during a period from 2014–2017 (out of a total of 2,812 completed investigations." (2d Miller Decl. at 5.)

[5] The NIAC is a computer database check of the records of certain intelligence agencies.

If the investigation reveals unmitigable derogatory information—such as "undue foreign influence"—the military suitability determination will be unfavorable and DOD can discharge the MAVNI enlistee under "other than honorable conditions," such as an "uncharacterized" discharge. (8/23/2017 Tr. at 37–38; *see* PI Mot. Ex. 8; 1st Miller Decl. ¶ 14 (negative outcome "could result in an applicant's administrative discharge from the Armed Forces under any administrative characterization of service, including 'other than honorable' conditions"); 2d Miller Decl. at 9; Defs.' Resp. to the Court's Aug. 24, 2017 Order Exs. A & B, Aug. 30, 2017, ECF No. 39 ("Defs.' 8/30/2017 Resp.").)[6] An uncharacterized discharge also means that the individual would no longer be eligible to become a naturalized citizen under the MAVNI program. (8/23/17 Tr. at 24–25.)

Although on its face, DOD's enhanced security screening requirements for MAVNI enlistees does not necessarily impact the adjudication of MAVNI naturalization applications, as explained *infra*, USCIS will not conduct an examination of a MAVNI naturalization applicant until the applicant successfully completes DOD's enhanced security screening.

**B.     Naturalization for MAVNI Enlistees**

Generally, non-citizens who serve in the United States military during designated periods of hostilities are afforded an expedited path to citizenship. *See* 8 U.S.C. § 1440.[7] Since September 11, 2001, such a period of hostilities has existed. *See* Exec. Order No. 13269, 67 Fed. Reg. 45, 287 (July 3, 2002). Thus, the MAVNI program not only gives non-citizens who are not lawful permanent residents the opportunity to enlist in the United States military, it also provides

---

[6] Certain derogatory findings are "waivable," while others are "unmitigable." (Defs.' 8/30/2017 Resp. Exs. A & B.)

[7] During peacetime, 8 U.S.C. § 1439 provides the requirements for naturalization based on military service. (1st Miller Decl. ¶ 5.)

an expedited path to citizenship.  (1st Miller Decl. ¶¶ 4–9; Renaud Decl. ¶ 11, July 7, 2017 ("1st

Renaud Decl.").)[8]

An applicant for naturalization pursuant to 8 U.S.C. § 1440 must submit to USCIS the

standard Form N-400 naturalization application along with a USCIS Form N-426.[9]  (1st Miller

Decl. ¶¶ 4–8.)  DOD must execute the N-426, which certifies the applicant's qualifying military

service.  (1st Miller Decl. ¶¶ 6–8; 1st Renaud Decl. ¶ 10; PI Mot. Ex. 29.)  The N-426 indicates

the applicant's dates of service and whether the applicant served "on active duty" or in the

"Selected Reserve of the Ready Reserve."  (1st Miller Decl. ¶ 6; PI Mot. Ex. 29.)  The applicant

bears the burden of showing that he "[h]as been, for at least one year prior to filing the

application for naturalization, and continues to be, of good moral character, attached to the

principles of the Constitution of the United States, and favorably disposed toward the good order

and happiness of the United States."  8 C.F.R. § 329.2.

Until recently, USCIS processed MAVNI naturalization applications in the same fashion

as all other § 1440 applications, by following the generally-applicable requirements for

naturalization, such as the FBI criminal background check, *see* 8 U.S.C. § 1446(d); 8 C.F.R.

§ 335.3; (1st Renaud Decl. ¶¶ 3, 4, 15), as well as checking the Defense Clearance Investigative

Index ("DCII") database to see if the "applicant has any derogatory information in his or her

military records."  (1st Renaud Decl. ¶ 5; PI Mot. Ex. 7 "USCIS Policy Manual".)  Once these

---

[8] Under section 1440, the path to citizenship is eased in at least three ways.  First, service members may be naturalized "regardless of age, and notwithstanding the provisions of section 1429 of this title as they relate to deportability and the provisions of section 1442 of this title."  8 U.S.C. § 1440(b)(1). Second, "no period of residence or specified period of physical presence within the United States or any State or district of the Service in the United States shall be required."  *Id.* § 1440(b)(2).  Third, "no fee shall be charged or collected from the applicant for filing a petition for naturalization or for the issuance of a certificate of naturalization" granted under this section.  *Id.* § 1440(b)(4).

[9] USCIS Form N-426 is required for all applications submitted pursuant to 8 U.S.C. § 1440, not just MAVNIs.

checks were completed, the applicant could be scheduled for an examination by a USCIS officer. 8 C.F.R. § 335.2; (1st Renaud Decl. ¶ 3.) By statute, USCIS must adjudicate all naturalization applications within 120 days of completing the examination. 8 U.S.C. § 1447(b); 8 C.F.R. § 335.3.

To date, USCIS has naturalized at least 10,000 MAVNI enlistees through the aforementioned process. (7/19/2017 Tr. at 57.) And, pursuant to an initiative to expedite processing of applications from enlistees who are at basic training, the "Naturalization at Basic Training Initiative," USCIS adjudicated most of these applications in approximately 10 weeks' time—MAVNI enlistees would submit their naturalization applications upon arrival at basic training (a process typically lasting 10 weeks)[10] and USCIS would adjudicate the applications and naturalize MAVNI enlistees by the last week of basic training.[11] (1st Miller Decl. ¶ 9; 1st Renaud Decl. ¶ 13.) Overall, as of May 2017, the average processing time for all military N-400s, including MAVNI enlistees, was slightly more than 4 months.[12] (Renaud Decl. ¶ 3, July 28, 2017 ("3d Renaud Decl.").)

