## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KUSUMA NIO, *et al.,* | ) ) ) |
| PLAINTIFFS, | ) ) No. 1:17-cv-00998-ESH ) |
| v. | ) ) |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES: ELAINE DUKE, in her official capacity as Secretary of the U.S. Department of Homeland Security (Acting); L. FRANCIS CISSNA, in his official capacity as Director of United States Citizenship and Immigration Services; UNITED STATES DEPARTMENT OF DEFENSE; and JAMES MATTIS, in his official capacity as Secretary, U.S. Department of Defense. | ) **SECOND AMENDED CLASS** ) **ACTION COMPLAINT AND** ) **PRAYER FOR DECLARATORY,** ) **TEMPORARY, PRELIMINARY** ) **AND PERMANENT INJUNCTIVE,** ) **ADMINISTRATIVE PROCEDURE** ) **ACT, AND MANDAMUS RELIEF** ) ) ) ) ) ) |
| DEFENDANTS. | ) |

## <u>COMPLAINT</u>

1.     On behalf of a group of United States soldiers who deserve much more, this action seeks to restore honor, transparency, and the rule of law to a once-orderly naturalization process that has become plagued by dishonor, irrationality, and lawlessness.  Until the actions complained of herein began, naturalization of military enlistees was swift and straightforward, as Congress intended and specified.  Eligible enlistees sought and obtained certifications of their honorable service, immigration officials expedited the paperwork, and immigration personnel rendered eligibility determinations based on the same fundamental citizenship factors that apply to all persons seeking to be naturalized.  Indeed, naturalization for those soldiers who apply and satisfy the eligibility requirements is mandatory – the naturalization at issue here is not a

1

discretionary immigration benefit.  That orderly and fair process – applied to thousands of soldiers – came to a screeching halt within the last year.  Since then, even though they otherwise satisfy the necessary eligibility criteria and are serving honorably in the military, hundreds of enlistees have had their naturalization applications placed on "hold" – and their lives upended – as a result of ill-considered and ultimately unlawful policy decisions by agency bureaucrats.  The conduct complained of herein is a disservice to these soldiers, who have sworn allegiance to the United States and committed to defend this Nation during a time of military conflict – and it is well past time for this unlawful conduct to end.

2.      Plaintiffs are enlisted non-citizen United States Army soldiers who are serving honorably in the Selected Reserve of the Ready Reserve ("Selected Reserve").  By virtue of their honorable service in the Selected Reserve, federal law, including 8 U.S.C. § 1440, entitles each Plaintiff-soldier to apply to become a naturalized United States citizen and it requires immigration officials to adjudicate those applications in accordance with the law.  Plaintiffs have upheld their end of the bargain.  Defendants have not.

3.      Instead, via improper inter-agency instructions, unlawful agency guidance and final agency actions, and other unlawful means, Defendants are impeding and delaying the naturalization of these soldiers by imposing on them additional citizenship qualifications/criteria which have no lawful basis.  And, by so doing, Defendants are acting unlawfully and depriving Plaintiffs of the valuable rights due to them under the law.  Through this action, on behalf of themselves and all similarly-situated United States soldiers, Plaintiffs seek injunctive, declaratory, and other relief from this Court in order to compel and enjoin Defendants as necessary to process and adjudicate Plaintiffs' naturalization applications as required by law.

4.     The United States recruited and enlisted each Plaintiff into the Armed Forces of the United States under the Military Accessions Vital to the National Interest ("MAVNI") program, a program touted by Defendant United States Department of Defense ("DoD") as "vital to the national interest," under which certain non-U.S. citizens with critical language skills and/or specialized medical training enlist and serve in the United States Armed Forces.  DoD recruits individuals into the MAVNI program by, among other things, representing that enlistees will be granted an "expedited" path to U.S. citizenship via naturalization.  Indeed, DoD mandates – via written enlistment contracts – that Plaintiffs and other MAVNI recruits apply for U.S. citizenship as soon as the service branch (*e.g.*, the Army) has certified their honorable service.

5.     Each Plaintiff-soldier has kept his/her end of the bargain.  Equipped with the specialized skills – such as medical training and foreign language capabilities – sought by military leaders to fill critical personnel needs, each Plaintiff (a) enlisted in the Army, (b) is serving honorably and has obtained from DoD a duly-issued N-426 Form confirming his/her honorable service in the Selected Reserve, and (c) has applied for naturalization with Defendant United States Department of Homeland Security ("DHS").  As enlisted soldiers in the Selected Reserve, Plaintiffs are and have been serving in the United States military, have sworn an oath to support and defend the Constitution of the United States and are obliged to serve this Nation at the direction of their military commanders.

6.     However, in violation of federal law, including 8 U.S.C. § 1440, Defendants have reneged on the representations made to these soldiers and are failing to process their naturalization applications as the law requires.  Thus, Defendants are blocking and delaying the valuable benefit afforded by law to these highly sought after military enlistees – namely, the prospect of expedited United States citizenship.

7.      Among other actions, DoD improperly instructed DHS and its component agency, Defendant United States Citizenship and Immigration Services ("USCIS"), to place Plaintiffs' naturalization applications on "hold" pending the successful completion of specialized background investigations done by the military for DoD purposes (and not required by the laws governing naturalization).  DHS and USCIS acquiesced and unlawfully placed Plaintiffs' naturalization applications on "hold" pending completion of these military background investigations.  There is no lawful basis for DoD's instruction and interference, nor is there any legal basis for DHS and USCIS to permit or acquiesce in such interference or to impose the "hold."  The military security clearance criteria being applied to Plaintiffs' naturalization applications have never before been applied to citizenship applications and are not found in any naturalization statute.  In fact, this new and additional screening being imposed by DoD (and enabled and adopted by DHS) has nothing to do with citizenship eligibility, but instead is reserved for persons applying for high-level governmental security clearances.  In other words, there is no U.S. law that conditions naturalization on an applicant's ability to obtain a high-level security clearance, yet Defendants are imposing that condition on Plaintiffs.  As a result of this unlawful conduct, Plaintiffs are facing imminent and irreparable harm due to the withholding of and/or delay in the processing of their naturalization applications.

8.      The enhanced scrutiny and interference by Defendants are not unique to the named Plaintiffs, nor does the conduct arise out of any particular security or other concern specific to these Plaintiffs; indeed, each Plaintiff believes that he/she is eligible to be naturalized and would be naturalized but for the hold and the new, unlawful, and extra-statutory preconditions to naturalization that Defendants have imposed on Plaintiffs as described herein.

Defendants' policies apply to certain MAVNI enlistees who have applied for – or are eligible to apply for – naturalization but have not yet been granted citizenship.

9.      Incredibly, to make matters worse, DoD recently has adopted new policies precluding the certification of honorable service of members of the Selected Reserve until these soldiers serve in an active duty status and/or satisfy other preconditions to naturalization established by DoD.  DoD's policies – and naturalization conditions – are contrary to the plain language of 8 U.S.C. § 1440 and implementing regulations.  Compounding the impact of this ill-considered and unlawful policy, pursuant to a final DoD policy implemented on October 13, 2017, DoD is revoking or decertifying previously-issued N-426 honorable service certifications for Selected Reserve MAVNIs, including Plaintiffs.  Upon information and belief, DoD's policies with respect to these honorable service certifications has been undertaken in whole or in part in order to further delay, interfere with, and/or prevent the naturalization of Selected Reserve MAVNIs and, ultimately, to facilitate their discharge from the military.  Simply put, DoD wants to set its own conditions for naturalization for these soldiers.  For its part, DHS is facilitating this DoD conduct, including by continuing to "hold" the final adjudication of naturalization applications pending DoD's implementation of these policies.

10.      Accordingly, Plaintiffs bring this civil action on behalf of themselves in their individual capacities, and on behalf of a class of all similarly-situated individuals ("the Class"), to obtain Administrative Procedure Act ("APA"), mandamus, declaratory, due process, and temporary, preliminary, and permanent injunctive relief to compel and enjoin Defendants so that they comply with their obligations pursuant to the Constitution and the mandates and directions specified in federal law, including 8 U.S.C. §§ 1440 and 1571, to properly and timely act upon, and to otherwise cease interfering with, the processing of Plaintiffs' naturalization applications.

## JURISDICTION

11.     This action arises under the Immigration and Nationality Act of 1952 ("INA") and the U.S. Constitution.  This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question) and the APA, 5 U.S.C. § 701 et seq.

## VENUE

12.     Venue is proper in the Court under 28 U.S.C. § 1391(e) because the individual Defendants are officers of the United States acting in their official capacities, and the United States Department of Homeland Security, the United States Citizenship and Immigration Services, and the United States Department of Defense are all present in this district.  Further, the individual Defendants perform official duties in Washington, D.C.

## PARTIES[1]

13.     Plaintiff Dr. Kusuma Nio resides in Springfield, Illinois.  Dr. Nio enlisted in the Selected Reserve through the MAVNI program in August 2015 and serves with the 1st Forward Surgical Team in Fort Hamilton, New York.  Plaintiff Wanjing Li resides in St. Louis, Missouri.  Ms. Li enlisted in the Selected Reserve through the MAVNI program in February 2016 and serves with the 325th Combat Support Hospital.

---

[1]     Following the initiation of this action, as previously acknowledged in Court filings, Plaintiffs Nio and Park became naturalized United States citizens.  As such they no longer are seeking some of the relief they originally sought, namely related to the final processing of their naturalization applications, and the allegations by "Plaintiffs" in this Second Amended Complaint with respect to such relief should not be deemed to include them.  For the same reasons, these two plaintiffs did not join in Plaintiffs' original Motion for Preliminary Injunction or the renewed Motion for Temporary and Preliminary Injunctive Relief, filed contemporaneously with this Second Amended Complaint.  Plaintiffs remain in this case in order to obtain the benefit of all other relief sought in this action that remains available to them.

14.     Plaintiff Jae Seong Park resides in Fort Jackson, South Carolina.  Mr. Park enlisted in the Selected Reserve through the MAVNI program in October 2015, completed Basic Combat Training ("BCT") at Fort Jackson, South Carolina in December 2016, and remains on active-duty status at Fort Jackson awaiting assignment to further training.

15.     Plaintiff Haendel Crist Calisto Alves de Almeida resides in West New York, New Jersey.  Mr. Almeida enlisted in the Selected Reserve through the MAVNI program in May 2016 and serves with the 405th Combat Support Hospital located in West Hartford, Connecticut.

16.     Plaintiff Prashanth Batchu resides in Union City, New Jersey.  Mr. Batchu enlisted in the Selected Reserve through the MAVNI program in June 2016 and serves with 419th Transportation Company.

17.     Plaintiff Lucas Calixto resides in Somerville, Massachusetts.  Mr. Calixto enlisted in the Selected Reserve through the MAVNI program in February 2016 and serves with the 743rd Transportation Company in Roslindale, Massachusetts.

18.     Plaintiff Shu Cheng resides in Temple City, California.  Ms. Cheng enlisted in the Selected Reserve through the MAVNI program in February of 2016 and serves with the 349th Combat Support Hospital in Bell, California.

19.     Plaintiff Seung Joo "Josh" Hong resides in Germantown, Maryland.  Mr. Hong enlisted in the Selected Reserve through the MAVNI program in May 2016 and serves with the 392nd Signal Battalion.

20.     Plaintiff Ye Liu resides in Dearborn, Michigan.  Mr. Liu enlisted in the Selected Reserve through the MAVNI program in March 2016 and serves with the 1001st Quartermaster Company in Columbus, Ohio.

21.     Plaintiff Emeka Udeigwe resides in Cleveland, Ohio.  Mr. Udeigwe enlisted in the Selected Reserve through the MAVNI program in March 2016 and serves with the 463rd Engineer Battalion unit in Wheeling, West Virginia.

22.     Defendant United States Department of Homeland Security is responsible for the administration and enforcement of immigration laws of the United States.

23.     Defendant Elaine Duke is sued in her official capacity as Acting Secretary of the United States Department of Homeland Security.[2]  The Secretary of DHS is responsible for the administration and enforcement of immigration laws of the United States.

24.     Defendant United States Citizenship and Immigration Services is responsible for the overall administration and the implementation of the immigration laws of the United States.

25.     Defendant L. Francis Cissna is sued in his official capacity as Director of the United States Department of Homeland Security, United States Citizenship and Immigration Services.  The Director of USCIS is responsible for the overall administration of USCIS and the implementation of the immigration laws of the United States.

26.     Defendants DHS, Ms. Duke, USCIS, and Mr. Cissna are collectively referred to as the "DHS Defendants."

27.     Defendant United States Department of Defense is responsible for the overall administration of military policy, which includes the MAVNI program.

---

[2]     Following the commencement of this action, Gen. John Kelly transitioned to a new position.  As Gen. Kelly was sued solely in his official capacity based on his official duties as DHS Secretary, it is appropriate that Ms. Duke, or her successor – acting or permanent – is substituted as the "DHS Secretary" party to this action.  Similarly, on October 8, 2017, L. Francis Cissna was confirmed as Director of USCIS and, as such, he should be substituted for Mr. McCament.

