# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| KUSUMA NIO, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Case No. 1:17-cv-00998-ESH-RMM** |
| | ) | |
| UNITED STATES DEPARTMENT | ) | **[Oral Argument Requested]** |
| OF HOMELAND SECURITY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

_____)

## PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs Haendel Crist Calisto Alves de Almeida, Prashanth Batchu, Lucas Calixto, Shu Cheng, Seung Joo Hong, Wanjing Li, Ye Liu, and Emeka Udeigwe (collectively, "Plaintiffs"), for themselves and on behalf of the certified Class, by and through undersigned counsel, respectfully move this Court for a temporary restraining order and a preliminary injunction pursuant to Rules 65.1(a) and 65.1(c) of the Local Rules of the U.S. District Court for the District of Columbia and Rule 65 of the Federal Rules of Civil Procedure.

As set forth in the accompanying Memorandum of Points and Authorities, and the exhibits and declarations attached thereto, Defendants continue to engage in a wide range of unlawful conduct impeding and delaying the adjudication of the naturalization applications filed by Plaintiffs and the Class, including:

(a)     Failing and refusing to comply with their own July 7, 2017 policy (the "July 7 Policy") by withholding and/or further delaying naturalization adjudication even for those soldiers who have satisfied all of the requirements of that policy;

(b)     Mandating that soldiers undergo a second, redundant FBI check identical to the FBI check conducted as part of the "enhanced DoD security checks" ("Redundant FBI Check Policy") solely on the grounds that USCIS purportedly was not the requesting agency for the initial FBI check;

(c)     Refusing to request and review, or unreasonably delaying the request for and review of, the information gathered in connection with Defendants' "enhanced DoD security checks," so as to withhold and/or further delay the naturalization of eligible soldiers, and otherwise failing to set up any process whatsoever for the timely exchange of such information;

(d)     Refusing to report, or unreasonably delaying the reporting of, the completion of "enhanced DoD security checks" for soldiers so as to withhold and/or further delay the naturalization of such soldiers, and otherwise failing to set up any process whatsoever for the timely reporting of such information;

(e)     Mandating, as a condition of naturalization adjudication, that soldiers who have already completed their "enhanced DoD security checks" further successfully complete irrelevant, military-specific National Security Determination ("NSD") and Military Service Suitability Determination ("MSSD") adjudications (the "NSD/MSSD Policy"); and

(f)     Systematically imposing a wide array of unlawful additional prerequisites for adjudication of naturalization applications, such as: requiring the completion of Basic Combat Training ("BCT"), Advanced Individual Training ("AIT"), or other active-duty service; submission by the applicant of a Form DD-214 (Certificate of

Release or Discharge from Active Duty); or satisfaction of the criteria set forth in a now-enjoined October 13, 2017 DoD policy memorandum.

Defendants conduct is causing severe irreparable injury to the Class members and Plaintiffs as it further substantially delays the adjudication of their naturalization applications and compounds and exacerbates the irreparable harm that these individuals already have experienced as a consequence of the inordinate delays caused by the July 7 Policy itself.

In addition, eleven days ago, Defendants produced to Plaintiffs what Defendants identify as the purported administrative record for the July 7 Policy ("Agency Record" or "AR").  However, a significant percentage of the record remains redacted and unavailable to Plaintiffs or their counsel, delaying their ability to respond.[1]  In addition, even with the redactions, the record is razor thin, comprising a total of 232 pages, some of which are duplicative.  Apart from omitting important documents, it includes improper material that actually post-dates the July 7 Policy. Plaintiffs anticipate substantial disputes with Defendants over the content of the Agency Record before it is finalized.

Yet, that part of the Agency Record provided to date – along with the record index (Dkt. 111, at 3–5) contains critical information relevant to the July 7 Policy that shows that there is no reasonable justification for the July 7 Policy and that the agency's action was arbitrary and capricious.  The Court denied (without prejudice) Plaintiffs' initial motion in this case to preliminarily enjoin the July 7 Policy, notwithstanding the irreparable harm that it was causing,

---

[1]   Acknowledging this problem, on March 13, 2018, Defendants agreed to an extension for the Plaintiffs' response: "21 days after the production of the unredacted (inasmuch as it will be) Record following entry of the order will be fine, so long as we get 14 days after that for our reply (which we get now.)."  Plaintiffs have not yet sought an extension from the Court, but will do so shortly. Neither Plaintiffs nor the Court should have to adjudicate the lawfulness of the July 7 Policy on a defense motion for summary judgment without first resolving disputes over access to and the content of the Agency Record.

because Plaintiffs had yet to establish likelihood of success on the merits at that stage of the proceedings.  *See* Dkts. 43, 44.  But, at that time, neither Plaintiffs nor the Court had the benefit of any part of Agency Record.  The record produced by Defendants in no way supports the major change in naturalization policy embodied by the July 7 Policy and otherwise demonstrates that the agency's action is arbitrary and capricious.  In fact, the Agency Record reveals that the agency decision-maker never even reviewed or considered the classified reports that Defendants previously relied on so heavily (and provided *in camera* for the Court to rely on) as the principal justification for the July 7 Policy.

Plaintiffs note that Defendants recently filed a motion for summary judgment on the issue of the lawfulness of the July 7 Policy.  In connection with the opposition to such motion, Plaintiffs intend to cross move for summary judgment in their favor on that issue.  However, that issue cannot be fully briefed and submitted for some time because, as noted, Plaintiffs have not yet been provided with an unredacted version of the materials that Defendants claim constitute the Agency Record, nor have Plaintiffs had the opportunity to challenge the completeness of the record or to supplement Defendants' record designation with material that properly should be part of the record.  *See* 01/23/18 Hrg. Tr. at 85:10-14 ("THE COURT: The reason why we need the Agency Record to be filed is then you can go through the process and they can supplement it.  They're entitled to quibble with you.").[2]

---

[2]   Compounding these problems, Defendants failed to comply with the Local Rules by failing to provide a statement of undisputed facts with citation to the Agency Record.  *See* Dkt. 116-1, at 14–18.  *See also* Local Civil Rule 7(h)(1) ("Each motion for summary judgment shall be accompanied by a statement of material facts … which shall include references to the parts of the record relied on to support the statement."); 01/23/18 Hrg. Tr. at 74:13–15 ("THE COURT: I need [a motion] that has a statement that is tied to the documents, the way it says A.R. this and A.R. that.").  Defendants also have relied inappropriately in their summary judgment motion on numerous facts outside of each agency's respective administrative record, including the agency record for another policy and numerous post hoc facts and documents which occurred or were

For these reasons, there likely will be substantial delay before cross-motions for summary judgment can be properly submitted to and decided by the Court.  In the meantime, Plaintiffs and the Class are suffering extraordinary irreparable injury.  And the Agency Record as identified by Defendants – even without any challenge or supplementation by Plaintiffs – shows that Plaintiffs are likely to prevail on the merits of their claims.  As a consequence, Defendants' pending motion for summary judgment (unwarranted as it is) does not obviate the need for temporary and preliminary relief as to the July 7 Policy.

These circumstances – and the extraordinary harm that Plaintiffs and the Class are suffering as a result thereof – compel Plaintiffs to return to this Court to seek immediate relief temporarily and preliminary enjoining the July 7 Policy and the other unlawful policies and conduct set forth above.

Pursuant to Local Civil Rule 7(m), undersigned counsel for Plaintiffs met and conferred with counsel for Defendants by telephone on March 12, 2018 regarding Plaintiffs' motion for temporary and preliminary injunctive relief, but the parties were unable to resolve or narrow the disputed issues being brought to the Court in the present application.[3]

---

created after the July 7 Policy was implemented.  *See, e.g.*, Dkts. 116-1, at 14 (citing ECF No. 19-6), 16 (citing USCIS CAR at 2, a Declaration of Daniel Renaud dated March 5, 2018).  *See also* 01/23/18 Hrg. Tr. at 72:23–25, 75:9–13 ("THE COURT: No, that's where you run into trouble [citing the unclassified Miller declarations].  Maybe you didn't read what I said in *Kirwa*.  Those were post [hac] in most cases. … I am going to give you the opportunity and time to file a proper administrative record that does not include the third declaration of Ms. Miller.").

[3]    In addition, prior to this meet-and-confer, Plaintiffs brought their concerns about the policies and practices at issue in the present application to Defendants as they came to Plaintiffs' attention in recent weeks and months, in an effort to resolve these concerns without the need for Court intervention.  Unable to resolve these concerns through repeated discussions and correspondence, Plaintiffs requested to confer with Defendants about the present Motion on February 26, 2018.  Defendants' first availability for the meet-and-confer was not until two weeks later, on the afternoon of March 12, 2018.

For the reasons set forth in the accompanying memorandum, Plaintiffs respectfully request that the Court grant this motion and issue Orders temporarily and preliminarily:

(i)     Enjoining DHS Defendants from applying the July 7, 2017 Policy, the Redundant FBI Check Policy, or the NSD/MSSD Policy to Plaintiffs and the Class and directing DHS Defendants to immediately adjudicate the naturalization applications filed by Plaintiffs and the Class;

(ii)    Enjoining DHS Defendants from withholding or delaying the adjudication of naturalization applications for Plaintiffs and members of the Class who have completed "enhanced DoD security checks" and directing Defendants to immediately adjudicate naturalization applications filed by Plaintiffs and members of the Class to oath or denial following completion of the "enhanced DoD security checks," and in no event more than one month following a "favorable" MSSD determination (and for those Plaintiffs and Class members who already are past the one-month mark, within two weeks of the Court's order);

(iii)   Enjoining DoD Defendants from improperly interfering with the naturalization process by causing the delay or withholding of naturalization application processing and directing the DoD Defendants to report the completion of "enhanced DoD security checks" for all non-citizen Selected Reserve MAVNIs (including current *Kirwa* class members/future *Nio* Class members) to USCIS, the Court, and Plaintiffs' counsel immediately (and no later than five business days after completion or within five business days

of the Court's order for those non-citizen Selected Reserve MAVNIs whose

"enhanced DoD security checks" already are complete);

(iv)    Enjoining the DoD Defendants from discharging Plaintiffs or Class members

pending adjudication of their N-400 Applications for Naturalization, except as

related to the conduct of an individual and based on sufficient grounds generally

applicable to members of the military for discharge from service;

(v)    Directing Defendants to provide regular reports to the Court and Plaintiffs

of the status of the adjudication of Plaintiffs' and the Class' N-400

Applications for Naturalization;  and

(vi)    Directing Defendants to coordinate, cooperate, and make best efforts to

naturalize at the earliest opportunity at BCT/AIT any members of the Class

who have been shipped to BCT/AIT without having first been naturalized.

In support of this Motion, Plaintiffs submit the attached exhibits and declarations, including the declarations of Plaintiff Shu Cheng ("Cheng Decl."), twenty-seven additional Class members ("Class Member A," "Class Member B," and so on), and Jennifer Wollenberg ("Wollenberg Decl.").

Plaintiffs respectfully request that the Court hear oral argument on this Motion within twenty-one days of its filing, per Local Rule 65.1(d).

Dated: March 16, 2018                    Respectfully submitted,


                                        _____/s/ Joseph J. LoBue_____
                                        Joseph J. LoBue (D.C. Bar No. 484097)
                                        Douglas W. Baruch (D.C. Bar No. 414354)
                                        Jennifer M. Wollenberg (D.C. Bar No. 494895)
                                        Neaha P. Raol (D.C. Bar No. 1005816)
                                        Shaun A. Gates (D.C. Bar No. 1034196)
                                        Katherine L. St. Romain (D.C. Bar No. 1035008)
                                        Fried, Frank, Harris, Shriver & Jacobson LLP
                                        801 17th Street, NW
                                        Washington, D.C. 20006
                                        Telephone:  (202) 639-7000
                                        Facsimile:  (202) 639-7003
                                        Email: joseph.lobue@friedfrank.com
                                        Email: douglas.baruch@friedfrank.com
                                        Email: jennifer.wollenberg@friedfrank.com

                                        *Counsel for Plaintiffs and Certified Class*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————

KUSUMA NIO, *et al.*,

        Plaintiffs,

        v.

UNITED STATES DEPARTMENT
OF HOMELAND SECURITY, *et al.*,

        Defendants.

