**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————

KUSUMA NIO, *et al.*,                              )
                                                  )
              Plaintiffs,                         )
                                                  )
       v.                                         )        **Case No. 1:17-cv-00998-ESH-RMM**
                                                  )
UNITED STATES DEPARTMENT                           )
OF HOMELAND SECURITY, *et al.*,                    )        **[Oral Argument Requested]**
                                                  )
              Defendants.                         )
———————————————————————)

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to the June 20, 2018 Order of this Court (Dkt. 159), Plaintiffs Haendel Crist Calisto Alves de Almeida, Prashanth Batchu, Lucas Calixto, Shu Cheng, Seung Joo Hong, Wanjing Li, Ye Liu, Kusuma Nio, Jae Seong Park, and Emeka Udeigwe (collectively, "Plaintiffs"), for themselves and the Class, respectfully move this Court for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

At this time, Plaintiffs seek summary judgment against Defendants with respect to their Second Amended Complaint ("SAC") claims that Defendants' policies and conduct are contrary to 8 U.S.C. § 1440, violate the Administrative Procedure Act ("APA") (including 5 U.S.C. § 706(2) and 5 U.S.C. §§ 553 and 552), are impermissibly retroactive as to Plaintiffs and the Class, and are unconstitutional.[1]

---

[1]     As explained more fully in the accompanying Memorandum of Points and Authorities, in accordance with the Court's June 20, 2018 Order, Plaintiffs and the Class are deferring seeking judgment on certain SAC claims.

Pursuant to Local Civil Rules 7(h) and 7(n), Plaintiffs separately identify the material facts in support of their APA, constitutional, and other claims in the accompanying memorandum of points and authorities in support of their Motion, wherein Plaintiffs also set forth the legal grounds warranting summary judgment based on those facts.

Accordingly, Plaintiffs request that the Court grant the motion, enter partial summary judgment in their favor, and order the necessary relief for these violations, including a declaratory judgment that Defendants' actions are contrary to law, setting aside and permanently enjoining enforcement of the "MSSD" portion of the "July 7 Policy," converting the preliminary injunction issued with respect to the "New N-426 Policy" into a permanent injunction, and providing such other and further relief as may be necessary to redress the harm to Plaintiffs and the Class resulting from these violations.[2]

For all these reasons, Plaintiffs request that the Motion be granted.

---

[2] Plaintiffs also are entitled to mandamus relief, as there is a clear and indisputable right to the relief sought and Defendants are violating their clear duties. *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016). However, if the Court provides relief under Plaintiffs' other claims, it need not reach the mandamus claim. *See id.; Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 379 (2004).

Dated: August 13, 2018                      Respectfully submitted,

        */s/ Douglas W. Baruch*
Douglas W. Baruch (D.C. Bar No. 414354)
Jennifer M. Wollenberg (D.C. Bar No. 494895)
Kayla Stachniak Kaplan (D.C. Bar No. 996635)
Neaha P. Raol (D.C. Bar No. 1005816)
Shaun A. Gates (D.C. Bar No. 1034196)
Katherine L. St. Romain (D.C. Bar No. 1035008)
Fried, Frank, Harris, Shriver & Jacobson LLP
801 17th Street, NW
Washington, D.C. 20006
Telephone: (202) 639-7000
Facsimile: (202) 639-7003
Email: douglas.baruch@friedfrank.com
Email: jennifer.wollenberg@friedfrank.com

*Counsel for Plaintiffs and the Certified Class*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KUSUMA NIO, *et al.*, | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )   **Case No. 1:17-cv-00998-ESH-RMM** |
| | ) |
| UNITED STATES DEPARTMENT | ) |
| OF HOMELAND SECURITY, *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Douglas W. Baruch (D.C. Bar No. 414354)
Jennifer M. Wollenberg (D.C. Bar No. 494895)
Kayla Stachniak Kaplan (D.C. Bar No. 996635)
Neaha P. Raol (D.C. Bar No. 1005816)
Shaun A. Gates (D.C. Bar No. 1034196)
Katherine L. St. Romain (D.C. Bar No. 1035008)
Fried, Frank, Harris, Shriver & Jacobson LLP
801 17th Street, NW
Washington, D.C. 20006
Telephone: (202) 639-7000
Facsimile: (202) 639-7003
Email: douglas.baruch@friedfrank.com
Email: jennifer.wollenberg@friedfrank.com

*Counsel for Plaintiffs and the Certified Class*

# TABLE OF CONTENTS

**Page**

I.     BACKGROUND ...................................................................................................1

II.    PRELIMINARY STATEMENT ...........................................................................4

III.   ARGUMENT .......................................................................................................8

      A.    LEGAL STANDARDS FOR GRANTING THE MOTION ...................8

      B.    STATEMENT OF FACTS .........................................................................9

      C.    THE DOD INVESTIGATORY ASPECT OF THE JULY 7
            POLICY, IF NOT MOOT, VIOLATES 5 U.S.C. § 706(2) ...................16

      D.    THE DOD ADJUDICATORY ASPECT OF THE JULY 7
            POLICY VIOLATES 5 U.S.C. § 706(2) ..............................................17

            1.    The MSSD Policy Is Not in Accordance with Law ...................17

            2.    Defendants' MSSD Policy Is Arbitrary and Capricious
                 Because the Administrative Record Does Not Provide a
                 Reasonable Justification..............................................................21

            3.    The MSSD Policy Is Arbitrary and Capricious Because
                 the Agency Failed to Consider Important Factors ......................24

      E.    THE MSSD POLICY VIOLATES 5 U.S.C. §§ 553 AND 552 ...........29

            1.    The MSSD Policy Violates 5 U.S.C. § 553 ...............................29

            2.    The MSSD Policy Violates 5 U.S.C. § 552 ...............................32

      F.    DEFENDANTS IMPROPERLY HAVE APPLIED THEIR
            POLICIES RETROACTIVELY ...........................................................33

      G.    THE JULY 7 POLICY VIOLATES THE
            NATURALIZATION CLAUSE OF THE CONSTITUTION ..............34

            1.    The Congressional Mandate in § 1440 Requires Honorable
                 Service and Otherwise Relaxes Naturalization Criteria..............34

            2.    The July 7 Policy Violates the Congressional Mandate
                 in § 1440 .....................................................................................37

      H.    THE NEW N-426 POLICY IS UNLAWFUL .......................................41

IV.   CONCLUSION..................................................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alliance for Natural Health US v. Sebelius,*
   714 F. Supp. 2d 48 (D.D.C. 2010) ........................................................................38

*Am. Trading Transp. Co., Inc. v. United States,*
   791 F.2d 942 (D.C. Cir. 1986) ............................................................................27

*Am. Wild Horse Pres. Campaign v. Perdue,*
   873 F.3d 914 (D.C. Cir. 2017) ............................................................................21

*Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior,*
   143 F. Supp. 2d 7 (D.D.C. 2001) ...........................................................................8

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ...............................................................................................9

*Arkema Inc. v. EPA,*
   618 F.3d 1 (D.C. Cir. 2010) ................................................................................33

*ArQule, Inc. v. Kappos,*
   793 F. Supp. 2d 214 (D.D.C. 2011) .......................................................................8

*Boudette v. Barnette,*
   923 F.2d 754 (9th Cir. 1991) ..............................................................................40

*Davis v. Dist. Dir., INS,*
   481 F. Supp. 1178. (D.D.C. 1979) ......................................................................34

*Defenders of Wildlife v. Babbitt,*
   130 F. Supp. 2d 121 (D.D.C. 2001) .......................................................................9

*Dep't of Navy v. Egan,*
   484 U.S. 518 (1988) .................................................................................. *passim*

*Detroit Trust Co. v. The Thomas Barlum,*
   293 U.S. 21 (1934) ..............................................................................................35

*Electronic Privacy Information Center v. U.S. Department of Homeland Security,*
   653 F.3d 1 (D.C. Cir. 2011) .................................................................29, 30, 31

*Envtl. Def. Fund, Inc. v. Costle,*
   657 F.2d 275 (D.C. Cir. 1981) ............................................................................27

*Fedorenko v. United States*,
    449 U.S. 490 (1981) ........................................................................................35

*Foster v. Mabus*,
    103 F. Supp. 3d 95 (D.D.C. 2015) ..................................................................24

*Galvan v. Press*,
    347 U.S. 522 (1954) ........................................................................................34

*In re Convento*,
    210 F. Supp. 265 (D.D.C. 1962) ................................................................ 19-20

*In re Reyes*,
    910 F.2d 611 (9th Cir. 1990) ..........................................................................40

*INS v. Pangilinan*,
    486 U.S. 875 (1988) ........................................................................................40

*J.J. Cassone Bakery, Inc. v. NLRB*,
    554 F.3d 1041 (D.C. Cir. 2009) ......................................................................38

*Jafarzadeh v. Nielsen*,
    No. 16-1385 (JDB), 2018 U.S. Dist. LEXIS 131157 (D.D.C. Aug. 6, 2018) ........................37

*Kirwa v. Dep't of Def.*,
    285 F. Supp. 3d 21 (D.D.C. 2017) ................................................................ *passim*

*Kirwa v. Dep't of Def.*,
    285 F. Supp. 3d 257 (D.D.C. 2018) .............................................................. *passim*

*Kirwa v. Dep't of Def.*,
    No. 17-1793(ESH), 2018 U.S. Dist. LEXIS 86908 (D.D.C. May 23, 2018) ....................21, 41

*Lone Mountain Processing, Inc. v. Sec'y of Labor*,
    709 F.3d 1161 (D.C. Cir. 2013) ................................................................ 21-22

*Mendoza v. Perez*,
    754 F.3d 1002 (D.C. Cir. 2014) ......................................................................29

*Molerio v. FBI*,
    749 F.2d 815 (D.C. Cir. 1984) ....................................................................19, 39

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ..........................................................................................24

*Nat'l Mining Ass'n v. Dep't of Labor*,
    292 F.3d 849 (D.C. Cir. 2002) ........................................................................33

*Nat'l Mining Ass'n v. McCarthy*,
758 F.3d 243 (D.C. Cir. 2014) ..............................................................................29

*Nat'l Wilderness Inst. v. U.S. Army Corps of Eng'rs*,
No. 01-273 TFH, 2002 U.S. Dist. LEXIS 27743 (D.D.C. Oct. 9, 2002) ..................8

*Nio v. Dep't of Homeland Sec.*,
270 F. Supp. 3d 49 (D.D.C. 2017) ................................................................ *passim*

*Nio v. Dep't of Homeland Sec.*,
323 F.R.D. 28 (D.D.C. 2017) ........................................................................ *passim*

*Oceanic Steam Navigation Co. v. Stranahan*,
214 U.S. 320 (1909) ..............................................................................................34