Beginning in early 2017, though, USCIS began to delay the processing of MAVNI N-400 applications pending the results of DOD's enhanced security screening. (*See, e.g.*, 1st Renaud Decl. ¶¶ 21–25; Renaud Decl. & Document Production, July 17, 2017 ("2d Renaud Decl.") & attachment thereto (copies of USCIS documents referenced in 1st Renaud Decl. ¶¶ 23–26); 1st

---

[10] MAVNI enlistees who join the program as medical personnel do not have to attend basic training and can have their N-426s certified when they go to officer indoctrination training. (8/23/2017 Tr. at 15; 7/19/2017 Tr. at 32–33.)

[11] Other military naturalization applications also underwent expedited processing—for example, a military member serving abroad on active duty would receive an adjudication within 180 days of when USCIS received all associated background checks. (1st Renaud Decl. ¶ 12.)

[12] As a point of comparison, as of May 2017, USCIS was processing non-military applications for naturalization in 8.5 to 9 months' time. (3d Renaud Decl. ¶ 3.)

Miller Decl. ¶ 18.)  According to DOD, "on or around April 2017," it "informed USCIS that it was concerned about the naturalization of individuals whose Office of Personnel Management (OPM) background investigation and DOD counterintelligence security review has not yet been completed," and thus, "DOD and USCIS jointly determined that it was in the best interest of the United States to ensure [that] the naturalization decision of USCIS was informed by the outcome of the completed OPM background investigation and the DOD counterintelligence security review."  (1st Miller Decl. ¶ 18; *see also* 2d Miller Decl. at 8–10.)  On July 7, 2017, Daniel Renaud—Associate Director, Field Operations Directorate, of the USCIS Headquarters in Washington D.C.— provided "final agency guidance" to the USCIS Field Offices in an email with the subject line "Updated MAVNI N-400 Guidance."  (2d Renaud Decl. ¶¶ 3–4.)  The email summarizes USCIS's authorization as follows:

> USCIS has determined that the completion of DOD background checks is relevant to a MAVNI recruit's eligibility for naturalization.  As such, all pending and future MAVNI cases may not proceed to interview, approval, or oath until confirmation that all enhanced DOD security checks are completed.

(2d Renaud Decl. attachment at 25.)  Under the heading "Guidance," it states:

> USCIS must ensure that each MAVNI naturalization applicant demonstrates good moral character and attachment to the U.S. Constitution as required by the INA and 8 CFR. In order to do so, each applicant must receive proper DOD vetting and clearance in alignment with the September 30, 2016 MAVNI extension authorization and restrictions. Consequently, USCIS will not proceed to interview, approve, or oath any currently pending or future MAVNI naturalization applicants applying for naturalization under INA § 329, regardless of their active duty or reserve service, until all enhanced DOD security checks are completed.

(*Id.*)

In plaintiffs' view, the USCIS's July 7, 2017 guidance amounts to an unlawful "hold" on the processing of MAVNI naturalization applications.  Defendants initially accepted the description of USCIS's action as a "hold" (*see* 7/19/2017 Tr. at 101)—indeed the term "hold"

appears in several earlier USCIS emails (*see, e.g.*, 2d Renaud Decl. ¶¶ 3–4)—but subsequently

has tried to disavow that label. (*See* Defs.' Supp. Mem. of Law in Opp'n to Pls.' Mot. for

Prelim. Inj. at 2, Aug. 14, 2017, ECF No. 31 ("Defs.' Supp. Opp.") ("July 7, 2017 guidance was

intended to end all holds, while broadening existing background check resources under 8 C.F.R.

§ 335.1, to include DOD enhanced security checks for MAVNI applicants."); *see id*. Ex. B (July

27, 2017 email from Claudia F. Young, Division Chief, Citizenship and Operations Support,

Field Operations Directorate, stating: "Please be advised that the below guidance from Associate

Director Dan Renaud [the July 7th, 2017 guidance] supersedes all previous emails and guidance

on MAVNI holds. This guidance clarified that there is no longer any hold on N-400s filed by

MAVNI recruits.").) Yet, at the same time that USCIS asserts that there is no "hold," it uses

mandatory language about awaiting DOD enhanced security screening:

> However, these applications *cannot be processed* until all DOD enhanced security
> checks are complete. Field Operations is now engaged in discussions with DOD
> on the process DOD/USCIS will have to inform USCIS of MAVNI enlistees who
> have successfully completed the required enhanced background checks. We will
> keep you updated on the process and let you know of any cases that successfully
> complete the required enhanced background checks.

(Defs.' Supp. Opp. Ex. B (emphasis added).) Thus, even if the USCIS's July 7, 2017 action is

not labeled a "hold," it appears to have the same effect—MAVNI naturalization applicants

cannot be examined by USCIS until DOD completes its enhanced security screenings.

It further appears that MAVNI applicants must "successfully" complete DOD's enhanced

security screening in order for USCIS to continue processing their naturalization applications.