28.     Defendant James Mattis is sued in his official capacity as Secretary of Defense of the United States Department of Defense.  As Secretary of Defense, Gen. Mattis is responsible for the overall administration of DoD, which includes the MAVNI program.

29.     Defendants DoD and Gen. Mattis are collectively referred to as the "DoD Defendants."

## BACKGROUND AND FACTS

### The MAVNI Program and Plaintiffs' Service Commitments

30.     Typically, U.S. Armed Forces enlistees must meet U.S. citizenship or permanent residence requirements.  10 U.S.C. § 504(b).  However, 10 U.S.C. § 504(b)(2) authorizes the Secretary of Defense and the Secretaries of the military service departments to enlist certain non-U.S. citizens and non-permanent residents if enlistment of such individuals is "vital to the national interest."  Under this authority, DoD initiated the MAVNI program in 2008.

31.     The MAVNI program is designed to attract two types of recruits into the military: (a) health care professionals and (b) individuals who possess critical foreign language skills. DoD officials acknowledge that soldiers with these skills "are necessary to sustain effective military operations."  The MAVNI pilot program was initiated in 2008, and operated from 2009 through the present, with brief interruptions and enlistment suspension periods.

32.     Under MAVNI, DoD encouraged qualified individuals to enlist, in large part, by touting the opportunity of an "expedited" path to U.S. citizenship, and, DoD even has contractually mandated that MAVNI enlistees – including Plaintiffs – apply for citizenship "as soon as the [service branch (*e.g.*, the Army)] has certified [the MAVNI recruit's] honorable service."  This citizenship opportunity was a powerful enticement to Plaintiffs and other such qualified individuals who contemplated MAVNI enlistment.

33.     Plaintiffs are soldiers who possess the skills that DoD has deemed "vital to the national interest."  They enlisted under the MAVNI program, signed MAVNI enlistment contracts, and are serving honorably in the Selected Reserve.  Each Plaintiff has taken the military service oath.  Each Plaintiff's enlistment contract obligates him/her to eight years of service in the Army Reserve, six years of which must be served in the Selected Reserve.  Each Plaintiff is assigned to a U.S. Army Selected Reserve unit and each has served with his/her unit by participating in multiple Selected Reserve drill periods or by serving in an active-duty status. Finally, a responsible and authorized Army official has executed a Form N-426 for each Plaintiff, certifying his/her honorable service in the military as a member of the Selected Reserve.

34.     The commitment that each Plaintiff has undertaken to serve as a soldier in the U.S. Army Reserve is serious and substantial.  As the standard MAVNI Army Reserve enlistment contract states, an agreement to enlist "is more than an employment agreement.  It effects a change in status from civilian to military member of the Armed Forces."  As such, per the Enlistment/Reenlistment Document Armed Forces of the United States (DD Form 4/1), each soldier (a) is "[r]equired to obey all lawful orders and perform all assigned duties," (b) is "[s]ubject to the military justice system" and, among other things, "may be tried by military courts-martial," (c) may be "[r]equired upon order to serve in combat or other hazardous situations," and (d) must otherwise "meet acceptable military standards" such that any failure to meet their service obligations as Selected Reservists can result in demotion and/or discharge from the service under other than honorable conditions.

35.     As a member of the Army Reserve, each soldier "may at any time, and without [his/her] consent, be ordered to active duty to complete a total of 24 months of active duty."  In times of war or national emergency declared by Congress, these soldiers "may, without [his/her]

consent, be ordered to serve on active duty for the entire period of the war or emergency and for six (6) months after its end."  As members of the Selected Reserve, these soldiers may, without their consent, be ordered to 365 days of consecutive active duty whenever "the President determines that it is necessary to augment the active forces for any operational mission or for certain emergencies."

36.   Finally, as members of the U.S. military, Plaintiffs may be required to compromise individual liberties that are considered fundamental in ordinary American society. As their enlistment contracts provide, a service member's freedom of religious expression may be curtailed:  "I understand that the Army cannot guarantee accommodation of religious practices, and that religious accommodations may be modified or revoked based on changes in military necessity."  A service member's freedom of speech, expression, and association also may be curtailed.  Consequently, prior to enlistment, the Army provides recruits with USMEPCOM Form 601-23-4 – "Restrictions on Personal Conduct in the Armed Forces" – which specifies that military service entails behavioral limitations not applicable to civilians in America:

> Military life is fundamentally different from civilian life.  The military has its own laws, rules, customs, and traditions, including numerous restrictions on personal behavior, that would not be acceptable in civilian society.  These are necessary because military units and personnel must maintain high standards for morale, good order and discipline, and unit cohesion that are essential for combat effectiveness.

### The Statutory and Regulatory Framework Applicable to Plaintiffs' Naturalization Applications

37.   The Constitution confers upon Congress the power to establish a uniform Rule of Naturalization.  U.S. Constitution, Art. I, Sect. 8, Cl. 4.  One naturalization statute enacted by

11

Congress pursuant to its Constitutional authority and applicable to Plaintiffs here is plain and simple.  The INA, at 8 U.S.C. § 1440(a), provides that:

> [a]ny person who, while an alien or a noncitizen national of the United States, has served honorably as a member of the Selected Reserve of the Ready Reserve or in an active-duty status in the military, air, or naval forces of the United States . . . during any . . . period which the President by Executive order shall designate as a period in which Armed Forces of the United States are or were engaged in military operations involving armed conflict with a hostile foreign force . . . may be naturalized as provided in this section . . . .

38.     On July 3, 2002, the President determined by Executive Order that the military is engaged in armed conflict for the purposes of 8 U.S.C. § 1440.  Exec. Order No. 13269, 67 Fed. Reg. 45,287 (July 3, 2002).  Executive Order No. 13269 has remained in effect through the present.

39.     Section 1440 eases the path to U.S. citizenship for certain non-U.S. citizens who serve in the Selected Reserve or on active duty in the United States Armed Forces during a time of armed conflict.  Such service members qualify for naturalization under this section with honorable service "as a member of the Selected Reserve of the Ready Reserve *or* in an active-duty status."  8 U.S.C. § 1440 (emphasis added).  This disjunctive language of the statute is clear and unequivocal:  Selected Reserve service alone qualifies a person to naturalize, and citizenship is not dependent on an individual performing active-duty service.

40.     The statute eases the path to citizenship in at least three specific ways.  First, service members may be naturalized "regardless of age, and notwithstanding the provisions of section 1429 of this title as they relate to deportability and the provisions of section 1442 of this title."  8 U.S.C. § 1440(b)(1).  Second, "no period of residence or specified period of physical presence within the United States or any State or district of the Service in the United States shall

be required."  8 U.S.C. § 1440(b)(2).  Third, "no fee shall be charged or collected from the

applicant for filing a petition for naturalization or for the issuance of a certificate of

naturalization" granted under this section.  8 U.S.C. § 1440(b)(4).

41.     DoD's role under this statute is limited, ministerial, and non-discretionary.  The

service member's executive department (*i.e.*, service branch) merely certifies to DHS – the

agency responsible for adjudicating and conferring citizenship – the service member's service

and whether it is honorable.

42.     The statute contains an express revocation provision that provides, in pertinent

part, the following:  "Citizenship granted pursuant to this section may be revoked in accordance

with section 1451 of this title if the person is separated from the Armed Forces under other than

honorable conditions before the person has served honorably for a period or periods aggregating

five years."  8 U.S.C. § 1440(c).

43.     The regulations implementing 8 U.S.C. § 1440 are located at 8 C.F.R Part 329,

entitled "SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: PERSONS

WITH ACTIVE DUTY OR CERTAIN READY RESERVE SERVICE IN THE UNITED

STATES ARMED FORCES DURING SPECIFIED PERIODS OF HOSTILITIES."  Section

329.2 provides that a service member is eligible for naturalization under 8 U.S.C. § 1440 upon

establishing that he or she has "served honorably in the Armed Forces of the United States as a

member of the Selected Reserve of the Ready Reserve or in an active duty status in the Armed

Forces of the United States during . . . [a]ny other period as may be designated by the President

in an Executive Order pursuant to section 329(a) of the Act . . . ."  Like the statute, the

disjunctive language of the implementing regulations makes clear that "active duty service" is

not required if the soldier has served in the Selected Reserve.

44.     Volume 12 of the USCIS Policy Manual, the agency's centralized repository for USCIS's immigration policies, explains the laws and policies that govern United States citizenship and naturalization, and further confirms that service in the Selected Reserve counts as qualifying service; indeed, *"[o]ne day of qualifying service is sufficient in establishing eligibility."*  USCIS Policy Manual Volume 12, Part I, Chapter 3, current as of July 26, 2017 (emphasis added).

45.     The regulations also confirm that the honorable service requirement can be satisfied either through current service that is honorable or a separation from military service under honorable conditions: "*[h]onorable service and separation* means service and separation from service which the executive department under which the applicant served determines to be honorable . . . ."  8 C.F.R 329.1 (emphasis in original).  *See also* 10 U.S.C § 12685; Army Regulation 135-178 ("Army National Guard and Reserve, Enlisted Administrative Separations"). The service department "under which the applicant served or is serving" certifies the member's honorable service to USCIS officials.   8 C.F.R. 329.4.

46.     USCIS has established an official form for this purpose – "USCIS Form N-426: Request for Certification of Military or Naval Service" – wherein the military service branch certifies whether or not the applicant is serving or has served honorably.

47.     Notably, the Army recited the statutory framework for citizenship in the standard enlistment contract that each Plaintiff signed, confirming the Army's limited role in certifying the service under Section 1440 and making clear that the actual citizenship determinations are *not* made by the military:

> 3. I understand that I am enlisting under a federal law that allows
> the Secretary of the Army to authorize the enlistment of certain
> non-citizens of the United States (10 U.S.C. 504(b)(2)).  I also
> understand that I am enlisting during a period of time in which any

14

alien who serves honorably as a member of the Selected Reserve of the Ready Reserve or in an active-duty status in the military, air or naval forces of the United States may apply for United States Citizenship (8 U.S.C. 1440).

4. In exchange for being permitted to enlist in the Army, I agree to apply for U.S. citizenship as soon as the Army has certified my honorable service.  I understand that the Army does not grant U.S. citizenship, and the Army does not guarantee that my application for U.S. citizenship will be approved.

## **Defendants' Violations of Applicable Law**

48.     Plaintiffs have fulfilled their obligations under the law and their enlistment contracts.  They possess the language and/or medical skills deemed "vital" by DoD.  They enlisted as members of the Selected Reserve during a period of armed conflict, thereby serving a "vital national interest."  They are serving honorably.  They obtained N-426 certifications from DoD confirming their honorable service.  And, they have applied to become naturalized United States citizens.

49.     Defendants have failed to fulfill their statutory and regulatory duties and are improperly and unlawfully interfering with and/or delaying the lawful naturalization adjudication process.

## **DoD's Improper Interference in the Naturalization Process**

50.     Impeding Plaintiffs' "expedited" path to citizenship, DoD (as described below) improperly instructed DHS to suspend the processing of Plaintiffs' naturalization applications. This instruction is improper and unlawful because it exceeds DoD's lawful authority and interferes with DHS's duties.  In fact, DoD's (and its military service departments') sole role in Plaintiffs' naturalization process is ministerial and non-discretionary.  The relevant military department simply certifies whether the service member seeking naturalization is serving, or has served, honorably.  That task is simple, objective, and quick.  It involves no investigation,

15

security screenings, research, or subjectivity.  Filled out by the soldier's immediate command authority who have direct knowledge of the soldier's service status and/or access to the soldier's service record, it routinely is accomplished in minutes.

51.     For each Plaintiff, the Army already has performed this ministerial function by executing N-426 forms confirming that each Plaintiff has fulfilled the honorable service requirement.  Even if DoD cannot confirm a Selected Reservist's honorable service, DoD nevertheless is obligated to complete the N-426 Form, verifying the period of service and stating – in the block provided on the Form for this very purpose – the reasons why the service was not honorable, if applicable.  DoD has no further role in the naturalization application process.  DoD has no legal authority to refuse to provide N-426 certifications to MAVNIs who request them, to de-certify, recall, or revoke N-426 certifications, or to direct or request DHS to suspend or "hold" final adjudication of Plaintiffs' naturalization applications or impose additional military conditions or requirements for naturalization.

52.     On September 30, 2016, the Under Secretary of Defense for Personnel and Readiness (Acting) promulgated policy guidance directing the military departments to delay orders to active-duty training for MAVNI enlistees until DoD completed security clearance investigations, such as Tier 5 (formerly known as SSBI) investigations and Counterintelligence Security Interviews ("CI"), for such enlistees.  And, notwithstanding its sharply limited and purely ministerial role in the naturalization process for Plaintiffs per statute – *i.e.*, the confirmation of honorable service – in an improper attempt to delay or prevent the final adjudication of their applications, DoD (and its service branch, the Army) instructed DHS to stop processing MAVNI applications for naturalization pending completion of the security clearance investigations.  For their part, DHS and USCIS complied with, or acquiesced in DoD's improper

instruction, or otherwise agreed, and halted the full processing of all MAVNI naturalization applications contrary to its duties under law.  The result has been a cessation and delay in the processing and final adjudication of Plaintiffs' naturalization applications for impermissible and unlawful reasons.  Prior to September 30, 2016, the naturalization applications of MAVNI service members were processed to completion, and citizenship was conferred, without such DoD security clearance investigations.