———————————————————————

)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Case No. 1:17-cv-00998-ESH-RMM**

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
## FOR A TEMPORARY RESTRAINING ORDER
## AND MOTION FOR PRELIMINARY INJUNCTION

Joseph J. LoBue (D.C. Bar No. 484097)
Douglas W. Baruch (D.C. Bar No. 414354)
Jennifer M. Wollenberg (D.C. Bar No. 494895)
Neaha P. Raol (D.C. Bar No. 1005816)
Shaun A. Gates (D.C. Bar No. 1034196)
Katherine L. St. Romain (D.C. Bar No. 1035008)
Fried, Frank, Harris, Shriver & Jacobson LLP
801 17th Street, NW
Washington, D.C. 20006
Telephone:  (202) 639-7000
Facsimile:   (202) 639-7003
Email: joseph.lobue@friedfrank.com
Email: douglas.baruch@friedfrank.com
Email: jennifer.wollenberg@friedfrank.com

*Counsel for Plaintiffs and Certified Class*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...........................................................................................................1

STATEMENT OF FACTS ............................................................................................3

    I.     The July 7 Policy .......................................................................................3

    II.    DHS Defendants Fail to Comply with the July 7 Policy ............................4

    III.   DHS Defendants' FBI Check Policy ..........................................................9

    IV.   DHS Defendants' NSD/MSSD Policy......................................................10

ARGUMENT ...............................................................................................................11

    I.     Applicable Legal Standard........................................................................11

    II.    Plaintiffs Are Likely to Succeed on the Merits.........................................12

          A.    Defendants' July 7 Policy Violates 5 U.S.C. § 706 ......................12

                1.    *The Agency Record Does Not Establish a Reasonable Justification for the July 7 Policy as Required by § 706(2)* ........................................................................13

                2.    *DHS Defendants Entirely Failed to Consider Important Aspects of the Problem in Contravention of § 706(2)* .......16

                3.    *DHS Defendants Have Imposed Unreasonable Systemic Delays in Violation of § 706(1)*..........................................22

          B.    Defendants' Failure to Comply With Their Own July 7 Policy Violates 5 U.S.C. § 706 ................................................................22

                1.    *Section 706(2)*................................................................22

                2.    *Section 706(1)*................................................................26

           C.    Defendants' Redundant FBI Check Policy Violates 5 U.S.C. § 706...............................................................................29

                1.    *Section 706(2)*................................................................30

                2.    *Section 706(1)*................................................................32

i

      D.     Defendants' NSD/MSSD Policy Violates 5 U.S.C. § 706.............33

            1.    *Section 706(2)*....................................................................33

            2.    *Section 706(1)*....................................................................36

      E.     All of the Challenged DHS Policies are Unlawfully
            Retroactive and Violate 5 U.S.C. §§ 552 and 553........................38

III.   Plaintiffs will Suffer Irreparable Injury if this
      Court Does Not Grant Preliminary Injunctive
      Relief...........................................................................................40

IV.   The Balance of Equities Weighs in Favor of
      Plaintiffs, and Granting Preliminary Relief
      Serves the Public Interest..........................................................44

CONCLUSION..............................................................................................45

# TABLE OF AUTHORITIES

**Page**

**Cases**

*AHA v. Burwell*,
812 F.3d 183 (D.C. Cir. 2016) ..............................................................................22

*Am. Fed'n of Gov't Emps. v. Fed. Labor Relations Auth.*,
593 F. Supp. 1203 (D.D.C. 1984) ....................................................................25, 45

*Am. Trading Transp. Co. v. United States*,
791 F.2d 942 (D.C. Cir. 1986) ..............................................................................20

*Am. Wild Horse Pres. Campaign v. Perdue*,
873 F.3d 914, 922-28 (D.C. Cir. 2017)...........................................................25, 26

*Arkema Inc. v. EPA*,
618 F.3d 1 (D.C. Cir. 2010) ..................................................................................38

*\*Bennett v. Spear*,
520 U.S. 154 (1997)........................................................................................29, 33

*Caswell v. Califano*,
583 F.2d at 17 ........................................................................................................45

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ........................................................................40, 44

*Cobell v. Norton*,
240 F.3d at 1081 (D.C. Cir. 2001) ........................................................................27

*Davis v. Pension Benefit Guar. Corp.*,
571 F.3d 1288 (D.C. Cir. 2009) ............................................................................11

*Dep't of the Navy v. Engen*,
484 U.S. 518 (1988)...............................................................................................34

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*,
653 F.3d 1 (D.C. Cir. 2011) ..................................................................................39

*Foster v. Mabus*,
103 F. Supp. 3d 95, (D.D.C. 2015) .......................................................................21

*Glendale Neighborhood Ass'n v. Greensboro Hous. Auth.*,
901 F. Supp. 996 (M.D.N.C. 1995) ......................................................................23

*Hamandi v. Chertoff,*
    550 F. Supp. 2d 46 (D.D.C. 2008) ..........................................................26, 37, 40

*In re Am. Rivers & Idaho Rivers United,*
    372 F.3d 413 (D.C. Cir. 2004) ...............................................................................22

*In re Barr Labs., Inc.,*
    930 F.2d at 76 ........................................................................................................29

*In re Core Communs., Inc.,*
    531 F.3d 849 (D.C. Cir. 2008) ........................................................................22, 33

*In re Convento,*
    210 F. Supp. 265 (D.D.C. 1962) ...........................................................................34

*Jacksonville Port Auth. v. Adams,*
    556 F.2d 52 (D.C. Cir. 1977) ................................................................................44

*Jicarilla Apache Nation v. U.S. Dep't of Interior,*
    613 F.3d 1112 (D.C. Cir. 2010) ............................................................................26

*Lone Mountain Processing, Inc. v. Sec'y of Labor,*
    709 F.3d 1161 (D.C. Cir. 2013) ............................................................................26

*McGinn, Smith & Co., Inc. v. Fin. Indus. Regulatory Auth.,*
    786 F. Supp. 2d 139 (D.D.C. 2011) ......................................................................44

*Mendoza v. Perez,*
    754 F.3d 1002 (D.C. Cir. 2014) ............................................................................39

*Molerio v. FBI,*
    749 F.2d 815 (D.C. Cir. 1984) ........................................................................10, 34

*Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ................................................................................................16

*N. Mariana Islands v. United States,*
    686 F. Supp. 2d 7 (D.D.C. 2009) ..........................................................................44

*Nat'l Conservative Political Action Comm. v. FEC,*
    626 F.2d 953 (D.C. Cir. 1980) ..............................................................................23

*Nat'l Mining Ass'n v. Dep't of Labor,* 292 F.3d 849
    (D.C. Cir. 2002) .....................................................................................................38

*Nken v. Holder,*
    556 U.S. 418 (2009)........................................................................................12, 44

*PCHRG v. FDA*,
 740 F.2d 21 (D.C.Cir.1984) ...........................................................................27

*Pursuing America's Greatness v. Fed. Election Comm'n*,
 831 F.3d 500 (D.C. Cir. 2016) .......................................................................12

*Radio-Television News Dirs. Ass'n v. FCC*,
 229 F.3d 269 (D.C. Cir. 2000) .......................................................................33

*Sai v. Transp. Sec. Admin.*,
 54 F. Supp. 3d 5 (D.D.C. 2014) .....................................................................12

*Save Jobs USA v. U.S. Dep't of Homeland Sec.*,
 105 F. Supp. 3d 108 (D.D.C. 2015) ...............................................................40

*Simpkins v. Shalala*,
 999 F. Supp. 106 (D.D.C. 1998) ....................................................................23

*Telecommc'ns Research & Action Center v. FCC*,
 750 F.2d 70 (D.C. Cir. 1984) ...........................................................27, 32, 36

*U.S. Ass'n of Reptile Keepers v. Jewell*,
 103 F. Supp. 3d 133 (D.D.C. 2015) ...............................................................44

*Union of Concerned Scientists v. Atomic Energy Comm'n*,
 499 F.2d 1069 (D.C. Cir. 1974) .....................................................................22

*Vargas v. Meese*,
 682 F. Supp. 591 (D.D.C. 1987) ....................................................................40

*Way of Life Television Network, Inc. v. Fed. Commc'ns Comm'n*,
 593 F.2d 1356 (D.C. Cir. 1979) .....................................................................22

*\*Winter v. Natural Res. Def. Council, Inc.*,
 555 U.S. 7 (2008) ......................................................................................11, 44

**Statutes**

5 U.S.C. §§ 552 and 553 .................................................................................40

5 U.S.C. § 706 ......................................................................................... *passim*

5 U.S.C. § 706(1) .................................................................................... *passim*

5 U.S.C. § 706(2) .................................................................................... *passim*

*\*8 U.S.C. § 1440 .................................................................................... *passim*

8 U.S.C. § 1446 ...............................................................................................26

8 U.S.C. §1571(b) ........................................................................................................19, 32

**Other Authorities**

8 C.F.R. § 316.14(b)(1)...............................................................................................26

8 C.F.R. § 335 ..............................................................................................................26

8 C.F.R. § 335.3(a).......................................................................................................30

## **INTRODUCTION**

The events of the past several weeks and months – and the mounting irreparable harm these events are causing – compel Plaintiffs to return to this Court seeking further temporary and preliminary injunctive relief.  As described in the 28 soldier declarations submitted with this memorandum, the conduct alleged herein is egregious.

Defendants continue to engage in widespread unlawful conduct impeding and delaying the adjudication of naturalization applications filed by Plaintiffs and the Class, including, *inter alia*:

- Failing and refusing to comply with their own July 7, 2017 policy ("July 7 Policy") by withholding and/or further delaying naturalization adjudication *even for those soldiers who have satisfied all of the requirements of that policy*;

- *Mandating that soldiers undergo a second, redundant FBI check* identical to the FBI check conducted as part of the "enhanced DoD security checks," solely on the grounds that USCIS purportedly was not the requesting agency for the initial FBI check;

- *Refusing to request and review, or unreasonably delaying the request for and review of, the information gathered in connection with the "enhanced DoD security checks*," so as to withhold and/or further delay the naturalization of eligible soldiers, and otherwise failing to set up any process whatsoever for the timely exchange of such information;

- *Mandating*, as a condition of naturalization adjudication, that soldiers who already have completed their "enhanced DoD security checks" further successfully complete *irrelevant, military-specific National Security Determination ("NSD") and Military Service Suitability Determination ("MSSD") adjudications*; and

- *Systematically imposing a wide array of unlawful additional prerequisites for adjudication of naturalization applications*, such as: requiring the completion of Basic

Combat Training ("BCT"), Advanced Individual Training ("AIT"), or other active-duty service; submission by the applicant of a Form DD-214 (Certificate of Release or Discharge from Active Duty); or satisfaction of the criteria set forth in a now-enjoined October 13, 2017 DoD policy memorandum.

These actions and policies clearly violate the law – 8 U.S.C. § 1440 – which specifies that the only additional criterion for naturalization eligibility for Plaintiffs and the Class is service in the Selected Reserve during a period of armed conflict.  And, to be clear, Defendants are imposing these policies and taking these actions in relation to soldiers *who already have completed the "enhanced DoD security checks" called for by the July 7 Policy*.

In addition, Defendants recently produced the purported administrative record for the July 7 Policy ("Agency Record" or "AR").  The record (even though redacted and not yet fully available to Plaintiffs or the Court) makes clear that the July 7 Policy is arbitrary and capricious.  Indeed, the Agency Record reveals that the USCIS decision-maker – Mr. Renaud – never even reviewed the classified reports that Defendants previously relied on so heavily (and submitted to the Court) as the primary justification for the July 7 Policy.  Incredibly, Defendants never informed the Court that *no* classified documents are part of the Agency Record for that policy.

As this Court already has found, the delays resulting from the July 7 Policy have caused, and will continue to cause, severe irreparable harm to this vulnerable group of soldiers.  Dkt. 44 at 17-19; *Kirwa,* Dkt. 29 at 31-34.  The additional unlawful and improper policies and actions by Defendants described herein only compound and exacerbate this harm.  It remains a cruel irony that these soldiers – each of whom answered the duty call to fill the vital national interests of the U.S. and enlisted in the U.S. Army on the promise of "expedited" naturalization – are being treated in such a callous, heartless, and unlawful manner by the Government of the nation that they

volunteered to serve, protect, and defend.  To preserve their right to seek citizenship in the manner

the law prescribes, and to prevent further delays and resulting harm, Plaintiffs request that the

Court grant their motion for a temporary restraining order and preliminary injunction.

## STATEMENT OF FACTS

### I.      THE JULY 7 POLICY

As the Court is aware, and as Defendants' own data show, prior to the July 7 Policy, the

"estimated average gross cycle time" for applications for naturalization filed by military members

(including MAVNI soldiers) ranged from 3.8 months to 4.4 months.  Dkt. 25-1, Exs. 1-2.  The data

further show that, before DHS Defendants implemented the July 7 Policy, "estimated average

active case cycle time" for military applications (including applications by MAVNI soldiers)

ranged from 3.7 months to 4.2 months.  *Id.*

On July 7, 2017, USCIS issued a policy entitled "Updated MAVNI N-400 Guidance" that

radically changed these circumstances for MAVNI soldiers.  That policy states:

> On September 30, 2016, the Department of Defense (DoD) issued a policy
> memorandum to require enhanced security checks for MAVNI recruits. . . .
>
> USCIS must ensure that each MAVNI naturalization applicant demonstrates good
> moral character and attachment to the U.S. Constitution as required by the INA and
> 8 CFR.  In order to do so, each applicant must receive proper DOD vetting and
> clearance in alignment with the September 30, 2016 MAVNI extension
> authorization and restrictions.  Consequently, USCIS will not proceed to interview,
> approve, or oath any currently pending or future MAVNI naturalization applicants
> applying for naturalization under INA § 329, regardless of their active duty or
> reserve service, until all enhanced DOD security checks are completed.

Ex. 1 (AR) at 5.[1]

The scope of the "enhanced DoD security checks" for MAVNI soldiers is extraordinary

and unprecedented in the naturalization context.  The checks consist of a Tier 5 Single Scope

---

[1]     The Agency Record as produced is located at Ex. 1.  Hereinafter citations are to "AR."