*Porter v. Califano*,
592 F.2d 770 (5th Cir. 1979) .................................................................................38

*Schneiderman v. United States*,
320 U.S. 118 (1943) ......................................................................................... 36-37

*Schwab v. Coleman*,
145 F.2d 672 (4th Cir. 1944) ...........................................................................39, 40

*Sec. Univ. v. Acosta*,
No. 1:16-cv-01469, 2018 U.S. Dist. LEXIS 114483 (D.D.C. July 10, 2018) ..........8

*SEIU Nat'l Indus. Pension Fund v. Harborview Healthcare Ctr., Inc.*,
191 F. Supp. 3d 13 (D.D.C. 2016) ...........................................................................9

*Sierra Club v. Mainella*,
459 F. Supp. 2d 76 (D.D.C. 2006) ...........................................................................8

*Tutun v. United States*,
12 F.2d 763 (1st Cir. 1926) ...................................................................................40

*United States v. Ginsberg*,
243 U.S. 472 (1917) ........................................................................................36, 37

*Wiedersperg v. INS*,
No. 98-15410, 1999 U.S. App. LEXIS 16952 (9th Cir. July 20, 1999) ............ 39-40

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ..................................................................................................42

**Statutes**

5 U.S.C. § 552 ......................................................................................................32

5 U.S.C. § 553 ................................................................................................. *passim*

5 U.S.C. § 706(2) ............................................................................................ *passim*

8 C.F.R. § 329 ................................................................................................. *passim*

8 C.F.R. § 335.3(a) ..................................................................................................20

8 U.S.C. § 1421(a) ...................................................................................................38

8 U.S.C. § 1427(a) .............................................................................................19, 36

8 U.S.C. § 1440 ............................................................................................... *passim*

8 U.S.C. § 1440(b) .......................................................................................... *passim*

8 U.S.C. § 1446(d) .............................................................................................38-39

8 U.S.C. § 1571(b) .......................................................................................15, 26-27

Pub. L. 107-296, 116 Stat. 2135, § 451(b) ............................................................39

**Other Authorities**

80 Fed. Reg. 79487 (Dec. 22, 2015) ......................................................................32

Federal Rules of Civil Procedure

    Rule 56 .................................................................................................................1, 9

H.R. Rep. No. 90-1968 (1968) ................................................................................35

Rules of the United States District Court for the District of Columbia

    Rule 7(h) ................................................................................................................9

    Rule 7(n) ................................................................................................................9

S. Rep. No. 90-1292 (1968) .....................................................................................20

U.S. Const. art. I, § 8, cl. 4 ......................................................................................34

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and the June 20, 2018 Order of this Court (Dkt. 159), Plaintiffs (on behalf of themselves and the Class) respectfully move this Court to enter summary judgment in their favor with respect to certain claims in the Second Amended Complaint ("SAC").

## I.    BACKGROUND[1]

Plaintiffs and the Class are U.S. Army soldiers serving in the Selected Reserve of the Ready Reserve ("Selected Reserve").   Each enlisted two or more years ago through the Military Accessions Vital to the National Interest ("MAVNI") program, which recruits highly-skilled, lawfully-present immigrants into the U.S. military and offers an expedited path to naturalization in exchange for military service.  Each soldier's enlistment contract obligates the soldier to a multi-year period of military service (generally eight years), including the two years already served. Each soldier has a military rank, and many have been promoted.  Each soldier is assigned to a U.S. military reserve unit.   Each soldier has served honorably in the U.S. military.   The Army has certified (at least once and sometimes on multiple occasions) each soldier's honorable service. And each soldier has submitted an application to become a naturalized U.S. citizen.

Under federal law, namely § 329 of the Immigration and Nationality Act ("INA"), codified at 8 U.S.C. § 1440, each soldier is entitled to have his/her naturalization application adjudicated in accordance with naturalization criteria set forth in the INA.  Since the MAVNI program's inception and up until the period immediately preceding the policies and conduct challenged in this action,

---

[1]     The complex factual and procedural background of this case and Defendants' policies and actions is further summarized in the Court's prior opinions in this case and the related *Kirwa* action.   *See Kirwa v. Dep't of Def.*, 285 F. Supp. 3d 257, 263-65 (D.D.C. 2018); *Nio v. Dep't of Homeland Sec.*, 323 F.R.D. 28, 30-31 (D.D.C. 2017); *Nio v. Dep't of Homeland Sec.*, 270 F. Supp. 3d 49, 53-61 (D.D.C. 2017); *Kirwa v. Dep't of Def.*, 285 F. Supp. 3d 21, 25-35 (D.D.C. 2017).

more than 10,000 predecessor MAVNI soldiers with the same profiles as Plaintiffs and the Class became naturalized U.S. citizens, in an expedited manner, as authorized by § 1440.

That orderly naturalization process came to a screeching halt in late 2016/early 2017. Defendants United States Department of Homeland Security ("DHS"), United States Citizenship and Immigration Services ("USCIS," and together with DHS, "DHS Defendants"), and United States Department of Defense ("DoD," and together with DHS and USCIS, "Defendants") abruptly changed the rules *after* these soldiers enlisted, leaving them in immigration limbo and wreaking havoc and harm on their lives. Defendants erected one new barrier after another along these soldiers' path to naturalization, extending and blocking their route, rather than shortening it as the law clearly provides. Indeed, this lawsuit has exposed a coordinated and unlawful effort by Defendants to interfere with Plaintiffs' and the Class's statutory right to seek naturalization and to have their naturalization applications adjudicated in accordance with the law. Plaintiffs now seek summary judgment to end these illegal practices and obtain necessary relief.

The road from the filing of the original complaint to this Motion is littered with Defendants' ever-shifting policies, practices, and excuses – all in an attempt to avoid legal reckoning. When Plaintiffs commenced this action in May 2017, MAVNI soldier naturalization applications had been on hold for months, meaning that the applications were not being fully adjudicated and MAVNI soldiers were not being naturalized. Although DHS Defendants first vigorously denied that any such "hold" existed, they reversed course only after the Court forced them to respond to the allegations. *See, e.g.*, Renaud Decl., Dkt. 19-6 ¶¶ 20-26 (acknowledging and describing "[t]he USCIS Hold"). This litigation further revealed that DHS Defendants were implementing this hold at the behest of and in coordination with DoD. *See, e.g.*, Miller Decl., Dkt. 19-7 ¶ 18 ("DoD and

USCIS mutually agreed that USCIS would slow down the Form N-400 adjudications of the MAVNI pilot program applicants.").

During the course of the early proceedings, Plaintiffs also learned that DoD was planning to discharge *en masse* enlisted Selected Reserve MAVNIs who had not yet been naturalized. *See* May 19, 2017 "Action Memo," Dkt. 17-8. Yet, on the very day when Defendants were obligated to respond to Plaintiffs' motion for preliminary injunctive relief with respect to the naturalization hold and DoD interference, Defendants hastily fashioned and implemented a major new policy – referred to in this litigation as the "July 7 Policy" – which purported to justify DHS Defendants' failure to finally adjudicate the naturalization applications of these soldiers. It was only after Plaintiffs pointed out the inconsistency between the July 7 Policy and DoD's discharge plans that Defendants then disavowed any such discharge intentions, claiming that the plans had been "verbally" overridden by Defendant James Mattis, the Secretary of Defense. Miller Decl., Dkt. 25-2, at 8 of 216.

Three months later, Defendants sought yet again to interfere with these soldiers' naturalizations. After this Court signaled that Defendants would not prevail on any argument that class members were not eligible for naturalization until they had gone to basic training or served in an active duty status, *Nio*, 270 F. Supp. 3d at 60, Defendants decided that they would block naturalizations by revoking or rescinding the honorable service certifications that are necessary evidence to satisfy the one DoD-related condition for naturalization under § 1440. Thus, with no advance warning to Plaintiffs or the Court, on October 13, 2017, DoD implemented its "New N-426 Policy." That interference tactic failed, however, when this Court entered preliminary injunctions enjoining enforcement of the New N-426 Policy against enlisted MAVNIs seeking

naturalization.  *See* Dkt. 74, at 1 (granting injunction for reasons set forth in opinion granting injunction in *Kirwa*, 285 F. Supp. 3d 21).

As the Court is well aware, MAVNI naturalization adjudications pursuant to the July 7 Policy are moving at a snail's pace.  As of the most recent Court-ordered reporting by Defendants, only a fraction of the Class has been naturalized – only 244 naturalizations out of approximately 2,500 current/future Class members.   The primary blame for this anemic naturalization adjudication rate rests squarely with one aspect of the July 7 Policy:   USCIS, pursuant to Defendants' interpretation of the July 7 Policy, will not approve Class members for naturalization until DoD renders so-called *military service suitability adjudications* ("MSSDs") with respect to these soldiers, even though the DoD investigations which precede those MSSDs have long since been completed and any "derogatory" information has been identified before the MSSDs even begin.

As shown below, USCIS has no lawful basis for failing to adjudicate Class members' applications for naturalization.  These soldiers – all of whom already have honorably served in the U.S. military – should not be subjected to this MSSD prerequisite to naturalization.

## II.   PRELIMINARY STATEMENT

The causes of action in the Second Amended Complaint arise from the July 7 Policy and the New N-426 Policy, and include claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, and the Constitution.  As set forth below, Plaintiffs seek judgment with respect to each policy.  However, pursuant to the Court's June 20, 2018 Order (Dkt. 159, at 1), Plaintiffs are deferring briefing on their APA § 706(1) claims.

Moreover, as directed by the Court, Plaintiffs have separated their APA § 706(2) arguments with respect to the July 7 Policy to distinguish the arguments addressing the "investigation" aspects

of the Policy from those addressing the "adjudication" aspects of the Policy.  Dkt. 159, at 1 ("Plaintiffs should separate their arguments ... so that the briefing addresses defendants' July 7th Policy with the MSSD and without the MSSD (i.e., the steps in DOD's security screening process prior to the CAF Adjudication)[.]").   Indeed, this distinction between investigation and adjudication is extremely important to the legal analysis here.  As discussed in Section III.B below, the July 7 Policy – as interpreted and applied by Defendants – mandates that USCIS will not adjudicate a Class member's naturalization application until (1) DoD completes its enhanced security screening investigation of that soldier, ***and*** (2) the military conducts its adjudications, making a post-enlistment or second "suitability" determination for the soldier.

The first step – the "investigation" – is when DoD gathers additional background information on soldiers, conducting Top Secret security clearance investigation fact-finding made up of three elements: (a) an SSBI/Tier 5 investigation initiated with the National Background Investigations Bureau ("NBIB") of the Office of Personnel Management ("OPM") shortly after the soldier enlists; (b) a National Intelligence Agency Check ("NIAC"), which includes name checks in various databases, such as the FBI Name database, the FBI Foreign Terrorism Tracking Task Force database, the National Crime Information Center, and the Defense Central Index of Investigations ("DCII"); and (c) a Counter Intelligence ("CI") investigation, including CI interview.