(8/23/2017 Tr. at 25 (MAVNI enlistee cannot naturalize if DOD discharges an enlistee under

other than honorable conditions, "notwithstanding the presence or absence of an N-426 and

whether it's revoked or not," because "[y]ou have to have an honorable discharge if you are

discharged.").)[13]

## C. Plaintiffs

### 1. Enlistment

Between February and June 2016, each of the named plaintiffs enlisted in the United States Army's Selected Reserve of the Ready Reserve through the MAVNI program. Their enlistment contracts obligate them to serve eight years of service in the Army Reserve, six years of which must be served in the Selected Reserve. (Defs.' Resp. to the Court's July 14, 2017 Order ("Defs.' 7/17/2017 Resp.") Ex. B (Pls.' Enlistment Contracts), July 17, 2017, ECF No. 23.) Each plaintiff was assigned to a U.S. Army Selected Reserve unit and has participated in multiple drills with their units.[14] (De Almeida Decl. ¶¶ 6, 8; Batchu Decl. ¶¶ 5, 7; Calixto Decl. ¶¶ 6, 8; Cheng Decl. ¶¶ 6, 8; Udeigwe Decl. ¶¶ 5, 8; Hong Decl. ¶¶ 6, 7; Li Decl. ¶¶ 4, 6; Liu Decl. ¶¶ 4, 6.) Although each plaintiff expected to go to basic training within approximately six months of enlistment, none has done so due to DOD's enhanced security screening of MAVNI enlistees. As of September 1, 2017, 575 days have elapsed since the date of enlistment of the earliest plaintiff, and 451 days since the date of enlistment of the latest plaintiff. (De Almeida Decl. ¶ 7; Batchu Decl. ¶ 6; Calixto Decl. ¶ 7; Cheng Decl. ¶ 7; Udeigwe Decl. ¶ 6; Hong Decl.

---

[13] In two instances, MAVNI enlistees—not named plaintiffs—received uncharacterized discharges despite having valid N-426s and were discharged from the Army because the "[m]aximum DEP time [two years] has been exceeded." (Pls.' Supp. Mem. In Support of Pls.' Mot. For Prelim Inj., Ex. 2, Aug. 18, 2017, ECF No. 33; *see also* 8/23/2017 Tr. at 22–25; 8/23/17 Hr'g Pls.' Ex. 1; Defs.' 8/30/2017 Resp. ¶ 3.) These two individuals, if they had no valid immigration status, could be subject to removal proceedings. As of July 2017, the maximum DEP time has been extended to three years, but this policy was not applied retroactively. (Defs.' 8/30/2017 Resp. ¶ 3.)

[14] Plaintiffs are part of the Army Reserve Delayed Training Program ("DTP"). (2d Miller Decl. at 6.) DTP "allows these members of the Selected Reserve to attend drill periods for pay and benefits, known as Inactive Duty for Training (IDT) during the period prior to assignment to initial military training (also known as basic training)." (2d Miller Decl. at 6.)

¶ 6; Li Decl. ¶ 5; Liu Decl. ¶ 6; *see also* 7/19/2017 Tr. at 39–40.)  DOD has declined to give an

estimate as to how long the enhanced security screening will take, but as of September 5, 2017, it

had not been completed for any of the eight named plaintiffs.  (*See* Defs.' Weekly Report in

Resp. to Court's Aug. 24, 2017 Order, Sept. 1, 2017, ECF No. 41 ("9/1/2017 Weekly Report");

Defs.' Am. Weekly Report in Resp. to Court's Aug. 24, 2017 Order, Sept. 5, 2017, ECF No. 42

("9/5/2017 Weekly Report").)[15]

### 2.    Naturalization Applications

Between August 19, 2016, and March 23, 2017, while drilling with the DTP and awaiting

a basic-training date, each named plaintiff applied for naturalization by filing their Form N-400,

along with a properly executed N-426.  Plaintiffs' naturalization applications have now been

pending for as little as five months or for as much as slightly over a year.  Thus, even if

plaintiffs' USCIS examinations occurred today (which they will not because DOD has yet to

complete enhanced security screening for any named plaintiff and USCIS is waiting on those

screenings) USCIS could take up to an additional four months to reach a final decision on

naturalization.  *See* 8 U.S.C. § 1447(b); 8 C.F.R. § 335.3.  In the meantime, at least four of the

eight named plaintiffs no longer have a lawful immigration status.  (8/23/2017 Tr. at 31–32, 69

(listing three plaintiffs that defendants were aware of and a fourth whom plaintiffs' counsel

informed the Court would lose his student visa on September 1, 2017); PI Mot. Ex. 24, at 3;

9/1/2017 Weekly Report; *see also* 9/5/2017 Weekly Report.)  These four plaintiffs could be

subjected to removal proceedings by Immigration and Customs Enforcement ("ICE"), and

DHS/USCIS cannot provide them with protection from possible deportation.  (Asher Decl. ¶ 7,

---

[15] According to defendant's September 1, 2017 Weekly Report, the NIACs are complete for all
plaintiffs, four of the SSBIs are complete, and "CI Interview Dates" have been scheduled for
dates ranging from September 12, 2017, to January 28, 2018.  (*See* 9/1/2017 Weekly Report.)

Aug. 10, 2017; *see also* 7/19/2017 Tr. at 13–14; 8/23/2017 Tr. at 22–25, 27–28; 8/23/2017 Hr'g

Pls.' Ex. 1.)

### 3. DOD's N-426 Review

Further complicating matters for plaintiffs is the fact that DOD has undertaken a

"review" of its policy for issuing N-426s and is contemplating revoking previously issued N-

426s for MAVNI enlistees who have not served on "active-duty." However, the status of DOD's

N-426 Review is not entirely clear from the current record.