53.     Since September 2016, numerous officials (from both DoD and USCIS) have admitted that DHS and USCIS have implemented this "hold" pursuant to DoD's instruction.  For example, on March 14, 2017, in response to a Congressional inquiry on behalf of a MAVNI service member whose naturalization application had been delayed, a USCIS field office reported that "Ms. [X's] case is pending due to military background checks required by the Department of Defense.  USCIS is unable to render a decision on Ms. [X's] application at this time."  In April 2017, another USCIS field office supervisor confirmed that there was a "new DoD memo" issued in recent months stating that all applications from MAVNI soldiers who have not started initial active-duty training are "now on hold."

54.     USCIS representatives on the "military hotline" likewise have informed MAVNI service members – including some of the Plaintiffs – that MAVNI naturalization applications have been placed on "hold" pending completion of the extensive, military-specific background investigations being imposed by DoD.  These communications from USCIS have taken place over the course of the last several months, including February, March, April, and May 2017.

55.     On February 6, 2017, a U.S. Army Human Resources Command official – who claims to have consulted with "senior DoD officials" – stated that "[t]he Army does not have any plans of letting a USAR [*i.e.*, U.S. Army Reserve] MAVNI get naturalized" before he/she is

17

ordered to initial active-duty training upon completion of the extensive, military-specific background investigations being imposed by DoD.

56.     Neither the Army nor DoD has any legal authority to "let" or "not let" MAVNI soldiers serving honorably as members of the Selected Reserve "get naturalized."  Under the law, the Army's role merely is to certify whether the MAVNI service member is serving, or has served, honorably.  Indeed, Defendant officials recently have admitted that DoD serves only "a ministerial role in determining if an individual is serving honorably" through the issuance of a Form N-426: "The submission of this form confirms whether the applicant served honorably as a member of the SRRR [Selected Reserve of the Ready Reserve] or in an active-duty status."  The Army already has made that certification, in writing, for each Plaintiff through duly issued N-426s.

57.     Nevertheless, the evidence is overwhelming that DoD further insinuated itself into the naturalization process by instigating, directing, and driving the unlawful naturalization "hold."  Some of the additional evidence on this point is summarized in the table below:

| Feb. 2017 | A USCIS official states: "If any field office has MAVNI Select Reserve of the Ready Reserve who are drilling and have no ship date for Basic Training, please hold the case as we are awaiting guidance from DOD regarding what constitutes serving in the armed forces." |
|---|---|
| Feb. 2017 | A USCIS official states: "We are working with OCC to determine what to do with MAVNI N-400s who are on hold pending the DOD enhanced BGC while in Basic Training." |
| Apr. 2017 | A DoD official admits that: "Knowing that …failure of these background checks could lead to discharge from the military and make an individual unable to meet the honorable service requirements that the N-426 certifies, a strategic pause was prudent with respect to the MAVNI pilot program.  As a result, DoD and USCIS mutually agreed that USCIS would slow down the Form N-400 adjudication of the MAVNI pilot program applicants." |
| Apr. 2017 | A USCIS official states: "These cases should also be placed on hold pending the OSD [Office of the Secretary of Defense] response.  Please advise field offices of the hold.  Once we receive guidance from OSD, CB will forward it ASAP as we understand the extensive impact the hold has on both the USCIS Field and |

| | |
|---|---|
| | the DOD Field." |
| Apr. 2017 | A USCIS Congressional Liaison informs the Office of Senator Sheldon Whitehouse of the following: "On April 13, 2017, we received guidance from our Headquarter to place a temporary hold on certain military cases pending further guidance from the Office of the Secretary of Defense." |
| Apr. 2017 | A MAVNI doctor relays to Army personnel what USCIS informed him about the hold on his N-400 application, including the following: "All MAVNI applications are currently on hold [because] the office has become aware of ambiguities in the law, which they believe indicates the need for soldiers to do at least a day of active duty, such as attending Basic training.... [and] they couldn't move forward until the secretary of defense clarified what constituted active duty." |
| May 2017 | A news organization comments on the DoD hold and also references an Army document which explains the immigration status predicament that the DoD hold is causing: "His citizenship oath was postponed indefinitely April 13 by the United States Citizenship Immigration Service, who told him the Defense Department has suspended all applications from foreign-born recruits looking to serve." |
| May 2017 | The Department of the Army informs Congressman Jeff Duncan of the following: "[Your constituent's] naturalization application cannot be forwarded to [USCIS] at this time. Current US Army policy states that [MAVNI] applicants will be processed for expedited naturalization upon arrival at their Basic Combat Training unit…. In addition to the required SSBI, a National Intelligence Agency Check and a Counterintelligence Interview must also be performed and with favorable results prior to permitting these applicants to depart for active duty. These required actions can take 8-24 months to complete and render a decision." |

| May 2017 | A USCIS Congressional Liaison relayed the following information to the Office of Senator Sheldon Whitehouse: "[USCIS officials] are certainly aware of [the MAVNI naturalization applicant's] situation and that of others but they are unfortunately stuck at a standstill until they receive word from DoD that it is ok to go forth in processing [the MAVNI naturalization applicant's] N-400….The reason DoD is in a standstill is because there are various types of MAVNI cases, each with different specialties.  When the DoD decides when/which certain specialties are needed, they will process those security clearances and coordinate with USCIS.  [USCIS] unfortunately cannot give a timeframe on this for now." |
|---|---|
| May 2017 | A USCIS official states that "USCIS is currently working with DOD on the intent of the MAVNI extension memo as it relates to these cases,  With the memo in mind, the following N-400 applications should be held until we receive further guidance on these cases." |
| June 2017 | A news article quotes a USCIS spokesperson: "USCIS spokeswoman Jane Cowley said …the agency is 'reviewing' the policy on whether service before basic training counts toward eligibility for citizenship.  'The current hold (on the MAVNI program) applies to all recruits who have not attended basic training or whose security or suitability screening requirements have not been completed'…." |
| July 2017 | A DoD official admits that "[o]n or around April of 2017, senior leaders from DoD's USD (P&R) informed USCIS that it was concerned about the naturalization of individuals whose Office of Personnel Management (OPM) background investigation and DoD counterintelligence security review has not yet been completed." |
| July 2017 | A DoD official admits that "DoD and USCIS mutually agreed that USCIS would slow down the Form N-400 adjudications." |
| July 2017 | A DoD official admits that "DOD and USCIS jointly determined that it was in the best interest of the United States to ensure the naturalization decision of USCIS was informed by the outcome of the completed OPM background investigation and the DoD counterintelligence security review." |
| July 2017 | A DoD official states that DoD "actually call[ed] up USCIS" to "tell them to slow down the process" for the MAVNI naturalization applications. |

### DHS Accepts and Adopts the Unlawful Naturalization "Hold"

58.     Beginning in at least February 2017, and at the behest of DoD, USCIS's Field Operations Directorate ("USCIS FOD") issued a string of directives to USCIS field offices providing "final agency guidance" and "setting national policies regarding the processing of N-400 applications filed by MAVNI recruits."  These directives established a series of "holds" on

the processing and final adjudication of naturalization applications filed by MAVNI Selected

Reserve soldiers.

59.     On February 28, 2017, USCIS FOD verbally instructed field offices to "hold" the

processing of naturalization applications filed by "MAVNI Select Reserve of the Ready Reserve

who are drilling and have no ship date for Basic Training" pending "guidance from DOD

regarding what constitutes serving in the armed forces."  This "hold" was unlawfully,

improperly, and irrationally applied to Plaintiffs (and the members of the Class) because DoD

already has issued each of the Plaintiffs (and each member of the Class) an N-426 certifying their

honorable service for naturalization under 8 U.S.C. § 1440.

60.     On April 13, 2017, via e-mail, USCIS FOD issued a directive entitled "Reservist

N-400 Hold."   The directive stated that the National Benefits Center had imposed a "hold" on

applications from members of the Selected Reserve of the Ready Reserve "at such time as the

cases become interview ready" and instructed the field offices to do the same.  The fact that such

cases had become "interview ready" establishes that any and all necessary USCIS background

investigations required for naturalization had been completed as to these applicants.

Nevertheless, USCIS directed that the processing of "[t]hese cases should be placed on hold

pending the OSD [Office of the Secretary of Defense] response" regarding the definition of

"active duty."  USCIS applied the hold to Plaintiffs (as well as Class members) even though the

directive otherwise acknowledged that, with respect to already-signed N-426s, "USCIS field

offices should proceed as 'business as usual' unless suspicion of abuse of authority {e.g.

Academy cadets are not eligible under 328 or 329} is suspected."  This "hold" was unlawfully,

improperly, and irrationally applied to Plaintiffs (and other members of the Class) who already

had obtained duly and properly issued N-426 certifying their honorable service.

61.     On May 19, 2017, via email, USCIS FOD issued a directive entitled "MAVNI Hold."  This directive reiterated that a hold was in place on the processing of naturalization applications filed by members of the Selected Reserve of the Ready Reserve in the Delayed Training Program who had not yet been to basic combat training.

62.     On May 25, 2017, via email, USCIS FOD repeated its directive to field offices that "N-400 applications should be held" on cases for "MAVNI SRRR recruits who have attended drill but have not attended Basic per the September 30, 2016 [DoD] memo."  USCIS applied the hold to Plaintiffs (as well as the members of the Class) even though this directive likewise acknowledged that: "The N-426 should be completed by the commanding officer or a person authorized to sign on his/her behalf.  Only if the form is blank or signed by someone obviously not performing in the capacity of a commander or acting for the commander should we make a call or R[equest] F[or] E[vidence]."  This "hold" was unlawfully, improperly, and irrationally applied to Plaintiffs (and other members of the Class) who had a duly and properly issued N-426 certifying their honorable service.

63.     On July 7, 2017, after the filing of the original Complaint in this action, USCIS FOD issued another directive to field offices:

> USCIS has determined that the completion of DOD background checks is relevant to a MAVNI recruit's eligibility for naturalization.  As such, all pending and future MAVNI cases may not proceed to interview, approval or oath until confirmation that all enhanced DoD security checks are completed.

64.     According to statements by Defendant officials, the newly-required "enhanced DoD security checks" include a Tier 5 (formerly SSBI) investigation, a National Intelligence Agency Check ("NIAC"), a CI review, and a CI interview.  Defendant officials also asserted the possibility of "an issue-oriented interview and/or issue-oriented polygraph."  USCIS directed its

field offices "not to complete naturalization adjudications under section 329(a), 8 U.S.C. § 1440(a), for MAVNI recruits until after these checks have been completed."  USCIS has made clear that this directive applies to "all currently pending and future MAVNI naturalization applicants applying for naturalization under section 329(a), 8 U.S.C. § 1440(a)," which includes Plaintiffs and the members of the Class.

65.     The "enhanced DoD security checks" being imposed on MAVNI soldiers conflict with existing USCIS background investigation guidelines.  The published USCIS Policy Manual sets forth the background checks required for military members who apply for naturalization, specifying that military applicants require only those background checks that are required for "all applicants for naturalization" as well as a "Defense Clearance Investigative Index (DCII) query." At least as late as May 25, 2017, USCIS followed its published guidance (in this respect, while holding the naturalization applications for a different unlawful reason) as USCIS officials acknowledged that "USCIS should not request SSBI results for any military naturalization applications . . . [and that] USCIS should proceed with the standard background and security checks we currently run."  And Defendant officials have admitted in filings with the Court that USCIS's "longstanding policy" with respect to military background checks has been limited to DCII queries.  Thus, the USCIS July 7, 2017 directive conflicts with USCIS's own published guidance and longstanding prior practice.  Moreover, on information and belief, USCIS (including in particular the USCIS official who issued the July 7, 2017 "hold" directive) did not have an understanding of what a Tier 5 or Tier 3 background check covers or entails or how that check differs from the DCII query already called for in the USCIS published guidance.

66.     Defendants' "hold" on the processing of MAVNI applications adversely has impacted Plaintiffs.  USCIS representatives have admitted to members of Congress that "all

military applications" for naturalization are supposed to be expedited.  Moreover, recent data

published by USCIS in its May and June 2017 National Performance Reports show that the

"estimated average gross cycle time" for applications for naturalization filed by military members

(including MAVNI soldiers) ranges from 3.8 months (May report) to 4.4 months (June report).