Background Investigation ("SSBI"); a National Intelligence Agency Check ("NIAC"); a counter-intelligence focused security review and interview ("CI Review"); and an issue-oriented interview or polygraph, if needed.  *See Kirwa*, Dkt. 29 at 10-11.  As the Court has recognized, and as Defendants have admitted, the "enhanced DoD security checks" at issue never before have been applied or used for naturalization purposes but rather were reserved for the adjudication of a top-level security clearance.  *See e.g.,* Dkt. 44 at 3 n.5

## II.    DHS DEFENDANTS FAIL TO COMPLY WITH THE JULY 7 POLICY

Irrespective of the lawfulness of the July 7 Policy itself (which is in dispute), DHS Defendants are not complying with that policy because they are failing to adjudicate the naturalization applications *even for those soldiers who successfully have completed their "enhanced DoD security checks."*  DHS Defendants have interposed a wide array of additional criteria as the grounds for its refusals, including: requiring the completion of BCT, AIT, and/or other active-duty service; submission by the applicant of a Form DD-214 (Certificate of Release or Discharge from Active Duty); satisfaction of the criteria set forth in an October 13, 2017 DoD policy memorandum; and/or other requirements over and above the "enhanced DoD security checks."  DHS Defendants' conduct has been systemic and widespread and includes the actions of the USCIS Military Helpline, the USCIS Military Info-line, and numerous field offices.[2]

---

[2]    *See, e.g.*, Ex. 2 (2/21/18 Email) ("[P]art of the MAVNI/Military natz process is that you have to attend basic training to complete the process."); Class Member T ¶¶ 13-14 (USCIS officer explaining that "part of the MAVNI/Military natz process is that you have to attend basic training to complete the process"); Class Member B ¶ 9 (USCIS officer asking soldier why he had even come to the field office to make inquiries about his naturalization process when he had not yet completed basic training); Class Member S ¶ 11 (USCIS officer informing soldier that he "would be able to naturalize only after [] basic training and AIT since naturalization during the training is not possible anymore"); Class Member I ¶¶ 9-10 (USCIS telling soldier that she "should wait until after AIT to be naturalized"); Class Member V ¶ 14 (USCIS representative stating that soldier "would be better off waiting until after AIT to pursue the completion" of naturalization); Ex. 3 (02/21/18 Email) ("Most MAVNI cases will actually go to Basic Training before getting their naturalization cases adjudicated, and will be naturalized when they return home from basic training

In addition to imposing these extra-statutory and extra-policy criteria, Defendants also are interjecting inordinate and inexplicable delays at every step of the process. For example, Defendants have admitted that DoD waits weeks after it informs recruiters that a soldier's background checks are complete before "officially" or "formally" notifying USCIS of this same fact. *See, e.g.*, Ex. 7 (02/28/18 Email). Yet, even this admitted delay vastly understates the actual amount of delay that is occurring. Soldiers who had their "enhanced DoD security checks" and MSSDs completed in September and October of 2017 still had not had their completed status "officially" reported to USCIS as of January or February of 2018, resulting in additional delays of 12 weeks or more. *See, e.g.*, Class Member A ¶¶ 7-12. Many more MAVNI soldiers who had their "enhanced DoD security checks" and MSSDs completed in January 2018 still had not had their completed status "officially" reported to USCIS, more than 6 to 8 weeks later.[3]

Furthermore, although the July 7 Policy has now been in place for over eight months, and the Agency Record shows that USCIS recognized the need to do so even prior to July 7 (AR 4),

---

and their AIT."); Class Member K ¶ 13 (telling soldier that he would only be able to naturalize after completing BCT because he would not be able to leave base for a naturalization interview after basic began); Class Member D ¶ 9 (informing soldier to call closer to his ship date so that USCIS could put his application "on hold" until he finished BCT); Ex. 4 (03/02/18 Email) ("It is not unusual for an applicant to have their interview/oath ceremony when they return from Basic/AIT. Please notify us upon your return from Basic/AIT and we will provide you with an update."); Ex. 5 (02/20/18 Notice) (stating that soldier's naturalization application could not be acted upon until "Other: Further review (MAVNI case)," even though soldier's "enhanced DoD security checks" were complete and soldier already received a favorable MSSD); Ex. 6 (3/13/18 Email) ("[W]e have not yet received the 'official' DOD notice of your clearance. . . Just because you received a favorable MSSD from the Army only means that you are now cleared to attend basic training and AIT."); Class Member W; Class Member X; Class Member Y; Class Member Z; Class Member AA.

[3]   *See, e.g.*, Class Member Q ¶ 9; Class Member D ¶ 9; Class Member K ¶ 12; Class Member A ¶ 11; Class Member N ¶ 8; Class Member I ¶¶ 9-11; Class Member G ¶¶ 13-15; Class Member J ¶ 13; Class Member F ¶¶ 13, 15; Class Member V ¶¶ 13, 14; Class Member P ¶¶ 11-14; Class Member S ¶¶ 10-11, 12; Class Member U ¶ 8; Class Member R ¶¶ 9-10; Class Member T ¶¶ 13-15.

USCIS still has not put any process in place to request or obtain background check status or information from DoD.  *See, e.g.*, Ex. 8 (Jan. 23, 2018 Tr.) at 49:21-51:19.  Even when a MAVNI soldier provides proof to USCIS that his or her "enhanced DoD security checks" have been successfully completed, USCIS refuses to take any action to verify or obtain the background check status or information.  Instead, USCIS describes the current process as follows:

> If you just received a ship date, it is a 3 or 4 week delay before DOD notifies us. As soon as we get notification we will send the file to the field office.  There IS NOT a process for us to ask or request DOD expedite notification to us, DOD provides notice when they provide it.

Ex. 7 (02/28/18 Email).

In fact, USCIS officers have denied that the "enhanced DoD security checks" have been "officially" or "formally" reported as complete even for MAVNI soldiers who have been reported as complete to this Court.  As of February 28, 2018, Defendants reported that at least 191 class members have both completed their "enhanced DoD security checks" and received favorable NSD and MSSD adjudications by DoD.  Dkt. 109 ¶¶ 1-2.  Numerous soldiers included on this list subsequently contacted USCIS, only to be told that USCIS has no "official" or "formal" confirmation that their DoD background checks are complete, notwithstanding the agency's report to the Court showing that the background checks for these soldiers were completed weeks and months ago.  *See, e.g.*, Ex. 9 (03/02/18 Email); Class Member S ¶ 13.

The delays do not cease even after USCIS finally acknowledges that it has received "official" or "formal" confirmation that an individual soldier's "enhanced DoD security checks" have been successfully completed.  For example, USCIS has informed MAVNI soldiers that it will take up to three months (after the "official" reporting of completion by DoD) just to issue a naturalization interview *notice* to the soldier.  *See* Ex. 10 (2/27/2018 Information Service Summary).  As another example, *USCIS has informed MAVNI soldiers that it takes "another 4 to*

*5 months" after the "enhanced DoD security checks" are "officially" reported as complete for the soldier to actually receive an interview and be naturalized.* Ex. 11 (2/26/18 Email). This additional multi-month period, by itself, exceeds the average processing time that pertained to military naturalization applications prior to the July 7 Policy. This additional multi-month period of delay is on top of the time that it takes to "officially" report completion of background checks between DoD and USCIS, and is in addition to the two-plus years that the soldiers must wait to complete the "enhanced DoD security checks" themselves.

Finally, other recent conduct by Defendants will, as a practical matter, add many more months of delay to the naturalization process for the majority of MAVNI soldiers. Because of the serial delays described above, the vast majority of MAVNI soldiers will be shipped to BCT/AIT before being naturalized. The BCT/ACT period lasts approximately twenty weeks for many MAVNIs.[4] In January 2018, just when DoD began issuing orders for MAVNI soldiers to ship to BCT, USCIS ended its "Naturalization at Basic Training" program.[5] *See, e.g.*, Ex. 12 (02/08/18 Email). In addition, USCIS personnel no longer will travel to military bases "to conduct naturalization interviews, oath ceremonies, and the like." *Id.* Accordingly, all non-citizen MAVNI soldiers who ship to BCT automatically will suffer this additional twenty-week delay and citizenship deprivation.

---

[4]    BCT typically takes 10 to 12 weeks. AIT, which occurs immediately after BCT, typically takes 9 to 10 additional weeks (but for some MAVNIs, their AIT period is much longer given their military occupation).

[5]    The Court made note of this program in one of its previous orders: "[P]ursuant to an initiative to expedite processing of applications from enlistees who are at basic training, the 'Naturalization at Basic Training Initiative,' USCIS adjudicated most of these applications in approximately 10 weeks' time — MAVNI enlistees would submit their naturalization applications upon arrival at basic training (a process typically lasting 10 weeks) and USCIS would adjudicate the applications and naturalize MAVNI enlistees by the last week of basic training." Dkt. 44 at 6 (citing 1st Miller Decl. ¶ 9; 1st Renaud Decl. ¶ 13).

As noted, Defendants recently reported that at least 191 members of the Class have *both* (i) completed their "enhanced DoD security checks" *and* (ii) received favorable NSD/MSSD adjudications.  Dkt. 109 ¶¶ 1-2; Dkt. 109-1 at 2-10.  The number of soldiers with completed "enhanced DoD security checks" is much higher, however, because Defendants' 191-soldier figure includes only soldiers who also have completed favorable NSD and MSSD adjudications.  The vast majority of these soldiers satisfied these requirements more than a month prior to the date of the report, with a substantial number satisfying the requirements more than five months prior to that date.  Dkt. 109-1 at 2-10.  Yet, as of February 28, 2018, only 23 MAVNI soldiers had been naturalized since Defendants adopted the July 7 Policy, Dkt. 109 ¶ 3, and many of these naturalizations occurred only because of action, or the immediate threat of action, by this or other courts.

The inordinate delays that DHS Defendants have interjected into the process *after the soldiers in question already have completed their "enhanced DoD security checks" undermine the assurances that Defendants previously made to the Court that the naturalization process would move quickly following the DoD background checks*:

> THE COURT: And will you continue to do [for] these applications whatever you have to do that doesn't require DoD's vetting?
>
> [DEFENDANTS]: Yes, that's right.
>
> THE COURT: So you will proceed with these?  This is a representation of the government which we will hold you to.
>
> [DEFENDANTS]: Yes, up until the interview point, yes.
>  . . .
> THE COURT: You will proceed with everything you can do short of an interview?
>
> [DEFENDANTS]: Yes.
>
> THE COURT: Before you hear from DoD?

[DEFENDANTS]: Yes, that's right.

THE COURT: Then you're going to hear from DoD and you don't, can't tell when the interview will be?

[DEFENDANTS]: It would be scheduled promptly.  I can say that.

Ex. 13 (Oct. 27, 2017 Tr.) at 77:19-78:8; 80:12-80:20.[6]

## III.   DHS DEFENDANTS' FBI CHECK POLICY

DHS Defendants are requiring redundant FBI checks for individuals who already have completed the very same checks as part of their "enhanced DoD security checks" (the "Redundant FBI Check Policy").  DHS Defendants claim that this entirely duplicative FBI check is necessary because USCIS purportedly was not the requesting agency for the identical FBI check already obtained by DoD.  *Defendants have admitted that these two sets of FBI checks — i.e.*, those performed as part of the "enhanced DoD security checks" and those subsequently being imposed by DHS Defendants on MAVNI soldiers — *are identical*:

> While FBI name checks are a part of a T3 or T5, USCIS's National Benefits Center runs FBI name checks, as well as a variety of other background checks, on every naturalization applicant before the applications are sent out to the Field for interviews.  These checks are required by law and regulation, and neither the law nor the regulation contemplates receiving the results of an FBI name check through a third agency that has previously run *the same checks*.

Ex. 15 (02/09/18 Email) (emphasis added); *see also* Dkt. 25-2 (2nd Miller Decl.) at 155 (Tier 5 investigation "shall include results from the following components . . . Federal Bureau of Investigation (FBI) Checks.  Checks shall be conducted of investigative and criminal history files provided by the FBI, including a technical finger print search."); Ex. 15 (02/09/18 Email) ("FBI

---

[6]  *See also* Ex. 14 (3/14/18 Email) (To a MAVNI with a naturalization application received by USCIS on March 3, 2017, USCIS wrote "While we did receive the notification from DoD on your DoD background checks, there are still USCIS background checks that must be completed as well. As soon as the USCIS background checks have completed and all required preprocessing is complete on your file we will forward your file . . .").

name checks are a part of a T3 or T5 …").  In addition, the Section Chief of the National Name Check Program Section of the FBI has described a single FBI background check process used for requests from all "customers" (*e.g.*, DoD, USCIS) covering a full spectrum of purposes including, specifically, "security clearance" and "naturalization" purposes.  Ex. 16 (FBI Decl.) ¶ 5.

Many MAVNI soldiers have had their naturalization applications placed on hold pending completion of this redundant USCIS FBI background check. *See, e.g.*, Ex. 17 (02/09/18 Email) (stating that soldier's "FBI name checks have not been completed, she cannot be interviewed or naturalized at this time");   Class Member J ¶ 12 (USCIS informing soldier that "USCIS background checks," which "are different from the DoD background checks, still needed to be completed and that the process could take another three to six months"); Ex. 18 (03/01/18 Email) (stating that "unfortunately, USCIS has their own background check" that is still pending); Ex. 19 (03/02/18 Email) ("USCIS has our own background check requirements in addition to the [DoD] background check you referenced in your email below.").