Once the fact-finding/investigation is complete, the second step, or adjudication, begins. The investigation results are forwarded to the DoD Consolidated Adjudications Facility ("CAF") for an adjudication called a national security determination ("NSD"), which generally is used to grant or deny Top Secret clearances but is being used for non-citizen MAVNIs to make so-called military suitability "recommendations" to the Army as a first step in or prerequisite to the MSSD.

Then, the Army G-1, or HR/personnel department, considers the DoD CAF recommendation and purportedly "weighs" that recommendation regarding whether the soldier could be given access to Top Secret information (even though these soldiers are not being provided such clearances and most do not have and will not have military occupations that require such access or clearances) against other criteria, including the Army's need for that soldier's skill set.  The result of that "weighing" is an MSSD.  However, if the DoD CAF "recommendation" is unfavorable and the Army G-1 MSSD is "suitable," DoD engages in another round of decision-making.  DoD CAF's and the Army G-1's processes are adjudications done solely for military personnel/HR purposes.

The **_investigation_** aspect of the July 7 Policy (the SSBI/Tier 5, NIAC and CI interview), and the **_adjudication_** aspect of the July 7 Policy (the NSD/MSSD) are two very different events, and for purposes of the APA § 706(2) challenges, by directing distinct briefing from the parties, the Court has recognized that it should separately assess the legality of each phase.  For purposes of this Motion, the primary focus of Plaintiffs' APA § 706(2) claim is on the **_adjudication_** phase of the July 7 Policy.  The reason for Plaintiffs' approach is that, as discussed further in Section III.C below, while Plaintiffs believe that Defendants' July 7 Policy of requiring soldiers to undergo the SSBI/Tier 5, NIAC, and CI investigation as a prerequisite to naturalization violates APA § 706(2), the issue is moot because those investigations apparently have been completed for every Class member whom DoD intends to investigate.

Accordingly, Plaintiffs focus their APA § 706(2) summary judgment motion on the adjudication phase of the July 7 Policy.  And, as set forth below in Section III.D, that aspect of the policy is contrary to law and arbitrary and capricious.  Indeed, it makes no logical sense for Defendants to halt naturalizations pending these DoD military **_adjudications_**, and there is nothing in the Administrative Record ("AR") that supports such a policy.  Defendants' attempts to justify

the July 7 Policy have centered on contentions that the DoD *investigations* may yield facts that bear on legitimate naturalization eligibility criteria, primarily an applicant's "good moral character." But, to the extent that USCIS actually intended to consider for naturalization purposes the underlying "derogatory" information gathered by DoD – even though it is unclear, to this day, whether USCIS has received, much less considered, any of the underlying "derogatory" information – all such information has been gathered *before* the DoD adjudications begin.

Thus, it is irrational and arbitrary and capricious for USCIS to wait for DoD to make its own, separate *military* personnel/HR assessments of the "investigation" information if USCIS nevertheless is going to independently evaluate that same underlying information to make good moral character or attachment to the Constitution assessments. On the other hand, if USCIS is not actually going to review the underlying information gathered during the DoD investigations, then USCIS's justification for its July 7 Policy fails.

Further, as shown below in Sections III.E and III.F, the July 7 Policy also must be set aside under the APA because of its improper, retroactive effect and because DHS failed to follow notice-and-comment rulemaking procedures.

In addition, the July 7 Policy is unconstitutional. As set forth in Section III.G below, Defendants are imposing preconditions to naturalization – namely the completion of DoD investigations and DoD adjudications – that are not specified by Congress as naturalization criteria for soldiers. To the contrary, Congress, which has the sole constitutional authority to establish "an uniform rule of naturalization," has specified in the INA the *only* permissible eligibility conditions that soldier-applicants such as Plaintiffs and the Class must meet. The Executive Branch has no legal ability to impose any other conditions, but that is precisely what Defendants have done

through the July 7 Policy's requirement for MSSDs.  This conduct plainly violates Article I, Section 8 of the Constitution, and Plaintiffs are entitled to summary judgment on this claim.

Additionally, DoD's New N-426 Policy is unlawful and violates APA § 706(2).  As set forth in Section III.H below, the Court's preliminary injunction enjoining DoD Defendants from implementing the New N-426 Policy (as applicable to Plaintiffs and the Class) and from taking any actions to rescind, recall, revoke, or otherwise decertify the honorable service certifications issued to Plaintiffs and the Class now should be converted to a permanent injunction.

## III.   ARGUMENT

### A.    LEGAL STANDARDS FOR GRANTING THE MOTION

A plaintiff's motion for summary judgment on an APA § 706(2) claim must be granted if the agency decision is "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *See Sec. Univ. v. Acosta*, No. 1:16-cv-01469, 2018 U.S. Dist. LEXIS 114483, at *6-7 (D.D.C. July 10, 2018) (quoting 5 U.S.C. § 706(2)).  The court's function "'is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'"  *ArQule, Inc. v. Kappos*, 793 F. Supp. 2d 214, 219 (D.D.C. 2011) (Huvelle, J.) (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)).  Where, as here, there is a claim that the agency acted improperly by failing to consider relevant factors in issuing its policy, the Court may consider relevant evidence for that purpose, even if it is not in the administrative record.  *See Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior*, 143 F. Supp. 2d 7, 11 (D.D.C. 2001); *see also Nat'l Wilderness Inst. v. U.S. Army Corps of Eng'rs*, No. 01-273 TFH, 2002 U.S. Dist. LEXIS 27743, at *9-10 (D.D.C. Oct. 9, 2002).  As this Court has stated:

> In reviewing the action of the agencies, the Court must engage in a thorough, probing, in-depth review, to determine whether the agencies have examined the relevant data and articulated a

satisfactory explanation for its action.  In thoroughly reviewing the
agency's actions, the Court considers whether the agency acted
within the scope of its legal authority, whether the agency has
explained its decision, whether the facts on which the agency
purports to have relied have some basis in the record, and whether
the agency considered the relevant factors.

*Defenders of Wildlife v. Babbitt,* 130 F. Supp. 2d 121, 124 (D.D.C. 2001) (Huvelle, J.) (internal

quotations and citations omitted).

Plaintiffs' constitutional claims are decided under traditional Rule 56 standards.  A motion

for summary judgment shall be granted when "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also SEIU*

*Nat'l Indus. Pension Fund v. Harborview Healthcare Ctr., Inc.*, 191 F. Supp. 3d 13, 17 (D.D.C.

2016).  A fact is material if it is capable of affecting "the substantive outcome of the litigation."

*SEIU Nat'l Indus. Pension Fund*, 191 F. Supp. at 17 (citing *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986)).  A genuine issue of material fact exists only when there is enough evidence

for a reasonable fact-finder to find for the nonmoving party.  *Id.*

### B.   STATEMENT OF FACTS[2]

1.   Under the July 7 Policy, "USCIS will not proceed to interview, approve, or oath

any currently pending or future MAVNI applicants applying for naturalization under INA § 329

... until all enhanced DoD security checks are completed."  July 7, 2017 Renaud Email (AR 5).

2.   The three elements of the so-called "enhanced DoD security checks" that occur

***prior*** to the DoD CAF adjudication are an SSBI/Tier 5 investigation, NIAC, and CI interview.

---

[2]     Plaintiffs provide this Statement of Facts ("SOF") pursuant to Local Civil Rules 7(h) and
7(n).  Appendices, including the Administrative Record ("AR") Appendix and Plaintiffs'
Appendix ("PA"), will be prepared and filed within 14 days following the completion of briefing.
At that time, Plaintiffs plan to re-submit their briefs with reference to all AR pagination (as
materials more recently added to the Administrative Record have yet to be paginated) and PA
pagination for the Court's ease of reference.

September 30, 2016 DoD Memo, Dkt. 17-10, at 7-8 of 10 (AR __); MAVNI FY18 Policy Flow, Dkt. 119-20 (PA __); MAVNI/LPR FY17 Policy Flow, Dkt. 154-10 (PA __); MAVNI Policy Flow FY16 Policy, Dkt. 154-11 (PA __).

3.      After those three elements – the SSBI/Tier 5 investigation, the NIAC, and the CI interview – are complete, the investigation results are "adjudication ready" and are forwarded to the DoD CAF for its adjudication.  September 30, 2016 DoD Memo, Dkt. 17-10, at 7-8 of 10 (AR __); MAVNI FY18 Policy Flow, Dkt. 119-20 (PA __); MAVNI/LPR FY17 Policy Flow, Dkt. 154-10 (PA __); MAVNI Policy Flow FY16 Policy, Dkt. 154-11 (PA __).

4.      The DoD MSSD adjudication process for MAVNIs consists of multiple steps, including the "recommendation" from the DoD CAF and a follow-on MSSD by the Army. September 30, 2016 DoD Memo, Dkt. 17-10, at 7 of 10 (AR ___); Arendt Decl., Dkt. 128-2 ¶ 2 (PA __) ("The MSSD recommendation, which comes from the Consolidated Adjudication Facility (CAF) and is not binding on the Military Services .... The Service Secretary concerned ... renders the final suitability determination …."); MAVNI FY18 Policy Flow, Dkt. 119-20 (PA __).

5.      For MAVNI soldiers who receive an unfavorable or "unsuitable" recommendation from the DoD CAF, there can be even more steps within the MSSD process.  MAVNI FY18 Policy Flow, Dkt. 119-20 (PA __).

6.      In making its recommendation to the Army, DoD CAF applies adjudicative guidelines that were established for individuals who require access to classified information or are seeking to hold a sensitive position ("Adjudicative Guidelines").  September 30, 2016 DoD Memo, Dkt. 17-10, at 7 of 10 (AR __) ("Military Suitability Determination:  The DoD CAF will render a National Security Determination based on 13 National Adjudicative Guidelines.  JPAS will then be coded as 'No Determination Made' (MAVNIs are not eligible for a security clearance during

their initial accession ...).”); Defendants’ Responses, Dkt. 39 ¶ 1 (PA __); August 2006 DoD Memo re Implementation of Adjudicative Guidelines for Determining Eligibility For Access to Classified Information, Dkt. 39-1, at 4 of 31 (PA __) (“The following adjudicative guidelines are established for ... individuals who require access to classified information.”); Security Executive Agent Directive 4: National Security Adjudicative Guidelines, Dkt. 39-2, at 2 of 28 (PA __) (“This … Directive establishes the single, common adjudicative criteria for all covered individuals who require initial or continued eligibility for access to classified information or eligibility to hold a sensitive position.”).