On July 7, 2017, defendants filed the declaration of Stephanie P. Miller—the Director,

Accession Policy Directorate, in the Office of the Under Secretary of Defense for Personnel and

Readiness, DOD—which stated that "Presently, DOD is not certifying any new MAVNI N-426s.

For a variety of reasons, some [of] which remain classified, DOD is undertaking a review of the

entire MAVNI pilot program, its procedures, and the standards for certifying approximately 400

existing N-426s." (1st Miller Decl. ¶¶ 19–20.) Defendants also filed a declaration from Mr.

Renaud which indicated that "USCIS understood that DOD might act to revoke some of the

Forms N-426s that had been submitted and decided to temporarily hold affected naturalization

applications until it determined whether these individuals were eligible to naturalize." (1st

Renaud Decl. ¶ 24.)

At the July 19, 2017 hearing, defense counsel stated that DOD "has not decertified any of

the presently certified N-426 forms . . . . [But] is not presently certifying any new N-426s."

(7/19/2017 Tr. at 20.) When asked if DOD was thinking of revoking N-426s "because

somebody signed that wasn't a person with authority or because they were signed prematurely or

that drilling [as opposed to active-duty service] does not count as honorable service," counsel

replied:

> Right. And so in the [declaration] of Stephanie Miller she indicates that they're [referring to DOD] undertaking a review of the N-426 process. I don't know the contours of that process. I assume that everything that Your Honor just said will be part of that process for the rereview to either recertify or revoke.

(7/19/2017 Tr. at 24.) He further referred to plaintiffs' N-426s as "potentially revocable" (7/19/2017 Tr. at 46), but he indicated that revocation of any of the eight named plaintiffs' N-426s was not "imminent." (7/19/2017 Tr. at 56.) Similarly, an attorney from DOD's Office of General Counsel who was present at the hearing represented that whether to revoke plaintiffs' N-426s was "something that's being decided, Your Honor, right now." (7/19/2017 Tr. at 48.) At the end of the hearing this Court asked defendants to file answers to a number of questions, including questions about the status of DOD's N-426 review.

In response, defendants filed a second declaration from Ms. Miller, which states that "members of the Selected Reserve . . . must have served in an 'active duty status' for DOD to certify honorable service," and that DOD had "recently determined" that N-426s issued to an enlistee "without creditable active duty service could be considered signed in error and may be decertified upon the completion of a review of the existing standards for certifying approximately 400 existing N-426s." (2d Miller Decl. at 6–7.)

However, on August 23, 2017, at the continuation of the preliminary injunction hearing, defense counsel appeared to refute Ms. Miller's declaration:

> With respect to Ms. Miller's second declaration which is ECF 25-2, her answer four is not a final answer in the sense that it says the DOD has determined that you have to have active duty status—and we discussed this a bit at the last hearing. That is not the final position of the United States. There's some inter-agency discussions going on right now and will in the coming weeks. That is not a final position of the United States, and it is not clear at this point that that is going to be the final legal answer that the United States rests on.

(8/23/2017 Tr. at 10; *see also* 8/23/2017 Tr. at 16.) Counsel further stated that DOD was developing N-426 criteria on whether someone without active-duty status could receive an N-

426, and he also explained that although DOD had told officers to stop issuing N-426s pending development of this criteria, some N-426s had been issued by accident since that instruction issued. (8/23/2017 Tr. at 11–12, 14.) With regard to revocation, the most counsel could say is that "I'm not certain that any will ever be revoked." (8/23/2017 Tr. at 14.) When asked about the current status of DOD's N-426 Review, counsel's "best answer" was that "the procedures for N-426s, issuing new ones and reissuing or revoking old ones, has not been decided yet."[16] (8/23/2017 Tr. at 14.)

This representation, however, is arguably contradicted by an August 17, 2017 DOD Memorandum, which plaintiffs brought to the Court's attention, in which Charles D. Luckey— the Chief of Army Reserve/Commanding—states that "[e]ffective immediately, I withhold authority to certify the honorable service (N-426) of Soldiers who have not yet attended Initial Entry Training (IET)." (8/23/2017 Hr'g Pls.' Ex. 2; *see also* Thomas Decl. ¶ 5, Aug. 29, 2017.) In a subsequent filing, defendants embrace this memorandum and claim that it is "consistent" with Ms. Miller's July 7, 2017 declaration in that it indicates that DOD is not "presently" certifying any new MAVNI N-426s. (Defs.' 8/30/2017 Resp. at 2 & Ex. D.)

Although the record contains conflicting representations as to the current status of DOD's N-426 Review, there is no question that: (1) DOD's current view, despite what appears to be a clear conflict with the statutory language in 8 U.S.C. § 1440 and defense counsel's representation that DOD's view does not represent the "final position of the United States," is that active-duty status is the only way to qualify for a valid N-426; (2) DOD has stopped issuing N-426s to MAVNI enlistees who have not served in active-duty status; and (3) DOD is

---

[16] It became apparent at the hearing that USCIS and DOD have differing views as to whether active-duty service is required for issuance of an N-426. (8/23/2017 Tr. at 15–17.)

reviewing whether to revoke N-426s that had previously been issued to MAVNI recruits, including the named plaintiffs, if they had not been to active-duty status.  (1st Renaud Decl. ¶ 24; 1st Miller Decl. ¶¶ 19–20.)  Moreover, if DOD revokes plaintiffs' N-426s, they cannot be naturalized since USCIS will not process their applications if they are not filed with an N-426.  (7/19/2017 Tr. at 36–37, 58; 8/23/2017 Tr. at 25.)