The data further show that "estimated average active case cycle time" for military applications

(including applications by MAVNI soldiers) ranges from 3.7 months (May report) to 4.2 months

(June report).  Furthermore, to the extent that these data do not account for the fact that the

"hold" was in place by at least February 2017, the reported cycle times may be inflated.  Yet,

even accepting the accuracy of the reported data, Plaintiffs' naturalization applications already

have been pending far longer than any of these figures with no end in sight.  Indeed, Defendant

officials have stated that Tier 5 background investigations for MAVNI applicants have "taken on

average 422 days" to complete.  This figure does not include any additional time it would take to

complete the NIAC, CI review, CI interview, and so-called "issue-oriented interview and/or

issue-oriented polygraph."  Defendant officials have admitted that they cannot estimate the

amount of time it will take to complete all of these requirements.  Further, these application-

pending periods are far in excess of the length Congress intended:  The INA specifically states:

"It is the sense of Congress that the processing of an immigration benefit application [defined to

include naturalization applications] should be completed not later than 180 days after the initial

filing of the application."  8 U.S.C. §1571(b).

### The MAVNI Naturalization "Hold" Is
### Unlawful, Irrational, and Contrary to the Statute

67.     Defendants' imposition of a military-specific, uber-investigation condition on

MAVNI soldiers' naturalization is improper.  The DHS Defendants' application of the hold to

Plaintiffs and the members of the Class is unlawful, irrational, and contrary to the INA.  The

investigative protocol being imposed on the naturalization process for MAVNIs never before has

been applied to any type of application for naturalization.  Rather, the investigative protocol

being imposed typically has been used only in connection with granting security clearances, a

process separate and distinct from naturalization conditions.  As one DoD official explained:

"Per the Federal Investigative Standards, established by the Office of Personnel Management

(OPM), Tier 5 investigations are required for positions designated as critical sensitive, special

sensitive, or access to Top Secret or Sensitive Compartmented Information (SCI)."

68.     Defendants have imposed a new, substantive, eligibility condition for

naturalization not set forth in the law.  The Constitution specifies that Congress – not the

Executive – has the power to set forth naturalization law.  U.S. Constitution, Art. I, Sec. 8, Cl. 4.

As relevant here, naturalization preconditions are set forth in 8 U.S.C. § 1440.  In that statute,

Congress did not impose security clearance screenings as part of the naturalization process for

Selected Reserve or active duty soldiers, and nothing in the statute authorizes DHS or DoD to

impose this or any other additional substantive requirement.  If Congress had intended to

mandate such additional requirements for naturalization, it could have done so.  In fact, Congress

did the opposite, by enacting a statute that eases the naturalization requirements and processing

time for soldiers serving honorably during periods of armed conflict.

69.     In enacting Section 1440, Congress intended to reward MAVNI soldiers for

voluntarily answering our Nation's call to service, not to punish and disadvantage them.

Defendant officials have admitted as much by acknowledging that "Section 1440(a) relaxes the

preconditions for naturalization established in Section 1427."  Yet, through their unlawful

actions, Defendants have imposed on Plaintiffs one of the most onerous requirements for

naturalization that one could imagine — a rigorous investigation for top-level security clearance.

Accordingly, DoD's improper instruction, and DHS's unlawful compliance with that instruction, are contrary to the plain language and clear purpose of the statute.  And, even if DHS pretends that it established this new condition on its own, without any outside influence, it would remain unlawful.

70.     Furthermore, Section 1440 specifically and expressly removed and eliminated the length-of-residency requirement normally required for naturalization for this class of individuals — *i.e*., those willing to volunteer to serve during periods of armed conflict.  However, Defendants have attempted to justify the imposition of the "enhanced DoD background checks" on MAVNI soldiers on the grounds that these soldiers purportedly have not resided in the United States as long as legal permanent resident soldiers.  As one DoD official asserted, Tier 5 investigations include "certain valuable checks for foreign born recruits, such as developed reference interviews, which are necessary in the case of personnel whose lack of extended presence in the U.S. will cause their investigation to be short of scope."

71.     However, Congress already has made the policy determination on this point for this class of individuals — *i.e.* those willing to volunteer to serve during periods of armed conflict — and determined that these individuals should not be disadvantaged in relation to naturalization based on length of residency.  Specifically, Section 1440(b)(2) commands that, for naturalization of such individuals, "no period of residence or specified period of physical presence within the United States or any State or district of the Service in the United States shall be required."  8 U.S.C. § 1440(b)(2).  Thus, in defiance of the law, Defendants' "hold" effectively reinstates the very residency requirement that the statute expressly eliminated.

72.     Defendant officials also have attempted to justify the hold on the grounds that "the background checks may result in the recruit receiving an other-than-honorable discharge from the

military." But Congress has already made the policy determination on this point as well. Section 1440(c) expressly provides that an individual's citizenship may be "revoked . . . if the person is separated from the Armed Forces under other than honorable conditions before the person has served honorably for a period or periods aggregating five years." Thus, the statute directly addresses this issue and provides the process for dealing with the situation where a service member, otherwise qualified for naturalization, subsequently is discharged under other-than-honorable conditions. The statute gives this class of individuals — *i.e.*, those volunteering to serve during a period of armed conflict — the benefit of the doubt, allowing them to naturalize in the first instance and providing for revocation in the event of an unfavorable subsequent discharge. Thus, the DHS Defendants' action is directly contrary to the statute in this respect as well.

73.     In addition, Defendants' application of the "hold" to Plaintiffs and the members of the Class is arbitrary, capricious, and irrational for numerous independent reasons. First, most of the Plaintiffs, consistent with the broader MAVNI population, have resided in the U.S. for longer than the period required for naturalization of legal permanent residents (typically three or five years, but in some cases shorter periods of residency or no residency at all). In fact, some of the Plaintiffs have resided in the United States since childhood. Thus, it is arbitrary and irrational to apply the enhanced DoD background investigation requirement to them based on Defendants' length-of-residency rationale, while at the same time imposing no such requirement on legal permanent residents with little or no history in the U.S. The "hold" directive is thus untethered to the issue that the agency claims to be addressing (length of residency). Instead, the "hold" punishes MAVNIs simply for being MAVNIs regardless of how long they have resided in the United States.

74.     Second, USCIS's "enhanced DoD security check" hold was plainly arbitrary, capricious, and irrational as promulgated.  Specifically, on July 7, 2017, USCIS issued its hold directive to field offices as follows:  "USCIS has determined that the completion of DOD background checks is relevant to a MAVNI recruit's eligibility for naturalization.  As such, all pending and future MAVNI cases may not proceed to interview, approval, or oath until confirmation that all enhanced DoD security checks are completed."  However, at the time USCIS issued this directive, DoD had stated its intention to discharge the soldiers in question without conducting any of these "enhanced DoD security checks."

75.     In particular, on or about May 19, 2017, DoD officials issued an action memo ("DoD Action Memo") detailing DoD's plans regarding Selected Reserve MAVNIs.  The DoD Action Memo made clear: (i) that DoD had no intention of conducting the "enhanced DoD security checks" on which USCIS later claimed it was waiting; (ii) that DoD did not have the resources to conduct such security checks; and (iii) that DoD instead intended to discharge these MAVNI Selected Reserve soldiers without performing such security checks.

> **Group 3**:  [Selected Reserve MAVNIs] . . .
>
> - Approx. 500 Group 3 MAVNIs have received command endorsement [*i.e.*, N-426 "honorable service" certifications] and applied for naturalization based on having "performed creditable service" in the form of two weekend drills.  These citizenship applications are under review by [USCIS].
>
> - **Action:**  The heightened risk associated with Groups 1/2, and the application of resources needed to mitigate that risk, render it infeasible to continue to process [Group 3] MAVNIs.  **Except for individual cases deemed vital to the national interest, Group 3 will be separated by Secretarial plenary authority.**

76.     The DoD Action Memo specified that the plans set forth therein would be executed in the absence of a countermanding directive by the Secretary of Defense.  USCIS was fully aware of the DoD Action Memo no later than June 28, 2017 (and likely far earlier).  Thus, USCIS issued its July 7, 2017 field directive to "hold" MAVNI applications pending completion of "enhanced DoD security checks" with express knowledge that DoD had no intention of performing those security checks.  One can scarcely conceive of a more arbitrary, capricious, and irrational agency action.  While DoD recently claimed that the Secretary of Defense "verbally … modif[ied] the proposed course of action" with respect to Selected Reserve MAVNIs, Defendants failed to produce any written record of these supposed orders, notwithstanding a July 19, 2017 Court order that it produce any such information.  No written record of this purported modification has been identified or provided to the Court or Plaintiffs.  In all events, any purported subsequent verbal modification of the May 19, 2017 DoD Action Memo would in no way alter the sham nature of USCIS's July 7, 2017 directive.

77.     Defendants' "hold" is arbitrary, capricious, and contrary to law for the further reason that it treats similarly-situated individuals differently in two separate respects.  Prior to instituting the present "hold," USCIS naturalized thousands of MAVNI soldiers without "enhanced DoD security checks."  USCIS will apply the "enhanced DoD security check" procedure only to a portion of the MAVNI population.  Moreover, many (if not most) MAVNIs have resided in the United States at least as long as the period required for naturalization of permanent residents.  Yet, despite their similarly-situated residence status, USCIS is applying enhanced background checks only to MAVNI applications for naturalization.

**DoD's Unlawful N-426 Policies**

78.     In mid-2017, DoD adopted a policy precluding the certification of honorable

service for members serving in the Selected Reserve until such service members serve in an

active duty status.  Pursuant to that policy, according to Defendant officials, "DoD is not

certifying any new MAVNI N-426s" and it is reserving the right, in furtherance of the policy, to

rescind the honorable service certifications that Selected Reserve MAVNIs, including Plaintiffs,

who have received them without active duty service.  Defendant officials stated that N-426s

issued to "individuals without creditable active duty service could be considered signed in error

and may be decertified upon completion of a review of the existing standards . . . ."

79.     On September 6, 2017, the Court in this case issued a decision denying without

prejudice Plaintiffs' Motion for Preliminary Injunction.  Dkt. 44.  In that decision, the Court

indicated that it was "puzzled" by Defendants' legal position that Section 1440 required active

duty service.  Dkt. 44 at 16.  The Court did not decide the question, however, because the active

duty policy had not been applied to any of the Plaintiffs.

80.     On September 1, 2017, certain MAVNI Selected Reservists filed a related action

against DoD.  *See Kirwa v. Dept. of Defense, et al.*, Case. No. 1:17-cv-01793-ESH (D.D.C.)

("*Kirwa* action").  In the *Kirwa* action, plaintiffs alleged that the unlawful active duty policy was

being applied to them, and they moved for a preliminary injunction to obtain relief from that

unlawful policy, which the court converted to a summary judgment motion.

81.     On October 13, 2017, on the eve of a hearing and decision in that case, in an

attempt to avoid an adverse ruling, and without rescinding its prior policy, DoD issued a new

policy, referred to herein as the "New DoD N-426 Policy."  On its face, the New DoD N-426

Policy imposes an active duty service requirement and other unlawful conditions on the issuance

of N-426s to new enlistees who want to apply for naturalization.  DoD understands that, without

an N-426, DHS will not accept and begin to process the service member's application for

naturalization.

82.    The New DoD N-426 Policy specifies that for soldiers who previously obtained

N-426s but who had not yet naturalized by October 13, 2017 (*i.e.*, including Plaintiffs), DoD

would be recalling, revoking or decertifying the N-426s.  The Policy further states that soldiers in

this circumstance may receive a new N-426 certification only after DoD determines that the

service member has completed certain DoD "background investigation and suitability vetting."

83.    These N-426 policies are intended to disrupt and interfere with the naturalization

processing of MAVNIs, including Plaintiffs, since DHS cannot or does not process or adjudicate

Section 1440 naturalization applications without a duly executed N-426.   For its part, DHS is

facilitating this DoD conduct by continuing to "hold" the final adjudication of naturalization

applications pending DoD's implementation of these policies.

84.    DoD's policies and DHS's hold are contrary to the plain language of the statute

and implementing regulations.  For example, in unambiguous fashion, Section 1440 provides that

a service member with honorable service "as a member of the Selected Reserve of the Ready

Reserve *or* in an active-duty status" is eligible for naturalization as a U.S. citizen.  8 U.S.C. §

1440(a) (emphasis added).  Indeed, whereas the prior version of the statute limited naturalization

to those serving in an active duty status, the National Defense Authorization Act for Fiscal Year

2004, Pub. L. No. 108-136, 117 Stat. 1392, 1693 (2003) amended the statute to add those serving

as members of the Selected Reserve.  Therefore, contrary to the position expressed in the DoD

policy, Congress made clear that naturalization is available based on either service as a member

of the Selected Reserve or service in active duty status.

31

85.     The regulations implementing 8 U.S.C. § 1440 are to the same effect.  8 C.F.R. § 329.2 provides that a service member is eligible for naturalization under 8 U.S.C. § 1440 upon establishing that he or she has "served honorably in the Armed Forces of the United States as a member of the Selected Reserve of the Ready Reserve *or* in an active duty status in the Armed Forces of the United States . . . ."  8 C.F.R. § 329.2 (emphasis added).  Like the statute, the disjunctive language of the regulations makes clear that active duty service is not required for naturalization if the soldier has served in the Selected Reserve.  Thus, in promulgating its final rule on this provision, DHS explained:

> In conformance with the expansion of eligibility made by the NDAA [National Defense Authorization Act for Fiscal Year 2004] (see section 329(a) of the INA, 8 U.S.C. 1440(a)), this final rule extends eligibility for naturalization to include those individuals who have served honorably in the U.S. Armed Forces *either* in an active duty status *or* as a member of the Selected Reserve of the Ready Reserve.  See revised 8 CFR 329.2(a).  In addition, this rule amends the title 8 CFR part 329 to include service in the Selected Reserve of the Ready Reserve.  Currently, the title only lists active duty service as a basis for naturalization where service occurred during specified periods of hostilities.