## IV.    DHS DEFENDANTS' NSD/MSSD POLICY

DHS Defendants are holding the processing of naturalization applications filed by MAVNI soldiers until DoD Defendants complete NSD and MSSD adjudications for such soldiers (the "NSD/MSSD Policy").  This policy is separate and distinct from DHS Defendants' July 7 Policy, which requires USCIS field offices to await the completion of "enhanced DoD security checks" so that field offices may consider information discovered in connection with such background checks in their "good moral character" determinations.  AR at 5.  By contrast, the NSD/MSSD Policy precludes adjudication of naturalization applications pending completion of NSD and MSSD adjudications for these soldiers by the DoD Consolidated Adjudication Facility ("DoD CAF") and the Army.

The NSD/MSSD process is a lengthy, time consuming, multi-step, multi-tiered process that begins at some point *after* the soldier's "enhanced DoD security checks" are complete. *See* Ex. 20 (DoD MAVNI NSD/MSSD flow chart). In the first step of the process, DoD CAF renders an NSD adjudication accompanied by an MSSD recommendation to the Army. *Id.* The Army then reviews DoD CAF's recommendation and renders an MSSD adjudication. *Id.* If the NSD and MSSD adjudications are both favorable, the MAVNI soldier is given orders and a ship date to BCT and (several weeks or months later) the successful completion of the "enhanced DoD security checks" is "officially" reported to USCIS. If the NSD and MSSD adjudications are not both favorable, the soldier is cycled back into the NSD/MSSD process for reconsideration and re-adjudication, causing lengthy and additional *post-investigation* naturalization adjudication delays. *Id*.

The NSD and MSSD adjudications are performed under criteria and legal standards unique to those determinations and include factors such as credit history, use of information systems, age, physical fitness, financial situation, number of dependents, and sexual proclivities. Dkt. 93-4 at 69-76; Ex. 21 (DoDI 1304.26); Dkt. 39-1 (August 30, 2006 memorandum on the implementation of adjudicative guidelines for determining eligibility for classified information); Security Executive Agent Directive 4 - National Security Adjudicative Guidelines, effective June 8, 2017 available at https://www.state.gov/m/ds/clearances/60321.htm. Such criteria do not apply to naturalization adjudications.

## ARGUMENT

## I.      APPLICABLE LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Davis v. Pension Benefit Guar.*

*Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009); *Sai v. Transp. Sec. Admin.*, 54 F. Supp. 3d 5, 8 (D.D.C. 2014) (quoting *Davis*, 571 F.3d at 1291).  The final two factors – the balance of the equities and the public interest – merge where the Government is the opposing party.  *See Pursuing America's Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009).  Based on the evidence, and under the applicable law, Plaintiffs have established entitlement to relief under each of these four factors.

## II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Under 5 U.S.C. § 706(2), "[t]he reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be – arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A) & (2)(C).  And under 5 U.S.C. § 706(1), a "reviewing court shall … compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  Plaintiffs are likely to succeed on the merits of their claims that DHS Defendants' (1) July 7 Policy, (2) failure to follow their own July 7 Policy, (3) Redundant FBI Check Policy, and (3) NSD/MSSD Policy each violates § 706(1) and § 706(2) of the APA as unreasonably delaying USCIS's mandatory obligation to adjudicate naturalization applications and as arbitrary and capricious or otherwise not in accordance with law.

### A.    Defendants' July 7 Policy Violates 5 U.S.C. § 706

The Agency Record clearly establishes that Defendants' July 7 Policy is arbitrary and capricious.  The record reveals that DHS Defendants do not have a reasonable justification for the July 7 Policy and have entirely failed to consider important aspects of the problem when it formulated that policy.  Indeed, the record reveals that the agency decision-maker *did not even review the classified reports that Defendants previously relied on as the primary justification for the July 7 Policy*. Dkt. 111; AR 1-3. Furthermore, through their July 7 Policy, DHS Defendants

have systematically imposed unreasonable delays on the adjudication of naturalization applications filed by Plaintiffs and the Class.  With the benefit of the purported Agency Record, Plaintiffs and the Class therefore renew their motion for preliminary injunction on the grounds that DHS Defendants' actions violate sections 706(1) and 706(2) of the APA.

## 1. *The Agency Record Does Not Establish a Reasonable Justification for the July 7 Policy as Required by § 706(2)*

The Agency Record is threadbare and fails to provide a reasoned explanation or reasonable justification for the July 7 Policy.  In fact, DHS Defendants based this major policy change on a handful of emails that the agency decision-maker did not even personally review, and certain oral discussions that were not sufficiently significant at the time to warrant memorialization or other written record.   Daniel M. Renaud ("Mr. Renaud"), Associate Director, Field Operations Directorate ("FOD"), USCIS, was "the official who made the final decision to institute" the July 7 Policy.  AR at 1.  According to Mr. Renaud's March 5, 2018 claim, the Agency Record includes:

> [A] briefing paper for the Secretary of Homeland Security, which I helped draft in June 2017, as FOD considered whether to require completion of DoD background and security checks for military naturalization purposes for MAVNI enlistees.  The documents also include five emails from DoD officials regarding derogatory information obtained during DoD background checks, which my staff received between December 2016 and June 2017.  Although I did not personally review each of these emails, my staff described their content to me prior to my decision to require the DoD background checks.  Of particular importance to my decision were two cases about which my staff was orally briefed during a visit to Fort Jackson on or about May 9, 2017.  In both cases, an applicant naturalized before his or her DoD background checks revealed derogatory information that USCIS would have considered, had it known about the information, in determining whether the individual was eligible to naturalize.

AR at 2.  That the agency would make a major policy change affecting thousands of individuals, and causing such individuals widespread irreparable harm (*see* Dkt. 44 at 17-19), based on a few emails that the agency decision-maker did not even "personally review," by itself casts serious doubt on the validity of the agency's action.

Yet, there are many other serious deficiencies in the agency's explanation. First, Mr. Renaud acknowledged that the record contained only "two" cases of "particular importance to [his] decision." AR at 2. However, the Agency Record shows that Mr. Renaud gave no consideration whatsoever to the size of the population from which these two cases "of particular concern" arose, or whether that number was disproportionately large in relation to the size of that population. Furthermore, the agency did not find that the so-called "derogatory information" discovered about these two particular individuals actually would have prevented their naturalization, or has resulted or will result in their denaturalization. Rather, Mr. Renaud carefully states: "In both cases, an applicant naturalized before his or her DoD background checks revealed derogatory information *that USCIS would have considered*, had it known about the information, in determining whether the individual was eligible to naturalize." AR at 2 (emphasis added). Absent a finding that the discovered information actually would have altered the results in these "two" cases, the two cases relied on by Mr. Renaud are completely *immaterial*.

The Agency Record provides no explanation whatsoever – let alone a reasoned one – showing how the other emails (which otherwise were not of "particular importance" to the agency) support or justify the July 7 Policy. *See* AR at 2. To the contrary, *the majority of the Agency Record relates to information obtained through DHS investigations*, not through any so-called "enhanced DoD security checks." *See generally* AR at 33-231; AR at 80 ("An investigation conducted by the Department of Homeland Security, and subsequently forwarded to this office [of the Department of the Army], established that PFC . . . was not in a valid immigration status for the entire two year period prior to his enlistment."); AR at 164 (same). As a result, such information cannot support or justify the July 7 Policy.

Aside from the handful of irrelevant and immaterial emails addressed above, Mr. Renaud stated the following as the basis for the agency's decision:

> In addition to the documents attached here, my decision took into account numerous verbal conversations, both telephonic and in-person, between my staff at USCIS and DoD personnel between the fall of 2016 and the summer of 2017. These conversations took place regularly, on both scheduled and *ad hoc* bases, and occurred approximately two to three times per week between February 2017 and the date of my decision to require the DoD background checks. As a result of these conversations, I learned *that DoD had significant national security concerns* regarding the population of MAVNI recruits, informed by a classified DoD Inspector General Report and other classified reports, which I understand have been provided to the Court. These verbal conversations were not memorialized in written documentation but were strong contributing reasons for the guidance issued on July 7, 2017.

AR at 2-3 (emphasis added).

Mr. Renaud fails to provide a reasoned explanation or reasonable justification for the July 7 Policy. It is immaterial under the INA "that DoD had significant national security concerns" regarding the MAVNI population. DoD's national security concerns are different from and broader than the factors that are relevant to naturalization. Unless DoD's security concerns regarding the MAVNI population are tied to the question of "good moral character" or eligibility for naturalization under the INA, DHS's explanation does not provide a reasonable justification for the July 7 Policy. Moreover, the record now makes clear that the agency did not even review the classified reports that Defendants previously relied on so heavily (and submitted to the Court) as the principal justification for the July 7 Policy.

Finally, Mr. Renaud refers to "a briefing paper for the Secretary of Homeland Security, which [he] helped draft in June 2017." AR at 2. However, that "briefing paper" provides no justification for the July 7 Policy. Rather, it confirms the improper and erroneous nature of that policy. For example, the briefing paper explains that the July 7 Policy was derived from and

motivated by a prior unlawful active-duty service "hold" (confirming, yet again, that the "hold"

alleged by Plaintiffs at the commencement of this case and denied by Defendants was in fact real):

> In or around February 2017, USCIS began to see Forms N-400, Application for Naturalization, being filed along with Form N-426, Request for Certification of Military or Naval Service, for MAVNI participants who enlisted in the Delayed Training Program (DTP) and drilling with the Selected Reserve of the Ready Reserve (SRRR) while awaiting their military background checks to clear, permitting them to attend Basic Combat Training (BCT). This raised a question within USCIS Field Offices: was attending pre-BCT drills sufficient to meet the honorable service and SRRR membership requirements of INA 329(a). On April 13, 2017, USCIS brought the issue of DTP cases to DOD's attention. DOD expressed concern that DTP applicants who had not yet attended BCT were filing N-400s and certified N-426s. During this meeting, USCIS and DOD decided it would be *in the best interests of both organizations to place these cases on a processing hold* . . .
>
> *USCIS has placed approximately 400 N-400 applications on hold* with certified N-426s for recruits in the DTP who have not attended BASIC Training due to incomplete enhanced security checks. Originally, *the hold* was for the purpose of awaiting guidance from DOD on whether the N-426s were appropriately issued.

AR at 7 (emphasis added).

As a preliminary matter, neither USCIS nor DoD should be acting in their own "best

interests." Rather, the agencies should be acting in accordance with the law. In any event, the

"briefing paper" reveals that the July 7 Policy was developed to maintain the unlawful active-duty

service requirement through other means, and thus provides no reasonable basis for the policy.

### 2. *DHS Defendants Entirely Failed to Consider Important Aspects of the Problem in Contravention of § 706(2)*

On its face, the Agency Record is wholly insufficient to support the major policy change

embodied by the July 7 Policy. However, DHS Defendants' action is deficient for several

additional reasons. An agency action is arbitrary and capricious if the agency "entirely failed to

consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm

Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (citations and quotation marks omitted). Here, DHS

Defendants failed to consider many crucial aspects of the problem including, in particular, the severe adverse impacts that would result from the policy change.

As noted above, prior to implementing the July 7 Policy, the average USCIS processing time for military naturalization applications (including those filed by MAVNIs) ranged between 3 to 4 months.  The Agency Record makes clear that DHS Defendants did not give any consideration to the processing delay that the July 7 Policy would cause to MAVNI applications.  Indeed, the USCIS official who "made the final decision to institute" the July 7 Policy directive has since admitted that he does not even understand what a Tier 5 or Tier 3 background check covers or entails, or how that check differed from the DCII query already called for by USCIS's pre-July 7, 2017 policy. Dkt. 25-1 (2nd Renaud Decl.) at 5.

Of course, in proceedings before the Court, Defendants have now acknowledged – as they must – the extraordinary delays that have resulted, and will continue to result, from implementation of the July 7 Policy:

> THE COURT:  I do want to have an accurate reporting system. I don't need to have as many attachments as I got.  But it certainly would be helpful to know how we're doing because there is a claim here.  It is not just discovery but whether we're going to get these people through or whether they're going to hit a wall or whether they're going to have to wait an indeterminable amount of time.
>
> [DEFENDANTS]:  I think the answer is that people are going to have to wait.  *It is simply a math problem*.  If you have to do 2100 and you could do, for example, 50 a month which would be, I don't think they could do that many but if they could do 50 in a month, that is still well over a year.

Ex. 22 (Jan. 23, 2018 Tr.) at 20:11-23 (emphasis added).

In fact, at the rate of 50 per month – which Defendants themselves argue is likely overstated – *the "wait" amounts to 3.5 years*.  Yet, the agency gave no consideration to this simple "math problem" and the grave consequences that it reflects.  And the questions asked by the Court – "whether we're going to get these people through or whether they're going to hit a wall or whether

17

they're going to have to wait an indeterminable amount of time" – are the type of questions that

the agency was reasonably required to consider, but "entirely failed to consider," before imposing

the July 7 Policy on the MAVNI population.  This is particularly so because DoD already had

determined that it was "infeasible" to perform the "enhanced DoD security checks" on this

extensive population.  Specifically, on or about May 19, 2017, DoD officials issued an action

memo ("DoD Action Memo") detailing DoD's plans regarding Selected Reserve MAVNIs.