7.      DoD CAF uses the Adjudicative Guidelines to predict whether a person can be trusted, in the future, with access to classified information or in a sensitive position.  August 2006 DoD Memo re Implementation of Adjudicative Guidelines for Determining Eligibility For Access to Classified Information, Dkt. 39-1, at 4 of 31 (PA __) (“Decisions ... take into account factors that *could* cause a conflict of interest ....” (emphasis added)); Security Executive Agent Directive 4: National Security Adjudicative Guidelines, Dkt. 39-2, at 7 of 28 (PA __) (noting that the adjudicative process is for risk assessment purposes).

8.      Under the Adjudicative Guidelines, DoD CAF is required to resolve any doubts by making an unfavorable or “unsuitable” recommendation.   August 2006 DoD Memo re Implementation of Adjudicative Guidelines for Determining Eligibility For Access to Classified Information, Dkt. 39-1, at 5 of 31 (PA __) (“Any doubt concerning personnel being considered for access to classified information will be resolved in favor of the national security.”); Security Executive Agent Directive 4: National Security Adjudicative Guidelines, Dkt. 39-2, at 4 of 28 (PA __) (“any doubt shall be resolved in favor of the national security”).

9.     Under the Adjudicative Guidelines, DoD CAF may make an unfavorable or "unsuitable" recommendation based on a soldier's "questionable judgment" or "irresponsibility." August 2006 DoD Memo re Implementation of Adjudicative Guidelines for Determining Eligibility For Access to Classified Information, Dkt. 39-1, at 6 of 31 (PA __); Security Executive Agent Directive 4: National Security Adjudicative Guidelines, Dkt. 39-2, at 8 of 28 (PA __).

10.     The Adjudicative Guidelines include the following guidelines: "Foreign Influence," "Sexual Behavior," "Financial Considerations," "Alcohol Consumption," "Psychological Conditions," "Handling Protected Information," and "Use of Information Technology Systems."   August 2006 DoD Memo re Implementation of Adjudicative Guidelines for Determining Eligibility For Access to Classified Information, Dkt. 39-1, at 5-6 of 31 (PA __); Security Executive Agent Directive 4: National Security Adjudicative Guidelines, Dkt. 39-2, at 7 of 28 (PA __).

11.     Under the Adjudicative Guidelines, contact with a foreign family member or a substantial financial or property interest in a foreign country may be a disqualifying "foreign influence" and result in a DoD CAF unfavorable or "unsuitable" recommendation.  August 2006 DoD Memo re Implementation of Adjudicative Guidelines for Determining Eligibility For Access to Classified Information, Dkt. 39-1, at 8 of 31 (PA __); Security Executive Agent Directive 4: National Security Adjudicative Guidelines, Dkt. 39-2, at 10 of 28 (PA __).

12.     Under the Adjudicative Guidelines, sexual behavior that "reflects lack of discretion or judgment" may be disqualifying and result in a DoD CAF unfavorable or "unsuitable" recommendation.  August 2006 DoD Memo re Implementation of Adjudicative Guidelines for Determining Eligibility For Access to Classified Information, Dkt. 39-1, at 12 of 31 (PA __);

Security Executive Agent Directive 4: National Security Adjudicative Guidelines, Dkt. 39-2, at 13 of 28 (PA __).

13.     Under the Adjudicative Guidelines, "frivolous" spending may be disqualifying and result in a DoD CAF unfavorable or "unsuitable" recommendation.  Security Executive Agent Directive 4: National Security Adjudicative Guidelines, Dkt. 39-2, at 16 of 28 (PA __).

14.     Under the Adjudicative Guidelines, employment with an organization engaged in analysis of foreign affairs or protected technology materials may be disqualifying and result in a DoD CAF unfavorable or "unsuitable" recommendation.   August 2006 DoD Memo re Implementation of Adjudicative Guidelines for Determining Eligibility For Access to Classified Information, Dkt. 39-1, at 28 of 31 (PA __); Security Executive Agent Directive 4: National Security Adjudicative Guidelines, Dkt. 39-2, at 23 of 28 (PA __).

15.     The MSSD standard includes the following criteria: aptitude, education, physical fitness, medical, dependency status, character, age, citizenship, and drug/alcohol abuse. September 30, 2016 DoD Memo, Dkt. 17-10, at 7 of 10 (AR __) ("The accessing service will ... render the final military suitability determination in accordance with DoDI 1304.26 and any service specific policies."); DoDI 1304.26, Dkt. 119-21, at 9-13 of 22 (PA __); Arendt Decl., Dkt. 128-2 ¶ 2 (PA __) ("These standards (aptitude, education, physical fitness, moral character, age, and citizenship) ....").

16.     The MSSD is a personnel decision, as the Army ultimately "weighs" the DoD CAF's identification of any risk factors against the Army's need for the soldier's skill set.  Arendt Decl., Dkt. 128-2 ¶ 2 (PA __) ("The Service Secretary, or his/her designee, ... is in the best position to weigh any known risk factors against the need for that individual's skill set in [the] military department concerned.").

17.     Daniel M. Renaud, Associate Director, Field Operations Directorate ("FOD"), USCIS, was "the official who made the final decision to institute" the July 7 Policy that, according to Defendants, contains the MSSD requirement.  Renaud Decl. ¶ 2 (AR 1).

18.     According to Mr. Renaud, of "particular importance" to his decision to implement the July 7 Policy was an oral briefing on two cases where "an applicant naturalized before his or her DoD background checks revealed derogatory information that USCIS would have considered, had it known about the information, in determining whether the individual was eligible to naturalize."  Renaud Decl. ¶ 3 (AR 2).

19.     The only email in the Administrative Record regarding these "two cases" references the "SSBI" multiple times, but at no point mentions an NSD or MSSD.  Renaud Decl. ¶ 3 (AR 2) ("[T]here are references to the cases in a sixth attached email, with the subject line 'FW: Ft. Jackson Visit.'"); May 2017 Email String (AR 11-13) ("regarding the information that is obtained from SSBI," "SSBI still pending," and "at least a few of the SSBIs have cleared").

20.     The agency-designated Administrative Record references SSBI results with respect to another case.  February 2017 Email String (AR 14-20) ("Based upon the information we received from OPM," and "Below is an OPM referral and the information was derived from a background investigation for an SSBI investigation").

21.     Over 85% of the 232-page agency-designated Administrative Record consists of one December 2016 email and its attachments.  AR 33-232.  That email (and its attachments) only concerns "[a]n investigation conducted by the Department of Homeland Security."  *See, e.g.*, Army Memo ¶ 1 (AR 164).  Nothing in that portion of the Administrative Record pertains to any "enhanced DoD security checks" – whether at the investigations or adjudications stage.

22.     The Administrative Record as designated by the agency (AR 1-232) never mentions NSDs, MSSDs, or the NSD or MSSD process.

23.     Nowhere in the agency-designated Administrative Record (AR 1-232) does the agency mention, let alone discuss or consider, the Adjudicative Guidelines that DoD Defendants apply to render MSSD determinations.

24.     Prior to the July 7 Policy, the average USCIS processing time for military naturalization applications (including those filed by MAVNIs) – from start to finish – was approximately four months.  Renaud Decl., Dkt. 25-1 ¶ 5 (AR __).

25.     Nowhere within the agency-designated Administrative Record (AR 1-232) is there any evidence that the agency considered how that average processing time may be negatively impacted by the July 7 Policy.

26.     Nowhere within the agency-designated Administrative Record (AR 1-232) is there any evidence that the agency considered Congress' intent with respect to (a) naturalization application processing times generally (8 U.S.C. § 1571(b)), (b) naturalization application processing times for members of the military specifically, or (c) "expedited" naturalization under 8 U.S.C. § 1440.

27.     Nowhere in the agency-designated Administrative Record (AR 1-232) is there any evidence that the agency considered DoD's resources or intent to conduct MSSDs, even though USCIS was aware that, approximately six weeks earlier, DoD had stated that it was "infeasible" for DoD to conduct MSSDs on all MAVNIs. May 2017 DoD Memo, Dkt. 17-8, at 3 of 3 (PA __) (filed in this action, where USCIS is a named Defendant, on June 28, 2017).

28.     Nowhere in the agency-designated Administrative Record (AR 1-232) is there evidence that the agency considered DoD plans, policies, or practices for MAVNI summary

discharges, through time-out policies, Secretarial plenary authority, or otherwise, even though USCIS was aware of such plans at the time of the July 7 Policy was issued.  May 2017 DoD Memo, Dkt. 17-8, at 3 of 3 (PA __) (stating that "Group 3 will be separated by Secretarial plenary authority").

29.     Nowhere within the agency-designated Administrative Record (AR 1-232) is there evidence that the agency considered whether USCIS can apply the July 7 Policy to the intended MAVNI population, nor does the agency explain why it was adopting an under- and over-inclusive rule (which Defendants since have admitted).

## C.      THE DOD INVESTIGATORY ASPECT OF THE JULY 7 POLICY, IF NOT MOOT, VIOLATES 5 U.S.C. § 706(2)

As explained above, the July 7 Policy has two different aspects – DoD investigations and DoD adjudications – pertinent to this Motion.  With respect to investigations, the policy prevents USCIS from processing to final decision the naturalization applications filed by Plaintiffs and the Class pending completion of the SSBI/Tier 5, NIAC, and CI investigations.  SOF ¶¶ 1-2.

Even so, it appears that these investigations are now complete for each Plaintiff and Class member for whom DoD intends to complete such investigations.  Arendt Decl., Dkt. 128-2 ¶ 5 (PA __) (stating, on April 3, 2018, that "[m]ost MAVNI personnel in the DTP have already completed their screening interviews"); Defendants' July 20, 2018 Report, Dkt. 170 (Exhibit A shows no CI Screening Results being sent to DoD CAF after May 9, 2018 and includes "CI Screening Results at DoD CAF" dates for all but 81 entries, the majority of which have "N/A" in that column or the "3 Year Mark" column, suggesting DoD considers them to be "discharged" or otherwise not subject to the investigations and/or adjudications).  If so, for all practical purposes, the issues under APA § 706(2) relating to the investigations aspect of the July 7 Policy appear to

be moot because that aspect of the policy is no longer preventing USCIS from processing and adjudicating the soldiers' naturalization applications.

However, to the extent that the DHS Defendants apply the investigatory aspect of the July 7 Policy to Class members for whom DoD has chosen not to complete the investigations (*e.g.*, because DoD has chosen to "time-out" or otherwise discharge the soldiers prior to investigation completion), Plaintiffs submit that such action, waiting for investigations that will not occur, is *per se* arbitrary and capricious and must be set aside under § 706(2).  *See* 5 U.S.C. § 706(2)(A) ("[T]he reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be – arbitrary, capricious ....").