## II.    PROCEDURAL HISTORY

When plaintiffs' naturalization applications were not adjudicated within their expected time frame, they made inquiries to USCIS and found that DHS/USCIS was "holding" their applications at the request of DOD pending DOD enhanced security screening.  Plaintiffs filed their initial complaint on May 24, 2017, alleging that DOD's "interference" in the naturalization process and USCIS's acquiescence to DOD's request to hold MAVNI applications pending completion of DOD's background checks were unlawful.  On June 28, 2017, following a Washington Post story revealing the existence of an internal DOD Action Memo, dated May 19, 2017, which indicated that DOD proposed never completing the enhanced security screening for MAVNIs currently in the DTP (*see* PI Mot. Ex. 8), plaintiffs filed a motion for a preliminary injunction.

Defendants filed their opposition on July 7, 2017—the same day that USCIS issued its field guidance formally instituting a "hold" on MAVNI applications.  Mr. Renaud's declaration, which was attached to defendants' opposition, referenced a number of internal documents, including the July 7th USCIS field guidance.  This Court ordered defendants to provide the referenced documents relating to USCIS's decision to hold adjudication of MAVNI applications pending enhanced security screening.  (Order, July 14, 2017, ECF No. 22.)  On July 17, 2017, the July 7th USCIS field guidance was first provided as a result of defendants' filing of a second

declaration from Mr. Renaud with attachments. (2d Renaud Decl. ¶ 3.)[17] Then at a July 19, 2017 hearing, DOD revealed for the first time that it was in the process of reviewing its standards for issuing N-426s and whether "active duty" was required for a valid certification. (*See, e.g.*, 7/19/2017 Tr. at 48.)

Following the hearing, and given the questions that arose at the hearing and the need for additional briefing, the Court ordered (1) defendants to file supplemental declarations responding to specific questions posed by the Court; (2) plaintiffs to file an amended complaint and a revised request for preliminary relief; (3) defendants to supplement their opposition to the motion for preliminary injunction; and (4) plaintiffs to file a reply to defendants' supplemental opposition. (*See* Order, July 19, 2017, ECF No. 24.) At a hearing on August 23, 2017, the Court learned of additional developments, leading it to require further submissions from defendants and to conduct an *ex parte* review of two classified documents that defendants had cited to support their national security justification for the DHS Security Screening Requirement—"the 2017 Inspector General Report" and the "2017 Defense Intelligence Agency Report." (Order, August 24, 2017, ECF No. 36.) Defendants filed their responses to the Court's questions and provided the documents for review on August 30, 2017.

The Court is now in a position to rule on the motion for preliminary injunction.

---

[17] Mr. Renaud represented that the July 7th USCIS field guidance and other

attached documents represent a compilation of all final agency guidance provided to USCIS Field Offices and/or to the National Benefits Center by FOD headquarters from February 28, 2017, through the present, setting national policies regarding the processing of N-400 applications filed by MAVNI recruits. I have reviewed the attached documents and attest that they are true and accurate copies of final agency guidance.

(2d Renaud Decl. ¶ 4.)

**DISCUSSION**

## I. LEGAL STANDARD

A preliminary injunction grants "intermediate relief of the same character as that which may be granted finally." *De Beers Consol. Mines v. United States,* 325 U.S. 212, 220 (1945). It is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. The final two factors merge where, as here, the government is the opposing party. *See Pursuing America's Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009).

## II. PRELIMINARY INJUNCTION AGAINST DOD DEFENDANTS

Given that 8 U.S.C. § 1440 applies to "[a]ny person who . . . has served honorably as a member of the Selected Reserve of the Ready Reserve *or* in an active-duty status in the military," *id.* § 1440(a) (emphasis added), the Court is puzzled by DOD's position that "active duty" service is required for naturalization under the MAVNI program. Still, it cannot grant plaintiffs' motion for a preliminary injunction against DOD's N-426 Review because plaintiffs have failed to establish that they will suffer any irreparable harm absent an injunction. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Currently, plaintiffs each have a valid N-426, and DOD has not represented that it intends to imminently revoke any of plaintiffs' N-426s. (*See* 2d Miller Decl. at 7.)

In short, the fact that DOD has stopped issuing any new N-426s while its N-426 Review

is ongoing has no impact on plaintiffs.  Given this conclusion, this Court need not address the remaining preliminary-injunction factors and denies preliminary injunctive relief against DOD on the ground that, at least at this stage, plaintiffs have failed to establish any imminent injury from DOD's current N-426 Review.  *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297; *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 162 (2010).

## III.    PRELIMINARY INJUNCTION AGAINST DHS DEFENDANTS

The Court denies plaintiffs' motion for a preliminary injunction against DHS Defendants. Plaintiffs have met their burden on irreparable harm, but have yet to make a strong enough showing of a likelihood of success on the merits to succeed at this stage.  In addition, a balancing of plaintiffs' irreparable harm against the public interest does not tip decidedly in plaintiffs' favor.  *See Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011); *see also Morales v. Sec'y, U.S. Dep't of State*, 220 F. Supp. 3d 1, 4 (D.D.C. 2016).