75 Fed. Reg. 2785, [FR 3-10] (Jan. 19, 2010) (emphasis added).

86.     The USCIS Policy Manual provides and confirms that service in the Selected Reserve qualifies an individual for naturalization under Section 1440 and that "[o]ne day of qualifying service is sufficient in establishing eligibility."  In fact, prior to formulating their "active duty" service requirement, and consistent with the law, regulation, and Policy Manual, Defendant officials admitted in their court filings that:

> As members of the U.S. Armed Forces during a period of hostilities, MAVNI recruits are eligible to apply for naturalization under Section 1440 once they join the military, they begin serving as a member of the SRRR [Selected Reserve of the Ready Reserve] or in an active-duty status.

87.     Moreover, under Section 1440, USCIS has naturalized members of the Selected Reserve who had not previously served in any active duty status, and, on information and belief, continues to do so for those Selected Reservists who are medical professionals.  In short, DoD's N-426 policies appear to be little more than hastily assembled litigation positions aimed at further manipulating the naturalization process.

88.     The active duty service requirement, and other extra-statutory preconditions to naturalization set forth in the DoD N-426 policies are contrary to law as applied to Selected Reservists.  Moreover, separate and apart from these unlawful conditions – which permeate the New DoD N-426 Policy and should render it unlawful in its entirety, the portion of the New DoD N-426 Policy that purports to revoke, recall, or decertify previously issued N-426s to Plaintiffs and the Class is unlawful.  Nothing in the statute authorizes such revocation, recall, or decertification, and nothing in the statute authorizes DoD to withhold new certifications from otherwise statutorily eligible Selected Reservist naturalization applicants.  To the contrary, pursuant to the law, DoD "shall determine whether" Plaintiffs – currently serving enlistees – have served honorably in the Selected Reserve.  DoD's policies, as applied to Plaintiffs and the Class, are contrary to the plain and unambiguous terms of the governing statute and regulations.

### Plaintiffs' Honorable Service and Applications for Naturalization

89.     Plaintiff Dr. Kusuma Nio enlisted in the Selected Reserve through the MAVNI program in August 2015.  Dr. Nio is a surgeon by occupation.  Dr. Nio took his service oath on August 12, 2015.  Dr. Nio began serving with the 1st Forward Surgical Team in Fort Hamilton, New York, as a Specialist (E-4) in August 2016, and has since participated in multiple Selected Reserve drill periods with his unit.  Dr. Nio submitted his N-400 Application for Naturalization in September 2016, and USCIS received his application on September 19, 2016.  Dr. Nio's

Company Commander signed Form N-426 certifying Dr. Nio's honorable service in the Selected Reserve.

90.     After an unexplained, lengthy delay, Dr. Nio was given a naturalization interview on April 10, 2017.  Upon completion of that interview, he was recommended for approval, was provided documentation to that effect, and was scheduled for a citizenship oath ceremony on May 5, 2017.  However, on April 13, 2017, Dr. Nio received a "de-scheduling notice" informing him that his oath ceremony had been canceled.  Dr. Nio met with immigration officers at the St. Louis Service Center, including a Field Officer Supervisor, to inquire about the reason for the cancellation of his oath ceremony and was informed that the DoD had instructed USCIS that naturalization applications for MAVNI service members such as Dr. Nio were put on hold. Following these communications, on May 7, 2017, Dr. Nio contacted his United States Senators and Representative.  A staff member from United States Senator Tammy Duckworth's office inquired into the status of Dr. Nio's application and USCIS confirmed that, "Dr. Nio's case is currently pending due to military background checks required by the Department of Defense. USCIS is unable to render a decision on Dr. Nio's application at this time.  Once the background checks have been completed, his case will continue through the immigration process."

91.     After Plaintiffs filed the original Complaint in this matter, Dr. Nio was naturalized as a United States citizen.  A CI interview was not completed for Dr. Nio prior to his naturalization.  Dr. Nio had not served in an active duty status with the Army at any time prior to his naturalization.

92.     Plaintiff Wanjing Li enlisted in the Selected Reserve through the MAVNI program in February 2016.  Ms. Li took her service oath on February 5, 2016.  Ms. Li began serving with the 325th Combat Support Hospital as a Specialist (E-4) on March 19, 2016 and has

since participated in multiple Selected Reserve drill periods with her unit.  Ms. Li submitted her

N-400 Application for Naturalization on August 17, 2016, and USCIS received her application

on August 19, 2016.  An authorized supervisor signed Ms. Li's Form N-426 certifying Ms. Li's

honorable service in the Selected Reserve.

93.     After a lengthy delay, Ms. Li was scheduled for a naturalization interview on

March 13, 2017.  Upon completing the interview, Ms. Li was informed by the USCIS officer

conducting the interview that her application was recommended for approval.  USCIS officials

have admitted that Ms. Li's application for naturalization was approved on May 3, 2017.

However, Ms. Li subsequently was told by USCIS that her naturalization application has been

put on hold, as have all other such applications by MAVNI service members.

94.     USCIS officials have admitted that all USCIS requirements for processing Ms.

Li's naturalization application are complete but that "further processing" of the application

"awaits the completion of her DoD enhanced background investigation."  Ms. Li's naturalization

application has been pending since August 17, 2016.  DoD officials have stated that Ms. Li's Tier

5/SSBI investigation is complete and was completed in 530 days.   Ms. Li's CI Focused Review

and CI Interview were completed on September 22, 2017.  .

95.     Plaintiff Jae Seong Park enlisted in the Selected Reserve through the MAVNI

program in October 2015.  Mr. Park was sent to BCT at Fort Jackson, South Carolina, in May

2016.  Mr. Park successfully completed BCT on December 15, 2016.  Mr. Park has been retained

on active-duty status at Fort Jackson awaiting assignment to further training, which has not been

provided due to pending military background checks.  Mr. Park's command at Fort Jackson

executed Form N-426 certifying Mr. Park's honorable service as a member of the Selected

Reserve.

96.     Mr. Park completed most of his naturalization requirements in May 2016, including his naturalization interview at the local USCIS office at Fort Jackson.  Despite his one-year long service on active duty, Mr. Park's naturalization application was placed on hold. Mr. Park has checked on the status of his naturalization application and was told by USCIS, through the military hotline, on February 22, 2017, that he would need to speak with local office representatives to ascertain his status.  The local USCIS office at Fort Jackson informed him on May 4, 2017 that his application has been put on hold pending the completion of a military background check.  After Plaintiffs filed the original Complaint in this matter, Mr. Park was naturalized as a United States citizen.

97.     Plaintiff Haendel Crist Calisto Alves de Almeida enlisted in the Selected Reserve through the MAVNI program in May 2016.  Mr. Almeida took his service oath on May 26, 2016. Mr. Almeida began serving with the 405th Combat Support Hospital located in West Hartford, Connecticut as a Private (E-2) in August 2016 and since has participated in multiple Selected Reserve drill periods with his unit.  Mr. Almeida submitted his N-400 Application for Naturalization in February 2017 and USCIS received his application that same month.  Mr. Almeida's Company Commander signed his Form N-426 certifying Mr. Almeida's honorable service in the Selected Reserve.

98.     Mr. Almeida's ship date to BCT has been postponed indefinitely by direction of the DoD.  Mr. Almeida has checked on the status of his naturalization application and was informed by USCIS that his and other MAVNI applications have been put on hold pending additional background investigations by the DoD.

99.     USCIS officials have admitted that all USCIS background checks required for processing Mr. Almeida's naturalization application were completed by June 2017 but that

36

"further processing" of the application "awaits the completion of his DoD enhanced background investigation." Mr. Almeida's naturalization application has been pending since February 6, 2017. DoD officials have stated that Mr. Almeida's Tier 5/SSBI investigation is complete and was completed in 373 days. Mr. Almeida's CI Focused Review and CI Interview were completed on September 12, 2017

100.    Plaintiff Prashanth Batchu enlisted in the Selected Reserve through the MAVNI program in June 2016. Mr. Batchu took his service oath on June 7, 2016. Mr. Batchu began serving with the 419th Transportation Company as a Specialist (E-4) in September 2016 and has participated in multiple Selected Reserve drill periods with his unit. Mr. Batchu submitted his N-400 Application for Naturalization in March 2017 and USCIS received his application shortly thereafter. Mr. Batchu's Commander signed Form N-426 certifying Mr. Batchu's honorable service in the Selected Reserve.

101.    Mr. Batchu's ship date to BCT has been postponed indefinitely by direction of the DoD. Mr. Batchu has checked on the status of his naturalization application and was told by USCIS that his application has been put on hold pending additional security screening by the DoD and that all other similar MAVNI applications are subject to the same hold.

102.    USCIS officials have stated that Mr. Batchu's application awaits the completion of his DoD enhanced background investigation. Mr. Batchu's naturalization application has been pending since March 23, 2017. DoD officials have stated that Mr. Batchu's Tier 5/SSBI is complete and was completed in 475 days. Mr. Batchu's CI interview is still pending.

103.    Plaintiff Lucas Calixto enlisted in the Selected Reserve through the MAVNI program in February 2016. Mr. Calixto took his service oath on March 16, 2016. Mr. Calixto began serving with the 743rd Transportation Company in Roslindale, Massachusetts as a Private

(E-1) in April 2016 and has since participated in multiple Selected Reserve drill periods with his unit.  Mr. Calixto submitted his N-400 Application for Naturalization in March 2017, and USCIS received his application on March 7, 2017.  An authorized command official signed Form N-426 certifying Mr. Calixto's honorable service in the Selected Reserve.  On April 14, 2017 USCIS requested that Mr. Calixto arrange for his command to issue another N-426, which he subsequently obtained and sent to USCIS on April 15, 2017.  USCIS confirmed receipt and informed Mr. Calixto that they did not need anything else from him at that time to process his application.

104.    Mr. Calixto's ship date to BCT has been postponed indefinitely by DoD, presumably pending completion of military background checks. Mr. Calixto has inquired about the status of his naturalization application and was informed by a USCIS officer that his case was put on hold pursuant to an instruction from DoD to not process applications for MAVNI service members who have not attended BCT.

105.    USCIS officials have stated that Mr. Calixto's application awaits the completion of his DoD enhanced background investigation.  Mr. Calixto's naturalization application has been pending since March 7, 2017.  DoD officials have stated that Mr. Calixto's Tier 5/SSBI investigation is complete and was completed in 405 days.  Mr. Calixto's CI Focused Review and CI Interview were complete on September 26, 2017

106.    Plaintiff Shu Cheng enlisted in the Selected Reserve through the MAVNI program in February 2016.  Ms. Cheng took her service oath on February 23, 2016.  Ms. Cheng began serving with the 349th Combat Support Hospital as a Specialist (E-4) in May 2016 and has since participated in multiple Selected Reserve drills periods with her unit.  Ms. Cheng submitted her N-400 Application for Naturalization on February 27, 2017, and USCIS received her application

on March 2, 2017.  Ms. Cheng's Company Commander signed Form N-426 certifying Ms.

Cheng's honorable service in the Selected Reserve.

107.    Ms. Cheng has inquired about the status of her naturalization application,

including by calling the Military Helpline.  On May 3, 2017, the Military Helpline confirmed that

Ms. Cheng's naturalization application was still "pending" because her military background

check had not been completed.

108.    USCIS officials have admitted that all USCIS background checks required for

processing Ms. Cheng's naturalization application were completed by May 2017 but that "further

processing" of the application "awaits the completion of her DoD enhanced background

investigation."  Ms. Cheng's naturalization application has been pending since February 27,

2017.  DoD officials have stated that Ms. Cheng's Tier 5/SSBI investigation is complete and was

completed in 517 days.  Ms. Cheng's CI Focused Review and CI Interview were completed on

September 12, 2017.  Plaintiff Seung Joo "Josh" Hong enlisted in the Selected Reserve through

the MAVNI program in May 2016.  Mr. Hong took his service oath on May 13, 2016.  Mr. Hong

began serving with the 392nd Signal Battalion at Fort Meade as a Private First Class (E-3) in

August 2016 and has participated in multiple Selected Reserve drill periods with his unit.  Mr.

Hong submitted his N-400 Application for Naturalization in February 2017, and USCIS received

his application on February 28, 2017.  Mr. Hong's command signed Form N-426 certifying Mr.

Hong's honorable service in the Selected Reserve.

109.    Mr. Hong's ship date to BCT has been postponed indefinitely by direction of the

DoD.  Mr. Hong has checked on the status of his naturalization application and was told by

USCIS that his application and all other MAVNI applications have been put on hold pending

additional background investigations by the DoD.