> **Group 3**:  [Selected Reserve MAVNIs] . . .
>
> - Approx. 500 Group 3 MAVNIs have received command endorsement [*i.e.*, N-426 "honorable service" certifications] and applied for naturalization based on having "performed creditable service" in the form of two weekend drills.  These citizenship applications are under review by [USCIS].
>
> - **Action:**  The heightened risk associated with Groups 1/2, and the application of resources needed to mitigate that risk, render it infeasible to continue to process [Group 3] MAVNIs.  **Except for individual cases deemed vital to the national interest, Group 3 will be separated by Secretarial plenary authority.**

Ex. 23 (Dkt. 17-8, May 2017 DoD Action Memo) (emphasis in original).

The DoD Action Memo made clear that: (i) DoD did not have the resources to conduct the

"enhanced DoD security checks" on which USCIS claimed it was waiting; (ii) DoD had no

intention of conducting such checks; and (iii) DoD instead intended to discharge these soldiers

without performing such security checks.  USCIS was fully aware of the DoD Action Memo no

later than June 28, 2017 (and likely far earlier).  *Id.*  Thus, DHS Defendants issued the July 7 Policy

to "hold" MAVNI applications pending completion of "enhanced DoD security checks" knowing

that DoD had no intention of performing those security checks. [7]  One can scarcely conceive of a

---

[7]   USCIS also did not consider DoD's "time-out" policies in considering whether the July 7 Policy was rational.  At the time the policy was put in place, DoD was discharging Class members after two years of service, if they had not yet completed BCT.  Some Class members were in fact

more arbitrary, capricious, and irrational agency action.  At a minimum, the agency was required to consider the admitted "infeasibility" of completing such background checks before implementing its policy change.[8]

Similarly, the agency wholly ignored the express statutory policy favoring prompt adjudication of naturalization applications in general and the specific statutory policy favoring expedited and eased naturalization processing for military service members:  "It is the sense of Congress that the processing of an immigration benefit application [defined to include naturalization applications] should be completed not later than 180 days after the initial filing of the application."  8 U.S.C. §1571(b).  Moreover, military naturalization applicants are to be treated more favorably.  As the Court has explained, "[the soldiers'] part of the bargain was to give … the DoD eight years of military service …" and in exchange for this commitment, "they would have a right to apply for expedited citizenship."  Ex. 25 (Oct. 27, 2017 Tr.) at 25:5-9; Dkt. 44 at 17-19;

---

discharged after two years of service before DoD extended the period to three years, and it appears, that USCIS still is waiting for "official" notification from DoD that those Class members background checks are complete, even though it has been eight months or more since the discharge.  Under the two-year time-out rule, most of the Class would have been discharged by now and without any "official" notification from DoD of completed background checks.  Further, USCIS did not consider any other military "time-out" policies, including those that were being discussed at the very same time that the July 7 Policy was enacted.  Ex. 24 (2/14/18 Under Secretary of Defense Memo) (ordering discharge of service members non-deployable for 12 months "for any reason" and noting that "[i]n July, the Secretary of Defense directed the Office of the Under Secretary of Defense of Personnel and Readiness…").  It is irrational to create a policy premised on something being done that will not be done.  Moreover, DoD's post hoc changes to one of its time-out rules, and suggestion that the rule could be extended to four years if necessary, does not change the irrationality of the USCIS decision at the time it was made.

[8]   The DoD Action Memo specified that the plans set forth therein would be executed in the absence of a countermanding directive by the Secretary of Defense.  While DoD later claimed on July 28, 2017 that the Secretary of Defense "verbally … modif[ied] the proposed course of action" with respect to Selected Reserve MAVNIs, this hearsay litigation assertion post-dates the July 7 Policy.  Dkt. 25-2 (2nd Miller Decl.) at 8.  Moreover, any such modification to DoD's proposed course of action regarding the discharge of such soldiers does not affect the "feasibility" of performing the background checks.

s*ee also Kirwa*, Dkt. 29 at 31-34 ("delaying naturalization applications after applicants have been promised an expedited path to citizenship constitutes irreparable harm").  The Agency Record reveals that DHS Defendants gave no consideration to these important policy issues.  *Am. Trading Transp. Co. v. United States*, 791 F.2d 942, 948-51 (D.C. Cir. 1986) (agency action may be found arbitrary and capricious when agency fails to consider principal legislative goals).  At a minimum, the agency needed to provide a reasoned explanation as to why information in a handful of emails (that the decision-maker did not even review) outweighed these important statutory policies.

The agency ignored still other important aspects of the problem.  In its haste to promulgate the policy in the midst of litigation, USCIS failed to consider whether the agency even had the capability to implement and apply the policy as promulgated.  In fact, the agency never had this capability because it lacks the means to reliably identify the pool of naturalization applicants to which the July 7 Policy was intended to apply.  In particular, USCIS is unable to identify actual MAVNI applicants.  Rather, USCIS can identify only individuals who "appear to be MAVNI recruits" by relying on "inferences" from "other information."  The USCIS Chief of the Office of Performance and Quality has admitted as much in a sworn statement:

> I understand that since USCIS issued the July 7, 2017 guidance at issue in this litigation, the Field Operations Directorate ("FOD") has manually tracked which military naturalization applicants *appear to be* MAVNI recruits.  However, because the process is manual and because it *relies on inferences* based on other information reported on Form N-400, such as whether the applicant identified himself or herself as a lawful permanent resident, it is possible that certain information may be *under- and/or over-inclusive*.

Dkt. 108-3 ¶ 10 (emphasis added).

Surely, before USCIS issued a major policy change it was required to inquire whether the agency was capable of implementing the new policy.  The Agency Record shows that DHS Defendants gave no consideration to whether the agency could reasonably implement the July 7

Policy.  At a minimum, the agency needed to provide a reasoned explanation as to why information

in a handful of emails justified imposition of a rule that was both under- and over-inclusive.

Finally, the agency also ignored the fact that the DoD policy memorandum on which it

expressly based its policy change – *i.e.*, the September 30, 2016 DoD policy memorandum – does

not in fact apply to the regulated population.  Specifically, the July 7 Policy states:

> *On September 30, 2016, the Department of Defense (DoD) issued a policy memorandum* to require enhanced security checks for MAVNI recruits.  . . . USCIS must ensure that each MAVNI naturalization applicant demonstrates good moral character and attachment to the U.S. Constitution as required by the INA and 8 CFR.  In order to do so, each applicant must receive proper DoD vetting and clearance *in alignment with the September 30, 2016 MAVNI extension authorization and restrictions*.  Consequently, USCIS will not proceed to interview, approve, or oath any currently pending or future MAVNI naturalization applicants applying for naturalization under INA § 329, regardless of their active duty or reserve service, until all enhanced DoD security checks are completed.

AR at 5 (emphasis added); AR at 7 ("On September 30, 2016, DOD issued a policy requiring

enhanced security checks for MAVNI recruits to be completed for all MAVNI enlistees prior to

attending Basic Training or serving for any period of time on active duty in the Armed Forces.").

However, *DoD has admitted that the September 30, 2016 DoD policy memorandum does not apply

to Plaintiffs or any members of the Class, all of whom enlisted prior to September 30, 2016*.  Ex.

25 (Oct. 27, 2017 Tr.) at 43:23-24 (Mr. Arendt stating that the September 30, 2016 memorandum

"would apply [only] to anyone recruited after September 2016").  Hence, the September 30, 2016,

DoD memorandum cannot provide any reasonable justification for DHS Defendants changing their

policy toward these individuals on July 7.  DHS Defendants ignored this fact.  *See Foster v. Mabus*,

103 F. Supp. 3d 95, 108-13 (D.D.C. 2015) (agency action vacated where agency failed to consider

an important aspect of the problem).

###### 3. *DHS Defendants Have Imposed Unreasonable Systemic Delays in Violation of § 706(1)*

Six months have passed since this Court first considered Plaintiffs' request for a preliminary injunction of the July 7 Policy under § 706(1).  In this time, the delays have only compounded.  *See AHA v. Burwell*, 812 F.3d 183, 193 (D.C. Cir. 2016) (remanding case and noting that, "[t]aking the above factors into account, the district court — more than a year after its first denial and with the problem only worsening — might find it appropriate to issue a writ of mandamus ordering the Secretary to cure the systemic failure to comply with the deadlines").  Indeed, "[a]t some point, promises are no longer enough, and we must end the game of 'administrative keep-away.'"  *In re Core Commc'ns, Inc.*, 531 F.3d 849, 859 (D.C. Cir. 2008) (quoting *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 420 (D.C. Cir. 2004)).

#### B. <u>Defendants' Failure to Comply With Their Own July 7 Policy Violates 5 U.S.C. § 706</u>

DHS Defendants have failed, and continue to fail, to comply with their own (albeit unlawful) July 7 Policy by systematically refusing to adjudicate the naturalization applications *of even those soldiers who have satisfactorily completed the "enhanced DoD security checks,"* including soldiers who have had their enhanced DoD security checks completed for many months.  These individuals are among the most stringently-vetted applicants for naturalization in U.S. history, having fully satisfied even the lengthy, burdensome, and extra-statutory requirements imposed on them under the July 7 Policy.  Yet, DHS Defendants continue to refuse to adjudicate their naturalization applications.

###### 1. *Section 706(2)*

"It is a 'well-settled rule that an agency's failure to follow its own regulations is fatal to the deviant action.'"  *Way of Life Television Network, Inc. v. Fed. Commc'ns Comm'n*, 593 F.2d 1356, 1359 (D.C. Cir. 1979) (quoting *Union of Concerned Scientists v. Atomic Energy Comm'n*,

22

499 F.2d 1069, 1082 (D.C. Cir. 1974)).  Thus, the failure of an agency to follow its own policy is arbitrary and capricious under § 706(2).  *See Simpkins v. Shalala*, 999 F. Supp. 106, 116 (D.D.C. 1998) ("The [HHS] Secretary's failure to follow these authorities or from all appearances even consider these provisions [including HHS's own Guidebook], renders the Secretary's action arbitrary and capricious [under the APA § 702(2)(A)]."); *see also Nat'l Conservative Political Action Comm. v. FEC*, 626 F.2d 953, 959 (D.C. Cir. 1980) ("Agencies are under an obligation to follow their own regulations, procedures, and precedents, or provide a rational explanation for their departures."); *Glendale Neighborhood Ass'n v. Greensboro Hous. Auth.*, 901 F. Supp. 996, 1003 (M.D.N.C. 1995) ("HUD, like other federal agencies, must follow its own guidelines.  Failure to follow such regulations and guidelines is generally an arbitrary and capricious action." (internal quotations and citations omitted)).

This Court already has held that "USCIS cannot indefinitely delay adjudication of MAVNIs' naturalization applications, and they cannot impose requirements that contravene statutory or regulatory requirements."  Dkt. 44 at 18.  Here, DHS Defendants are doing both.  In particular, DHS Defendants have interposed a wide array of unlawful additional criteria as the grounds for its refusal to adjudicate particular applications including: requiring the completion of BCT, AIT, and/or other active-duty service; submission by the applicant of a Form DD-214 (Certificate of Release or Discharge from Active Duty); satisfaction of the criteria set forth in the October 13, 2017 policy memorandum; and/or other requirements over and above the "enhanced DoD security checks."  *See* Statement of Facts ("SOF") Section II *supra*.

Even when USCIS does not expressly state that the soldier's application is being held up for such extra-statutory service requirements, the result (and clear intent of the agencies) is the same.  Indeed, since July 7, 2017, none of the eight non-citizen named Plaintiffs has even been

interviewed for naturalization (Dkt. 109-1), and DoD is not promptly notifying USCIS when "enhanced DoD security checks" or MSSD determinations are complete (or USCIS is disavowing such notice). Numerous Class members with MSSD completions listed in Defendants' February 28, 2018 report to the Court (Dkt. 109-1) continue to be told by USCIS that their applications cannot be adjudicated (and not before the soldier ships to BCT) because USCIS has not yet received or belatedly received the "official" notification of background check completion. [9]

Just by way of illustration, Plaintiff Shu Cheng, who Defendants reported to the Court had favorably completed the "enhanced DoD security check" process *and* received a favorable MSSD on January 22, 2018 – over seven weeks ago, has not yet been interviewed for naturalization. Nevertheless, during that time, Defendants were able to: (1) notify Ms. Cheng's Army recruiter that her background checks were done; (2) make all the necessary arrangements for Ms. Cheng to ship to BCT and then to a separate AIT location; (3) issue orders and inform Ms. Cheng to be ready to ship on March 26, 2018; (4) update multiple military on-line forms and reports (accessible to Ms. Cheng) to include her ship date and note her favorable background check results; and (5) report to this Court on February 28 that her background checks were complete and favorable. *See* Cheng Decl. And, according to USCIS "most" MAVNIs will be subject to a similar post-MSSD

---

[9] In addition, there are already-discharged Class members whose naturalization applications have been ready for adjudication (even under the July 7 Policy) as well as Class members whose background checks must be complete, given that the military has notified them that, although nothing about their service is other than honorable, "derogatory information found requires separation." There is no reason that USCIS should not be doing exactly what it told this Court it would do with these applications under the July 7 Policy: "collect and consider evidence obtained from DoD to the same degree that they collect and consider evidence obtained from other federal government entities such as the FBI" and "evaluate [the naturalization application] in accordance with the same regulatory definition of 'good moral character' that applies to every other naturalization applicant." Dkt. 31 at 34. Yet, USCIS has not collected or considered any evidence or continued the processing of any of these applications.

delay, which (conveniently) will require them to complete BCT and AIT before having a naturalization interview scheduled.  *See* Ex. 3 (02/21/18 Email).