### D.  THE DOD ADJUDICATORY ASPECT OF THE JULY 7 POLICY VIOLATES 5 U.S.C. § 706(2)

DHS Defendants have implemented a policy that prevents the final processing of naturalization applications filed by MAVNI soldiers even after the DoD investigations (the SSBI/Tier 5, NIAC, and CI investigations) are complete.  Under this distinct, second aspect of the July 7 Policy, USCIS will not process naturalization applications until DoD first renders DoD's "suitability" ***adjudications*** for these soldiers (the "MSSD Policy").  For the reasons set forth below, the MSSD Policy should be set aside under APA § 706(2)(A) as arbitrary, capricious, and otherwise not in accordance with law.

### 1.  The MSSD Policy Is Not in Accordance with Law

The MSSD adjudication process is a complicated, time consuming, multi-step, multi-tiered process that begins only ***after*** the soldier's enhanced DoD security investigations are complete and the individual's file is "adjudication ready," as Plaintiffs' annotation of DoD's own process chart below clearly depicts (SOF ¶ 3):



The MSSD adjudications are performed under criteria and legal standards unique to those determinations and include factors such as credit history, use of information systems, age, physical fitness, financial situation, number of dependents, and sexual proclivities. SOF ¶¶ 4-16. For example, in making MSSD "recommendations," DoD adjudicators are required to apply a long list of specific guidelines – the Adjudicative Guidelines – which were not developed for, and have no application in, the naturalization context. *See* SOF ¶¶ 6-7.

Furthermore, an individual may receive a negative MSSD on the grounds of potential "foreign influence," based simply on the individual's foreign contacts, such as family members or friends in a foreign country. SOF ¶ 11. While this may form a valid basis to deny a Top Secret

security clearance, virtually all persons applying for (and being granted) naturalization in the U.S. have substantial foreign contacts.  Thus, this circumstance is not and cannot be disqualifying for naturalization.

The MSSD Policy is contrary to law and should be found unlawful and set aside by the Court under 5 U.S.C. § 706(2).  NSDs and MSSDs are military-specific personnel adjudications – not background checks or investigations – conducted for purposes of authorizing access to classified information and assessing suitability for additional military service.  These military-specific adjudications are performed by agencies that have no lawful role in the naturalization process and involve standards that are fundamentally different than the "good moral character" requirement under the INA, *see* 8 U.S.C. § 1427(a).  SOF ¶¶ 4-16.  As the Supreme Court has explained:

> A [security] clearance does not equate with passing judgment upon an individual's character.  Instead, it is only an attempt to predict his possible future behavior and to assess whether, under compulsion of circumstances or for other reasons, he might compromise sensitive information.  It may be based, to be sure, upon past or present conduct, but it also may be based upon concerns completely unrelated to conduct, such as having close relatives residing in a country hostile to the United States. "***To be denied [clearance] on unspecified grounds in no way implies disloyalty or any other repugnant characteristic***."

*Dep't of Navy v. Egan*, 484 U.S. 518, 528-29 (1988) (emphasis added) (quoting *Molerio v. FBI*, 749 F.2d 815, 824 (D.C. Cir. 1984)).

Furthermore, security clearance determinations must, of necessity and purpose, lean toward denials, and the MSSD adjudications (which are based on NSD recommendations) likewise err on the side of "unsuitable" findings.  SOF ¶ 8; *see Egan*, 484 U.S. at 531 ("[S]ecurity-clearance determinations should err, if they must, on the side of denials.").  By contrast, citizenship for soldiers should be liberally granted.  *In re Convento,* 210 F. Supp. 265, 268 (D.D.C. 1962) (holding

that § 1440 "should be liberally construed in favor of petitioner's naturalization" and that "[n]o useful purpose or Congressional policy will be served by denying the petition," which would "result in the deportation rather than the naturalization of a worthy applicant who has served in our armed forces in time of war").

Nothing in 8 U.S.C. § 1440 permits or contemplates that soldiers seeking to naturalize under that provision of the INA may be subjected to separate MSSD adjudications as a prerequisite for adjudication of their naturalization applications. To the contrary, the purpose of § 1440 is to ease and expedite the naturalization process for soldiers serving in time of armed conflict. *See* 8 U.S.C. § 1440(b) (relaxing the age, period of residence/presence, fee, and other standard naturalization requirements); *see also* S. Rep. No. 90-1292, at 3 (1968) (Comm. Rep.) ("Legislation providing for the expeditious naturalization of non-citizens who have rendered honorable service in the Armed Forces of the United States covers a span of more than 100 years of American history. The rewards embodied in these enactments consistently have been in the form of relief from compliance with some of the general requirements for naturalization applicable to civilians.").

Moreover, the statute and regulations make clear that, except where the naturalization requirements are ***eased*** for these soldiers, these individuals should be subject only to the same requirements that are imposed for naturalization generally. *See* 8 U.S.C. § 1440(b) ("A person filing an application under subsection (a) of this section shall comply in all other respects with the requirements of this [subchapter] …."); *see also* 8 C.F.R. § 335.3(a) ("USCIS shall grant the application if the applicant has complied with all requirements for naturalization under this chapter."). Thus, no additional requirements may be imposed on this class of individuals that are not required for naturalization generally.

Finally, the statute is explicit with regard to the limited military determination that must be performed to establish naturalization eligibility under § 1440. The statute specifies that the military branch need only certify the soldier's "honorable service." 8 U.S.C. § 1440(b)(3). That certification already has been made by the Army for each Class member. Dkt. 72, at 1 (certifying class of soldiers who have "been issued Form N-426s certifying honorable service"); *see also Nio*, 323 F.R.D. at 32 ("Individuals in the proposed class share key factual characteristics that make this case amenable to class-wide resolution: All are members enlisted in the Selected Reserve through the MAVNI program, are serving honorably, have a valid N-426 …."); *Kirwa v. Dep't of Def.*, No. 17-1793(ESH), 2018 U.S. Dist. LEXIS 86908, at *4 & n.1 (D.D.C. May 23, 2018) ("Second, in both this case and the related *Nio* case, … what made them *Kirwa* class members was past honorable service and the lack of a completed Form N-426. … Indeed the class definition in the related *Nio* action largely parallels the *Kirwa* definition except for the fact that *Kirwa* class members do not have an N-426."). No further military-specific adjudications are contemplated or allowed by the statute.

Accordingly, the agency policy of requiring completed DoD MSSD determinations as a prerequisite to adjudicating naturalization applications plainly is contrary to law.

**2. Defendants' MSSD Policy Is Arbitrary and Capricious Because the Administrative Record Does Not Provide a Reasonable Justification**

An agency action must be set aside under 5 U.S.C. § 706(2)(A) if the agency has not set forth a reasonable explanation or justification for the action. *See Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017) ("A central principle of administrative law is that, when an agency decides to depart from decades-long past practices and official policies, the agency must at a minimum acknowledge the change and offer a reasoned explanation for it."); *Lone Mountain Processing, Inc. v. Sec'y of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013) ("Failing to

supply such analysis renders the agency's action arbitrary and capricious."). DHS Defendants' MSSD Policy should be set as arbitrary and capricious because there is no reasonable justification for a rule that prevents processing and decisioning of naturalization applications based on separate, irrelevant military-specific personnel/HR decisions.

Here, the Administrative Record fails to provide a reasoned explanation or reasonable justification for the MSSD Policy. In fact, *the Administrative Record as designated by the agency never mentions NSDs, MSSDs, or the NSD or MSSD process*, let alone explains why any such process or adjudication should be a prerequisite to naturalization. SOF ¶ 22.

Furthermore, the so-called explanations that are set forth in the Administrative Record have no logical connection to, and in no way support, the MSSD Policy. Daniel M. Renaud, Associate Director, FOD, USCIS, was "the official who made the final decision to institute" the July 7 Policy that contains the MSSD requirement. SOF ¶ 17. Mr. Renaud's purported justification for the July 7 Policy was that the DoD *investigations* themselves might reveal "derogatory information" that USCIS would consider in adjudicating a soldier's naturalization application. SOF ¶ 18. But any such information is available for USCIS to "consider" as soon as the DoD investigations themselves are complete, *i.e.,* prior to the MSSD adjudications. SOF ¶ 3. For example, according to Mr. Renaud, of "particular importance" to his decision to implement the July 7 Policy was an oral briefing on two cases where "an applicant naturalized before his or her DoD background checks revealed derogatory information that USCIS would have considered, had it known about the information, in determining whether the individual was eligible to naturalize." SOF ¶ 18. The only email in the Administrative Record regarding these two cases references the "SSBI" multiple times, but at no point mentions an NSD or MSSD. SOF ¶ 19. Thus, the agency's explanation has no relevance to the separate aspect of the July 7 Policy that prevents processing and decisioning

of MAVNI naturalization applications pending DoD's completion of MSSD adjudications.  Again, once the DoD investigations themselves (including the SSBI/Tier 5) are complete, any potential derogatory information is available for USCIS to "consider" in making its naturalization decision. Thus, the agency has not supported its additional requirement that naturalization application processing stop pending DoD's separate and irrelevant (and harmful) MSSD adjudication.

Likewise, the agency's "national security" arguments have no relevance here.  All of the Class members subjected to the MSSD Policy already will have completed their DoD investigations.  The investigation files for such individuals are complete.  When DoD has the information necessary to make its internal HR/personnel decision, the information would be available for USCIS to make a "good moral character" determination for each individual.  The MSSD Policy – for USCIS purposes – accomplishes nothing except to impede and prevent the processing of the naturalization applications for these soldiers.

The remainder of the agency-designated Administrative Record either again references SSBI *investigation* results (SOF ¶ 20) or relates primarily to information obtained through *DHS* investigations (and not through DoD investigations, much less DoD adjudications).  SOF ¶ 21 ("An investigation conducted by the Department of Homeland Security, and subsequently forwarded to this office [of the Department of the Army], established that PFC … was not in a valid immigration status for the entire two year period prior to [his/her] enlistment.").  Accordingly, this information likewise cannot support or justify the MSSD Policy.

Because the Administrative Record designated by the agency fails to provide a reasoned explanation or reasonable justification for DHS Defendants' MSSD Policy, the policy is arbitrary and capricious and should be set aside pursuant to APA § 706(2)(A).

**3.** **The MSSD Policy Is Arbitrary and Capricious Because the Agency Failed to Consider Important Factors**

An agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Foster v. Mabus*, 103 F. Supp. 3d 95, 108-13 (D.D.C. 2015) (agency action vacated where agency failed to consider an important aspect of the problem). Here, DHS Defendants failed to consider many important factors.

*First*, the agency failed to consider what an MSSD adjudication entailed or whether it was relevant to the "good moral character" assessment required under the INA. Nowhere in the agency-designated Administrative Record is there any evidence that the agency considered the Adjudicative Guidelines that DoD Defendants apply to render MSSD determinations. SOF ¶ 23. And the agency utterly ignores Supreme Court precedent which makes clear that military security determinations do "not equate with passing judgment upon an individual's character," "may be based upon concerns completely unrelated to conduct, such as having close relatives residing in a country hostile to the United States," and "in no way impl[y] disloyalty or any other repugnant characteristic." *Egan*, 484 U.S. at 528-29.