### A.    Irreparable Harm

The record demonstrates that the DHS Security Screening Requirement is causing irreparable harm to plaintiffs.  "[T]o meet the standard for irreparable harm the movant must present sufficient evidence that the purported injury is certain, great, actual, imminent, and beyond remediation."  *Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112–13 (D.D.C. 2015); *see also Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.  All eight plaintiffs are suffering irreparable harm because they are not obtaining citizenship rights and benefits, and, as a result of the legal limbo DHS Defendants have left them in pending resolution of their naturalization applications, their ability to travel and pursue professional and personal opportunities has been curtailed.  *See, e.g.*, *Roshandel v. Chertoff*, 554 F. Supp. 2d 1194, 1200–01 (W.D. Wash. 2008), *amended in part*, No. C07-1739MJP, 2008 WL 2275558 (W.D. Wash.

June 3, 2008).  While it is true that there is no right to naturalization, USCIS cannot indefinitely

delay adjudication of MAVNIs' naturalization applications, and they cannot impose

requirements that contravene statutory or regulatory requirements.  *See* 5 U.S.C. § 706; *see also*

*Roshandel*, 554 F. Supp. 2d at 1200–01 (noting as much in a similar challenge to USCIS's

processing of naturalization applications).

Representations made to plaintiffs in their enlistment contracts and by actors responsible

for implementing the MAVNI program led plaintiffs to reasonably believe that USCIS would

process their applications for naturalization quickly and without the extensive delay and hardship

that has been caused by USCIS's reliance on DOD's enhanced security screening.  (*See, e.g.*,

Calixto Decl. ¶ 7.)  As a result, plaintiffs are forced to live in uncertainty about the legality of

their immigration status, and they are prevented from ordering their day-to-day affairs or from

making future plans, including travel abroad to see family members.  *See, e.g.*, *Vartelas v.*

*Holder*, 566 U.S. 257, 268 (2012) (noting that "[l]oss of the ability to travel abroad is itself a

harsh penalty, made all the more devastating if it means enduring separation from close family

members living abroad") (footnote omitted).

Significantly, four plaintiffs have lost their lawful immigration status during the delay

and have no legal protection from removal and deportation proceedings.  (8/23/2017 Tr. at 31–

32, 69; 2d Miller Decl. at 9; PI Mot. Ex. 24 at 3.)  DHS refuses to give the Court any assurance

that these plaintiffs will not be removed.  (*See* Asher Decl. ¶ 7; *see also* 7/19/2017 Tr. at 13–14;

8/23/2017 Tr. at 22–25, 27–28; 8/23/2017 Hr'g Pls.' Ex. 1.)  These plaintiffs enlisted in the

MAVNI program over a year ago with the clear understanding, based on the explicit

representations of the government, that they would become naturalized citizens, not illegal

immigrants.[18]  Thus, plaintiffs have established irreparable harm.  *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (citation omitted); *Save Jobs USA*, 105 F. Supp. 3d at 112–13.

### B.    Likelihood of Success on the Merits

While plaintiffs have presented a host of legal arguments, the Court cannot conclude at this stage that they have cleared the high hurdle of demonstrating a likelihood of success on the merits on any specific claim.[19]  Even viewing the July 7th USCIS field guidance as final agency action within the meaning of the APA,[20] plaintiffs still face additional legal obstacles.

### 1.    Claims under APA § 706(2)

#### a.    Contrary to Law

Plaintiffs claim that the addition of an enhanced security screening is contrary to law, which this Court construes as a challenge under 5 U.S.C. § 706(2)(A)[21] or 5 U.S.C. § 706(2)(C).[22]  However, it is difficult to conclude that the DHS Security Screening Requirement

---

[18] In fact, plaintiffs' enlistment contracts required them to apply for citizenship as soon as DOD certified their N-426s.  (7/19/2017 Tr. at 36.)

[19] Because defendants raised jurisdictional arguments in their first opposition to plaintiffs' motion for a preliminary injunction, this Court notes that it has general federal question jurisdiction, 28 U.S.C. § 1331, to consider plaintiffs' claims under the APA.  *See Sackett v. EPA*, 566 U.S. 120, 131 (2012) (noting that the Court had federal question jurisdiction to consider 5 U.S.C. § 706(2) claims); *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1099–1100 (D.C. Cir. 2003) (noting that the court had federal question to consider 5 U.S.C. § 706(1) claims); *Hamandi v. Chertoff*, 550 F. Supp. 2d 46, 50 (D.D.C. 2008) (same).

[20] Because this Court does not find that plaintiffs have established a likelihood of success on the merits, it need not reach defendants' argument that the July 7th USCIS field guidance does not represent final agency action.

[21] "The reviewing court shall—hold unlawful and set aside agency action, findings, and conclusions found to be—arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

[22] "The reviewing court shall—hold unlawful and set aside agency action, findings, and conclusions found to be—in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

violates the relevant statutes and regulations given the broad mandate Congress bestowed on DHS/USCIS to oversee and evaluate naturalization applications. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66–67 (2004); *see also Nolan v. Holmes*, 334 F.3d 189, 198–99 (2d Cir. 2003).

8 U.S.C. § 1446, and its implementing regulations, authorizes DHS/USCIS to "conduct examinations" of applicants for naturalization. *Id.* § 1446(b). To facilitate effective examination of applicants for naturalization, Congress instructed DHS, USCIS, and other relevant agencies to investigate an applicant and determine if he or she is "a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States." *Id.* § 1427(a). Implementing regulations further explain that DHS/USCIS should evaluate each applicant to make sure he "[h]as been, for at least one year prior to filing the application for naturalization, and continues to be, of good moral character, attached to the principles of the Constitution of the United States, and favorably disposed toward the good order and happiness of the United States." 8 C.F.R. § 329.2(d).