110.    USCIS officials have stated that Mr. Hong's application awaits the completion of his DoD enhanced background investigation.  Mr. Hong's naturalization application has been pending since February 28, 2017.  DoD officials have stated that Mr. Hong's Tier 5/SSBI investigation is still pending and has been pending since May 17, 2016.   .  Mr. Hong's CI interview also is still pending.

111.    Plaintiff Ye Liu enlisted in the Selected Reserve through the MAVNI program in March 2016.  Mr. Liu took his service oath on March 16, 2016.  Mr. Liu began serving with the 1001st Quartermaster Company in Columbus, Ohio, as a Specialist (E-4) in April 2016 and has since participated in multiple Selected Reserve drill periods with his unit.  Mr. Liu submitted his N-400 Application for Naturalization in September 2016, and USCIS received his application on September 30, 2016.  An authorized command official signed Form N-426 certifying Mr. Liu's honorable service in the Selected Reserve.

112.    On multiple occasions, DoD postponed Mr. Liu's ship dates to BCT.  Mr. Liu has checked on the status of his naturalization application and has been informed by USCIS that his application has now been put on hold until he reports to BCT, and he will not be permitted to report to BCT until completion of the newly-ordered DoD background investigations.

113.    USCIS officials have admitted that all USCIS background checks required for processing Mr. Liu's naturalization application were completed by March 2017, but that "further processing" of the application "awaits the completion of his DoD enhanced background investigation."  Mr. Liu's naturalization application has been pending since September 30, 2016.  DoD officials have stated that Mr. Liu's Tier 5/SSBI investigation is still pending and, as of October 13, 2017, has been pending for over 575 days.  Mr. Liu's CI Focused review and CI Focused Security Interview was completed on September 27, 2017.  DoD officials have admitted

that they cannot estimate the additional time that it will take to complete these background checks.

114.     Plaintiff Emeka Udeigwe enlisted in the Selected Reserve through the MAVNI program in March 2016.  Mr. Udeigwe took his service oath on March 17, 2016.  Mr. Udeigwe began serving with the 463rd Engineer Battalion located in Wheeling, West Virginia, as a Specialist (E-4) in January 2017 and has since participated in multiple Selected Reserve drill periods with his unit.  Mr. Udeigwe submitted his N-400 Application for Naturalization in January 2017, and USCIS received his application that same month.  Mr. Udeigwe's command signed Form N-426 certifying Mr. Udeigwe's honorable service in the Selected Reserve.

115.     Mr. Udeigwe's ship date to BCT has been postponed indefinitely by direction of the DoD.  Mr. Udeigwe has inquired about the status of his naturalization application and has been told by USCIS that his application and all other MAVNI applications have been put on hold pending additional DoD background investigations.

116.     USCIS officials have admitted that all USCIS background checks required for processing Mr. Udeigwe's naturalization application were completed by June 2017 but that "further processing" of the application "awaits the completion of his DoD enhanced background investigation."  Mr. Udeigwe's naturalization application has been pending since January 13, 2017.  DoD officials have stated that Mr. Udeigwe's Tier 5/SSBI investigation is complete and was completed in 162 days.  Mr. Udeigwe's CI Focused review and CI Focused Security Interview was completed on September 28, 2017.  DoD officials have admitted that they cannot estimate the additional time that it will take to complete these background checks.

117.     Each Plaintiff has a completed NIAC.

118.    USCIS officials have admitted that all regular USCIS background checks, including the FBI checks, required for processing the Plaintiffs' naturalization applications are complete.

119.    Despite representing to this Court that USCIS "has only required that adjudicators collect and consider evidence obtained from DoD to the same degree that they collect and consider evidence obtained from other federal government entities such as the FBI," there is no indication that USCIS has obtained, collected, and begun/or is considering any of the Tier 5/SSBI, NIAC, and/or CI results that are complete for the Plaintiffs.

120.    DoD officials have admitted that they cannot estimate the additional time that it will take to complete the elements of the background checks that are not yet complete.

**Defendants' Unlawful Conduct Has Caused, and Will Continue to Cause, Substantial and Irreparable Harm to Plaintiffs**

121.    Plaintiffs are suffering and will continue to suffer irreparable harm if the requested relief is not immediately granted.  The right to acquire United States citizenship is a precious one.  The benefits of U.S. citizenship are priceless, and the consequences of a lost or unlawfully delayed opportunity to acquire citizenship are dire.  Depriving U.S. service members of their lawful right to apply to become naturalized citizens, an entitlement earned through their honorable military service and guaranteed by statute, is an ongoing and mounting harm for which there is no recompense.

122.    Defendants' conduct is unlawfully depriving Plaintiffs of the opportunity to realize fundamental rights and benefits that come along with citizenship including the right to vote, protection from deportation, work or school authorization, the right to travel outside of this country and return to the United States, the ability to meet personal, family and professional obligations, and peace of mind regarding their legal status to remain in the United States.  This

deprivation of citizenship opportunities continues with each passing day.  And every day of lost

citizenship rights and benefits is a day that these Plaintiffs can never recover or be recompensed

for losing.

123.    Defendants' conduct is unlawfully depriving Plaintiffs of the right to timely

adjudication of their naturalization applications as well as to adjudication of their applications

under the criteria established by law.  And if Plaintiffs' N-426 certifications are revoked by DoD

pursuant to the New DoD N-426 Policy, adjudication of Plaintiffs' pending naturalization

applications will be halted altogether, since DHS requires that form in order to process Plaintiffs'

applications.  Defendants' conduct has placed Plaintiffs in a state of limbo and left them to

languish indefinitely in that state.

124.    Furthermore, the imposition of new and impermissible naturalization

requirements has led to financial distress and hardship for many Plaintiffs.  The legal

immigration status of many Plaintiffs has been jeopardized by their enlistment in the U.S.

military combined with the unlawful delay in naturalization.  DHS officials have stated that, in

the agency's view, those Plaintiffs and members of the Class who entered the United States on F

or M nonimmigrant visas are subject to removal because of their enlistment in the U.S. Army.

According to the agency, these U.S. Army soldiers remain "lawfully presen[t]" in the United

States only "at the discretion of the agency" and only "for so long as DHS continues to forbear"

removal proceeding against them.  Furthermore, current DHS guidance relating to F and M

nonimmigrant visas provides that if a MAVNI Selected Reserve soldier receives "compensation

during Reserve duty, this marks the beginning of employment and the [Designated School

Officials] must terminate the student SEVIS record."  While DHS officials state that, at least for

now, the agency "will not enforce the requirement that designated school officials terminate the

Student and Exchange Visitor Information System (SEVIS) record of a student solely because he or she accepts compensation for participating in Reserve duty," the "requirement" still exists and this representation affords no comfort whatsoever to MAVNI soldiers whose enrollment already has been terminated or will yet be terminated by school officials in compliance with this DHS requirement.   Moreover, upon revocation of their existing N-426 certifications pursuant to the New DoD N-426 Policy, Plaintiffs will lose the modicum of protection and assurance against removal and deportation afforded to them by virtue of having a pending naturalization application.

125.    Indeed, Defendants' irrational policies have placed Plaintiffs and the members of the Class in an impossible situation.  On the one hand, Defendants maintain that, by volunteering to serve as MAVNI soldiers and applying for citizenship (which is expressly required of MAVNI soldiers), Plaintiffs and the members of the Class have demonstrated "immigrant intent" and thus cannot maintain or renew their legal non-immigrant status.  On the other hand, Plaintiffs and the members of the Class are being faulted, as MAVNIs, for not maintaining their legal non-immigrant status.

126.    Without the ability to obtain a job, a driver's license, a passport (which has prevented certain Plaintiffs from visiting loved ones, including ill family members), additional educational opportunities, and the myriad of other privileges that naturalization would afford, many of these Plaintiff soldiers and their families are suffering.  Further, the new uncertainty associated with their military careers, and concomitantly their legal status, is causing anguish and is particularly unconscionable given that each Plaintiff is serving during a period of armed conflict and has sworn an oath to protect and defend the United States.

44

127.    Finally, any loss of the opportunity to become U.S. citizens on the part of

Plaintiffs or the members of the Class, after already having volunteered to serve in the United

States military, could subject these individuals to extreme peril.  These individuals would be

subject to deportation to countries of origin such as, for example, China, where they could face

prosecution and imprisonment because of their decision to enlist in the U.S. Army and to swear

their allegiance to the United States and the Constitution.

## CLASS ACTION ALLEGATIONS

128.    The named Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of

Civil Procedure on behalf of themselves and all other persons similarly situated.  The named

Plaintiffs seek to represent the following class:

129.    Class: All individuals who have: (i) enlisted in the Selected Reserve through the

MAVNI program; (ii) have served honorably in the U.S. military through participation in at least

one Selected Reserve drill period or in an active-duty status; (iii) have received from the U.S.

military executed Form N-426s certifying their honorable service as members of the Selected

Reserve or in active-duty status; (iv) have submitted N-400 Applications for Naturalization to

USCIS; and (v) have had the processing or final adjudication of their naturalization applications

(including naturalization itself) withheld or delayed because of (a) a final USCIS processing hold

for MAVNIs, (b) a United States Department of Defense N-426 policy review, (c) a DoD N-426

recall/decertification policy, (d) enhanced DoD security screenings, (e) a DoD Consolidated

Adjudications Facility ("CAF") adjudication, (f) a so-called national security determination,

and/or (g) a so-called military service suitability vetting or determination..

130.    The members of the Plaintiffs' class warrant class action treatment because they

fulfill the certifying requirements under Rule 23(a) of the Federal Rules of Civil Procedure

("Rule 23(a)").  One DoD official has stated that as many as 10,000 individuals have been

recruited through the MAVNI program.  While the exact number of class members is unknown

to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs

believe that there currently are hundreds of members in the proposed class.  The May 19, 2017

DoD Action Memo indicates that, as of the date that information was compiled, there were at

least 500 current members of the proposed class.  Plaintiffs expect the proposed class to grow

during the pendency of this litigation and even perhaps after the conclusion of the litigation as

additional MAVNI soldiers who have been serving honorably with the U.S. military through

participation in Selected Reserve drill periods or in an active-duty status receive their unlawfully

withheld N-426 Forms, enabling them to apply for naturalization pursuant to 8 U.S.C. § 1440.

Once those individuals meet the class characteristics described herein, they should be allowed to

join the class and obtain any relief granted to the class.

131.     The proposed class meets the numerosity requirement of Rule 23(a)(1) because

the members of the class are so numerous that joinder of all members is impractical.

132.     The proposed class meets the commonality requirement of Rule 23(a)(2) because

there are questions of law and fact common to the class.  The questions of law and fact common

to the class include, for example: whether the DHS Defendants are acting contrary to the

pertinent statute and regulations by suspending processing of MAVNI applications for

naturalization pending special background investigations imposed by DoD; whether the DHS

Defendants' actions are arbitrary, capricious, and/or irrational; and whether DoD's N-426

policies are contrary to law.

133.     The proposed class meets the typicality requirement of Rule 23(a)(3) because

claims of the named Plaintiffs are typical of the claims of each of the class members.  Class

members similarly are affected by Defendants' wrongful conduct in violation of federal law, including 8 U.S.C. § 1440, that is described herein.

134.    The named Plaintiffs will fairly and adequately protect the interests of the class as required by Rule 23(a)(4) because their interests are identical to those of the other members of the classes.  Fair and adequate protection of the interests of the class will be further ensured because the named Plaintiffs are represented by competent legal counsel who are experienced in federal litigation, are undertaking representation on a pro bono basis, and have adequate resources and commitment to represent the class as a whole.

135.    Furthermore, as contemplated by Rule 23(b)(1), if the individual members of the class were to bring separate suits to address Defendants' policies, practices, and actions and inactions, Defendants may address the cases of the named Plaintiffs but ignore the naturalization applications and concerns of the remaining class members, thereby exacerbating Defendants' violations of the law.  Resolving this matter as a class action also would serve the Court's interest in judicial economy, by avoiding overburdening the Court with individual lawsuits brought by each of the many enlistees recruited through the MAVNI program whose naturalization applications are, or will be, subject to DoD's and DHS's unlawful policies.

136.    Alternatively, this case qualifies for class action treatment under Rule 23(b)(2) because Plaintiffs seek final injunctive and declaratory relief.  This relief is appropriate for the whole class as Defendants' actions and/or refusals to act apply generally to the class as a whole.

## CLAIMS FOR RELIEF

### Count I: Declaratory Judgment

137.    Plaintiffs re-allege paragraphs one through one hundred thirty-seven as if fully set forth herein.

47

138.   28 U.S.C. § 2201 authorizes a court, "[i]n a case of actual controversy within its jurisdiction . . . upon the filing of an appropriate pleading" to "declare the rights and other legal relations of any interested party seeking such declaration."

139.   8 U.S.C. § 1440 establishes a clear, limited, and purely ministerial role for DoD in the naturalization process.  DoD's role simply is to verify, by way of Form N-426, whether a service member has served or is serving honorably.