DHS Defendants' unlawful conduct cannot be written off – as Defendants have sought to do with previous misconduct – as an isolated incident or due to rogue employee acts within a far-flung bureaucracy.  There is overwhelming evidence to the contrary, including from the USCIS Military Helpline, the USCIS Military Info-line, as well as numerous USCIS Field Offices.

In *Kirwa*, this Court pointed out that any attempt by Defendants to impose active-duty or similar service criteria on Selected Reserve soldiers would run afoul of § 706(2):

> Early in the *Nio* and *Kirwa* litigation, DOD represented to this Court that it planned to change its N-426 policy to only permit certification for MAVNI enlistees who were serving in an active-duty status.  On the eve of the October 18th hearing, DOD, facing the probability that such a policy would be found to violate 8 U.S.C. § 1440(a), changed course yet again, offering a new set of criteria that would allow it to further prolong certification of Selected Reservists' N-426s.  DOD offered no reasoned explanation for this change, thereby suggesting that DOD's decision was an arbitrary and capricious one.

*Kirwa*, Dkt. 29 at 24 (citing *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 922-28 (D.C. Cir. 2017); *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1120 (D.C. Cir. 2010)).  Having been enjoined by this Court from imposing an unlawful service criteria through the N-426 mechanism, *see* Dkt. 74; *Kirwa*, Dkt. 29, Defendants effectively are trying to obtain the same result by failing to adjudicate naturalization applications even for soldiers who have successfully completed the "enhanced DoD security checks."  Defendants cannot shield their unlawful failure to comply with their own policies simply by couching their non-compliance in terms of inaction.  *See Am. Fed'n of Gov't Employees ("AFGE") v. Fed. Labor Relations Auth.*, 593 F. Supp. 1203, 1206 (D.D.C. 1984) (finding Federal Labor Relations Authority practice of failing to decide stay requests of arbitral awards under regulatory factors, thereby allowing

temporary stays to remain in effect by default, was a reviewable final agency action and violative of the APA and the agency's own regulations).

Finally, the principal justification that Defendants offered for the July 7 Policy (albeit now debunked by the Agency Record) – *i.e.*, "national security" concerns – has no relevance even as a theoretical matter to this issue.  All of the MAVNI soldiers adversely affected by DHS Defendants' non-compliance with the July 7 Policy already have withstood the investigation necessary for a top secret security clearance.  As a result, DHS Defendants have no reasonable justification for failing to adjudicate the naturalization applications for such soldiers.  *See Am. Wild Horse Pres. Campaign*, 873 F.3d at 922; *Lone Mountain Processing, Inc. v. Sec'y of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013).

### 2.    *Section 706(1)*

DHS Defendants' failure to comply with their own July 7 Policy also independently violates § 706(1).  USCIS has a mandatory, nondiscretionary duty to adjudicate naturalization applications.  *See* 8 U.S.C. § 1446; 8 C.F.R. § 316.14(b)(1); 8 C.F.R. § 335.  And, as this Court has noted, USCIS does not have "unfettered discretion to relegate aliens to a state of limbo, leaving them to languish there indefinitely."  *Hamandi v. Chertoff*, 550 F. Supp. 2d 46, 51 (D.D.C. 2008) (internal quotations and citations omitted).  Thus, to prevail under 5 U.S.C. § 706(1), Plaintiffs need only show that DHS Defendants are not completing the adjudication of MAVNI naturalization applications within "a reasonable amount of time."  *Hamandi*, 550 F. Supp. 2d at 50.  DHS Defendants' widespread refusal to promptly adjudicate naturalization applications for soldiers with *completed "enhanced DoD security checks"* easily satisfies this threshold.

In performing the § 706(1) analysis, courts may consider as useful guidance: "(1) whether a 'rule of reason' governs the time agencies take to make a decision, (2) timetables mandated by applicable statutory or regulatory schemes, (3) the spheres of regulation in which the agency is

imposing delay, (4) the effect expediting delay will have on other 'agency activities of a higher or competing priority,' and (5) 'the nature and extent of the interests prejudiced by delay.'" Dkt. 44 at 25 (quoting *Telecomms. Research & Action Ctr. v. FCC* ("*TRAC*"), 750 F.2d 70, 80 (D.C. Cir. 1984)). In addition, (6) "the court need not 'find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.'" *TRAC*, 750 F.2d at 80 (quoting *PCHRG v. FDA*, 740 F.2d 21, 34 (D.C.Cir.1984)).

Each of the *TRAC* factors demonstrate the unreasonableness of the delay here. Starting with the fifth factor – the nature and extent of the interests prejudiced by delay – this Court already has found that Class members are being seriously and irreparably harmed by each day of delay. *See* Dkt. 44 at 17-19; *see also* Argument Section III *infra*. And, as to the third factor – where "delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake," *TRAC*, 750 F.2d at 80 – the harm in this case extends to the mental and physical well-being of the Class members, all of whom are living with stress and fear due to their uncertain immigration status, *see* Argument Section III *infra*, and many of whom are unable to obtain basic necessities for themselves or their families as a result of this lack of status. *See, e.g.*, Class Member P ¶ 18. Where the consequences of further agency delay are "potentially quite severe" and relate to "personal interests in life and health," as is the case here, this factor greatly favors a finding of "unreasonable delay." *Cobell v. Norton*, 240 F.3d 1081, 1097 (D.C. Cir. 2001).

With respect to the first factor — a "rule of reason" governing the delay — there is no reason that supports any material delay in the adjudication of naturalization applications of soldiers who have completed "enhanced DoD security checks," let alone the weeks- and months-long inordinate delays that Defendants are imposing. *See, e.g.*, Ex. 11 (2/26/18 Email); Ex. 26 (2/14/18

Email); Ex. 27 (2/12/18 Email); SOF Section II *supra*. The admitted delay in "official" reporting of completed background checks is shocking, particularly given the simplicity of the task and the fact that Defendants recognized the need to set up a process to receive this and other information over eight months ago. AR at 4. Moreover, although the July 7 Policy has now been in place for over eight months, DHS representatives have admitted that the agency has not put any process in place to request or obtain background check status or information from DoD. Ex. 8 (Jan. 23, 2018 Tr.) at 49:21-51:19. Instead, DHS representatives describe the current process as follow: "DOD provides notice when they provide it." Ex. 7 (2/28/18 Email). In addition, USCIS officers actively deny that the "enhanced DoD security checks" have been "officially" reported as complete even for large numbers of MAVNI soldiers who have been reported as complete to this Court. *See, e.g.*, Ex. 9 (03/02/18 Email); Ex. 11 (2/26/18 Email); Ex. 19 (03/02/18 Email); SOF Section II *supra*. The unconscionable delays do not cease even after USCIS finally acknowledges that it has received "official" confirmation that an individual soldier's "enhanced DoD security checks" have been completed. *See* Ex. 11 (2/26/18 Email); SOF Section III *supra*.

While this Court previously has noted with respect to the second factor that "no statute or regulation mandates a timetable for completing the investigation and examination" of a MAVNI, Dkt. 44, at 25, USCIS policy does provide for "expedited" processing for military naturalizations. As this Court stated, "they would have a right to apply for expedited citizenship." Ex. 25 (Oct. 27, 2017 Tr.) at 25:5-9. But DHS Defendants' conduct already has unduly delayed adjudication for these soldiers for months and will, as a practical matter, add another twenty weeks of delay for the majority of MAVNI soldiers. *See* SOF Section II *supra*. Moreover, in January 2018, just when DoD began issuing orders for MAVNI soldiers to ship to BCT, USCIS abruptly ended its "Naturalization at Basic Training" program. *See* Ex. 12 (02/08/18 Email). Accordingly, all non-

28

citizen MAVNI soldiers who ship to BCT automatically will incur this additional multi-month delay.

Defendants admit that, as of February 28, 2018, only 23 MAVNI soldiers had been naturalized since Defendants adopted the July 7 Policy (Dkt. 109 ¶ 3), and many of these naturalizations occurred recently, in response to threatened legal action. Defendants are not holding up their end of the bargain, and there can be no justification or rationale for this additional delay when all of the enhanced DoD security checks – which is the only requirement of the July 7 Policy and the only thing on which Defendants represented to the Court they were waiting – are done. While a court does not need to find impropriety to hold that agency action is unreasonably delayed, this issue intersects with other factors and "[w]here the agency has manifested bad faith, ... the agency will have a hard time claiming legitimacy for its priorities." *In re Barr Labs., Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991). Considering the totality of circumstances present in this case, DHS Defendants' conduct plainly violates § 706(1).

### C.   Defendants' Redundant FBI Check Policy Violates 5 U.S.C. § 706

DHS Defendants are imposing the unlawful Redundant FBI Check Policy. As discussed above, it is undisputed that the two sets of FBI checks – *i.e.*, those performed as part of the "enhanced DoD security checks" and those being subsequently imposed by DHS Defendants on MAVNI soldiers – are precisely the same checks. Ex. 15 (2/9/18 Email) ("the same checks"); Dkt. 25-2 (2nd Miller Decl.) at 155; Ex. 16 (FBI Decl.); Ex. 17 (2/9/18 Email).

The Redundant FBI Check Policy constitutes a final agency action. The policy marks the "consummation of the agency's decisionmaking process" on the issue and is not "merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal citations omitted). The policy is mandatory and is actually being applied by DHS Defendants to withhold and preclude the adjudication of naturalization applications duly filed by class members.

### 1.      Section 706(2)

The Redundant FBI Check Policy is not in accordance with law and should be found unlawful and set aside by the Court under § 706(2).  To be clear, DHS Defendants' policy does not simply require USCIS to confirm with the FBI that the FBI checks have been done for the soldier in question, but, rather, the policy requires that the FBI checks be performed a second time. Nothing in 8 U.S.C. § 1440 permits or contemplates that soldiers seeking to naturalize under that provision may be subjected to superfluous, sequential FBI checks.  On the contrary, the purpose of § 1440 is to ease and expedite the naturalization process for soldiers serving in time of armed conflict.[10]    And the statute and implementing regulations make clear that no additional requirements may be imposed on this class of individuals that are not required for naturalization generally.  *See, e.g.*, 8 C.F.R. § 335.3(a) (USCIS "shall grant the application if the applicant has complied with the requirement for naturalization.").  It is inconceivable that Congress intended soldiers entitled to an expedited naturalization process to be forced to undergo, for a second time, identical time-consuming FBI checks as a prerequisite to naturalization, particularly when such soldiers also already have been vetted through background investigation procedures reserved for top level security clearances.

DHS Defendants' Redundant FBI Check Policy also should be set aside under § 706(2) because the policy is arbitrary and capricious in that there is no reasonable justification for a rule that requires that the exact same background check be performed for naturalization applicants twice in a serial manner.  Notably, the conclusory justification that Defendants have trotted out in

---

[10]    *See* 8 U.S.C. § 1440(b) ((1) soldiers may be naturalized "regardless of age, and notwithstanding the provisions of section 1429 of this title as they relate to deportability and the provisions of section 1442 of this title"; (2) "no period of residence or specified period of physical presence within the United States or any State or district of the Service in the United States shall be required"; and (3) "no fee shall be charged or collected from the applicant for filing a petition for naturalization or for the issuance of a certificate of naturalization" granted under this section).

the past – *i.e.*, "national security" – has no relevance here.   All of the Class members being subjected to the Redundant FBI Check Policy already have completed their "enhanced DoD security checks."   The new policy accomplishes nothing except to further delay the adjudication of the naturalization applications for these soldiers.

In addition to further delaying the adjudication of the naturalization applications for these soldiers (by many months) for no good reason, the policy results in a gratuitous waste of government resources.   For example, the Section Chief of the National Name Check Program Section of the FBI recently testified about significant delays in that program due to the "exponential" growth in the number of FBI name check requests, "with more and more customers seeking background information from FBI files on individuals before bestowing a privilege, such as Government employment or appointment, a security clearance, attendance at a White House function, a 'green card,' naturalization, or a visa." Ex. 16 (FBI Decl.).   As a result, the FBI actively is working to "address[] delays on three fronts: leveraging technology, augmenting resources and refining processes." *Id.*   As part of that initiative, the FBI "is working with federal agency customers to identify high priority requests or *requests no longer needed* to prioritize/reduce backlog." *Id.*   Thus, the Redundant FBI Check Policy not only causes delays for the MAVNI soldiers to whom the policy is directly applied, but also causes widespread collateral damages in the form of further delays for every federal agency that requires FBI checks for all manner of purposes, such as for "government employment or appointment, a security clearance, attendance at a White House function, a 'green card,' naturalization, or a visa." *Id.*   In light of these circumstances, DHS Defendants' Redundant FBI Check Policy plainly is irrational.