*Second*, DHS Defendants failed to consider the adverse impact that the MSSD Policy would have on the regulated population as well as the statutory policies favoring prompt naturalization processing for military service members. Prior to implementing the July 7 Policy, the average USCIS processing time for military naturalization applications (including those filed by MAVNIs) – from start to finish – was approximately four months. SOF ¶ 24. Nowhere within the agency-designated Administrative Record is there any evidence that the agency considered how that processing time may be impacted. SOF ¶ 25. Defendants now have admitted that the

time it takes for DoD to complete its MSSD adjudications alone (without considering the time spent on the DoD investigations), greatly exceeds four months.

For example, DoD completed the last step in the background check process, the CI Interview, for Plaintiff Haendel Almeida in September 2017.  Defendants' July 20, 2018 Report, Dkt. 170 (PA __) (Exhibit A shows Plaintiff's CI Screening Results being sent to DoD CAF on September 19, 2017 but that MSSD remains "pending").  Yet, DHS Defendants still have not acted on his naturalization application nearly one year later.  *Id*. (Exhibit A shows that USCIS has not scheduled naturalization interview).  Instead, DHS Defendants stopped the adjudication process for Mr. Almeida's application pursuant to the MSSD Policy pending DoD completion of Mr. Almeida's MSSD, even though the investigation results have been available for a long time.  Defendants' July 20, 2018 Court-ordered reporting shows that over 500 Class members had CI investigations completed on or before January 31, 2018, but did not have MSSDs as of Defendants' reporting many months later.  *Id*.  And it is not as though the DoD MSSD adjudications will somehow streamline the USCIS naturalization determination process, as USCIS still will be required to consider any so-called underlying "derogatory information," which was necessarily available ***prior*** to the DoD MSSD adjudications.

The adverse impact on the regulated population caused by the MSSD Policy is particularly acute for MAVNI soldiers who do not "pass" the initial NSD "recommendation" phase of the DoD adjudication process and are subjected to the hamster-wheel-like procedure in DoD's own depiction of the process (SOF ¶ 5):



Hamster-wheel process for soldiers with an initial "No" recommendation

The Administrative Record reveals that the DHS Defendants gave no consideration whatsoever to the adverse consequences that the MSSD Policy would have on the regulated population.  Indeed, as mentioned above, there is no indication in the Administrative Record that DHS Defendants knew or considered what the MSSD process entailed when they adopted their policy change.

*Third*, DHS Defendants wholly ignored the express statutory policy favoring prompt adjudication of naturalization applications in general and the specific statutory policy favoring expedited and eased naturalization processing for military service members.  As a general matter, "[i]t is the sense of Congress that the processing of an immigration benefit application [defined to include naturalization applications] should be completed not later than 180 days after the initial

filing of the application." 8 U.S.C. § 1571(b).  Moreover, military naturalization applicants are to

be treated more favorably.  As the Court has explained, in exchange for these soldiers' commitment

to the military, "non-citizens who serve in the United States military during designated periods of

hostilities are afforded an expedited path to citizenship."  *Nio*, 270 F. Supp. 3d at 54; s*ee also*

*Kirwa*, 285 F. Supp. 3d at 42 ("As held in *Nio*, delaying naturalization applications after applicants

have been promised an expedited path to citizenship constitutes irreparable harm.").

The Administrative Record reveals that DHS Defendants gave no consideration to these

important policy issues (SOF ¶ 26), rendering the MSSD Policy arbitrary and capricious.  *See Am.*

*Trading Transp. Co., Inc. v. United States*, 791 F.2d 942, 948-51 (D.C. Cir. 1986) (agency action

may be found arbitrary and capricious when agency fails to consider principal legislative goals);

*Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981) (courts "must be assured that

the agency action was based on a consideration of the relevant factors, and that the agency has

exercised a reasoned discretion, with reasons that do not deviate from or ignore ascertainable

legislative intent" (internal quotations and citations omitted)).  At a minimum, the agency needed

to provide a reasoned explanation as to why requiring completion of irrelevant (for naturalization

purposes) MSSD adjudications superseded these important statutory policies.

*Fourth*, the agency failed to consider, at the time that it adopted its policy change, whether

DoD had the resources or desire to conduct complete investigations and follow-on adjudications.

Nowhere in the agency-designated Administrative Record is the feasibility of such an effort

discussed.  SOF ¶ 27.  And, nowhere in the agency-designated Administrative Record is there any

evidence that the agency considered and reconciled DoD's then-existing plans for an *en masse*

Secretarial plenary authority discharge of the Plaintiffs and all Class members (as well as other

MAVNIs).  SOF ¶ 28.

The agency did not consider that (a) DoD did not have the resources to conduct the investigations and new MSSD determinations at issue; (b) DoD had no intention of performing these tasks; and (c) DoD instead intended to discharge these soldiers without performing these tasks.   Thus, DHS Defendants issued their policy preventing adjudication of MAVNI naturalization applications pending completion of MSSDs knowing that DoD was not committed to performing those adjudications, and even if DoD did perform the adjudications, did not have the resources to do them properly.   One scarcely can conceive of a more arbitrary, capricious, and irrational agency action.

*Fifth*, USCIS failed to consider DoD's "time-out" policies when it adopted the MSSD Policy.   Nowhere in the agency-designated Administrative Record is there any evidence the agency considered that, at the time the July 7 Policy was put in place, DoD was not conducting MSSDs on Class members but rather was discharging them after two years of service if they had not yet completed basic combat training.   SOF ¶ 28.   As noted above, it is irrational to create a policy premised on something being done that will not be done.

*Finally*, in its haste to promulgate the policy in the midst of litigation, USCIS failed to consider whether it even had the capability to implement and apply the policy as promulgated. Nowhere within the agency-designated Administrative Record is there any evidence that the agency considered whether USCIS had the means to identify the regulated population.   SOF ¶ 29. USCIS since admitted that it cannot, and that it only can identify individuals who "appear to be MAVNI recruits" by relying on "inferences" from "other information," making application of the policy admittedly "under- and/or over-inclusive."   Hoefer Decl., Dkt. 108-3 ¶ 10.   Surely, before USCIS issued a major policy change it was required to inquire whether the agency was capable of implementing the new policy.   Moreover, at a minimum, the agency should have provided a

reasoned explanation as to why it was knowingly adopting an under- and over-inclusive rule, but the agency did not include any such explanation in its designated Administrative Record (SOF ¶ 29).

### E.   THE MSSD POLICY VIOLATES 5 U.S.C. §§ 553 AND 552

#### 1.   The MSSD Policy Violates 5 U.S.C. § 553

DHS Defendants improperly adopted their MSSD Policy without complying with the notice-and-comment rulemaking requirements of 5 U.S.C. § 553. "Under the APA, agency action that represents a legislative rule must undergo [the] notice-and-comment procedures" of § 553. *Nio*, 270 F. Supp. 3d at 65. A rule is legislative if it "'purports to impose legally binding obligations or prohibitions on regulated parties' or 'sets forth legally binding requirements for a private party to' obtain a benefit." *Id.* (quoting *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251-52 (D.C. Cir. 2014)). As further explained by the D.C. Circuit, "[a] rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy." *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014). The MSSD Policy has the hallmark of a legislative rule.

The D.C. Circuit's decision in *Electronic Privacy Information Center v. U.S. Department of Homeland Security*, 653 F.3d 1 (D.C. Cir. 2011) ("*EPIC*"), provides the relevant analytical framework and controls here. In *EPIC*, the plaintiffs challenged the Transportation Security Administration's ("TSA") decision to implement body scanner screenings – as an alternative to metal detector screenings – on passengers prior to embarking on flights. TSA justified the policy change under its broad and general statutory authority to screen passengers prior to commercial flights. TSA implemented the policy without complying with the notice-and-comment requirements of § 553.

Although TSA had broad authority to "prescribe the details of the [statutorily-mandated] screening process," the court rejected TSA's assertions that its policy was exempt from notice-and-comment rulemaking as a mere "rule[] of agency organization, procedure, or practice."  653 F.3d at 3, 5.  The court explained that while security screenings, in a general sense, were "hardly novel," TSA's decision reflected a substantial change from its prior policy.  *Id.* at 6.  And, regardless of whether the decision created a "new substantive burden," it "substantively affect[ed] the public to a degree sufficient to implicate the policy interests animating notice-and-comment rulemaking."  *Id.*  The court found it significant that the new TSA policy was not discretionary but rather binding on the regulated population, *id.* at 6-7, just as the MSSD Policy is here.

Importantly, the D.C. Circuit rejected TSA's contention that it could implement the new policy merely as an interpretation of the agency's general statutory responsibility to conduct passenger security screenings.  As the court explained:

> [T]he purpose of the APA would be disserved if an agency with a broad statutory command (here, to detect weapons) could avoid notice-and-comment rulemaking simply by promulgating a comparably broad regulation (here, requiring passengers to clear a checkpoint) and then invoking its power to interpret that statute and regulation in binding the public to a strict and specific set of obligations.

*Id.* at 7.

Accordingly, DHS Defendants' similar attempt to justify their new MSSD Policy as an interpretation of, or guidance on, the agency's general statutory mandate to conduct "good moral character" determinations likewise must fail.

Once again, as noted in Section III.D.2 above, because Class members' DoD *investigations* are concluded, DHS Defendants' conclusory assertions of "national security" have no relevance here and do not provide any basis for ignoring the notice-and-comment requirements of § 553.

Further, as discussed in Section III.D.1 above and as the Supreme Court has made clear, even DoD's unfavorable MSSD adjudications "in no way impl[y] disloyalty or any other repugnant characteristic." *Egan*, 484 U.S. at 529.

Finally, the importance of the notice-and-comment procedure to "the fair and impartial administration of justice" is highlighted by a recent memorandum by the Attorney General of the United States, where the Attorney General explains:

> In promulgating regulations, the Department must abide by constitutional principles and follow the rules imposed by Congress and the President. These principles and rules include ... the Administrative Procedure Act's requirement to use, in most cases, notice-and-comment rulemaking when purporting to create rights or obligations binding on members of the public or the agency. Not only is notice-and-comment rulemaking generally required by law, but it has the benefit of availing agencies of more complete information about a proposed rule's effects than the agency could ascertain on its own, and therefore results in better decision making by regulators. ...
>
> [G]uidance may not be used as a substitute for rulemaking and may not be used to impose new requirements on entities outside the Executive Branch. Nor should guidance create binding standards by which the Department will determine compliance with existing regulatory or statutory requirements.