Having reviewed under seal the two 2017 classified documents completed by the Inspector General and the Defense Intelligence Agency, the Court cannot ignore (1) that enlistment of foreign nationals in the military implicates national security concerns outlined in the classified documents, and (2) that these national security concerns can bear on an applicant's good moral character, attachment to the Constitution, and disposition towards the United States. 8 U.S.C. § 1427(a); 8 C.F.R. § 329.2(d). Because additional screening for national security risks does not plainly conflict with these relevant factors for examination, and because no statute or regulation prohibits enhanced security screening, this Court cannot conclude that plaintiffs are likely to succeed on their contrary-to-law claim. *See Entergy Corp. v. Riverkeeper, Inc.*, 556

U.S. 208, 218 (2009) (noting that agency action is permissible if it represents a "reasonable interpretation of the statute—not necessarily the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts"); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 513, 517–18 (1994) (upholding application of a broad regulation because it did not conflict with the regulation's plain language).

### b. Arbitrary and Capricious

Plaintiffs also argue (1) that DHS Defendants acted in an arbitrary and capricious manner when they abruptly added the DHS Security Screening Requirement, and (2) that this Court should treat any national security justifications for the policy as a post hoc rationalization. 5 U.S.C. § 706(2)(A); *see Am. Wild Horse Pres. Campaign v. Perdue*, No. 15-5332, 2017 WL 3318750, at *6–10 (D.C. Cir. Aug. 4, 2017); *Menkes v. U.S. Dep't of Homeland Sec.*, 637 F.3d 319, 337 (D.C. Cir. 2011); *see also Humane Soc'y of U.S. v. U.S. Postal Serv.*, 609 F. Supp. 2d 85, 95–96 (D.D.C. 2009).

Defendants argue that the DHS Security Screening Requirement only implements existing statutory and regulatory provisions that permit investigation of an applicant's good moral character.  *See* 8 U.S.C. § 1446(a); 8 C.F.R. §§ 316.2, 329.2, 335.1, 335.2.  To shore up this argument, defendants note that USCIS already relies on other agencies to obtain background information on applicants.  *See* 8 C.F.R. § 335.2 (FBI criminal background checks).  On the other hand, plaintiffs argue that the DHS Security Screening Requirement is not permitted by existing statutes or regulations because it substantially changes the application process and adds a background check that is much more onerous than anything USCIS has required before. *See Electronic Privacy Information Center v. U.S. Department of Homeland Security*, 653 F.3d 1, 6 (D.C. Cir. 2011).

There can be no doubt that the DHS Security Screening Requirement is a dramatic change in DHS/USCIS policy. *See id.* at 6–8. Regulations give DHS/USCIS authority to investigate an applicant, 8 C.F.R. §§ 335.1, 335.2, but imposing a far more rigorous security process, which has been outsourced to DOD, represents a stark departure from the longstanding policies of DHS/USCIS.

For seventeen years, USCIS relied on an FBI background check and a DCII inquiry to vet MAVNI applicants. DHS/USCIS has never use a tool like the DHS Security Screening Requirement, and "[a] central principle of administrative law is that, when an agency decides to depart from decades-long past practices and official policies, the agency must at a minimum acknowledge the change and offer a reasoned explanation for it." *Am. Wild Horse Pres. Campaign*, 2017 WL 3318750, at *5; *see also Lone Mountain Processing, Inc. v. Sec'y of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013).

However, based on the justifications offered by defendants in the classified documents reviewed by this Court, it cannot conclude that defendants' explanation for its change in policy is a post hoc rationalization. *See Menkes*, 637 F.3d at 337. Nor can it characterize defendants' change in policy as arbitrary and capricious when the policies respond to present national security concerns. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1861 (2017) ("National-security policy is the prerogative of the Congress and President."); *Schneider v. Kissinger*, 412 F.3d 190, 195 (D.C. Cir. 2005); *see also Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978) (noting that application of injunctive-relief standards changes where core concerns of the executive branch are at stake).

### c. Notice and Comment

Plaintiffs argue that defendants should have subjected their new eligibility requirement to

notice and comment.  5 U.S.C. 706(2)(D); 5 U.S.C. § 553; *Electronic Privacy Information Center*, 653 F.3d at 4–7.  Under the APA, agency action that represents a legislative rule must undergo notice-and-comment procedures, which is not the case for "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice."  5 U.S.C. § 553(b)(A); *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015); *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014).  The precedential delineations between legislative rules and the latter category of exempted agency actions are not clean-cut and admit of sometimes contradictory applications. *See Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251–52 (D.C. Cir. 2014); *see also Soundboard Ass'n v. FTC*, No. 17-CV-00150 (APM), 2017 WL 1476116, at *10 (D.D.C. Apr. 24, 2017).  Still, a legislative rule can broadly be characterized as an agency action that "purports to impose legally binding obligations or prohibitions on regulated parties" or "sets forth legally binding requirements for a private party to" obtain a benefit.  *Nat'l Min. Ass'n*, 758 F.3d at 251–52; *see also Mendoza*, 754 F.3d at 1021 ("A rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy.").