140.   DoD's limited role in the naturalization process does not include performing military-specific background checks, including an SSBI/Tier 5 background investigation, CI review or interview, NIAC, and "issue-oriented interview and/or issue-oriented polygraph" checks as a pre-requisite to naturalization.  Notwithstanding this limited role, Defendants have halted the processing of Plaintiffs' naturalization applications on the erroneous basis that naturalization pursuant to 8 U.S.C. § 1440 is dependent on the completion and results of a military-specific DoD background check and/or post-enlistment military suitability vetting, DHS Defendants have implemented a policy to stop the processing of MAVNI naturalization applications pending completion of such "enhanced DoD security checks" and suitability vetting, and DHS Defendants have applied that policy to halt the processing and/or final adjudication of Plaintiffs' naturalization applications.

141.   8 U.S.C. § 1440 and the implementing regulations promulgated thereunder further provide that service members with honorable service *either* as a member of the Selected Reserve of the Ready Reserve *or* in an active-duty status are eligible for naturalization under Section 1440.  Service in an active duty status is not required.  In contradiction to the plain and clear language of the statute and regulations, DoD has adopted policies precluding the certification of honorable service for members serving in the Selected Reserve until such service members serve

in an active duty status.  Moreover, the New DoD N-426 Policy, issued on October 13, 2017, purports to revoke, recall, or decertify the existing N-426 certifications of honorable service already issued to Plaintiffs and the Class and to withhold issuance of new certifications pending a determination that these soldiers successfully completed a "background investigation and suitability vetting."  DoD has no such revocation, recall, or decertification authority under the law, nor may it impose these additional requirements as a condition to keeping or obtaining an N-426.

142.    Accordingly, Plaintiffs seek declaratory judgment that:

(i)      DoD's role pursuant to 8 U.S.C. § 1440 is limited to executing Form N-426 confirming whether a service member has served or is serving honorably;

(ii)     Congress has not imposed post-enlistment DoD background checks, including the SSBI/Tier 5, CI review or interview, NIAC, and "issue-oriented interview and/or issue-oriented polygraph" checks, and/or suitability vetting as naturalization conditions for persons applying for naturalization under 8 U.S.C. § 1440;

(iii)    DHS and USCIS may not, on the basis of DoD instruction or otherwise, stop, suspend, delay, or hold the processing or final adjudication of the naturalization applications of MAVNIs with honorable service (as may be confirmed by a MAVNI's commander on Form N-426) pending completion of any SSBI/Tier 5, CI, NIAC, "issue-oriented interview and/or issue-oriented polygraph" checks, or other military- or DoD-specific background investigations other than the DCII; and

(iv)    DoD may not (a) refuse to issue or withhold Form N-426s, (b) refuse to certify honorable service, and/or (c) revoke, rescind, or invalidate previously issued N-

426 certifications, for members of the Selected Reserve on the basis that such

service members have not served in an active duty status or pending post-

enlistment background investigations or suitability vetting.

**Count II: Temporary, Preliminary and Permanent Injunctive Relief**

143.    Plaintiffs re-allege paragraphs one through one hundred forty-three as if fully set

forth herein.

144.    DoD Defendants unlawfully and improperly have instructed DHS Defendants to

suspend the processing or final adjudication of Plaintiffs' N-400 Applications for Naturalization,

and have otherwise unlawfully interfered with the processing of such applications, contrary to

applicable law.

145.    DHS Defendants unlawfully and improperly have complied with DoD's

instruction and have failed to process Plaintiffs' N-400 Applications for Naturalization in

accordance with their obligations under law, affirmatively have implemented a policy to prevent

the final adjudication of MAVNI naturalization applications pending completion of "enhanced

DoD security checks," and have applied that policy to halt the processing of Plaintiffs'

naturalization applications in this case.

146.    Plaintiffs have been, and will continue to be, substantially and irreparably harmed

by Defendants' unlawful and improper actions, for which there is no adequate remedy at law.

Under the facts and circumstances of this case, the balance of the equities clearly favors

Plaintiffs, and injunctive relief is in the public interest.

147.    Accordingly, Plaintiffs seek preliminary injunctive relief against the DHS

Defendants:

(i)     to place and maintain the parties in the pre-dispute status quo;

50

(ii)    to preliminarily set aside the DHS Defendants' "hold" on the processing and final adjudication of Plaintiffs' N-400 Applications for Naturalization;

(iii)   to preliminarily compel the DHS Defendants to immediately resume adjudicating Plaintiffs' N-400 Applications for Naturalization to decision (and citizenship oath if warranted) without awaiting (a) any "enhanced DoD security checks," (b) any review or re-evaluation by DoD of already-issued Form N-426s, or (c) any revocation, recall, or decertification of Plaintiffs' existing N-426 honorable service certifications; and

(iv)   to compel the DHS Defendants to provide weekly reports to the Court and Plaintiffs of the status of the adjudication of Plaintiffs' and the Class' N-400 Applications for Naturalization.

148.    Plaintiffs seek permanent injunctive relief against the DHS Defendants:

(i)     to set aside the DHS Defendants' "hold" on the processing and final adjudication of the N-400 Applications for Naturalization duly filed by Plaintiffs and the Class;

(ii)    to compel the DHS Defendants to adjudicate to decision (including oath if warranted) the N-400 Applications for Naturalization duly filed by Plaintiffs and the Class without awaiting (a) any "enhanced DoD security checks," (b) any review or re-evaluation by DoD of already-issued Form N-426s, or (c) any revocation, recall, or decertification of Plaintiffs' existing N-426 honorable service certifications;

(iii)   to compel the DHS Defendants to comply with their statutory obligations pursuant to 8 U.S.C. § 1440 and to process without further delay and

without imposing any additional requirements for naturalization the N-400 Applications for Naturalization duly filed by Plaintiffs and the Class; and

(iv)   to compel the DHS Defendants to grant priority to, and expedite, the processing of the N-400 Applications for Naturalization duly filed by Plaintiffs and the Class to avoid further harm as the harm that has been caused by the unlawful processing suspension that has been imposed on such applications to date.

149.   Plaintiffs seek temporary and/or preliminary injunctive relief against the DoD Defendants:

(i)   to place and maintain the parties in the pre-dispute status quo;

(ii)   to temporarily and preliminarily set aside the application to Plaintiffs and the Class of any policy of DoD Defendants that requires service in an active duty status for certification of honorable service under 8 U.S.C. § 1440(a);

(iii)   to temporarily and preliminarily restrain the DoD Defendants from decertifying, rescinding, recalling, revoking, or otherwise invalidating Plaintiffs' existing and duly issued Form N-426s pursuant to the New DoD N-426 Policy or otherwise, except as related to the conduct of an individual Plaintiff and based on sufficient grounds generally applicable to members of the military for re-characterization of service; and

(iv)   to temporarily and preliminarily restrain the DoD Defendants from discharging Plaintiffs pending adjudication of their N-400 Applications for Naturalization, except as related to the conduct of an individual Plaintiff and

based on sufficient grounds generally applicable to members of the military for discharge from service.

150.   Plaintiffs seek permanent injunctive relief against the DoD Defendants:

(i)   to enjoin the DoD Defendants from interfering with the processing and adjudication of the N-400 Applications for Naturalization duly filed by Plaintiffs and the Class;

(ii)   to set aside the application to Plaintiffs and the Class of any policy of DoD Defendants that requires service in an active duty status for certification of honorable service under 8 U.S.C. § 1440(a);

(iii)   to restrain the DoD Defendants from decertifying, rescinding, revoking, or otherwise invalidating the existing and duly issued Form N-426s of Plaintiffs and the Class pursuant to the New DoD N-426 Policy or otherwise, except as related to the conduct of an individual Plaintiff or member of the Class and based on sufficient grounds generally applicable to members of the military for re-characterization of service; and

(iv)   to restrain the DoD Defendants from discharging Plaintiffs or members of the Class pending final adjudication of their N-400 Applications for Naturalization, except as related to the conduct of an individual Plaintiff or member of the Class and based on sufficient grounds generally applicable to members of the military for discharge from service.

151.   Plaintiffs further seek temporary, preliminary, and permanent injunctive relief, as necessary, against the Defendants enjoining them from taking any retaliatory actions against the Plaintiffs and the Class.

## Count III: Relief Pursuant to the Administrative Procedure Act

152.     Plaintiffs re-allege paragraphs one through one hundred fifty-two as if fully set forth herein.

### Relief Pursuant to 5 U.S.C. § 706(1)

153.     5 U.S.C. § 706(1) authorizes a court to "compel agency action unlawfully withheld or unreasonably delayed."  Reviewable agency action includes an agency's failure to act.  DHS Defendants unlawfully have withheld and/or unreasonably delayed the processing of the N-400 Applications for Naturalization duly filed by Plaintiffs and the Class contrary to the requirements of applicable law including 8 U.S.C. § 1440.

154.     Plaintiffs have a clear right to apply for naturalization pursuant to 8 U.S.C. § 1440, which provides an expedited pathway to citizenship.  Defendants have interfered with that right and the only adequate remedy is to order DHS Defendants to resume processing Plaintiffs' applications solely in accordance with existing naturalization criteria, law, and regulations.

155.     Specifically, Plaintiffs and members of the Class have a clear right under the law to adjudication of their naturalization applications without the additional requirement being imposed by DHS Defendants of "enhanced DoD security checks."  Notwithstanding this clear right to immediate adjudication on the present record, DHS Defendants have refused to adjudicate the N-400 Applications for Naturalization duly filed by Plaintiffs and members of the Class pending completion of an additional requirement that is contrary to law.  DHS Defendants have unlawfully withheld action required by law — *i.e.*, adjudication of the N-400 Applications

of Plaintiffs and the members of the Class on the present record — entitling Plaintiffs and the

Class to relief under 5 U.S.C. § 706(1).

156.     Plaintiffs and the members of the Class have the further right to reasonably timely

adjudication of their N-400 Applications for Naturalization.  Plaintiffs' applications for

naturalization already have been pending in excess of DHS's average processing time for military

applications.  Moreover, pursuant to 8 U.S.C. § 1571(b), Congress has made clear that processing

of naturalization applications – in the normal course (not taking into account the "expedited"

processing contemplated by 8 U.S.C. § 1440 or for military applications generally), should take

no longer than 180 days from the date of the filing of the naturalization application.  Defendant

officials further admit that they cannot even estimate the additional time it would take to

complete the "enhanced DoD security checks" that DHS has (unlawfully) imposed on these

applications.  This already unreasonable delay was compounded by DoD's improper N-426

policy review, and DHS's action to further "hold" the processing of MAVNI applications

pending that N-426 policy review.  DHS Defendants have placed Plaintiffs and the members of

the Class in a state of limbo and left them to languish there indefinitely.  DHS Defendants

unreasonably have delayed, and continue to unreasonably delay, the adjudication of the N-400

Applications for Naturalization duly filed by Plaintiffs and the members of the Class, further

entitling Plaintiffs and the Class to relief under 5 U.S.C. § 706(1).

157.     Accordingly, Plaintiffs seek an order from the Court pursuant to 5 U.S.C. § 706(1)

compelling DHS Defendants: (i) to comply with their statutory obligations pursuant to 8 U.S.C.

§ 1440 and otherwise to immediately act upon and process without further delay the N-400

Applications for Naturalization duly filed by Plaintiffs and the Class; and (ii) to grant priority to,

and expedite, the processing of the N-400 Applications for Naturalization duly filed by Plaintiffs and the Class to avoid further harm.

## Relief Pursuant to 5 U.S.C. § 706(2)

158.    5 U.S.C. § 706(2) authorizes a court to hold unlawful and set aside final agency action found to be arbitrary, capricious, an abuse of discretion (*e.g.* irrational), or otherwise not in accordance with law, in excess of statutory jurisdiction or authority, or without observance of procedure required by law.

159.    DHS Defendants have imposed a new requirement on MAVNI applicants for naturalization that mandates completion of "enhanced DoD security checks" that have never before been applied to any type of applicant for naturalization and which previously has been used only in connection with granting high-level security clearances.  DHS Defendants have implemented a policy to stop the processing of MAVNI naturalization applications pending completion of such "enhanced DoD security checks."  And DHS Defendants have applied that policy to halt the processing of the N-400 Applications for Naturalization duly filed by Plaintiffs and the members of the Class.

160.    DHS Defendants have imposed a new substantive requirement for naturalization that is not in accordance with law.  8 U.S.C. § 1440 does not impose security clearance screenings as part of the naturalization process and nothing in the statute authorizes Defendants to impose this additional substantive requirement.  On the contrary, in enacting Section 1440, Congress intended to reward Plaintiffs and the Class for answering the call to service during periods of armed conflict by "relax[ing] the preconditions for naturalization established in Section 1427."  And the statute otherwise makes clear that no additional requirements for naturalization should be placed on this class of individuals that are not generally required for

56

naturalization by providing that "[a] person filing an application under . . . this section shall

comply in all other respects with the requirements of this subchapter [relating to naturalization

generally]."  Yet, DHS Defendants have punished and disadvantaged these soldiers, and only

these soldiers, by imposing one of the most onerous requirements for naturalization that one

could imagine — successful completion of a rigorous investigation for top-level security

clearance.