DHS Defendants' policy is arbitrary and capricious for the additional reason that the agency failed to properly consider important aspects of the issue.   First, the policy is contrary to

the express Congressional policy favoring prompt adjudication of naturalization applications in general, *see* 8 U.S.C. §1571(b), and the specific statutory policy favoring expedited and eased naturalization procedures for military service members.   Second, the policy ignores the fact that the individuals subjected to the policy have not only already completed the exact same checks, but also have completed the lengthy and rigorous "enhanced DoD security checks."   Finally, the agency has given no consideration to the adverse impact and burdensome consequences that the policy has on the regulated population and FBI resources.

## 2.   Section 706(1)

DHS Defendants' Redundant FBI Check Policy also runs afoul of 5 U.S.C. § 706(1) for many of these same reasons.   Indeed, with respect to the fourth *TRAC* factor – the effect expediting delay will have on other agency activities – enjoining DHS Defendants from continuing their wholly unnecessary Redundant FBI Check Policy will free up agency resources for other activities that actually are necessary, both at DHS and at the FBI.   In addition, the same *TRAC* factors noted above with respect to the unreasonable delays in DHS Defendants' failure to apply the July 7 Policy, including the serious interests being prejudiced and the complete obliteration of any "expedited" timetable, apply equally here.   Moreover, with respect to the first factor, Defendants represented to this Court that all naturalization steps and checks short of interview (*i.e.*, "pre-processing") would proceed even where the "enhanced DoD security checks" were pending, so that an interview could be scheduled "promptly" as soon as the "enhanced DoD security checks" were completed.   Ex. 13 (Oct. 27, 2017 Tr.) at 77:19-78:8; 80:12-80:20.   And the Court explicitly put Defendants on notice that they would be held to that representation.   *Id.*   But Defendants have not done what they represented; instead, DHS Defendants are using their Redundant FBI Check Policy to justify further delays, citing it as the reason interviews cannot be scheduled even after all "enhanced DoD security checks" are complete and even after favorable NSD and MSSD

determinations. This conduct is "anything but reasonable, and that factor is decisive here." *In re Core Commc'ns Inc.*, 531 F.3d 849, 857 (D.C. Cir. 2008) (finding delay in complying with judicial instructions to violate § 706(2)); *see also Radio-Television News Dirs. Ass'n v. FCC*, 229 F.3d 269, 272 (D.C. Cir. 2000) (issuing writ of mandamus for immediate repeal of FCC rules, noting "[i]f these circumstances do not constitute agency action unreasonably delayed, it is difficult to imagine circumstances that would," (citation omitted) where circumstances showed that FCC failed to do anything in response to a court order to act "expeditiously" on remand and then issued a new temporary suspension of rules ten months later only when threatened with a new emergency motion; the suspension did not provide adequate justification for challenged rules but instead simply had effect of "further postponing a final decision"). Subjecting MAVNI soldiers to further delays in order to complete the same background check a second time is *per se* unreasonable.

### D. Defendants' NSD/MSSD Policy Violates 5 U.S.C. § 706

DHS Defendants have adopted the unlawful NSD/MSSD Policy, which puts on hold (again) the processing of naturalization applications filed by MAVNI soldiers until DoD Defendants complete separate and irrelevant NSD and MSSD adjudications for such soldiers. The NSD/MSSD Policy constitutes a final agency action. The policy marks the "consummation of the agency's decisionmaking process" on the issue and is not "merely tentative or interlocutory nature." *Bennett*, 520 U.S. at 178 (internal citations omitted). The policy is mandatory and is being applied by DHS Defendants to withhold and preclude the adjudication of naturalization applications duly filed by Class members.

#### 1. Section 706(2)

DHS Defendants' NSD/MSSD Policy is not in accordance with law and should be found unlawful and set aside by the Court under 5 U.S.C. § 706(2). NSDs and MSSDs are military-specific adjudications – not background checks or investigations – conducted for purposes of

permitting access to classified information and assessing continued suitability for military service.

These military-specific adjudications are performed by agencies that have no lawful role in the

naturalization process and involve legal standards that are fundamentally different than the "good

moral character" requirement under the INA.  As the Supreme Court has explained:

> A [security] clearance does not equate with passing judgment upon an individual's
> character.  Instead, it is only an attempt to predict his possible future behavior and
> to assess whether, under compulsion or circumstances or for other reasons, he might
> compromise sensitive information.  It may be based, to be sure, upon past or present
> conduct, but it also may be based upon concerns completely unrelated to conduct,
> such as having close relatives residing in a country hostile to the United States. "To
> be denied clearance on unspecified grounds in no way implies disloyalty or any
> other repugnant characteristic."

*Dep't of Navy v. Egan*, 484 U.S. 518, 528-29 (1988) (quoting *Molerio v. FBI*, 749 F.2d 815, 824

(D.C. Cir. 1984)).  Moreover, security clearance determinations must, of necessity and purpose,

lean toward denials.  *Egan*, 484 U.S. at 531 ("[S]ecurity-clearance determinations should err, if

they must, on the side of denials[.]").  By contrast, citizenship for soldiers should be liberally

granted. *In re Convento,* 210 F. Supp. 265, 268 (D.D.C. 1962) (holding that "[8 U.S.C. § 1440]

should be liberally construed in favor of petitioner's naturalization" and that "[n]o useful purpose

or Congressional policy will be served by denying the petition," which would "result in the

deportation rather than the naturalization of a worthy applicant who has served in our armed forces

in time of war").

There is no lawful basis for DHS Defendants to impose NSD and MSSD adjudications as

a precondition for adjudicating MAVNI naturalization applications.  In fact, DoD Defendants have

admitted that the NSD/MSSD adjudication process reflects nothing more than "an internal

personnel decision" by DoD.  Ex. 28 (Jan. 23, 2018 Tr.) at 9:15-22.  Nothing in 8 U.S.C. § 1440

permits or contemplates that soldiers seeking to naturalize under that provision may be subjected

to separate NSD/MSSD adjudications as a prerequisite for adjudication of their naturalization

applications.  On the contrary, as noted above, the purpose of § 1440 is to ease and expedite the naturalization process for soldiers serving in time of armed conflict.  The statute makes clear that no additional requirements may be imposed on this class of individuals that are not required for naturalization generally.  Indeed, the statute is quite clear and explicit with regard to the military determination that must be performed to establish eligibility for naturalization under § 1440.  The statute specifies that the military branch need only certify the soldier's "honorable service."  That certification already has been made by the Army for each and every Class member.

DHS Defendants' NSD/MSSD Policy also should be set aside under 5 U.S.C. § 706(2) because the policy is arbitrary and capricious in that there is no reasonable justification for a rule that prevents and withholds adjudication of naturalization applications based on separate military-specific suitability and security clearance adjudications that DoD acknowledges are mere "internal personnel decisions."  Again, the conclusory justification of "national security" has no relevance here.  All of the Class members subjected to the NSD/MSSD Policy have completed their "enhanced DoD security checks."  USCIS is thus able to make the required "good moral character" determinations for each individual without waiting for further "internal personnel decisions" by DoD.  The new policy accomplishes nothing except to further delay the adjudication of the naturalization applications for these soldiers.[11]

The NSD/MSSD Policy is arbitrary and capricious for the further reason that the agency failed to consider important aspects of the issue.  As with its other unlawful policies described

---

[11]   Indeed, these delays can compound because NIACs – one part of the "enhanced DoD security checks" – are not being considered by DoD CAF if they are more than two years old, and thus DoD adjudications of NSDs and MSSDs for those MAVNIs who enlisted the earliest (and have been waiting for naturalization the longest) are themselves being further delayed by months due to this "expired" information.  *See, e.g.*, Ex. 29 (03/09/18 Email); Ex. 30 (3/6/18 Facebook posts by USAREC's John Sheehy).  Notably, Defendants did not respond to Class counsel's request for attention to this issue.  *See* Ex. 31 (01/31/18 Email).

above, DHS Defendants have wholly failed to consider the adverse impact and burdensome consequences that the policy has placed on the regulated population as well as the statutory policy favoring prompt adjudication of naturalization applications in general and the specific statutory policy favoring expedited and eased naturalization processing for military service members.

### 2.    *Section 706(1)*

DHS Defendants' NSD/MSSD Policy also runs afoul of 5 U.S.C. § 706(1).  In particular, the NSD/MSSD Policy has caused substantial delays in the naturalization adjudication process for MAVNI soldiers because for many, if not most, MAVNI soldiers, the "enhanced DoD security checks" have been complete for many months and, as a result, adjudication of their naturalization applications has been suspended solely because of the NSD/MSSD Policy.  *For example, DoD completed the last step in the background check process, the CI Interview, for Plaintiff Haendel Almeida in September 2017.*  Yet, DHS Defendants still have not acted on his naturalization application.  Instead, DHS Defendants have withheld and precluded adjudication of Mr. Almeida's application pursuant to its NSD/MSSD Policy and until such time that DoD completes its NSD and MSSD adjudications.[12]  Thus, the same *TRAC* factors noted above with respect to the unreasonable delays in DHS Defendants' failure to apply the July 7 Policy, including the serious interests being prejudiced and the complete obliteration of any "expedited" timetable, apply equally here.

---

[12]  Compounding the problem and the harm, DoD Defendants suspended NSD and MSSD adjudications for MAVNI soldiers altogether for a full three-month period from mid-October 2107 through mid-January 2018.  Although Defendants failed to apprise the Court of this development, Defendants' representatives since have admitted that there were no DoD CAF recommendations between October 17, 2017 and January 13, 2018.  Dkt. 93-4, Ex. 1.

The delay (and consequent harm) caused by the NSD/MSSD Policy is particularly acute for MAVNI soldiers who do not "pass" their initial DoD NSD and MSSD adjudications.  These soldiers are subjected to a multi-tiered re-adjudication process depicted in the chart below:



Ex. 20.  All indications are that these soldiers will be relegated to "a state of limbo" with respect to their naturalization and left "to languish there indefinitely," *Hamandi*, 550 F. Supp. 2d at 51, as they either continue to spin on the NSD/MSSD hamster wheel or are ejected from it without a favorable NSD/MSSD and discharged.   In these situations, USCIS will never properly (and certainly not promptly) adjudicate naturalization.  Recognizing such an approach was unlawful, in an effort to escape a preliminary injunction in 2017, Defendants previously assured this Court that

they were not requiring a "pass" from DoD, but rather were just collecting information: "[USCIS] has only required that adjudicators collect and consider evidence obtained from DoD to the same degree that they collect and consider evidence obtained from other federal government entities such as the FBI. … USCIS does not require MAVNI naturalization applicants to 'pass' the background checks conducted by DoD." Dkt. 31 at 34.

This unlawful withholding of the DHS Defendants' mandatory, nondiscretionary duty to adjudicate naturalization applications is a direct violation of § 706(1).

**E.    All of the Challenged DHS Policies Are Unlawfully Retroactive and Violate 5 U.S.C. §§ 552 and 553**

"Generally, an agency may not promulgate retroactive rules without express congressional authorization." *Arkema Inc. v. EPA*, 618 F.3d 1, 7 (D.C. Cir. 2010).  "In the administrative context, a rule is retroactive if it 'takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past.'  The critical question is whether a challenged rule establishes an interpretation that 'changes the legal landscape.'"  *Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 859 (D.C. Cir. 2002) (internal citations omitted).  There is no question that the July 7 Policy, the FBI Check Policy, and the NSD/MSSD Policy change the legal landscape.

None of these requirements has ever been imposed previously on any class of applicants for naturalization, let alone military applicants who are entitled to an eased path to citizenship. Each of the Plaintiffs and members of the Class enlisted in and committed eight years of their lives to the Army based on the promise of – and under statutory and regulatory rules at the time that in fact provided – an expedited path to citizenship.  Dkt. 75, at 25:5-9 ("[The soldier's] part of the bargain was to give . . . the DoD eight years of military service . . . .  And they would have a right to apply for expedited citizenship.").  DHS Defendants' new policies have changed the legal

landscape and, not only deprived them of that right, but essentially made many of them and their family members illegal immigrants.

The July 7 Policy, the FBI Check Policy, and the NSD/MSSD Policy also are unlawful because the agency adopted these legislative rules without first complying with the notice and comment requirements of 5 U.S.C. § 553. "A rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy." *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014). The D.C. Circuit's opinion in *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1 (D.C. Cir. 2011) ("*EPIC*"), controls here. In *EPIC*, the plaintiffs challenged the Transportation Security Administration's ("TSA") decision to implement body scanner screenings – as an alternative to metal detector screenings – on passengers prior to embarking on flights. TSA justified the change under its broad and general statutory authority to screen passengers prior to commercial flights. TSA implemented the policy without complying with the notice and comment requirements of § 553. The Court held that the policy change "substantively affect[ed] the public to a degree sufficient to implicate the policy interests animating notice-and-comment rulemaking." *Id.* at 6. In reaching its conclusions, the D.C. Circuit explained:

> [T]he purpose of the APA would be disserved if an agency with a broad statutory command (here, to detect weapons) could avoid notice-and-comment rulemaking simply by promulgating a comparably broad regulation (here, requiring passengers to clear a checkpoint) and then invoking its power to interpret that statute and regulation in binding the public to a strict and specific set of obligations.