Memorandum from Office of Attorney Gen. to All Components regarding the Prohibition on Improper Guidance Documents (Nov. 16, 2017), *available at* https://www.justice.gov/opa/press-release/file/1012271/download. The views expressed here by the Attorney General align with the controlling principles set forth by the D.C. Circuit in *EPIC*.

The MSSD Policy purports to establish a binding prerequisite for the agency's adjudication of naturalization applications filed by Plaintiffs and the Class and therefore was required to be promulgated in accordance with the notice-and-comment procedures of § 553.

## 2.  __The MSSD Policy Violates 5 U.S.C. § 552__

DHS Defendants also failed to comply with the separate publication requirements of 5 U.S.C. § 552 in adopting the MSSD Policy.  Pursuant to § 552, "[e]ach agency shall separately state and currently publish in the Federal Register for the guidance of the public ... substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency."  5 U.S.C. § 552(a)(1)(D).

Section 552 expressly provides that, absent "actual and timely notice," "a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published."  5 U.S.C. § 552(a)(1).  None of the Plaintiffs or Class members possessed "actual and timely notice" of the MSSD Policy as it post-dates their enlistment in the military.   And the MSSD Policy unquestionably has "adversely affected" Plaintiffs and members of the Class by halting the adjudication of their naturalization applications. *Nio*, 270 F. Supp. 3d at 62 ("[T]he DHS Security Screening Requirement is causing irreparable harm to plaintiffs … as a result of the legal limbo DHS Defendants have left them in pending resolution of their naturalization applications ….") (internal quotations and citations omitted); *Nio*, 323 F.R.D. at 30, 35 (incorporating reasoning of *Kirwa*, 285 F. Supp. 3d at 42 ("[D]elaying naturalization applications after applicants have been promised an expedited path to citizenship constitutes irreparable harm.")).

As with § 553, Defendants cannot circumvent the APA's publication requirements simply by citing "national security."  As demonstrated above, no such concerns exist since the MSSD Policy takes effect only after the enhanced DoD background investigation for each soldier is complete.  And such a position is further belied by DHS Defendants' regular practice of publishing policies or notices which, unlike the MSSD Policy, actually implicate national security.  *See, e.g.*,

80 Fed. Reg. 79487 (Dec. 22, 2015) (DHS notice of proposed rulemaking concerning exemption of border crossing information from the Privacy Act, explaining that such information is relevant to preventing entrance of terrorists and terrorist weapons).

### F.   DEFENDANTS IMPROPERLY HAVE APPLIED THEIR POLICIES RETROACTIVELY

Defendants have applied the MSSD Policy to Plaintiffs and the Class in an unlawfully retroactive manner.  "Generally, an agency may not promulgate retroactive rules without express congressional authorization."  *Arkema Inc. v. EPA*, 618 F.3d 1, 7 (D.C. Cir. 2010).  "In the administrative context, a rule is retroactive if it takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past.  The critical question is whether a challenged rule establishes an interpretation that changes the legal landscape."  *Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 859 (D.C. Cir. 2002) (internal quotations and citations omitted).

There is no question that the MSSD Policy changes the legal landscape.  The agency adopted the MSSD Policy after the enlistment dates of each Plaintiff and Class member and after each had signed an enlistment contract requiring these soldiers to apply for naturalization.  The MSSD Policy never before has been imposed on any group of individuals, much less individuals entitled to an expedited naturalization path on the basis of their military service.  Moreover, as explained above, to the extent USCIS is not analyzing any underlying derogatory information as claimed but instead is using MSSDs as a proxy for naturalization eligibility, that would be an even more radical change in the legal landscape, as MSSD adjudications are performed under standards unique to those determinations and include factors such as credit history, use of information systems, age, physical fitness, financial situation, number of dependents, and sexual proclivities.

SOF ¶¶ 6-16.  In addition, DHS Defendants' MSSD Policy has changed the legal landscape by depriving soldiers of the right to expedited citizenship.

### G. THE JULY 7 POLICY VIOLATES THE NATURALIZATION CLAUSE OF THE CONSTITUTION

In addition to and independent of the APA violations, summary judgment should be entered for Plaintiffs on their claim that the July 7 Policy violates the "uniform Rule of Naturalization" clause of the Constitution.[3]  As the record shows, the "investigation" and "adjudication" aspects of the July 7 Policy (a) impose new and extra-statutory preconditions to naturalization, and (b) effectively assign to DoD naturalization decisions that are, per Congress' direction, within the exclusive province of USCIS.

#### 1. The Congressional Mandate in § 1440 Requires Honorable Service and Otherwise Relaxes Naturalization Criteria

Through the so-called "Naturalization Clause," the Constitution assigns to Congress the sole authority to "establish an uniform Rule of Naturalization."  U.S. Const. art. I, § 8, cl. 4.  The Constitution grants no such authority over naturalization to the Executive or any executive agency, and the Supreme Court has made clear that "over no conceivable subject is the legislative power of Congress more complete than it is over" immigration and naturalization.  *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909); *see also Galvan v. Press*, 347 U.S. 522, 531 (1954) (the rule that formulating "[p]olicies pertaining to the entry of aliens and their right to remain here ... is entrusted exclusively to Congress" is "as firmly imbedded in the legislative and

---

[3]     As the Court is aware, the Second Amended Complaint also asserts a "due process" constitutional claim.  In light of the fact that the Court has deferred briefing on the "unreasonable delay" claims under APA § 706(1) (Dkt. 159, at 1), Plaintiffs believe that it would be prudent and most efficient to defer briefing on a "due process" claim as well, since evidence of the process (or lack thereof) being provided to Plaintiffs with respect to their naturalization applications, including the manner in which USCIS is treating any so-called "derogatory" information identified and provided by DoD, still is being developed.

judicial tissues of our body politic as any aspect of our government"); *Davis v. Dist. Dir., INS*, 481 F. Supp. 1178, 1183 n.8. (D.D.C. 1979) ("***This Constitutional mandate empowers Congress*** to define the processes through which citizenship is acquired or lost, ***to determine the criteria by which citizenship is judged***, and to fix the consequences citizenship or noncitizenship entail." (emphasis added) (internal quotations and citation omitted)).  Pursuant to its constitutional mandate, Congress has specified naturalization eligibility criteria in the INA.  And neither the Judiciary nor the Executive is "'at liberty to imply a condition which is opposed to the explicit terms of the statute. ... To [so] hold ... is not to construe the Act but to amend it.'"  *Fedorenko v. United States*, 449 U.S. 490, 513 (1981) (quoting *Detroit Trust Co. v. The Thomas Barlum*, 293 U.S. 21, 38 (1934)).

The INA criteria applicable to Plaintiffs are set forth, in the first instance, in 8 U.S.C. § 1440 (authorizing the naturalization of soldiers who have served in the Selected Reserve of the Ready Reserve).  As explained in detail above, § 1440 eases and expedites naturalization for certain soldiers.  As relevant here for Plaintiffs and the Class, eligibility for this expedited naturalization is dependent on only one distinct condition, namely that the soldier is serving or has served honorably in the Selected Reserve.  *See* H.R. Rep. No. 90-1968, at 2 (1968) (Conf. Rep.) (in describing 1968 amendments, referring to § 1440 as "represent[ing] a long legislative history which has made service during prescribed periods ***the sole criterion*** for eligibility" (emphasis added)).  That condition has been satisfied by every member of the Class through the Army's execution of USCIS Form N-426.  *See Nio*, 323 F.R.D. at 32 ("Individuals in the proposed class share key factual characteristics that make this case amenable to class-wide resolution: All are members enlisted in the Selected Reserve through the MAVNI program, are serving honorably, have a valid N-426 ….").

Once that condition is satisfied, Congress specified that adjudication of a naturalization application filed pursuant to § 1440 shall be based on the same factors that apply to any other naturalization applicant, albeit with important exceptions that *favor* soldiers:

> A person filing an application under subsection (a) of this section shall comply in all other respects with the requirements of [the INA], except that-- …

8 U.S.C. § 1440(b).   The exceptions listed do not impose additional preconditions for naturalization, but instead expedite and ease the naturalization requirements and process.   For instance, Congress specifically exempted § 1440 applicants from any residency period requirement (other applicants must establish proof of residency in the U.S. for a minimum of five years) and waived the fee requirement (applicable to all other applicants) for soldiers.   *Compare* 8 U.S.C. § 1440(b)(2) *with* 8 U.S.C. § 1427(a); *see also* 8 C.F.R. § 329.2(d) (specifying that § 1440 applicants need only demonstrate one year of good moral character versus five years for other applicants).

Congress did not delegate to the Executive Branch any of its constitutional authority to set the eligibility criteria for military naturalizations.   *See United States v. Ginsberg*, 243 U.S. 472, 473 (1917) (describing how Congress, pursuant to the Naturalization Clause, legislatively "specifies with circumstantiality the manner ('and not otherwise') in which an alien may be admitted to become a citizen of the United States").   As such, federal agencies, whether DHS or DoD, have no constitutional prerogative to alter the criteria established by Congress, in the INA, for becoming a naturalized U.S. citizen.   Stated another way, any attempt by federal agencies to impose naturalization eligibility criteria that are not specified by Congress in the INA is an usurpation of Congress's constitutional powers and necessarily violates the Naturalization Clause. *See Schneiderman v. United States*, 320 U.S. 118, 131-59 (1943) (refusing to allow citizenship to be revoked on basis of communist affiliation because lack of communist affiliation was not a

36

condition precedent to naturalization imposed by Congress (unlike lack of disbelief in organized government), even where the naturalizing court argued it was relevant to attachment to the Constitution); *Ginsberg*, 243 U.S. at 474 ("An alien who seeks political rights as a member of this nation can rightfully obtain them only upon terms and conditions specified by Congress. Courts are without authority to sanction changes or modifications; their duty is rigidly to enforce the legislative will in respect of a matter so vital to the public welfare."); *Kirwa*, 285 F. Supp. 3d at 267 ("DOD… does not have the right to rewrite 8 U.S.C. § 1440 …."). And, here, where that attempt has come to fruition, with Defendants imposing extra-statutory naturalization preconditions – including the completion of a military adjudication following DoD investigations – Plaintiffs and the Class are entitled to relief from this constitutional violation. *See, e.g.*, *Jafarzadeh v. Nielsen*, No. 16-1385 (JDB), 2018 U.S. Dist. LEXIS 131157, at *28 (D.D.C. Aug. 6, 2018) (noting applicants' injury and entitlement to redress for Naturalization Clause claims).