The DHS Security Screening Requirement appears to have the characteristics of a legislative rule.  It is similar to the change in policy reviewed in *Electronic Privacy Information Center v. U.S. Department of Homeland Security*, 653 F.3d 1 (D.C. Cir. 2011) (hereinafter "*EPIC*"), which  involved a challenge to the Transportation Security Administration's ("TSA") decision to screen airline passengers by advanced imaging technology ("AITs"), instead of metal detectors.  653 F.3d at 2–3.  TSA reached its decision to implement AIT screening without notice-and-comment, arguing that TSA's broad statutory mandate allows it to screen airline passengers for dangerous weapons.  *Id.* at 3.  In *EPIC*, TSA relied on its broad mandate to justify

its decision to forego notice-and-comment procedures when adopting its policy on AITs. *Id.* at

4–5. The AIT program was clearly a new policy, but TSA still argued that it was not a

legislative rule because it imposed no new substantive obligations on passengers—they always

had to undergo screening, this was just another version. *Id.* at 6–7.

However, the D.C. Circuit was unpersuaded:

Concededly, there is some merit in the TSA's argument it has done no more than resolve an ambiguity inherent in its statutory and regulatory authority, but the purpose of the APA would be disserved if an agency with a broad statutory command (here, to detect weapons) could avoid notice-and-comment rulemaking simply by promulgating a comparably broad regulation (here, requiring passengers to clear a checkpoint) and then invoking its power to interpret that statute and regulation in binding the public to a strict and specific set of obligations.

*Id.* at 7.

Notwithstanding the similarities between *EPIC* and the DHS Security Screening

Requirement, this Court is unable to conclude that plaintiffs are likely to succeed on the merits of

their notice-and-comment claim given the national security concerns that defendants cite for their

change in policy. *See id.* at 8 (refusing to vacate a rule promulgated without notice-and-

comment procedure because it "would severely disrupt an essential security operation"); *see also*

5 U.S.C. § 553(b)(B); *Jifry v. FAA*, 370 F.3d 1174, 1179–80 (D.C. Cir. 2004).[23]

## 2. Claims under APA § 706(1)

In addition to their APA § 706(2) arguments, plaintiffs claim that the delay caused by the

DHS Security Screening Requirement is itself unreasonable under 5 U.S.C. § 706(1). As

---

[23] Plaintiffs also claim that DHS violated the APA's publication requirement by failing to publish the July 7th USCIS field guidance or a statement of reasons for its change in policy. *See* 5 U.S.C. § 552. But given the classified nature of the 2017 Inspector General Report and the 2017 Defense Intelligence Agency Report, it may be that defendants are exempt from the APA's publication requirement. *See id.* § 552(b).

explained earlier, plaintiffs are suffering from the delay caused by the DHS Security Screening Requirement, but to succeed under 5 U.S.C. § 706(1), plaintiffs must demonstrate that USCIS is not completing its investigation, examination, and adjudication of MAVNI naturalization applications within "a reasonable amount of time." *Hamandi v. Chertoff*, 550 F. Supp. 2d 46, 50 (D.D.C. 2008). Determining whether USCIS is performing its duty within a reasonable amount of time within the meaning of 5 U.S.C. § 706(1) is a fact intensive inquiry. *See Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 79–80 (D.C. Cir. 1984) (hereinafter "*TRAC*"); *see also Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003). The *TRAC* factors include: (1) whether a "rule of reason" governs the time agencies take to make a decision, (2) timetables mandated by applicable statutory or regulatory schemes, (3) the spheres of regulation in which the agency is imposing delay, (4) the effect expediting delay will have on other "agency activities of a higher or competing priority," and (5) "the nature and extent of the interests prejudiced by delay." *TRAC*, 750 F.2d at 80.

Concerning the second factor, USCIS must grant or deny an application within 120 days after its examination of a MAVNI applicant, 8 U.S.C. § 1447(b); 8 C.F.R. § 335.3, but no statute or regulation mandates a timetable for completing the investigation and examination. *See Hamandi*, 550 F. Supp. 2d at 50. With regard to the remaining factors, the current record is inadequate at this time to reach any conclusions. *See Mashpee Wampanoag Tribal Council*, 336 F.3d at 1100 (noting that "[r]esolution of a claim of unreasonable delay is ordinarily a complicated and nuanced task requiring consideration of the particular facts and circumstances before the court"); *see also Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 190 (D.C. Cir. 2016). Therefore, this Court cannot conclude plaintiffs have demonstrated that USCIS's delay rises to the level of unreasonable delay as a matter of law. 5 U.S.C. § 706(1); *see TRAC*, 750 F.2d at 80.

**C.      Harm to Defendants/Public Interest/Balance of the Equities**

Finally, the Court cannot conclude that the balance of equities strongly favors plaintiffs. Plaintiffs correctly note that the DHS Security Screening Requirement is causing them irreparable harm.  While their plight is regrettable, it cannot be concluded at this time that it is sufficient to override national security concerns.  *See Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087–88 (2017); *Adams*, 570 F.2d at 954–55; *see also Wayte v. United States*, 470 U.S. 598, 611 (1985) (noting the importance of the government's interest in ensuring national security).   Therefore, the Court concludes that this factor does not necessarily favor plaintiffs.

## CONCLUSION

For the reasons stated above, plaintiffs' motion for a preliminary injunction is denied without prejudice.  A separate Order, ECF No. 43, accompanies this Memorandum Opinion.


/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge


Date:   September 6, 2017