      161.    Furthermore, Section 1440 was enacted specifically to eliminate the length-of-

residency requirement normally required for naturalization for this class of individuals — *i.e.*,

those willing to volunteer to serve during periods of armed conflict.  However, through DHS's

new requirement and its justification, DHS Defendants effectively have reinstated the length-of-

residency requirement that Congress expressly eliminated.

      162.    DHS Defendants' action is arbitrary, capricious, and irrational.  On July 7, 2017,

USCIS issued its "hold" directive to field offices as follows:  "USCIS has determined that the

completion of DOD background checks is relevant to a MAVNI recruit's eligibility for

naturalization.  As such, all pending and future MAVNI cases may not proceed to interview,

approval, or oath until confirmation that all enhanced DoD security checks are completed."

However, at the time USCIS issued this directive, it understood that: (i) DoD had no intention of

conducting the "enhanced DoD security checks"; (ii) DoD did not have the resources to conduct

such security checks; and (iii) that DoD instead intended to discharge these MAVNI Selected

Reserve soldiers without performing such security checks.

      163.    Yet, even assuming that DoD now has the intention and resources to conduct the

"enhanced DoD security checks" in question, DHS Defendants' action nonetheless is arbitrary,

capricious, and irrational because it is divorced from DHS's stated rationale for the action.  Most

of the Plaintiffs, including likely most MAVNIs generally, have resided in the U.S. for longer than the period required for naturalization of legal permanent residents (typically three to five years, or less).  Some of the Plaintiffs have resided in the United States since childhood.  There is no valid basis to apply the "enhanced DoD security check" requirement to them under the agency's stated rationale for the requirement, which relates to otherwise allegedly inadequate investigatory "scope" resulting from lack of sufficient U.S. residency duration.  The agency's action is particularly unreasonable in light of the agency decision makers' lack of understanding of what Tier 3 and Tier 5 investigations entail at the time the directive was implemented.

164.    Importantly, if DHS Defendants merely wanted to await the results of the DoD background investigations in order to use those background materials to make their own independent assessment of good moral character or attachment to the Constitution, DHS Defendants would have insisted that the product of those investigations be sent to them for review, without awaiting for DoD's assessment of whether the applicant met the criteria necessary to receive a Top Secret security clearance.  Yet, even though the background investigations have been completed for several of the Plaintiffs and, on information and belief, other members of the Class, DHS has not requested or received the background information they say they will use to inform their naturalization decision.

165.    In all events, DHS Defendants' "hold" is arbitrary and capricious for the further reason that it treats similarly-situated individuals differently both in relation to the thousands of MAVNI soldiers that have naturalized without "enhanced DoD security checks" and in relation to the thousands of other individuals who have naturalized with equal or less residency time in the United States than most of the Plaintiffs and other members of the Class.

166.    DHS Defendants' action has been undertaken and applied to Plaintiffs and the Class without observance of procedure required by law.  DHS Defendants have imposed a new substantive legal requirement on MAVNI applications for naturalization that requires completion of "enhanced DoD security checks" as a pre-condition for adjudication.  This new requirement is not a mere interpretation of the "good moral character" requirement set forth in the statute and regulations (or any other term, for that matter).  The existing regulations already extensively define what constitutes "good moral character" and what does not.  Further, the existing regulations provide that the scope of the good moral character investigation for these applicants need cover only one-year prior to the date of application, *see* 8 C.F.R § 329.2(d), whereas the agency's justification for the "enhanced DoD background check" requirement is that such investigations cover many prior years.  DHS Defendants' action is thus a new substantive legal requirement that is subject to the notice and comment requirements of 5 U.S.C. § 553 prior to implementation.  DHS Defendants failed to comply with such requirements before issuing their "hold" directive and applying that directive to Plaintiffs' applications.

167.    Alternatively, DHS Defendants failed to comply with the publication requirements of 5 U.S.C. § 552, which requires publication in the Federal Register of all "rules of procedure" and "statements of general policy or interpretations of general applicability formulated and adopted by the agency."  DHS Defendants have made clear that their "hold" directive applies to "all currently pending and future MAVNI naturalization applicants applying for naturalization under section 329(a), 8 U.S.C. § 1440(a)."  Thus, the directive is one of general applicability subject to the publication requirements of 5 U.S.C. § 552.

168.    Section 552 further provides that, "[e]xcept to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or

be adversely affected by, a matter required to be published in the Federal Register and not so published." Plaintiffs and the members of the Class had no actual notice of DHS Defendants' "hold" directive and were adversely affected by the agency's failure to timely publish that directive. Among other things, had Plaintiffs known prior to enlistment that these lengthy background checks would be a pre-requisite to naturalization, that they would risk losing their then-existing legal immigration status because of the extensive delays, that they would face the risk of discharge prior to naturalization because of such delays, and that they would face the risk of deportation back to their countries of origin (such as, for example, China) after having volunteered to serve in the US armed forces and sworn allegiance to the United States, then Plaintiffs and the members of the Class would have followed a different path and arranged their affairs differently. DHS Defendants' failure to timely publish their "hold" directive precludes DHS Defendants from retroactively applying the directive to the naturalization applications filed by Plaintiffs and the members of the Class.

169.    DHS Defendants' action is arbitrary, capricious, irrational, otherwise not in accordance with law, and without observance of procedure required by law, entitling Plaintiffs and the Class to relief under 5 U.S.C. § 706(2).

170.    Accordingly, Plaintiffs seek an order: (i) holding unlawful and setting aside DHS Defendants' directive requiring the completion of "enhanced DoD security checks" as a prerequisite to adjudication of the N-400 Applications for Naturalization duly filed by Plaintiffs and the Class; (ii) declaring such directive arbitrary, capricious, otherwise not in accordance with law and without observance of procedure required by law; and (iii) enjoining DHS Defendants from applying such directive to the processing of the N-400 Applications for Naturalization duly filed by Plaintiffs and the Class.

60

171.     In mid-2017, DoD Defendants implemented a policy precluding the certification of honorable service under Section 1440 for members serving in the Selected Reserve until such service members serve in an active duty status.  DoD Defendants' policy is contrary to the plain language of the statute and implementing regulations, which unambiguously provide that service members with honorable service *either* as a member of the Selected Reserve of the Ready Reserve *or* in an active-duty status are eligible for naturalization.  DoD Defendants' policy also is directly contrary to the decision by Congress to amend Section 1440 to broaden the statute's scope specifically to include service by members of the Selected Reserve.  Finally, DoD "active-duty" service requirement is facially incompatible with the statute because, according to DoD officials, it applies only to language MAVNI Selected Reservists and not to medical MAVNI Selected Reservists, while the statute makes no reference whatsoever to skill or occupation.  DoD Defendants' policy is not in accordance with law entitling Plaintiffs and the Class to relief under 5 U.S.C. § 706(2).

172.     On October 13, 2017, without rescinding the prior N-426 policy which requires active duty service, DoD implemented the New DoD N-426 Policy.  Like the mid-2017 policy, the New DoD N-426 Policy expressly maintains the unlawful active duty service requirement at least for any post-October 13, 2017 enlistments or accessions.  The New DoD N-426 Policy specifies that the N-426 Forms previously issued to Plaintiffs and the Class will be recalled and decertified.  Thereafter, according to the policy, Plaintiffs and the Class will not be eligible to receive a new N-426 Form until, at a minimum, following a DoD "background investigation and suitability vetting."  The purported N-426 recall and new N-426 eligibility conditions are contrary to law, arbitrary, capricious, irrational, an abuse of discretion, and the result of DoD acting outside of its authority, entitling Plaintiffs and the Class to relief under 5 U.S.C. § 706(2).

173.     Accordingly, Plaintiffs seek an order: (i) holding unlawful and setting aside DoD

Defendants' N-426 policy precluding the certification of honorable service for members of the

Selected Reserve who have not served in an active duty status; (ii) declaring such policy not in

accordance with law; (iii) enjoining DoD Defendants from revoking or withholding issuance of

N-426s or certifications of honorable service on the basis of the mid-2017 policy or New DoD N-

426 Policy; and (iv) enjoining DoD Defendants from applying these policies to Plaintiffs and the

Class.

### Count IV: Mandamus

174.     Plaintiffs re-allege paragraphs one through one hundred seventy-four as if fully set

forth herein.

175.     DHS Defendants unlawfully and improperly have failed to process the N-400

Applications for Naturalization duly filed by Plaintiffs and the Class in accordance with their

obligations under law.

176.     28 U.S.C. § 1361 authorizes a court to "compel an officer or employee of the

United States or any agency thereof to perform a duty owed to the plaintiff" if the plaintiff can

demonstrate that: (1) the plaintiff seeking mandamus has a clear right to the relief requested;

(2) the defendant has a clear duty to perform the act in question; and (3) no other adequate

remedy is available.

177.     Plaintiffs have a clear right to apply for naturalization pursuant to 8 U.S.C.

§ 1440, which provides an expedited pathway to citizenship, and to have their N-400

Applications for Naturalization immediately adjudicated on the present record.  Defendants have

interfered with that right and the only adequate remedy is to order DHS Defendants to resume

processing Plaintiffs' applications solely in accordance with existing naturalization criteria, law, and regulations.

178.    Accordingly, Plaintiffs seek issuance of a writ of mandamus compelling DHS Defendants: (i) to comply with their statutory obligations pursuant to 8 U.S.C. § 1440 to immediately act upon and process without further delay the N-400 Applications for Naturalization duly filed by Plaintiffs and the Class; and (ii) to grant priority to, and expedite, the processing of the N-400 Applications for Naturalization duly filed by Plaintiffs and the Class to avoid further harm as the harm that has been caused by the unlawful processing suspension that has been imposed on such applications to date.

## Count V: Constitutional Violations

179.    Plaintiffs re-allege paragraphs one through one hundred seventy-nine as if fully set forth herein.

180.    Under the Constitution, namely, the "Uniform Rule of Naturalization" clause, Congress has the sole power to establish criteria for naturalization.

181.    By enacting 8 U.S.C. § 1440, Congress has specified the naturalization eligibility conditions for Selected Reservists such as Plaintiffs and the Class.

182.    Congress did not specify that persons seeking naturalization under Section 1440 must first complete enhanced military background investigations – including the Tier 5/SSBI requirements being imposed on Plaintiffs and the Class – nor did Congress make it a condition of naturalization that such persons – already serving in the military – undergo any further suitability vetting.  The unlawful policies and practices here therefore constitute additional, non-statutory, substantive pre-conditions to naturalization that are being imposed by Defendants.  As such, they

violate the Constitution with resulting harm to Plaintiffs and the Class, and effectively deprive them of their right to pursue naturalization under the law.

183.    Plaintiffs and the Class are eligible and entitled by law – namely, 8 U.S.C. § 1440 – to apply for naturalization as Selected Reservists serving honorably in the U.S. military during wartime.  If Plaintiffs and the Class are statutorily eligible to become naturalized under this statute (as they so allege), DHS must grant their applications; DHS has no discretion to deny naturalization to a person who satisfies the criteria established by Congress for naturalization. Defendants' imposition of unauthorized, unlawful, and arbitrary conditions on Plaintiffs' ability to apply for and have timely adjudicated their applications for naturalization violates Plaintiffs' right to due process under the Fifth Amendment to the U.S. Constitution because these soldiers cannot lawfully be denied immigration benefits – namely naturalization – for which they are eligible and are seeking.

184.    Plaintiffs request that the Court grant appropriate equitable relief on the forgoing basis.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs, on behalf of themselves and the class, respectfully request that this Court:

1.  Assume jurisdiction over this action;

2.  Issue the declaratory judgment requested in Count I of this Complaint;

3.  Grant the preliminary and permanent injunctive relief requested in Count II of this Complaint;

4.  Grant the relief requested pursuant to the APA (Count III of this Complaint);

5.  Issue the mandamus requested in Count IV of this Complaint;

6.   Grant the relief requested pursuant to Count V of this Complaint;

7.   Award Plaintiffs and the Class reasonable costs and attorneys' fees, including under

the Equal Access to Justice Act;

8.   Award such further relief as the Court deems just or appropriate.

Respectfully submitted this 20th day of October 2017.

_____/s/ Joseph J. LoBue_____
Joseph J. LoBue (D.C. Bar No. 484097)
Douglas W. Baruch (D.C. Bar No. 414354)
Jennifer M. Wollenberg (D.C. Bar No. 494895)
Neaha P. Raol (D.C. Bar No. 1005816)
Shaun A. Gates (D.C. Bar No. 1034196)
Katherine L. St. Romain (D.C. Bar No. 1035008)
Webster R. M. Beary (D.C. Bar No. 1041653)
Fried, Frank, Harris, Shriver & Jacobson LLP
801 17th Street, NW
Washington, D.C. 20006
Telephone:  (202) 639-7000
Facsimile:  (202) 639-7003
Email:  joseph.lobue@friedfrank.com
Email: douglas.baruch@friedfrank.com
Email: jennifer.wollenberg@friedfrank.com

*Counsel for Plaintiffs*