*Id.* at 7. The major policy changes implemented by DHS Defendants with the July 7 Policy, the FBI Check Policy, and the NSD/MSSD Policy are indistinguishable in all material respects from the circumstances at issue in *EPIC*.

Finally, DHS Defendants have violated the publication requirements of 5 U.S.C. § 552, which provides: "Each agency shall separately state and currently publish in the Federal Register for the guidance of the public . . . statements of general policy or interpretations of general applicability formulated and adopted by the agency." 5 U.S.C. § 552. Section 552 provides that, unless a person otherwise "has actual and timely notice" of the policy in question, "a person may not in any manner . . . be adversely affected by, a matter required to be published in the Federal Register and not so published." *Id*. DHS Defendants never published any of the policies at issue here in the Federal Register. And no Plaintiff or member of the Class could have had "actual notice" of any of the policies since each policy was adopted after these soldiers already had enlisted in the Army. As discussed below, Plaintiffs and the members of the Class unquestionably have been "adversely affected" by these new policies.

## III.   PLAINTIFFS WILL SUFFER IRREPARABLE INJURY IF THIS COURT DOES NOT GRANT PRELIMINARY INJUNCTIVE RELIEF

"[T]o meet the standard for irreparable harm the movant must present sufficient evidence that the purported injury is certain, great, actual, imminent, and beyond remediation." *Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112-13 (D.D.C. 2015); *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 270, 297 (D.D.C. 2006). As the Court already has found, all Class members are suffering irreparable harm because "delaying naturalization applications after applicants have been promised an expedited path to citizenship constitutes irreparable harm." *Kirwa* Dkt. 29 at 31; *Hamandi v. Chertoff*, 550 F. Supp. 2d 46, 51 (D.D.C. 2008); *Vargas v. Meese*, 682 F. Supp. 591, 595 (D.D.C. 1987). In particular, all of the Class members are – as this Court has characterized it – in "legal limbo" with "their ability to travel and pursue professional and personal opportunities" curtailed. Dkt. 44 at 17.

Each of the unlawful policies and actions described above stacks further delays on top of the delays already caused by DHS Defendants' July 7 Policy.[13] Thus, for the same reasons set forth in this Court's prior orders here and in the *Kirwa* action, the irreparable injury suffered by the Class members grows with each passing day. Class members will continue to be deprived of the opportunity to realize fundamental rights and benefits that come along with citizenship (including the right to vote, protection from deportation/removal proceedings, the right to obtain a driver's license, and the right to travel with a U.S. passport) and the ability to meet personal and professional obligations and goals.[14]

In addition, DoD has been ordering MAVNIs to renounce their foreign citizenship and relinquish their foreign passports even where they are not even scheduled for naturalization interviews, an order that could render them stateless. *See* Ex. 32 (2/5/18 Letter); Ex. 33 (Counterintelligence Screening Instructions to MAVNI Personnel Prior to Arrival); Ex. 34 ("Attached are a series of documents needed to complete security clearance process. Documents in Word are memos they are requiring related to passport destruction. If you have a foreign country's passport, you will have to turn it in.").

---

[13]    Further, a number of Class members are aware of DoD's failure to ensure that their CI interviews have been scheduled and/or that their SSBIs are continuing. It makes no sense for USCIS to wait for background checks that are not being done, especially when that wait is causing severe injury to soldiers. Moreover, the delay-on-delay harm was recently described to a Class member who was informed by USCIS that, even though his enhanced DoD background checks were complete, USCIS could not schedule his interview because some other background check related to his naturalization application purportedly had expired given that 15 months had passed.

[14]    *See, e.g.*, Class Member Q ¶¶ 15-17; Class Member C ¶¶ 15-19; Class Member B ¶¶ 15-16; Class Member E ¶¶ 12-13; Class Member D ¶ 13; Class Member K ¶¶ 16-18; Class Member A ¶ 14; Class Member N ¶¶ 11-13, 15; Class Member M ¶ 13; Class Member L ¶ 16; Class Member H ¶¶ 17-18; Class Member I ¶¶ 15, 18-19; Class Member G ¶¶ 17, 21; Class Member J ¶ 17; Class Member F ¶¶ 16, 19; Class Member V ¶ 19; Class Member P ¶¶ 21, 23; Class Member S ¶¶ 17, 19; Class Member U ¶¶ 14, 16-17; Class Member R ¶¶ 14, 16; Class Member O ¶¶ 14, 19-20; Class Member T ¶¶ 27, 29.

Class members also have had, or will have, to leave their jobs or schools, and otherwise cannot plan for future gainful employment or to continue their education.[15]  And class members face immediate risks and apprehension regarding the status of their family members — spouses and children — whose status is derivative of the class members' and whom they will be unable to regularly contact once shipped to BCT/AIT.[16]

Class members face continuing distress, financial and other hardship, and constant concerns about their current status and their future.[17]  As just one example, the delay in adjudicating one Class member's naturalization application – because USCIS asserted that it still had not received notice of his completed security checks even six weeks later (and two days *after* reporting to this Court that they had been completed) – have caused that soldier severe financial hardship for months due to his inability to work legally.  Class Member P ¶ 18.  This Class member is struggling to pay for housing and food for his family, and his Unit Commander even directly contacted USCIS on his behalf months ago in order to notify it that this "outstanding Soldier" with "strong moral character" was in "extreme financial hardship" due to USCIS's undue delay in adjudicating his naturalization, all to no avail.  Class Member P ¶ 19.

---

[15]   *See, e.g.*, Class Member Q ¶ 12; Class Member C ¶ 14; Class Member B ¶ 13; Class Member E ¶ 11; Class Member D ¶ 12; Class Member K ¶ 16; Class Member A ¶¶ 13-14; Class Member N ¶¶ 11-12; Class Member M ¶ 13; Class Member L ¶ 16; Class Member H ¶¶ 15-16, 20; Class Member I ¶¶ 14, 17; Class Member G ¶¶ 18-19; Class Member J ¶¶ 15-16; Class Member F ¶ 17; Class Member V ¶¶ 16-18; Class Member P ¶¶ 16, 18; Class Member S ¶ 15; Class Member U ¶¶ 11, 13, 15; Class Member R ¶¶ 11, 13; Class Member O ¶ 16; Class Member T ¶¶ 27-28.

[16]   *See, e.g.*, Class Member L ¶¶ 14-15; Class Member J ¶ 15; Class Member P ¶ 17; Class Member S ¶¶ 16-17; Class Member U ¶ 12; Class Member R ¶ 12; Class Member O ¶ 17; Class Member T ¶¶ 18, 26.

[17]   *See, e.g.*, Class Member Q ¶ 11; Class Member B ¶ 11; Class Member E ¶ 10; Class Member D ¶ 10; Class Member K ¶ 14; Class Member N ¶ 10; Class Member H ¶ 14; Class Member I ¶ 13; Class Member G ¶ 16; Class Member J ¶ 14; Class Member P ¶ 15; Class Member S ¶ 14; Class Member U ¶ 10; Class Member R ¶ 11; Class Member T ¶ 26.

And some Class members fear that they will not even be able to perform their Military Occupational Specialty ("MOS") to which they were assigned due to Defendants' delay and failure to follow their own policies.  For example, some Class members' MOS is "Motor Operator," which requires a valid driver's license.  But without valid immigration status these individuals cannot renew their driver's licenses, which are set to expire.  *See, e.g.*, Class Member O ¶¶ 12, 18.  Without the ability to perform their assigned military duties, these individuals cannot participate in or complete their military training.

Moreover, DHS Defendants' failure to comply with their own July 7 Policy by refusing to adjudicate the naturalization applications of even those soldiers who have successfully-completed the "enhanced DoD security checks" introduces a new category of harm.  These individuals will be shipped away for many months of BCT/AIT, with no ability to naturalize, and with no or very limited ability to respond to USCIS Requests for Evidence or to attend or reschedule naturalization interviews scheduled by USCIS during that period.[18]  Indeed, USCIS strangely has asserted that it will "continue coordinating with the applicant" after Class members go to basic training, in apparent ignorance of the reality that such coordination cannot take place during basic training. *See* Ex. 35 (02/13/18 Email).[19]

---

[18]   *See, e.g.*, Class Member Q ¶ 12; Class Member C ¶ 17; Class Member B ¶ 12; Class Member E ¶¶ 14-15; Class Member D ¶ 14; Class Member A ¶ 15; Class Member N ¶ 14; Class Member M ¶ 13; Class Member H ¶ 19; Class Member I ¶ 20; Class Member G ¶ 20; Class Member J ¶ 18; Class Member F ¶ 20; Class Member V ¶ 20; Class Member P ¶ 22; Class Member S ¶ 18; Class Member R ¶ 15; Class Member T ¶ 30.

[19]   There also is an open question about how and when the "holdover" members of the class will have their naturalization applications processed given Defendants' ever-shifting and inconsistent policies.  *See* Ex. 36 (June 2017 Holdover Memo) (requiring naturalization in order to leave BCT or AIT); Ex. 12 (2/9/18 Email).  Moreover, there is the concern that this June 2017 memo will be construed (or misconstrued) to mean that even more Class members will be caught in yet another Catch-22, where USCIS will not naturalize them before BCT/AIT, USCIS will not assist them with naturalization at BCT/AIT, and USCIS instructs them to wait until after they return from BCT and AIT, but DoD has a policy that requires them to be naturalized before they can leave BCT/AIT.

**IV.    THE BALANCE OF EQUITIES WEIGHS IN FAVOR OF PLAINTIFFS, AND GRANTING PRELIMINARY RELIEF SERVES THE PUBLIC INTEREST**

The balance of the equities and the public interest – factors that "'merge' in cases where the relief is sought against the government," *U.S. Ass'n of Reptile Keepers v. Jewell*, 103 F. Supp. 3d 133, 163-64 (D.D.C. 2015) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)) – weigh heavily in Plaintiffs' favor.

When deciding if the balance of equities favors granting a preliminary injunction, courts will consider whether an injunction would "substantially injure other interested parties." *McGinn, Smith & Co., Inc. v. Fin. Indus. Regulatory Auth.*, 786 F. Supp. 2d 139, 144 (D.D.C. 2011) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)); *see also Winter*, 555 U.S. at 24 (courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief" (internal quotations and citations omitted)).  Here, if the Court grants a preliminary injunction, Defendants will suffer no cognizable harm, while the harm to Class members, as described above, will subside.

By granting the injunction, Defendants will only be compelled to actually follow the law or even their own policy in the case of DHS Defendants' failure to comply with the unlawful July 7 Policy.  The public interest always is served by assuring agency adherence to statutory, regulatory, and policy standards against arbitrary action.  *See Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977) (finding that "there is an overriding public interest ... in the general importance of an agency's faithful adherence to its statutory mandate"); *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) (recognizing "the general public interest served by agencies' compliance with the law" in granting preliminary injunction against DHS).  Likewise, any notion that the balance should tip in Defendants' favor due to the cost associated with prompt adjudication of MAVNI applications is to be accorded no weight because

"the vindication of almost every legal right has an impact on the allocation of scarce resources." *AFGE*, 593 F. Supp. at 1207 (quoting *Caswell v. Califano*, 583 F.2d 9, 17 (1st Cir. 1978)) (requiring FLRA judges to decide stay requests as mandated by statute even if it would strain scarce government resources).  Weighing the harm that would continue to befall Class members without an injunction against the lack of harm that would accompany an order that Defendants follow the law and their own policies compels a finding that this preliminary injunction factor favors Plaintiffs.

While Defendants have attempted to justify the July 7 Policy itself based on national security concerns, there are no such national security concerns with respect to Defendants' failure to comply with the July 7 Policy, the Redundant FBI Check Policy, or the NSD/MSSD Policy that could tip the balance in Defendants' favor because all of the "enhanced DoD security checks" are complete for each Class member by the time these policies come into play.  Moreover, Defendants' national security justification can no longer be given any credit even with respect to the July 7 Policy itself because the Agency Record has revealed that these potential national security concerns – the classified documents previously presented to the Court – did not factor into the agency decision that led to the July 7 Policy.  *See* Dkt. 111 (administrative record index with classified documents conspicuously absent).

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that their motion be granted.

Respectfully submitted,


_____/s/ Joseph J. LoBue_____
Joseph J. LoBue (D.C. Bar No. 484097)
Douglas W. Baruch (D.C. Bar No. 414354)
Jennifer M. Wollenberg (D.C. Bar No. 494895)
Neaha P. Raol (D.C. Bar No. 1005816)
Shaun A. Gates (D.C. Bar No. 1034196)
Katherine L. St. Romain (D.C. Bar No. 1035008)
Fried, Frank, Harris, Shriver & Jacobson LLP
801 17th Street, NW
Washington, D.C. 20006
Telephone:  (202) 639-7000
Facsimile:  (202) 639-7003
Email: joseph.lobue@friedfrank.com
Email: douglas.baruch@friedfrank.com
Email: jennifer.wollenberg@friedfrank.com

*Counsel for Plaintiffs and Certified Class*