## 2. The July 7 Policy Violates the Congressional Mandate in § 1440

While there is ample evidence that USCIS actually is requiring not only **completion** of an MSSD, but also **favorable** results in order to be eligible for naturalization, the constitutional violation is established by the mere fact that USCIS is imposing additional eligibility requirements on the Class. Plaintiffs are confident that USCIS will be unable to cite to any provision in § 1440 or elsewhere in the INA that makes it a precondition of naturalization that DoD **first** performs investigations and **then** MSSD adjudications on this population. To the contrary, as noted, the relevant DoD activity that Congress has established is the ministerial act of certification of honorable service in the Selected Reserve. *See* 8 U.S.C. § 1440(b)(3); *Kirwa*, 285 F. Supp. 3d at 38 ("Counsel for DOD in *Nio* represented to the Court that 'DOD serves a ministerial role in determining if an individual is serving honorably.'" (quoting Dkt. 19, at 36)). And, DoD's Congressionally-established activity already has been fulfilled here for each Class member. Dkt.

37

72, at 1 (certifying class of soldiers who have "been issued Form N-426s certifying honorable service"); *see also Nio*, 323 F.R.D. at 32 ("All are members … [who] have a valid N-426 ….").

Beyond ensuring that a military applicant's naturalization application includes the requisite certification of honorable military service, USCIS is to adjudicate a military applicant in the same manner as every other naturalization applicant (or under relaxed requirements in many instances). 8 U.S.C. § 1440(b) ("shall comply in all other respects with the requirements [of the INA]").  Of course, no other naturalization applicant is required to undergo (let alone pass) a DoD Top Secret security clearance adjudication (and more) in order to be eligible to naturalize.  That is why the conduct challenged here finds no constitutional safe harbor by labeling it as part and parcel of USCIS's obligation to assess any naturalization applicant's "good moral character" or attachment to the Constitution.  USCIS's self-serving assertions otherwise are not entitled to deference.  *See Alliance for Natural Health US v. Sebelius*, 714 F. Supp. 2d 48, 59-60 (D.D.C. 2010) ("The Court shall make 'an independent assessment of [the plaintiffs'] claim of constitutional right when reviewing agency decision-making,' and it need not accord deference to the agency's 'pronouncement on a *constitutional* question.'" (emphasis in original) (quoting *Porter v. Califano*, 592 F.2d 770, 780 (5th Cir. 1979) & *J.J. Cassone Bakery, Inc. v. NLRB*, 554 F.3d 1041, 1044 (D.C. Cir. 2009))).

USCIS has no authority to impose these preconditions to naturalization unless Congress specified them as such.  Congress did no such thing.  Quite the opposite.  Congress requires *USCIS* to adjudicate naturalization eligibility, including good moral character and attachment to the Constitution.[4]  *See* 8 U.S.C. § 1446(d) ("The [USCIS] employee designated to conduct any such

---

[4]      Originally, Congress transferred naturalization authority to the Attorney General.  8 U.S.C. § 1421(a) ("The sole authority to naturalize persons as citizens of the United States is conferred upon the Attorney General.").  Then, through the Homeland Security Act of 2002, Congress

examination shall make a determination as to whether the application should be granted or denied, with reasons therefor.").  And USCIS can no more add an internal personnel/HR decision as a criterion for naturalization than it could add a requirement that an applicant must complete a course in nuclear physics.  And, the agency cannot attempt to shoe-horn this internal DoD personnel decision, based on factors and standards different than those necessary for naturalization, (SOF ¶¶ 6-16), into the Congressional requirements of good moral character and attachment to the Constitution because the Supreme Court has said that "'[t]o be denied [clearance] on unspecified grounds in no way implies disloyalty or any other repugnant characteristic.'"  *Egan*, 484 U.S. at 529 (quoting *Molerio*, 749 F. 2d at 824).  Unless Congress specified it as a condition of naturalization, no federal agency can impose such a condition, directly or indirectly.  Congress did not dictate that the existence of "foreign ties" are a barrier to naturalization, and it certainly would be an odd naturalization requirement to impose; thus completion (or passage) of an MSSD adjudication cannot be required by Defendants.

The Naturalization Clause prohibits either USCIS or the Court from reading such a requirement into the INA.  *See Schwab v. Coleman*, 145 F.2d 672, 675-76 (4th Cir. 1944) (refusing to read additional investigation requirements for enemy aliens into the Nationality Act because "[i]t must be assumed that in passing the statute" Congress knew what investigations were to be carried out and did not intend for more); *cf. Wiedersperg v. INS*, No. 98-15410, 1999 U.S. App. LEXIS 16952, at *11-12 (9th Cir. July 20, 1999) (explaining that the separation of powers doctrine prevents other branches from granting or denying citizenship in ways Congress has not provided

---

transferred this naturalization authority to the newly created Department of Homeland Security and specifically to USCIS, which replaced the Immigration and Naturalization Service of the Department of Justice.  Pub. L. 107-296, 116 Stat. 2135, § 451(b).  DoD, of course, is a separate executive department, headed by the Secretary of Defense.

because "'[w]hen a statute designates certain … manners of operation, all omissions should be understood as exclusions'" (quoting *Boudette v. Barnette*, 923 F.2d 754, 757 (9th Cir. 1991)).

Courts have struck down the other branches' usurpation of Congress's sole Naturalization Clause authority as a matter of law in similar situations.  For example, the Ninth Circuit affirmed the district court's decision to strike an executive order purporting to establish a period of armed conflict, but only for aliens serving in a specific geographic location, because no such limitation was authorized by 8 U.S.C. § 1440.  *In re Reyes*, 910 F.2d 611, 613-14 (9th Cir. 1990).  And in *Schwab v. Coleman*, the Fourth Circuit determined that certain naturalization applicants, who had challenged a naturalizing court's attempt to impose additional background investigation requirements, were entitled to a writ of mandamus because the Naturalization Clause means that all applicants who come within the uniform rule established by Congress are "entitled" to naturalization.   145 F.2d at 676-78.   The Fourth Circuit noted that to impose additional requirements for the investigation of good moral character "is not only to add to the requirements which the applicant must meet a condition which Congress has not imposed, but is also, in so far as the condition is insisted on, to nullify the provision of the statute." *Id.* at 675-76.  "'Congress having laid down the rules governing the admission of aliens to citizenship, it is not within the power of the court, in the exercise of an arbitrary discretion, to add to them.'"  *Id.* at 677 (quoting *Tutun v. United States*, 12 F.2d 763, 764 (1st Cir. 1926)); *see also INS v. Pangilinan*, 486 U.S. 875, 884-85 (1988) (determining that the Judiciary could not exercise equitable powers to disregard Congressional naturalization provisions).

Because the July 7 Policy imposes additional preconditions to naturalization on Plaintiffs and the Class beyond the Congressionally-specified criteria, the policy violates the Naturalization Clause and is unconstitutional.  Likewise, to the extent the July 7 Policy allows DoD to perform

adjudicative functions that are determinative for naturalization applications that have not been assigned to it by Congress, it violates the Naturalization Clause and is unconstitutional as a matter of law. Accordingly, Plaintiffs are entitled to summary judgment on this claim.

### H. THE NEW N-426 POLICY IS UNLAWFUL

As explained above, 8 U.S.C. § 1440(b)(3) specifies that the military's role is limited to the "ministerial duty" of certifying a soldier's "honorable service." *See Nio*, 323 F.R.D. at 35 (incorporating reasoning of *Kirwa*, 285 F. Supp. 3d at 37). That certification has been made for each Class member. *See Nio*, 323 F.R.D. at 32 ("Individuals in the proposed class share key factual characteristics that make this case amenable to class-wide resolution: All … have a valid N-426 …."); *Kirwa*, 2018 U.S. Dist. LEXIS 86908, at *4 n.1 ("Indeed the class definition in the related *Nio* action largely parallels the *Kirwa* definition except for the fact that *Kirwa* class members do not have an N-426.").

However, on October 13, 2017, DoD implemented its New N-426 Policy attempting to impose preconditions to naturalization under the guise of "interpreting" the terms "honorable service." *See Nio*, 323 F.R.D. at 30-31; *Kirwa*, 285 F. Supp. 3d at 32, 40-41. The New N-426 Policy directs military branches to "recall and de-certify" the N-426 honorable service certifications that already have been issued to Class members for whom MSSDs were not complete (and favorable). *Nio*, 323 F.R.D. at 31.

On October 27, 2017, this Court preliminarily enjoined Defendants "from implementing Section III" of the New N-426 Policy (the section applicable to Plaintiffs and the Class) and "from decertifying, rescinding, recalling, revoking, or otherwise invalidating ... existing and duly issued Form N-426s, except as related to the conduct of a class members and based on sufficient grounds generally applicable to members of the military for re-characterization of service." *Nio*, 323 F.R.D. at 35; Dkt. 74. The standard for granting a permanent injunction mirrors the standard for

a preliminary injunction, as the Court is required to consider four factors: (1) success on the merits; (2) whether the movant will suffer irreparable injury absent an injunction; (3) the balance of hardships between the parties; and (4) whether the public interest supports granting the requested injunction. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008).

For the reasons previously found by this Court, an injunction is warranted. *See Nio*, 323 F.R.D. at 30, 35 (incorporating reasoning of *Kirwa*, 285 F. Supp. 3d at 42-44). In issuing a preliminary injunction in this case and the related *Kirwa* case, the Court held that "DOD offered no reasoned explanation for this change, thereby suggesting that DOD's decision was an arbitrary and capricious one." *Kirwa*, 285 F. Supp. 3d at 38. Moreover, the Court stated that with the New N-426 Policy "DOD is depriving enlistees of their lawful right to apply for expedited citizenship." *Id*. at 40 n.20. Finally, the New N-426 Policy, in seeking to decertify and recall validly-issued N-426s and subjecting soldiers to additional requirements for obtaining new N-426s without any reasonable justification for doing so, is an impermissible retroactive agency action. *See id.* at 40 ("At the very least, precedent explains that a retroactive agency action is impermissible if it is arbitrary and capricious."). As such, the New N-426 Policy violates the APA.

Thus, the Court should hold unlawful and permanently enjoin the New N-426 Policy.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Plaintiffs' Motion for Partial Summary Judgment.

Dated: August 13, 2018

Respectfully submitted,

_____/s/ Douglas W. Baruch_____
Douglas W. Baruch (D.C. Bar No. 414354)
Jennifer M. Wollenberg (D.C. Bar No. 494895)
Kayla Stachniak Kaplan (D.C. Bar No. 996635)
Neaha P. Raol (D.C. Bar No. 1005816)
Shaun A. Gates (D.C. Bar No. 1034196)
Katherine L. St. Romain (D.C. Bar No. 1035008)
Fried, Frank, Harris, Shriver & Jacobson LLP
801 17th Street, NW
Washington, D.C. 20006
Telephone: (202) 639-7000
Facsimile: (202) 639-7003
Email: douglas.baruch@friedfrank.com
Email: jennifer.wollenberg@friedfrank.com

*Counsel for Plaintiffs and the Certified Class*