## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DR. KUSUMA NIO, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 1:17-00998-ESH-RMM |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| HOMELAND SECURITY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS

Defendants, the U.S. Department of Homeland Security, *et al.*, hereby move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7(h) on all claims brought against them. The grounds for Defendants' motion, as well as for Defendants' opposition to Plaintiffs' motion for summary judgment, are set forth in the attached memorandum of points and authorities. For the reasons explained in that memorandum, Defendants respectfully request that the Court deny Plaintiffs' Motion for Summary Judgment, and grant judgment in favor of the Defendants, and dissolve the preliminary injunction in this case. Defendants also hereby renew their Motion to Dismiss and incorporate those arguments by reference. *See* ECF No. 49, 80.

Dated: September 14, 2018                    Respectfully Submitted,

                                             JOSEPH H. HUNT
                                             Assistant Attorney General
                                             Civil Division

WILLIAM C. PEACHEY
Director, Office of Immigration Litigation

COLIN A. KISOR
Deputy Director

SARAH L. VUONG
Senior Litigation Counsel

C. FREDERICK SHEFFIELD
Trial Attorney

By: */s/ Elianis N. Perez*
ELIANIS N. PEREZ
Assistant Director
U.S. Department of Justice, Civil Division
Office of Immigration Litigation –
District Court Section
P.O. Box 868, Washington, DC 20044
Telephone: 202-616-9124
Facsimile: 202-305-7000
Email: elianis.perez@usdoj.gov

ATTORNEYS FOR DEFENDANTS

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DR. KUSUMA NIO, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action No. 1:17-00998-ESH |
| v. | ) |
| | ) |
| UNITED STATES DEPARTMENT OF | ) |
| HOMELAND SECURITY, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

### DEFENDANTS' MEMORANDUM IN RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director, Office of Immigration Litigation

COLIN A. KISOR
Deputy Director

SARAH L. VUONG
Senior Litigation Counsel

C. FREDERICK SHEFFIELD
Trial Attorney

By: */s/ Elianis N. Perez*
ELIANIS N. PEREZ
Assistant Director
U.S. Department of Justice, Civil Division
Office of Immigration Litigation –
District Court Section
P.O. Box 868, Washington, DC 20044
Telephone: 202-616-9124
Facsimile: 202-305-7000
e-Mail: elianis.perez@usdoj.gov

ATTORNEYS FOR DEFENDANTS

# TABLE OF CONTENTS

I.      INTRODUCTION ..............................................................................................1

II.     FACTUAL BACKGROUND ...........................................................................3

    A.      Naturalization under section 1440 ......................................................3

    B.      USCIS's July 7 Guidance ....................................................................5

    C.      DoD's October 13, 2017 Policy...........................................................9

    D.      Processing of MAVNI naturalization applications since July 7, 2017 .................11

III.    SCOPE AND STANDARD OF REVIEW .....................................................11

IV.     ARGUMENT...................................................................................................13

    A.      The Court should grant summary judgment in favor of Defendants as to
        Plaintiffs' claims under 5 U.S.C. § 706(2) because USCIS's July 7 Guidance
        is neither contrary to law nor arbitrary and capricious. .........................................14

        1.      USCIS's July 7 Guidance is not contrary to law. .....................................14

                a.      USCIS's decision to await completion of DoD background checks
                    before adjudicating naturalization applications filed by MAVNIs is
                    fully consistent with law. ..............................................................14

                b.      Plaintiffs' attempt to separately challenge the MSSD component of
                    the enhanced background check as unlawful is without merit ......19

        2.      The July 7 Guidance is not arbitrary and capricious.  ..............................21

                a.      The administrative record reflects that USCIS examined the
                    relevant data and made a rational choice based on that data .........22

                 b.      Plaintiffs' attempt to separately challenge the MSSD component of
                    the enhanced background check as arbitrary and capricious is
                    without merit. ................................................................................25

                 c.      Plaintiffs have not shown that the agency failed to consider
                    important factors. ..........................................................................27

    B.      Plaintiffs' retroactivity argument is without merit.................................................30

i

C.      USCIS's decision to require DoD background investigations to adjudicate naturalization applications for MAVNI recruits is not subject to the APA's notice and comment rulemaking requirement........................................................32

      1.      Defendants did not violate 5 U.S.C. § 553. ................................................32

      2.      Defendants USCIS did not violate 5 U.S.C. § 552(a)...............................38

D.      Plaintiffs have not established a Constitutional violation......................................40

E.      DoD's October 13, 2017, policy is lawful. ...........................................................45

V.      CONCLUSION.................................................................................................................47

CERTIFICATE OF SERVICE ....................................................................................................49

# TABLE OF AUTHORITIES

## CASE LAW

*Adams v. Vance*,
    570 F.2d 950 (D.C. Cir. 1978) ................................................................................ 24

*Ahmadi v. Chertoff*,
    No. 07-cv-03455, 2007 WL 3022573 (N.D. Cal. Oct. 15, 2007)............................... 36

*Aishat v. U.S. Dep't of Homeland Sec.*,
    288 F. Supp. 3d 261 (D.D.C. 2018) ......................................................................... 19

*Alliance for Cannabis Therapeutics v. Drug Enforcement Admin.*,
    15 F.3d 1131 (D.C. Cir. 1994) ................................................................................ 39

*Am. Hospital Ass'n v. Bowen*,
    834 F.2d 1037 (D.C. Cir. 1987) .............................................................................. 32

*Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*,
    461 U.S. 402 (1983) ............................................................................................... 47

*American Bioscience, Inc. v. Thompson*,
    269 F.3d 1077 (D.C. Cir. 2001) ........................................................................... 3, 12

*American Mining Congress v. Mine Safety & Health Administration*,
    995 F.2d 1106 (D.C. Cir. 1993) .............................................................................. 33

*Americans for Safe Access v. DEA*,
    706 F.3d 438 (D.C. Cir. 2013) ............................................................................... 12

*Appeal of Bolden*,
    848 F.2d 201 (D.C. Cir. 1988) ............................................................................... 13

*Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*,
    419 U.S. 281 (1974) ........................................................................................... 21, 27

*Campbell v. U.S. Dep't of Justice*,
    231 F. Supp. 2d 1 (D.D.C. 2002) ............................................................................ 40

*Cazarez-Gutierrez v. Ashcroft*,
    382 F.3d 905 (9th Cir. 2004)................................................................................... 41

*Central Texas Tel. v. FCC*,
    402 F.3d 205 (D.C. Cir. 2005) ............................................................................... 32

*Chadmoore Communications, Inc. v. F.C.C.*,
    113 F.3d 235 (D.C. Cir. 1997) .................................................................................. 31

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) .................................................................................................. 24

*Chirac v. Lessee of Chirac*,
    15 U.S. (2 Wheat.) 259 (1817) .................................................................................. 41

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) .................................................................................................. 12

*City of Roseville v. Norton*,
    219 F. Supp. 2d 130 (D.D.C. 2002) .......................................................................... 26

*Clifford v. Pena*,
    77 F.3d 1414 (D.C. Cir. 1996) .................................................................................. 13

*Davis v. District Director, INS*,
    481 F. Supp. 1178 (D.D.C. 1979) ............................................................................. 41

*De Canas v. Bica*,
    424 U.S. 351 (1976) .................................................................................................. 44

*Deppenbrook v. PBGC*,
    --- F.3d ---, 2015 WL 728062 (D.C. Cir. 2015) ...................................................... 12

*Dillmon v. Nat'l Transp. Safety Bd.*,
    588 F.3d 1085 (D.C. Cir. 2009) ................................................................................ 14

*Electronic Privacy Information Center v. U.S. Department of Homeland Security*,
    653 F.3d 1 (D.C. Cir. 2011) ............................................................................... 35, 37

*Entergy Corp. v. Riverkeeper, Inc.*,
    556 U.S. 208 (2009) ........................................................................................... 17, 43

*Erringer v. Thompson*,
    371 F.3d 625 (9th Cir. 2014).................................................................................... 33

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ........................................................................................... 12, 26

*Fedorenko v. United States*,
    449 U.S. 490 (1981) .................................................................................................. 31

*Flaherty v. Bryson*,
    850 F. Supp. 2d 38 (D.D.C. 2012) .................................................................. 27

*Fletcher v. Evening Star Newspaper Co.*,
    133 F.2d 395 (D.C. Cir. 1942) ........................................................................ 28

*Flores v. City of Baldwin Park*,
    No. 14-cv-9290, 2015 WL 756877 (C.D. Cal. Feb. 23, 2015)......................... 41

*Gibbons v. Ogden*,
    22 U.S. 1 (1824) .............................................................................................. 42

*Hani v. Gonzales*, No. 3:07-cv-517-S,
    2008 WL 2026092 (W.D. Ky. May 8, 2008) ................................................... 36

*INS v. Pangilinan*,
    486 U.S. 875 (1988) ........................................................................................ 44

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
    626 F.3d 84 (D.C. Cir. 2010) .......................................................................... 46

*Jafarzadeh v. Nielsen*, --F. Supp. 3d --, 16-1385-DJB,
    2018 WL 3732130 (D.D.C. Aug. 6, 2018)....................................................... 42

*Jifry v. FAA*,
    370 F.3d 1174 (D.C. Cir. 2004) ...................................................................... 37

*Kirwa v. United States Department of Defense*,
    285 F. Supp. 3d 21 (D.D.C. 2017) .................................................................. 31

*Kirwa v. U.S. Department of Defense*,
    285 F. Supp. 3d 257 (D.D.C. 2018) ................................................................ 42

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972) ........................................................................................ 44

*Korab v. Fink*,
    797 F.3d 572 (9th Cir. 2014)........................................................................... 42

*Loma Linda Univ. Med. Ctr. v. Sebelius*,
    684 F. Supp. 2d 42 (D.D.C. 2010) .................................................................. 11

*Marsh v. Oregon Nat. Res. Council*,
    490 U.S. 360 (1989) ........................................................................................ 24

*Massachusetts Mfg. Extension P'ship v. Locke*,
    723 F. Supp. 2d 27 (D.D.C. 2010) ...................................................... 39

*Mora-Meraz v. Thomas*,
    601 F.3d 933 (9th Cir. 2010)............................................................... 35

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ......................................................... 14, 21, 25, 46

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
    551 U.S. 644 (2007) ........................................................................ 12

*New York v. Lyng*,
    829 F.2d 346 (2d Cir. 1987)............................................................... 39

*Nguyen v. United States*,
    824 F.2d 697 (9th Cir. 1987)............................................................. 39

*Nolan v. Holmes*,
    334 F.3d 189 (2d Cir. 2003)....................................... 4, 15, 17, 33

*Olivares v. Transp. Sec. Admin.*,
    819 F.3d 454 (D.C. Cir. 2016) ......................................................... 13

*Perez v. Mortgage Bankers Ass'n*,
    135 S. Ct. 1199 (2015) ..................................................................... 32

*Pinkus v. U.S. Bd. of Parole*,
    507 F.2d 1107 (D.C. Cir. 1974) ....................................................... 36

*PPL Wallingford Energy LLC v. Fed. Energy Regulatory Comm'n*,
    419 F.3d 1194 (D.C. Cir. 2005) ....................................................... 46

*Resolute Forest Prods., Inc. v. U.S. Dep't of Agric.*,
    130 F. Supp. 3d 81 (D.D.C. 2015) .................................................... 12

*Rural Cellular Ass'n v. FCC*,
    588 F.3d 1095 (D.C. Cir. 2009) ....................................................... 12

*Sawan v. Chertoff*,
    589 F. Supp. 2d 817 (S.D. Tex. 2008) ............................................. 36

*Schneider v. Kissinger*,
    412 F.3d 190 (D.C. Cir. 2005) ......................................................... 24

*Shalala v. Guernsey Memorial Hospital*,
   514 U.S. 87 (1995) ................................................................................. 32

*Southwestern Bell Tel. Co. v. FCC*,
   168 F.3d 1344 (D.C. Cir. 1999) ............................................................ 12

*Takahashi v. Fish & Game Comm'n*,
   334 U.S. 410 (1948) ............................................................................... 41

*Thomas Jefferson Univ. v. Shalala*,
   512 U.S. 504 (1994) .......................................................................... 17, 43

*U.S. ex. rel. Knauff v. Shaughnessy*,
   338 U.S. 537 (1950) ............................................................................... 43

*United States v. Wong Kim Ark*,
   169 U.S. 649 (1898) ............................................................................... 41

*Visinscaia v. Beers*,
   4 F. Supp. 3d 126 (D.D.C. 2013) .......................................................... 11

*Wagafe v. Trump*,
   No. C17-0094-RAJ, 2017 WL 2671254 (W.D. Wash. June 21, 2017) ............ 42

*Wash. Alliance of Tech. Workers v. DHS*,
   249 F. Supp. 3d 524 (D.D.C. 2017) ...................................................... 42

*Wilson v. Lynch*,
   835 F.3d 1083 (9th Cir. 2016) ............................................................... 33

*Ziglar v. Abbasi*,
   137 S. Ct. 1843 (2017) .......................................................................... 24

## FEDERAL STATUTES

5 U.S.C. § 552 ........................................................................................... 38

5 U.S.C. § 552(a) ...................................................................................... 38

5 U.S.C. § 552(a)(1)(D) ............................................................................ 38

5 U.S.C. § 552(b) ...................................................................................... 39

5 U.S.C. § 552(b)(1)(A) ...................................................................... 39, 40

5 U.S.C. § 553 ........................................................................................... 32

5 U.S.C. § 553(b)(3)(A) ................................................................................ 32, 34

5 U.S.C. § 553(b)(3)(B) ................................................................................ 37, 38

5 U.S.C. § 706(2) ......................................................................................... 14, 30

5 U.S.C. § 706(2)(A) ........................................................................................... 12

8 U.S.C. § 1103 ................................................................................................... 42

8 U.S.C. § 1103(a)(1) .......................................................................................... 16

8 U.S.C. § 1103(a)(3) .......................................................................................... 16

8 U.S.C. § 1423-1427 ....................................................................................... 4, 15

8 U.S.C. § 1427 ..................................................................................................... 3

8 U.S.C. § 1427(a) .............................................................................................. 17

8 U.S.C. § 1429 ..................................................................................................... 3

8 U.S.C. § 1440 ............................................................................................... 3, 40

8 U.S.C. § 1440(a) ...................................................................................... *passim*

8 U.S.C. § 1440(b) ......................................................................................... 4, 15

8 U.S.C. § 1440(b)(1) ........................................................................................... 4

8 U.S.C. § 1440(b)(3) ......................................................................................... 21

8 U.S.C. § 1446 ............................................................................................. 15, 42

8 U.S.C. § 1446(a) ...................................................................................... *passim*

8 U.S.C. § 1446(b) ............................................................................................. 39

10 U.S.C. § 504(b)(2) ........................................................................................... 5

18 U.S.C. § 1546 ................................................................................................ 18

## PUBLIC LAW

Pub. L. No. 105-119 .......................................................................................................... 1, 5, 15

Pub. L. No. 110-251 .......................................................................................................... 16

## FEDERAL REGULATONS

8 C.F.R. § 316.2 ............................................................................................................... 4, 15

8 C.F.R. § 329.2(d) .......................................................................................................... 17, 33

8 C.F.R. § 335.1 ............................................................................................................ 4, 8, 33, 39

8 C.F.R. § 335.2 ............................................................................................................... 33, 35

8 C.F.R. § 335.2(b) .......................................................................................................... 5, 17, 34

## FEDERAL RULE OF CIVIL PROCEDURE

Fed. R. Civ. P. 56 ............................................................................................................ 11

Fed. R. Civ. P. 56(a) ........................................................................................................ 2

## I.      INTRODUCTION

The Court should reject Plaintiffs' ongoing and meritless attempts to insert their preferences into the national security determinations of the United States. The policies at issue in this case serve to protect vital national security interests and ensure that the privilege of naturalization is granted only to those who have been properly vetted and have demonstrated eligibility for this immense benefit. Congress has explicitly required appropriate background checks before U.S. Citizenship and Immigration Services ("USCIS") naturalizes an individual. This is particularly important for military recruits participating in the Military Accessions Vital to the National Interest ("MAVNI") pilot program, which allows certain foreign nationals in the United States who are not lawful permanent residents the opportunity to serve in the U.S. Armed Forces. This opportunity, in turn, may render such individuals eligible for naturalization.

While Congress provided a path to naturalization for foreign nationals willing to serve this country, it did not relax the background check requirements for such individuals, and Congress has left it to the discretion of USCIS to decide what investigation and which background checks are necessary for any naturalization application.[1] USCIS's background check requirements for MAVNI recruits exist for a very important reason: the naturalization of foreign nationals serving in the military implicates national security concerns, particularly when these individuals have not been subject to the background checks required to become a lawful permanent resident. The information obtained through the enhanced security checks that the Department of Defense ("DoD") conducts for MAVNIs based on a September 30, 2016 policy memo ("DOD background

---

[1] This discretion is subject to a "floor," in that certain background checks are required by Congress, but it is not subject to a "ceiling." *See, e.g., Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1998*, P.L. 105-119, Nov. 26, 1997 (requiring certain FBI background checks for all naturalization applicants).

checks") to mitigate such national security concerns, can bear on an applicant's eligibility for naturalization, including his or her good moral character, attachment to the Constitution, and disposition toward the good order and happiness of the United States. Accordingly, following a period of careful review and analysis of pressing national security and naturalization eligibility concerns, USCIS issued written guidance on July 7, 2017 ("July 7 Guidance"), requiring the completion of the DoD background checks before completing the naturalization adjudication under 8 U.S.C. § 1440(a). The new guidance affected all then-pending and future MAVNI naturalization applicants applying for naturalization under 8 U.S.C. § 1440(a).

Additionally, in light of important national security concerns, DoD issued a policy on October 13, 2017, setting forth a standardized process for certifying Form N-426, Request for Certification of Military or Naval Service ("Form N-426"), which is a necessary part of a MAVNI recruit's naturalization application. Because Congress entrusted DoD with the responsibility for certifying that a MAVNI recruit's service has been "honorable," the policy states that individuals who enlisted prior to October 13, 2017, must complete specified suitability screening measures – including a background check performed and adjudicated by DoD – before receiving a Form N-426 certification of honorable service. Thus, had part of the DoD policy not been enjoined, the policy would have permitted the military to recall and de-certify any Form N-426 that had been previously certified before the service member completed all applicable screening and suitability requirements.

The policies described above are necessary, rational, and lawful. Defendants therefore oppose Plaintiffs' motion for summary judgment, *see* ECF No. 177, and move for summary judgment under Federal Rule of Civil Procedure 56(a) in favor of the government. Defendants' motion is based on USCIS's and DoD's respective Certified Administrative Records ("CAR"). *See*

Local Civil Rule 7(h)(2). Defendants also hereby renew their Motion to Dismiss and incorporate those arguments by reference rather than repeat them here. *See* ECF Nos. 49, 80. Finally, Defendants ask that the Court dissolve the preliminary injunction. *See* ECF No. 74.

## II.   FACTUAL BACKGROUND[2]

### A.   Naturalization under section 1440[3]

8 U.S.C. § 1440 relaxes certain specific preconditions for naturalization established in 8 U.S.C. §§ 1427 and 1429, for "[a]ny person who, while an alien or a noncitizen national of the United States, has served  honorably as a member of the Selected Reserve of the Ready Reserve or in an active-duty status" in the armed forces of the United States during World War I, World War II, Korean hostilities, Vietnam hostilities, or other periods of military hostilities designated by the President of the United States by executive order.[4] 8 U.S.C. § 1440(a). For example, the

---

[2] Defendants do not agree that the "Statement of Facts" set forth in Plaintiffs' motion for summary judgment is accurate. *See* ECF No. 177, at 9-16. Indeed, much of Plaintiffs' statement either mischaracterizes the record, or amounts to improper legal argument. *See id*. Nevertheless, the Court should decide this case based on the administrative record, and not based on Plaintiffs' characterization of the facts. *American Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) ("when a party seeks review of an agency action under the [Administrative Procedure Act ("APA")], the district court sits as an appellate tribunal . . .  [and] [t]he 'entire case' on review is a question of law."); Local Civil Rule 7(h)(2) (noting that a statement setting forth genuine issues of fact to be litigated is unnecessary in cases where judicial review is based solely on the administrative record).

[3] Additional relevant background is set out in detail in the Court's prior opinions, *see* ECF Nos. 44, 72, 73. Defendants also incorporate by reference the Statutory and Regulatory Backgrounds of the naturalization process, 8 U.S.C. § 1440, and the MAVNI Program, as set forth in Defendants' Opposition to Plaintiffs' preliminary injunction motion, ECF Nos. 19, 31, and as laid out by the Court in its Memorandum Opinion denying the preliminary injunction, ECF No. 44.

[4] On July 3, 2002, the President of the United States signed an executive order designating the War on Terrorism as such a period of hostilities, and authorizing noncitizens who served honorably in the U.S. Armed Forces on or after September 11, 2001, to naturalize under the provisions of 8 U.S.C. § 1440(a). E.O. 13269 of July 3, 2002 ("Expedited Naturalization of Aliens and Noncitizen Nationals Serving in an Active-Duty Status During the War on Terrorism"). The authorization related to the War on Terrorism will remain in effect until a date designated by a future executive order. *Id*.

general statutory requirements for naturalization, as described in 8 U.S.C. §§ 1427 and 1429, require that an alien show he or she was lawfully admitted for permanent residence in accordance with all applicable provisions of the Immigration and Nationality Act ("INA"), and that he or she resided continuously and was physically present in the United States for specified periods. By contrast, naturalization under section 1440 does not require the applicant to be a lawful permanent resident, and does not require any period of continuous residence or physical presence in the United States. *See* 8 U.S.C. § 1440(a), (b); *see also* ECF No. 19-6 (July 7, 2017 Declaration of Danial Renaud), at ¶ 11. In addition, applicants may be naturalized under section 1440 regardless of age and notwithstanding certain provisions regarding deportability and "alien enemies." 8 U.S.C. § 1440(b)(1). Because an applicant for naturalization under section 1440 need not be a lawful permanent resident, and need not show any periods of physical presence or continuous residence, naturalization under section 1440 is sometimes referred to as "expedited naturalization." ECF No. 19-6, at ¶ 11.

However, under 8 U.S.C. § 1440(b), apart from the specific exceptions described above, applicants for naturalization under section 1440 "shall comply in *all other* respects with the requirements [for naturalization]." (emphasis added). These requirements include a showing of good moral character and attachment to the principles of the U.S. Constitution. *See, e.g.,* 8 U.S.C. §§ 1423-1427; 8 C.F.R. § 316.2; *see also Nolan v. Holmes*, 334 F.3d 189, 198 (2d Cir. 2003) (holding that § 1440 is ambiguous and the Government's interpretation that § 1440 includes a good moral character requirement is reasonable). Additionally, as is the case with all naturalization applicants, USCIS must complete a full background investigation in order to determine whether the applicant is eligible to naturalize. 8 U.S.C. § 1446(a); *see* 8 C.F.R. § 335.1 ("The investigation shall consist, *at a minimum*, of a review of all pertinent records, police department checks, and a

neighborhood investigation in the vicinities where the applicant has resided and has been employed, or engaged in business, for at least the five years immediately preceding the filing of the application") (emphasis added). Indeed, USCIS is obligated by statute to wait until criminal background checks are completed before adjudicating a naturalization application. 8 C.F.R. § 335.2(b); Dep't of Commerce & Related Case Agencies Appropriation Act, 1998, Pub. L. 105-119, title I, 111 Stat. 2440, 2448-49 (Nov. 26, 1997) (beginning with fiscal year 1998, no USCIS funds may be used to complete adjudication of an application for naturalization unless USCIS has received confirmation from the FBI that a full criminal background check has been completed).

The MAVNI program is a recruitment tool used by the U.S. Armed Forces to enlist certain foreign nationals with skills considered vital to the national interest of the United States. *See* 10 U.S.C. § 504(b)(2); ECF No. 19-7, Declaration of Stephanie Miller, at ¶ 4. To qualify for enlistment under MAVNI, a prospective recruit must be maintaining a qualifying nonimmigrant status or must be an asylee, refugee, Temporary Protected Status (TPS) beneficiary, or Deferred Action for Childhood Arrivals ("DACA") recipient. *See* ECF No. 19-1. As members of the U.S. Armed Forces during a period of hostilities, MAVNI recruits are eligible to apply for naturalization under 8 U.S.C. § 1440(a) once they meet the statutory requirements, including having served honorably as a member of the Selected Reserve of the Ready Reserve ("SRRR") or in an active-duty status, and "certification from the executive department under which the applicant served or is serving, which shall state whether the applicant served honorably…." ECF No. 19-6, at ¶ 15.

## B.    USCIS's July 7 Guidance

On September 30, 2016, DoD issued a policy memorandum, "Military Accessions Vital to the National Interest Pilot Program Extension," ("September 2016 Memo") which required certain

enhanced security checks for individuals in the MAVNI program. DoD Certified Administrative Record ("DoD CAR"), at 0125. On October 4, 2016, USCIS headquarters Field Office Directorate ("FOD") personnel transmitted the DoD September 2016 Memo to the Field.  *See* ECF No. 19-6, Declaration of Daniel Renaud, at ¶ 20. In the September 2016 Memo, DoD instructed its components not to permit MAVNI recruits to ship to Basic Training or serve for any period of time on active duty before they satisfactorily complete all DoD security screening requirements. DoD CAR at 0125; USCIS's Certified Administrative Record ("USCIS CAR"), at 7. In early 2017, USCIS began noticing a new population of MAVNI recruits filing applications for naturalization: specifically MAVNI recruits who were drilling with the U.S. Army Reserve on a voluntary basis as part of the Delayed Training Program ("DTP"), in which the Army permitted them to take part while their background investigations were pending, but before they could attend Basic Training or serve in an active-duty status under the terms of the September 2016 Memo. *See* ECF No. 19-6, at ¶ 21. Before the September 2016 Memo, USCIS had received few, if any, applications from MAVNI recruits who were drilling in the DTP. *Id.*; USCIS CAR at 7. After the September 2016 Memo, this new population of MAVNI recruits filing applications for naturalization before they had entered Basic Training raised several concerns. First, USCIS questioned whether drilling *with* the SRRR constituted service "as a member of the SRRR," as required for naturalization under section 1440(a). *Id.*, at ¶¶ 21-22; USCIS CAR at 7. Second, in light of the September 2016 Memo, USCIS questioned the validity of the Forms N-426 certifying honorable service, which were issued before DoD completed the necessary background checks determining that no derogatory information existed that would lead to the characterization of a recruit's service as something other than honorable. ECF No. 19-6, at ¶ 22; USCIS CAR at 7. Third, USCIS did not know whether

many of the Forms N-426 it was receiving were actually signed by individuals authorized by the Army to certify honorable service. ECF No. 19-6, ¶ 22; USCIS CAR at 5.

These concerns led USCIS to institute a temporary national hold on affected naturalization applications. ECF No. 19-6, at ¶ 23; USCIS CAR at 7. On or about February 28, 2017, USCIS headquarters FOD advised field offices and the National Benefits Center ("NBC") to hold applications filed by MAVNI recruits who were drilling in the SRRR and had no ship date for Basic Training, in anticipation of requesting and receiving guidance from DoD about the definition of "honorable service" as a "member of the SRRR," and about who in the Army was authorized to certify a recruit's honorable service. ECF No. 19-6, at ¶ 23; USCIS CAR at 7. The "hold" was a temporary moratorium on adjudicating applications to completion, but did not prevent USCIS from completing pre-processing and background checks. ECF No. 19-6, at ¶ 23. USCIS raised its concerns to DoD in approximately March 2017 and learned that DoD had not previously been aware that the Army was certifying service for this population of MAVNI recruits.[5] ECF No. 19-6, at ¶ 24. USCIS understood that DoD might act to revoke some of the Forms N-426 that had been submitted and decided to temporarily hold affected naturalization applications until it determined whether these individuals were eligible to naturalize. *Id.* On or about April 13, 2017, USCIS headquarters FOD issued a written hold on affected naturalization applications. *Id.*; USCIS CAR at 5. The email putting the hold in place stated that it referred to "all SRRR N-400 case work." ECF No. 19-6, at ¶ 25. Later in April and May 2017, USCIS headquarters FOD narrowed the scope of the hold in response to questions from the field. *Id.*; USCIS CAR at 5. USCIS also became aware of a classified DoD Inspector General Report detailing some of the problems with certain

---

[5] It appears that this class is comprised of only Army Soldiers, and not Navy Sailors or Air Force Airmen.

MAVNI soldiers' backgrounds. USCIS CAR at 7.[6] Based on communication with DoD, USCIS learned of instances in which individuals naturalized before DoD background checks had been completed, which revealed derogatory information that USCIS would have considered, had it known about the information, in determining whether the individuals were eligible to naturalize. USCIS CAR at 2, 11-13. USCIS was also made aware of derogatory information that DoD uncovered in cases of individuals who had applied or were eligible to apply for naturalization under 8 U.S.C. § 1440(a), in which the derogatory information was potentially relevant to naturalization eligibility. *See* USCIS CAR at 2, 8-10, 14-232.

On July 7, 2017, USCIS headquarters FOD issued written guidance to the Field stating that USCIS had determined that the completion of the DoD background checks is relevant to a MAVNI recruit's eligibility for naturalization. *Id.* at 4-6. As such, USCIS directed the Field not to complete naturalization adjudications under 8 U.S.C. § 1440(a) filed by MAVNI recruits until after those checks have been completed. *Id.* The new guidance affected all then-pending and future MAVNI naturalization applicants applying for naturalization under 8 U.S.C. § 1440(a). *Id.* Additionally, on July 27, 2017, USCIS's FOD further clarified that the July 7 Guidance was intended to end all holds, while broadening existing background check resources under 8 C.F.R. § 335.1, to include DoD enhanced security checks for MAVNI applicants. *Id.* at 4.

The culmination of DoD's enhanced background check process is a Military Service Suitability Determination ("MSSD"). *See* ECF No. 58-3 (October 13, 2017 Memorandum providing supplemental policy guidance on the vetting of MAVNI applicants); ECF No. 128-2 (Supplemental Declaration of Christopher P. Arendt, describing DoD's process for arriving at an

---

[6] This classified report has been provided to the Court *ex parte in camera*, *see* ECF No. 44, at 20, 22.

MSSD, and communicating the result of the MSSD to USCIS) at ¶¶ 2-3; ECF No. 128-1 (March 22, 2018 Declaration of Daniel Renaud) at ¶ 2 ("the process by which USCIS determines that all DoD background and security checks have been completed consists of DoD notifying USCIS when DoD has reached a final [MSSD], which USCIS understands is the culmination of DoD's enhanced background check process"). Once a MAVNI naturalization applicant's MSSD is complete, the result is shared with USCIS via a secure web-based portal. ECF No. 128-1, at ¶¶ 2, 4; ECF No. 128-2, at ¶ 3. "If the MSSD is favorable, USCIS considers that sufficient evidence that no significant derogatory information was located during the DoD enhanced background checks." ECF No. 128-1, at ¶ 5. If the MSSD is adverse, USCIS requests further information from DoD regarding the derogatory information that led to the adverse MSSD decision, whether the recruit has been discharged from the military, and if the recruit was discharged, how the discharge was characterized. *Id.*; *see also* ECF No. 166-1, at 6 ("if an MSSD is not favorable, USCIS must obtain further details on the derogatory information that led to the adverse MSSD . . . ."). An individual who has separated from service is eligible to naturalize under 8 U.S.C. § 1440(a) only if he or she "was separated under honorable conditions."

## C.   DoD's October 13, 2017 Policy

In response to security concerns, DoD has periodically strengthened the background investigation and suitability requirements for MAVNI enlistees. In February 2010, for instance, DoD noted its "concerns" that "personnel on active duty under [the MAVNI Program] did not undergo counterintelligence-focused screening as part of their security vetting process…[which] creates unacceptable vulnerability that could have serious impact of the safety and security of our personnel, equipment, and operations." DoD CAR at 0151. Thus, in August of 2010, DoD established provisions designed to strengthen the MAVNI program and mitigate potential

counterintelligence and security concerns, to include initiating a Single Scope Background Investigation (now called a Tier 5 investigation) and counterintelligence-focused security review for all MAVNI applicants.  DOD CAR at 0138-0143.  In 2016, in light of serious national security concerns, DoD added new requirements, including a National Intelligence Agency Check ("NIAC") and an issue-oriented interview and/or polygraph. DOD CAR 0125-133. A MAVNI enlistee who fails to satisfy one of these security screens may be subject to discharge from the Armed Forces under other than honorable circumstances.  *Id.*

On October 13, 2017, DoD noted that although it "has taken direct actions to mitigate security risks to mission presented by the previous practices vetting Service Members accessed under the [MAVNI] Pilot Program . . . continued progress depends on a consistent, sustained, and responsive approach." DoD CAR at 0001. Thus, on that same day, DoD issued a Memorandum for Secretaries of the Military Departments, titled "Certification of Honorable Service for Members of the Selected Reserve of the Ready Reserve and Members of the Active Components of the Military or Naval Forces for Purposes of Naturalization." DoD CAR at 0004-0007.[7] ("October 13 Policy"). The October 13 Policy set forth new guidance for Form N-426 certification as applied to three discrete groups of foreign national soldiers:  those without certifications who enlisted/accessed *on or after* October 13, 2017 (Section 1); those without certifications who enlisted/accessed *before* October 13, 2017 (Section 2); and those whose forms had already been certified (Section 3). *Id.* Only Section 3 of the new policy is at issue in this case, which permits the military to recall and de-certify any Form N-426, which had been previously certified before

---

[7] As noted in the Certification of the Index of the Administrative Record (ECF No. 81), the unclassified DoD CAR provided to Plaintiffs does not include the two classified documents that were considered by Mr. Kurta, prior to signing the October 13, 2017, memo, and which were provided to the Court for review *in camera*. *See* ECF No. 44, at 20.

the service member completed all applicable screening and suitability requirements. *Id.* at 0007. This Court issued a preliminary injunction enjoining DoD from implementing Section 3 on a classwide basis, with certain exceptions. *See* ECF No. 74.

**D.    Processing of MAVNI naturalization applications since July 7, 2017**

Since July 7, 2017, USCIS has naturalized more than 430 *Nio* class members. *See* ECF 184 (Defendants' Report of September 13, 2018, reflecting data as of August 14, 2018). As of August 14, 2018, an additional 195 *Nio* class members had completed their naturalization interviews, and 114 more *Nio* class members had interviews scheduled. *Id.* By August 14, 2018, USCIS had received notifications from DoD that over 575 *Nio* class members (in addition to the more than 430 naturalized class members) had completed their DoD background checks and been issued a final MSSD. *Id.* Moreover, the pace of naturalizations and DoD notifications regarding completed MSSDs has dramatically increased. *Id.* Between the "as of" dates for Defendants' June 6, 2018 and July 20, 2018 reports, 65 *Nio* class members were naturalized, and 43 MSSD determinations were uploaded to the shared portal with USCIS. ECF No. 170. By contrast, between the "as of" dates for Defendants' July 20, 2018 and September 13, 2018 reports, 187 *Nio* class members were naturalized, and 205 new MSSD determinations were uploaded to the shared portal. ECF No. 184.

**III.    SCOPE AND STANDARD OF REVIEW**

Summary judgment under Federal Rule of Civil Procedure 56 is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the standard of review under the Administrative Procedure Act ("APA"). *See Loma Linda Univ. Med. Ctr. v. Sebelius*, 684 F. Supp. 2d 42, 52 (D.D.C. 2010). Due to the limited role the Court plays in reviewing the administrative record, the typical summary judgment standards set forth in Federal Rule of Civil Procedure 56 are not applicable. *See Visinscaia v.*

*Beers*, 4 F. Supp. 3d 126, 130 (D.D.C. 2013); *see also* Comment to Local Civil Rule 7(h). Rather, the Court should enter summary judgment for the agency unless it violated the APA by taking an action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See Deppenbrook v. PBGC*, --- F.3d ---, 2015 WL 728062, at *4 (D.C. Cir. 2015); *Resolute Forest Prods., Inc. v. U.S. Dep't of Agric.*, 130 F. Supp. 3d 81, 89 (D.D.C. 2015). Whether the agency complied with the governing APA standard is entirely a question of law. *See Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). It requires the Courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This is a "highly deferential" standard, *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007), which "presume[s] the validity of agency action," *Southwestern Bell Tel. Co. v. FCC*, 168 F.3d 1344, 1352 (D.C. Cir. 1999), and precludes the Court from substituting its judgment for that of the agency, *see Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009). The Court "will not disturb the decision of an agency that has examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Americans for Safe Access v. DEA*, 706 F.3d 438, 449 (D.C. Cir. 2013) (quotations and citation omitted). A court's reversal of an agency's decision, therefore, is appropriate only where the decision was not "based on a consideration of the relevant factors" or where there "has been a clear error of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

12

Additionally, the Government may provide the declaration of an agency official in an APA case to "illuminate reasons obscured but implicit in the administrative record." *Clifford v. Pena*, 77 F.3d 1414, 1418 (D.C. Cir. 1996) (citations omitted); *see also Olivares v. Transp. Sec. Admin.*, 819 F.3d 454, 464 (D.C. Cir. 2016) (considering "post-hoc account" of agency decision in declaration form where it "furnishes an explanation of the administrative action that is necessary to facilitate effective judicial review"); *Appeal of Bolden*, 848 F.2d 201, 207 (D.C. Cir. 1988) (admitting post-decisional document into the record in an APA case where it helped "to amplify the administrative record").

## IV.     ARGUMENT

USCIS's July 7 Guidance, and DoD's October 13, 2017, policy, as the CARs reflect, were adopted after each agency considered serious derogatory information – including national security concerns – regarding some members of the MAVNI population. Congress left it to the discretion of USCIS to decide what investigation and which background checks are necessary for any naturalization application, and indeed the background check requirement for MAVNI recruits exists for a very important reason: the naturalization of foreign nationals serving in the military implicates national security concerns, particularly when these individuals have not been subject to the background checks required to become a lawful permanent resident, and the information obtained through the background checks that DoD conducts to mitigate such national security concerns can bear on an applicant's eligibility for naturalization, including his or her  good moral character, attachment to the Constitution, and disposition towards the United States. *See* USCIS CAR at 4-7.

Similarly, because Congress delegated to the DoD the responsibility of certifying that a MAVNI recruit's service has been "honorable," in light of the national security concerns present

within the population of non-citizen soldiers who enlisted under the DoD MAVNI program, DoD

determined that it was necessary to recall and de-certify any Form N-426 that had been previously

certified before the MAVNI recruit completed all applicable screening and suitability

requirements. Thus, the policies issued by each agency after they considered the serious national

security concerns plaguing the MAVNI program are both reasonable and rational. *Dillmon v. Nat'l*

*Transp. Safety Bd.*, 588 F.3d 1085, 1089 (D.C. Cir. 2009) (a court must "defer to the wisdom of

the agency, provided its decision is reasoned and rational"). As USCIS's and DoD's policies are

based on legally sufficient statements of bases and purpose, this Court should "not to substitute its

judgment for that of the agency," and should grant Defendants summary judgment and dissolve

the preliminary injunction entered on October 27, 2017 (ECF No. 74). *Motor Vehicle Mfrs. Ass'n*

*v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).[8]

**A.    The Court should grant summary judgment in favor of Defendants as to Plaintiffs' claims under 5 U.S.C. § 706(2) because USCIS's July 7 Guidance is neither contrary to law nor arbitrary and capricious.**

       **1.    USCIS's July 7 Guidance is not contrary to law.**

              **a.    USCIS's decision to await completion of DoD background checks before adjudicating naturalization applications filed by MAVNIs is fully consistent with law.**

The Court should grant summary judgment in Defendants' favor because USCIS's July 7

Guidance is entirely consistent with the laws governing applications for naturalization. In section

1440 of Title 8, Congress relaxed specific naturalization requirements, including those pertaining

to age, residency, and physical presence, for certain aliens who are members of the United States

military. 8 U.S.C. § 1440(b).  However, section 1440(b) provides that, apart from these specific

---

[8] In accordance with the Court's June 20, 2018 order, Defendants' opposition and cross-motion for summary judgment does not address Plaintiffs' "unreasonable delay claim."  *See* ECF No. 159, at 2.

"exceptions," "[a] person filing an application under . . . this section shall comply in *all* other respects with the requirements of this subchapter." 8 U.S.C. § 1440(b) (emphasis added). Thus, the statute preserves many of the general criteria that any applicant must meet to demonstrate eligibility to naturalize, *see, e.g.,* 8 U.S.C. §§ 1423-1427; 8 C.F.R. § 316.2, including good moral character and attachment to the principles of the U.S. Constitution. *See Nolan v. Holmes*, 334 F.3d 189, 198 (2d Cir. 2003) (holding that § 1440 is ambiguous and [the Government's] interpretation that § 1440 includes a good-moral-character requirement is reasonable). The explicit requirement that an applicant under section 1440 comply "in all other respects" clearly reflects that Congress *did not* relax the background check or investigation process set out at 8 U.S.C. § 1446 for naturalization applicants applying based on their qualifying military service. Indeed nothing in section 1440 can be plausibly read to permit USCIS to ignore its statutory obligation ensure that the background checks for MAVNI naturalization applicants are complete prior to their interviews. *See* 8 U.S.C. § 1446(a); Dep't of Commerce & Related Case Agencies Appropriation Act, 1998, Pub. L. 105-119, Title I, 111 Stat. at 2448-49.

Throughout their motion for summary judgment, Plaintiffs incorrectly conflate the substantive requirements for naturalization with the process for adjudicating naturalization applications. *See e.g.,* ECF No. 177, at 20, 26. Section 1440 relaxes several *substantive* requirements for naturalization, including the ordinary requirements that applicants be lawful permanent residents, and that they demonstrate periods of physical presence or continuous residence. But it is only in this limited sense that naturalization under section 1440 can be characterized as "expedited." ECF No. 19-6, at ¶ 11. Indeed, the fact that Congress has occasionally taken action to expedite certain military naturalization applications underscores its understanding section 1440 does not, by itself, require expedited processing of applications. *See,*

*e.g.,* The Kendell Frederick Citizenship Assistance Act, Pub. L. No. 110-251 (providing for expedited processing where a naturalization applicant is serving abroad on active duty); ECF No. 19-6, at ¶ 12 ("Military naturalization applications are sometimes eligible for expedited processing, which is different than expedited naturalization").

Congress has expressly delegated to the Secretary of Homeland Security the broad authority to administer the provisions of the INA with the force of law and to establish regulations of this purpose. *See* 8 U.S.C. § 1103(a)(1), (a)(3). This delegation includes, in the Secretary's discretion, requiring MAVNI recruits who are applying for naturalization under section 1440 to complete DoD background checks, where USCIS has determined that these background checks are pertinent to its investigation of applicants' eligibility for naturalization. Consistent with this discretionary authority, USCIS made a decision to require completed DoD background checks for MAVNI military naturalization applicants. As the administrative record reflects, this decision was informed in part by two cases where MAVNI applicants for naturalization were naturalized before DoD's background checks were completed. USCIS CAR 2-7. When the DoD background checks were completed, they revealed derogatory information that USCIS would have considered, had it known about the information, in determining whether the individual was eligible to naturalize. *Id.* at 2. In particular, USCIS learned that one MAVNI applicant had deep ties with foreign intelligence agents, and the other had a foreign DUI conviction. *Id.* at 12, 13.

USCIS's decision to await background checks from DoD prior to adjudicating MAVNI applications is also fully consistent with its own regulations and the USCIS Policy Manual. Indeed, USCIS regularly consults with other agencies and obtains information from outside entities to vet an individual for benefit eligibility, and as a source to determine an applicant's good moral character. 8 C.F.R. § 335.2(b) (requiring FBI criminal background checks); USCIS Policy Manual,

Vol. 12, Part B, Chap. 2 ("In addition, USCIS conducts other inter-agency criminal background and security checks on all applicants for naturalization."); USCIS Policy Manual, Vol. 12, Part I, Chap. 6 (requiring Defense Clearance Investigative Index queries for all naturalization applicants with military service).

Consistent with the foregoing, USCIS has determined that DoD background checks are a valuable source of information that directly bears on the applicant's eligibility for naturalization, and the agency has the discretion to require the results of such checks before MAVNI recruits may naturalize. USCIS CAR at 7; *Nolan*, 334 F.3d at 198 ("The potentially conflicting policy concerns here are the specific desire to provide aliens who have served in the United States Armed Forces with benefits in the form of relaxed requirements for naturalization, and the general goal of attempting to ensure that persons admitted to United States citizenship through naturalization be of good moral character."). As this Court has already noted, this is especially true given the national security concerns posed by certain MAVNI recruits. In denying Plaintiffs' first preliminary injunction motion, this Court noted:

> Having reviewed under seal the two 2017 classified documents completed by the Inspector General and the Defense Intelligence Agency, the Court cannot ignore (1) the enlistment of foreign nationals in the military implicates national security concerns outlined in the classified documents, and (2) that these national security concerns can bear on an applicant's good moral character, attachment to the Constitution, and disposition towards the United States. 8 U.S.C. § 1427(a); 8 C.F.R. § 329.2(d). Because additional screening for national security risks does not plainly conflict with these relevant factors for examination, and because no statute or regulation prohibits enhanced security screening, this Court cannot conclude that plaintiffs are likely to succeed on their contrary-to-law claim.

ECF No. 44, at 20-21 (citing *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009) (noting that agency action is permissible if it represents a "reasonable interpretation of the statute—not necessarily the only possible interpretation, nor even the interpretation deemed most reasonable by the courts"); and *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 513, 517–18 (1994)

(upholding application of a broad regulation because it did not conflict with the regulation's plain language)).

In fact, USCIS issued its July 7 Guidance because it was "still concerned about approving these [Form N-400] applications while the DOD enhanced security checks are outstanding because [of] security concerns regarding MAVNI recruits, informed by a classified DOD Inspector General report." USCIS CAR at 7. In addition to being aware of these classified documents, USCIS also specifically became aware that DoD's background checks revealed that certain MAVNI recruits were involved in international money laundering and suspicious wire transfers (USCIS CAR at 8-10), were not loyal to the United States and were dishonest (*Id.* at 14-18), had violent behavior and court-imposed protective orders issued against them (*Id.* at 18), and were engaged in visa fraud[9] (*Id.* 21-30, 35, 51-79).[10] In light of all of these concerns, USCIS acted within its statutory mandate in implementing an additional background check requirement before MAVNI recruits may be naturalized, and the July 7 Guidance is therefore lawful.

---

[9] Plaintiffs argue that the portions of the USCIS CAR related to MAVNI recruits engaged in visa fraud "cannot support or justify the MSSD Policy" because DoD learned of their involvement in such fraud through a DHS investigation. ECF No. 177, at 23. However, the CAR reflects that in two of the three visa fraud cases cited, DoD interviewed the recruit involved as part of its background check process and provided the interview transcript to USCIS. *See* USCIS CAR, at 22-30, 35-36. The information provided by DoD contained additional evidence and details regarding the suspected visa fraud that were not otherwise available to USCIS. *Id.* The administrative record thus shows that the DoD background investigation in these cases was in fact relevant to the recruits' eligibility for naturalization.

[10] An indictment appears in the CAR twice, in relation to two MAVNI recruits who were engaged in student visa fraud. The indictment, which charges an individual who owned and operated a network of schools engaged in student visa fraud and several of his employees with various crimes, including fraud and misuse of visas, permits, and other documents under 18 U.S.C. § 1546, is publically available in its final form in the public records of the United States District Court for the Central District of California, CR 15-00113, *United States of America v. Hee Sun Shim*, *et al.* The MAVNI recruits attended the schools at issue in the indictment.

**b.  Plaintiffs' attempt to separately challenge the MSSD component of the enhanced background check as unlawful is without merit.[11]**

In their motion for summary judgment, Plaintiffs separately challenge what they describe as the "adjudicatory aspect" of the MSSD. *See* ECF No. 177, at 17-21. This argument is based on the incorrect premise that the final adjudication of the MSSD is not itself part of the enhanced DoD background check process. As stated above, and as generally understood throughout these proceedings, the final MSSD is the *culmination* of the DoD's enhanced background check process referenced in the July 7 Guidance. *See* ECF No. 128-1, at ¶ 2; ECF No. 128-2, at ¶ 2; *see also* ECF No. 128, at 13-14. Likewise, the final MSSD is the document that DoD provides to notify USCIS that the DoD enhanced background checks are complete. *See* ECF No. 128-1, at ¶ 2; ECF No. 128-2, at ¶ 2.

Plaintiffs do not identify any statutory basis for the claim that USCIS acts unlawfully simply by *waiting* for completion of an MSSD to adjudicate a naturalization application.[12] *See* ECF No. 177, at 17-21. Rather, Plaintiffs' inaccurately posit that the MSSD imposes extra-statutory requirements on MAVNI applicants. *See* ECF No. 177, at 18 (arguing that the

---

[11] Because the July 7 Guidance constitutes a single final agency action – one that requires the completion of DoD background checks, including the MSSD – Defendants disagree with Plaintiffs' attempt to bifurcate the policy into "investigatory" and "adjudicative" aspects. *See* ECF No. 177, at 16-17. Defendants therefore believe the Court should consider the legality of the Guidance as a whole rather than considering whether certain aspects of Plaintiffs' challenge may be "moot." *Id.*

[12] Indeed, apart from section 1447(b), which explicitly allows for judicial intervention when USCIS does not make a determination on a naturalization application within 120 days after the applicant's interview, the INA does not require USCIS to adjudicate a naturalization application within any particular timeframe. *See Aishat v. U.S. Dep't of Homeland Sec.*, 288 F. Supp. 3d 261, 267 (D.D.C. 2018). To the extent that Plaintiffs argue that "the purpose of § 1440 is to ease and expedite the naturalization process," *see* ECF No. 177, at 20, as explained above, section 1440 eases the substantive naturalization requirements, and does not mandate faster processing of applications. *See supra*, at 14-16.

19

MSSD "Adjudicative Guidelines . . . were not developed for and have no application in . . . the naturalization context"); *see also id.* at 19 (arguing that security clearance decisions may not necessarily have a bearing on "good moral character," and that such determinations must "lean towards denials"). Plaintiffs' arguments on this point fail for the simple reason that neither the July 7 Guidance nor any other policy instructs USCIS adjudicators to decide naturalization applications based on whether an MSSD is favorable or adverse. Rather, USCIS awaits the completion of DoD enhanced background checks – including the MSSD – because these checks may reveal information that is useful for assessing an applicant's eligibility to naturalize under the INA. *See* ECF No. 128-1, at ¶ 5. As explained above, if an applicant's MSSD is favorable, USCIS "considers that sufficient evidence that no significant derogatory information was located during the DoD enhanced background checks." ECF No. 128-1, at ¶ 5. This process is far more efficient – and enables much more rapid adjudication in cases with favorable MSSDs – than a process in which USCIS would obtain the raw background check research from DoD without waiting for the MSSD. By contrast, if an applicant's MSSD is adverse, USCIS does not simply deny the naturalization application but instead requests further information from DoD regarding the derogatory information DoD located, whether the recruit has been discharged, and if the recruit was discharged, how that discharge was characterized. *Id*.; ECF No. 166-1, at 3. This information is important because the derogatory information may be relevant to the applicant's good moral character, attachment to the U.S. Constitution, or disposition toward the good order and happiness of the United States, and because an individual who has separated from service is only eligible to naturalize under 8 U.S.C. § 1440(a) if he or she "was separated under honorable conditions." ECF No. 128-1, at ¶ 5. USCIS's purpose in obtaining this information from DoD is not to rely on DoD's adverse MSSD but rather to make a *separate* determination on an applicant's eligibility to

naturalize based on the requirements set forth in the INA. *Id*. Plaintiffs' assertion that the MSSD "Adjudicative Guidelines" are not coterminous with the naturalization requirements is thus inapposite, and there is no merit to their claim that awaiting the result of an MSSD somehow serves to impose additional eligibility requirements.

Plaintiffs' perfunctory assertion that waiting for the result of an MSSD is contrary to 8 U.S.C. § 1440(b)(3) is equally without merit. *See* ECF No. 177, at 21. Section 1440(b)(3) simply requires an applicant to obtain "duly authenticated certification from the executive department under which the applicant served or is serving" to establish that the applicant served or is serving honorably in the U.S. Armed Forces during a designated period of hostilities, and if separated was separated under honorable conditions. The statute can in no way be read to somehow limit USCIS's discretion in how it conducts statutorily required background investigations. Nor does section 1440(b)(3) limit the evidence that USCIS may consider in order to determine whether an applicant has met other naturalization requirements, such as the requirements of good moral character and attachment to the principles of the U.S. Constitution.

### 2. The July 7 Guidance is not arbitrary and capricious.

The Court should also grant summary judgment in favor of Defendants because USCIS's July 7 Guidance is supported by the administrative record and is not "arbitrary and capricious." As discussed above, review under the "arbitrary and capricious standard is narrow and the reviewing court may not substitute its judgment for that of the agency." *See Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974). The reviewing court must determine whether the agency has "examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfr. Ass'n*, 463 U.S. at 43. Because USCIS's July 7 Guidance reflects a

rational choice based on data, there is no basis on which to conclude that the decision is arbitrary and capricious.

### a. The administrative record reflects that USCIS examined the relevant data and made a rational choice based on that data.

The administrative record in this case reflects that, following DoD's September 2016 Memo, USCIS became aware that there were unique and particular national security risks with certain MAVNI recruits that may affect eligibility for naturalization, and that could potentially lead to an other-than-honorable discharge from the armed forces. USCIS CAR at 4 ("USCIS has determined that the completion of DOD background checks is relevant to a MAVNI recruit's eligibility for naturalization."). It was only after a period of careful review and analysis (and frequent communications with DoD), and in light of pressing national security concerns, that USCIS issued the July 7 Guidance. USCIS CAR at 7 ("USCIS is still concerned about approving these applications while the DOD enhanced security checks are outstanding because [of] security concerns regarding MAVNI recruits, informed by a classified DOD Inspector General report."). It took USCIS from October 4, 2016 – when USCIS headquarters FOD personnel transmitted the DoD September 2016 Memo to the Field – until on or about April 13, 2017, for USCIS headquarters FOD to issue a written hold on affected naturalization applications. *See* ECF No. 19-6. The email putting the hold in place stated that it referred to "all SRRR N-400 case work." *Id.* ¶ 25. Later in April and May 2017, USCIS headquarters FOD narrowed the scope of the hold in response to questions from the field. *Id.*

After reviewing and considering all of the information received from DoD, including reports involving international money laundering and suspicious wire transfers (USCIS CAR at 8-10), allegiance to foreign governments and foreign intelligence agents (*id.* at 12-18), violent behavior and court-imposed protective orders (*id.* at 18), and visa fraud (*id.* 21-30, 35, 51-79),

USCIS issued its July 7 Guidance. Because reviews of the MAVNI program revealed that certain MAVNI recruits posed national security risks, and because correspondence with DoD demonstrated that the DoD background checks could result in relevant information potentially affecting MAVNI recruits' naturalization eligibility, it was not arbitrary or capricious for USCIS to consider these concerns in issuing its July 7 Guidance. Accordingly, Plaintiffs' claim that USCIS's action is "arbitrary, capricious, and irrational because it is divorced from DHS's stated rationale for the action," ECF No. 61 at ¶ 163, is demonstrably wrong.[13]

It was reasonable, and within USCIS's discretion, to determine that it should refrain from making a final determination on a MAVNI recruit's naturalization application until DoD verifies that the individual has completed the security checks that DoD has implemented to ensure that the individual does not present a national security risk to the United States. This Court noted:

> [B]ased on the justifications offered by defendants in the classified documents reviewed by this Court, it cannot conclude that defendants' explanation for its change in policy is a post hoc rationalization . . . Nor can it characterize defendants' change in policy as arbitrary and capricious when the policies respond to present national security concerns.

---

[13] Further, in their Second Amended Complaint, Plaintiffs argue that the July 7, 2017 guidance is "divorced from DHS's stated rationale for the action," ECF No. 61, at ¶ 163, in part by mischaracterizing DHS's "stated rationale" as "relate[d] to otherwise allegedly inadequate investigatory 'scope' resulting from lack of sufficient U.S. residency duration." The CAR amply demonstrates that USCIS's "stated rationale" for requiring the enhanced DoD background checks for naturalization purposes was in fact a determination "that the completion of DOD background checks is relevant to a MAVNI recruit's eligibility for naturalization," as well as specific "security concerns regarding MAVNI recruits, informed by a classified Inspector General report." USCIS CAR at 4, 7. The fact that MAVNI recruits have not undergone the prior background checks associated with lawful permanent residence – either those conducted by USCIS at the time of adjustment of status or those conducted by the Department of State at the time of an application for an immigrant visa – and the fact that some MAVNI recruits may be relatively new to the United States when they apply for naturalization, owing to the lack of a residency requirement in 8 U.S.C. § 1440, only add to the security concerns inherently posed by naturalizing these individuals without an examination of relevant background and security information obtained by DoD.

ECF No. 44 at 22 (citing *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1861 (2017) ("National-security policy is the prerogative of the Congress and President."); *Schneider v. Kissinger*, 412 F.3d 190, 195 (D.C. Cir. 2005); and *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978) (noting that application of injunctive-relief standards changes where core concerns of the executive branch are at stake)).

Moreover, USCIS has the discretion to determine which records are pertinent to its investigation of a naturalization applicant, including records from other entities or agencies. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) ("[w]e have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer"). The fact that DoD's background checks may cover additional areas that do not affect enumerated naturalization requirements does not mean that the DoD background checks are not relevant in all respects. In fact, USCIS has noted the relevance of certain information that has been uncovered in the DoD background checks to eligibility for naturalization. DoD background checks have revealed derogatory information that USCIS would consider in determining whether the individual is eligible to naturalize, including ties with foreign intelligence agents. USCIS CAR at 12. Thus, just as an FBI background check may reveal that an applicant has been convicted of an aggravated felony offense that prevents a finding of good moral character, as well as certain arrests or misdemeanors that may ultimately lead to the denial of a benefit, the DoD background checks may uncover information that USCIS independently assesses to determine if it affects eligibility for naturalization, including an individual's good moral character and attachment to the principles of the U.S. Constitution. Accordingly, there is no basis this Court to conclude that USCIS's decision to require the enhanced background checks was a "clear error of judgment," *see Marsh v. Oregon Nat. Res. Council*, 490

U.S. 360, 378 (1989), or that USCIS's explanation for its decision runs counter to the evidence before the agency, *see Motor Vehicle Mfr. Ass'n*, 463 U.S. at 43.

      **b. Plaintiffs' attempt to separately challenge the MSSD component of the enhanced background check as arbitrary and capricious is without merit.**

As noted above, Plaintiffs proceed from the incorrect premise that the adjudication of an MSSD is not itself part of the enhanced DoD background check process referenced in the July 7 Guidance. Plaintiffs' assertion that waiting for the completion of an MSSD renders the July 7 Guidance "arbitrary and capricious" likewise fails for many of the same reasons discussed above.

For example, Plaintiffs characterize the MSSD as a "separate, irrelevant military-specific personnel/HR decision," and they therefore contend that waiting for the result of an MSSD is arbitrary and capricious. *See* ECF No. 177, at 22. But as noted above, it is entirely rational for USCIS to await the outcome of an MSSD where that decision, if favorable, will eliminate the need for USCIS to separately review all of the raw background check material that DoD reviewed, and where that decision, if adverse, signals the presence of derogatory information that may be relevant to naturalization eligibility and may result in a recruit's other than honorable discharge from the U.S. Armed Forces. *See supra*, at 17-19; ECF No. 128-1, at ¶ 5 (noting that "an individual who has separated from service is eligible to naturalize under 8 U.S.C. § 1440(a) only if he or she was 'separated under honorable conditions'").

Moreover, Plaintiffs' attempt to distinguish the "investigatory" from the "adjudicatory" phase of the DoD background check is little more than a challenge to the timing and manner by which DoD communicates with USCIS about the completion of DoD background checks. *See* ECF No. 177, at 22-23. Plaintiffs effectively argue that USCIS has a legal duty to abandon their current process for receiving notice from DoD upon completion of an MSSD, and instead devise a new method of communication with DoD that allows them to adjudicate naturalization applications at

some earlier phase of the enhanced background check process. *See id.*, at 22. But the mere fact that Plaintiffs may prefer another approach does not render the method that is currently in use arbitrary and capricious. *See City of Roseville v. Norton*, 219 F. Supp. 2d 130, 170 (D.D.C. 2002) ("The fact that [an Environmental Assessment ("EA")] may not have considered a specific alternative preferred by plaintiffs is simply not grounds for finding the agency failed to meet its obligations in preparing the EA, or that the agency's decision was 'arbitrary and capricious.'"). This is particularly so given that, as noted above, it is rational for USCIS to await an MSSD because an applicant's eligibility under section 1440(a) may turn on whether he or she was "separated under honorable conditions." ECF No. 128-1, at ¶ 5. The Court should therefore reject Plaintiffs' effort to dictate the manner and timing by which USCIS and DoD communicate regarding the completion of background checks.

In their motion for summary judgment, Plaintiffs also argue that the July 7 Guidance was arbitrary and capricious because the administrative record "never mentions NSDs, MSSDs, or the NSD or MSSD process." *See* ECF No. 177, at 22. The administrative record does, however, repeatedly reference the importance of awaiting DoD's enhanced "background" or "security" checks, *see* USCIS CAR at 3-7, and DoD has communicated to USCIS that an MSSD is the "culmination of DoD's enhanced background checks and indicates that these checks are complete." ECF No. 128-1, at ¶ 5; ECF No. 128-2, at ¶¶ 2-3; *see* ECF No. 58-3. The fact that agency decision makers did not specifically reference the "MSSD" phase of DoD's enhanced background check process while formulating the July 7 Guidance does not render the policy arbitrary and capricious where the decision itself, and the basis for it, is abundantly clear from the administrative record. *Fox Television Stations, Inc.*, 556 U.S. at 513 (under the arbitrary and capricious standard, a court is not to substitute its judgment for that of the agency, and should

uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned) (quoting *Bowman Transp. Inc.*, 419 U.S. at 286) (quotation marks omitted)); *Flaherty v. Bryson*, 850 F. Supp. 2d 38, 63 (D.D.C. 2012) ("the fact that Plaintiffs would have preferred a more detailed analysis does not compel the conclusion that the Secretary's action was arbitrary and capricious") (internal quotation marks and citation omitted)).  Plaintiffs have thus failed to show that the MSSD component of DoD's enhanced background check process renders the July 7 Guidance "arbitrary and capricious."

### c. Plaintiffs have not shown that the agency failed to consider important factors.

Plaintiffs' claim that the agency did not consider various factors while adopting the July 7 Guidance simply reframes many of the same arguments addressed above.  Again, these arguments are rooted in misunderstandings about naturalization under section 1440 and USCIS's July 7 Guidance. *See* ECF No. 177, at 24-29. For example, Plaintiffs first allege USCIS "failed to consider" the manner in which MSSD Adjudicative Guidelines differ from naturalization eligibility requirements. *Id*. at 24. But as explained above, this distinction is irrelevant because USCIS did not, and does not, adjudicate naturalization applications based on MSSD Adjudicative Guidelines. Rather, based on its communications with DoD, USCIS simply regards the MSSD as the culmination of DoD's background check process, and is cognizant that derogatory information uncovered during that process could be relevant during the adjudication of a military naturalization application. ECF No. 128-1, at ¶¶ 2, 5; ECF No. 128-2, at ¶¶ 2-3. There is thus no merit to the assertion that USCIS should have considered "what an MSSD adjudication entailed." *Id*.

The second and third factors identified by Plaintiffs are similar: they allege that USCIS failed to consider "the adverse impact of the MSSD Policy would have on the regulated population," and the supposed "statutory policy favoring expedited and eased naturalization

processing for military service members." ECF No. 177, at 24, 26. The only adverse impact
Plaintiffs identify, however, is the fact that awaiting the completion of DoD background checks
takes time. *Id*. at 2. Plaintiffs have not alleged any instances in which MAVNI applicants with
pending background checks have been placed in removal proceedings or have been removed.[14]
Accordingly, while Plaintiffs may face inconveniences based on the additional time necessary to
process their applications, they have not identified any type of serious adverse impact that should
have been considered by USCIS but was not. As for the assertion that USCIS should have
considered the alleged "statutory policy favoring expedited and eased naturalization processing
for military service members," (ECF No. 177, at 26) Plaintiffs' argument fails because, again,
there is no statute favoring expedited *processing* of such applications, except for service members
serving on active duty abroad. Nor is there any statute or policy that eases the background checks
that MAVNI naturalization applicants must undergo. Rather, as explained above, naturalization
under section 1440 is often referred to as "expedited naturalization" because of relaxed *substantive*
requirements. *See supra*, at 4, 14-16. Accordingly, USCIS cannot be said to have acted arbitrarily
and capriciously for failing to consider a "statutory policy" of expedited processing which does
not exist.

Plaintiffs next contend that USCIS failed to consider whether DoD had the resources to
perform or the intention of performing the enhanced background checks. *See* ECF No. 177, at
27-28. Defendants respectfully request the Court to take judicial notice of their numerous reports
to the Court, which directly contradict Plaintiffs' assertions. *Fletcher v. Evening Star Newspaper*

---

[14] While Defendants are aware of one case in which a MAVNI recruit was placed in removal
proceedings, this occurred after the recruit was discharged (following the completion of
background checks), and not during the pendency of background checks. *See Zhu v. Department
of Homeland Security, et al.*, 2:18-cv-00489 (W.D. Wa).

*Co.*, 133 F.2d 395, 395 (D.C. Cir. 1942) (holding that it is "well-settled" that in determining that there is no genuine issue as to any material fact, "a court can take judicial notice of its own records in concluding the issue thus raised."). As these reports and their supporting declarations make abundantly clear, DoD does have the resources to conduct, and actually is conducting, the enhanced background checks, including new MSSD determinations. *See*, *e.g.*, ECF Nos. 93, 98. Most recently, Defendants have reported that, as of August 14, 2018, more than 430 *Nio* class members have naturalized, and over 575 *additional* class members have completed the DoD background checks.[15] ECF No. 184. Furthermore, as the USCIS CAR demonstrates, USCIS received results from DoD's completed enhanced background checks on numerous occasions between December 2016 and June 2017. *See e.g.* USCIS CAR at 8-182. It is, therefore, simply false to assert, as Plaintiffs did in their Second Amended Complaint, that "at the time USCIS issued this directive, it understood that…DoD had no intention of conducting the 'enhanced DoD security checks'" or "intended to discharge these MAVNI Selected Reserve soldiers without performing such security checks." ECF No. 61, ¶ 162. On the contrary, USCIS's decision to require the enhanced background checks for naturalization purposes was based on the results of such checks.

Relatedly, Plaintiffs contend that USCIS did not consider DoD's "time-out policies." ECF No. 177, at 28. To the extent Plaintiffs still allege that DoD decided to summarily discharge MAVNIs pursuant to a "time-out policy," or that USCIS failed to consider this policy, Plaintiffs are well aware this statement is demonstrably inaccurate. *See* ECF No. 177, at 15-16 (citing ECF No. 17-8, at 3). As Defendants have clarified in prior filings, the DoD Memo to which Plaintiffs

---

[15] The evident progress that USCIS has made in adjudicating MAVNI naturalization applications after the completion of enhanced DoD background checks also refutes Plaintiffs' claim that USCIS did not consider "whether it had the capability to implement and apply the policy as promulgated." ECF No. 177, at 28.

cite in support of this statement was pre-decisional and the policy discussed in this Memo never entered into force. *See* ECF No. 25-2, July 28, 2017 Declaration of Stephanie Miller, at 8 (noting that memorandum to which Plaintiffs cite was an "internal, pre-decisional, and deliberative document" which set forth "potential courses of action"). In fact, as Defendants have explained to the Court in prior filings, as early as July 27, 2017, DoD took steps to ensure that the "time-out" policy to which Plaintiffs refer is not being applied to any MAVNIs with pending background checks. *See* ECF No. 157, at 1-2 (noting that "DoD has already taken significant steps to ensure that class members do not time out of the DTP while waiting for the screening process to conclude."); *see also* ECF No. 26 (July 27, 2017 Memo extending period for completing minimum training requirements to 36 months in order to accommodate additional screening). Again, Plaintiffs' argument necessarily fails because USCIS cannot be found to have acted arbitrarily and capriciously for failing to consider policies that have had minimal effects on the MAVNIs with pending background checks.

As the foregoing illustrates, the July 7 Guidance is fully in accordance with the law governing naturalization and was a rational choice based on the materials in the administrative record. Likewise, there is not any basis on which to conclude that USCIS acts unlawfully, or in a manner that is arbitrary and capricious, by regarding the MSSD as the culmination of the DoD's enhanced background check process.  The Court should therefore reject Plaintiffs challenge to the July 7 Guidance based on 5 U.S.C. § 706(2) and grant summary judgment in favor of Defendants.

**B.      Plaintiffs' retroactivity argument is without merit.**

Plaintiffs' contention that the "MSSD Policy changes the legal landscape" such that it is "unlawfully retroactive" should be rejected for reasons similar to those discussed above. ECF No. 177, at 33-34. As this Court has noted, "[u]nder D.C. Circuit precedent, a new rule or policy

changes the legal landscape if it 'is substantively inconsistent with a prior agency practice and attaches new legal consequences to events completed before its enactment.'" *Kirwa v. United States Department of Defense*, 285 F. Supp. 3d 21, 40-41 (D.D.C. 2017) (citation omitted). The July 7 Guidance does not in any way change the substantive requirements for naturalization or attach "new legal consequences." It simply provides that USCIS will wait to adjudicate MAVNI naturalization applicants *under pre-existing* standards until DoD background checks, including the MSSD, are complete. As explained above, USCIS awaits the result of the MSSD because it understands it to be the culmination of DoD's background check process, and because the result of the MSSD informs USCIS as to whether it is necessary to request derogatory information and information about the applicant's discharge from DoD prior to adjudicating the naturalization application. *See* ECF No. 128-1, at ¶ 5; ECF No. 166-1, at 3. USCIS does not, as Plaintiffs allege use "MSSDs as a proxy for naturalization eligibility." ECF No. 177, at 33. The Court should therefore reject Plaintiffs' contention that the Guidance "changes the legal landscape" so as to be unlawfully retroactive.

Moreover, unlike rules adopted pursuant to notice and comment procedures, "an agency may give retroactive effect to a new policy or rule adopted in the course of an adjudication so long as the resulting inequities are 'counterbalanced by sufficiently significant statutory interests.'" *Chadmoore Communications, Inc. v. F.C.C.*, 113 F.3d 235, 287 (D.C. Cir. 1997). The statutory interests in this case are indeed significant. As the Supreme Court has often noted, "there must be strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship." *Fedorenko v. United States*, 449 U.S. 490, 506 (1981). As discussed above, the administrative record reflects that USCIS's decision to await the results of DoD background checks before adjudicating MAVNI naturalization applications is rooted in ensuring that these

applicants possess the requisite good moral character and attachment to the Constitution necessary to naturalize. USCIS CAR 2-7. By contrast, the only inequity identified by Plaintiffs is the additional time it takes to adjudicate these applications. Given the foregoing, the Court should reject Plaintiffs' retroactivity challenge to July 7 Guidance.

**C.      USCIS's decision to require DoD background investigations to adjudicate naturalization applications for MAVNI recruits is not subject to the APA's notice and comment rulemaking requirement.**

**1.   Defendants did not violate 5 U.S.C. § 553.**

Contrary to Plaintiffs' claims that the July 7 Guidance should have undergone notice and comment rulemaking pursuant to 5 U.S.C. § 553, *see* ECF No. 61, at ¶¶ 166-68, the enhanced background checks are not a "new substantive requirement" and do not violate the APA's notice-and-comment rulemaking requirements. The APA provides that, absent a published finding of good cause, an agency may issue a "legislative rule" only after following the notice and comment procedure described in the APA. 5 U.S.C. § 553. An agency need not, however, follow those procedures to issue "interpretative rules, general statements of policy, or rules of agency organization, procedure or practice." 5 U.S.C. § 553(b)(3)(A); *see Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015) (citing *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 99 (1995)); *see also Am. Hospital Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C. Cir. 1987). A legislative rule has the force of law and creates new rights or duties, while an interpretive rule merely clarifies an existing rule and does not change law, policy, or practice. *Mortgage Bankers Ass'n*, 135 S. Ct. at 1204. Interpretive rules and rules of agency organization, procedure, or practice do not add to the substantive law that already exists in the form of a statute or legislative rule. *See Central Texas Tel. v. FCC*, 402 F.3d 205, 213 (D.C. Cir. 2005).

In *American Mining Congress v. Mine Safety & Health Administration*, 995 F.2d 1106, 1109 (D.C. Cir. 1993), the D.C. Circuit articulated a framework to distinguish between legislative rules and interpretive rules. *See also Wilson v. Lynch*, 835 F.3d 1083, 1099 (9th Cir. 2016); *Erringer v. Thompson*, 371 F.3d 625 (9th Cir. 2014) (all applying the *Am. Min. Congress* framework). Under this framework, a legislative rule, *i.e.*, a rule that "has the force of law," will be found:  (1) when, in the absence of the rule, there *would not* be an adequate legislative basis for agency action; (2) when the agency has explicitly invoked its general legislative authority; or (3) when the rule effectively amends a prior legislative rule.  *Am. Min. Congress*, 995 F.2d at 1109 (emphasis added).  Here, USCIS has not invoked its general legislative authority, so only the first and third prongs of the *American Mining Congress* test are at issue.

Under the first prong of the test, even in the absence of the July 7 Guidance, USCIS has an adequate legislative basis supporting its decision to wait for the results of DoD's background investigations before interviewing or approving Plaintiffs' naturalization applications. Eligibility for naturalization under section 1440 requires that an applicant "[h]as been, for at least one year prior to filing the application for naturalization, and continues to be, of good moral character, attached to the principles of the Constitution of the United States, and favorably disposed toward the good order and happiness of the United States."  8 C.F.R. § 329.2(d); *see also Nolan*, 334 F.3d at 198 (holding that § 1440 is ambiguous and [the Government's] interpretation that § 1440 includes a good moral character requirement is reasonable).

Before a person may be naturalized, the law mandates a "personal investigation of the person applying for naturalization." 8 U.S.C. § 1446(a); 8 C.F.R. § 335.2. Moreover, 8 C.F.R. § 335.1 – which was subject to notice and comment – states that "[t]he investigation shall consist, *at a minimum*, of a review of all pertinent records, police department checks, and a neighborhood

33

investigation in the vicinities where the applicant has resided and has been employed, or engaged in business . . . ." (emphasis added). Further, section 1446(b) authorizes USCIS to "take testimony concerning any matter touching or in any way affecting the admissibility of any applicant for naturalization. . . and to require by subpoena the attendance and testimony of witnesses, including applicant, before such employee so designated and the production of relevant books, papers, and documents."

These statutes and regulations constitute a valid legislative basis for USCIS to undertake the procedural steps laid out in the July 7 Guidance in the adjudication of Plaintiffs' naturalization applications. Requiring a completed DoD background check before naturalization ensures that USCIS is considering all relevant information before making a final determination on these recruits' naturalization applications. Indeed, USCIS regularly consults with other agencies and obtains information from outside sources to investigate an individual for benefit eligibility, which, for naturalization applicants, includes good moral character. *See, e.g.*, 8 C.F.R. § 335.2(b) (requiring FBI criminal background checks). Therefore, the relevant statutes and regulations – not the July 7 Guidance as Plaintiffs argue – provide USCIS with the authority to investigate an applicant's eligibility and to consider information provided by other agencies when determining whether an applicant is eligible for the benefit sought. It is both reasonable and within USCIS's authority for the agency to refrain from making a final determination on these recruits' naturalization applications until DoD verifies that the individual has completed the enhanced security checks, as USCIS will rely on the results to help ensure that the individual demonstrates good moral character and attachment to the U.S. Constitution as required by the INA and applicable regulations.

The July 7 Guidance is not a legislative rule, but rather an "interpretive rule, general statement[] of policy, or rule[] of agency organization, procedure or practice," and thus it is exempt from APA notice-and-comment rulemaking.  *See Mora-Meraz v. Thomas*, 601 F.3d 933, 939 (9th Cir. 2010) (citing 5 U.S.C. § 553(b)(3)(A)). Contrary to Plaintiffs' claim, ECF No. 177, at 29, the July 7 Guidance is not similar to Transportation Security Administration's ("TSA") use of advanced imaging technology ("AIT"), which the D.C. Circuit found to be subject to notice and comment. *Electronic Privacy Information Center v. U.S. Department of Homeland Security*, 653 F.3d 1 (D.C. Cir. 2011) ("*EPIC*").  In *EPIC*, TSA implemented AIT screening without notice-and-comment based on its broad statutory mandate allowing it to screen airline passengers for dangerous weapons.  653 F.3d at 2–3.  The D.C. Circuit held that because the "procedure at the checkpoint elides the privacy interests at the heart of the petitioners' concern with AIT" and "intrudes upon his or her personal privacy," it therefore "affects the public to a degree sufficient to implicate the policy interests animating notice-and-comment rulemaking" *Id*. at 7. The *EPIC* court's analysis is inapposite to the July 7 Guidance.

Unlike *EPIC*, the enhanced background check requirements in this case do not "elide the personal privacy interests" of these MAVNI recruits the way that AIT did to the *EPIC* plaintiffs' personal privacy by "producing an image of the unclothed passenger." *Id.* at 7. Rather, Plaintiffs' privacy interests are not affected at all, as they have already conceded that the enhanced security checks can be completed by DoD, and they are aware, when they apply for naturalization, that USCIS will conduct background checks and investigations, including collecting information from other agencies, to determine whether they are eligible to naturalize. 8 U.S.C. § 1446(a); 8 C.F.R. § 335.2. Plaintiffs nevertheless allege that they are inconvenienced by the enhanced background check to the extent that it "unreasonably delay[s]" their pending naturalization applications – and

35

consequently, their ability to become United States citizens. ECF No. 61, at ¶ 156. However, the "fact that there may be a substantive impact on Plaintiffs because a particular procedure is more time consuming than another does not transform an interpretive rule or a rule of agency practice or procedure into one with the force of law." *EPIC*, 653 F.3d at 5; *Pinkus v. U.S. Bd. of Parole*, 507 F.2d 1107, 1113 (D.C. Cir. 1974).

It should come as no surprise, then, that courts have consistently rejected similar challenges. In one putative class action concerning naturalization delays, the court rejected a claim that the "expanded name check" program constituted a substantive rule in the naturalization context. *Ahmadi v. Chertoff*, No. 07-cv-03455, 2007 WL 3022573 (N.D. Cal. Oct. 15, 2007). The court explained:

> The expanded name check has created significant delays. The expanded name check did not, however, add a new requirement in the naturalization process, as plaintiffs contend. The agencies have long been required to conduct an investigation into an applicant's background before adjudicating an application. The expanded name check merely enlarged the scope of that investigation.

*Id.* at *9; *see also Sawan v. Chertoff*, 589 F. Supp. 2d 817, 833-34 (S.D. Tex. 2008) (collecting cases); *Hani v. Gonzales*, No. 3:07-cv-517-S, 2008 WL 2026092, at *5 (W.D. Ky. May 8, 2008) (collecting cases). The background checks in the *Ahmadi* case expanded the scope of an investigation and directed adjudicators how best to use the limited resources available to them in conducting that investigation, just as is true in this case. That is not substantive law, but rather an enhanced investigation to ensure that applicants meet the requirements for naturalization. Similar to the understanding that extended namechecks do not establish a substantive rule under delegated legislative authority, USCIS' policy requiring DoD background checks in consideration of eligibility for naturalization does not violate the APA's notice-and-comment rulemaking mandate.

Even if the Court were to decide that the additional background checks constitute a "legislative rule," the national security concerns at issue in this case undercut Plaintiffs' claim that this Court should invalidate or vacate USCIS' requirement for DoD background checks to be completed for MAVNI recruits applying for naturalization. CAR, at 7 (referencing security concerns regarding MAVNI recruits, as informed by a classified DOD Inspector General report). This Court has previously noted that tension, pointing to the "the national security concerns that defendants cite for their change in policy" when it denied Plaintiffs' motion for a preliminary injunction. ECF No. 44, at 23 (citing *EPIC*, 653 F.3d at 8 (refusing to vacate a rule promulgated without notice-and comment procedure because it "would severely disrupt an essential security operation"); and *Jifry v. FAA*, 370 F.3d 1174, 1179–80 (D.C. Cir. 2004)). An exception to the notice and comment requirement exists when "the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B). This exception "excuses notice and comment in emergency situations, or where delay could result in serious harm." *Jifry*, 370 F.3d at 1179.

USCIS has taken this step in the July 7 Guidance, specifically stating that it "has become aware of circumstances and instances where MAVNI enlistees have applied for naturalization or been naturalized before a DoD background check revealed derogatory information suggesting that they lacked good moral character or attachment to the U.S. Constitution." CAR at 5. Again, the derogatory information about MAVNI applicants that has been obtained through DoD enhanced background checks "includes, but is not limited to, immigration fraud, criminal acts, aggravated felonies, active membership and participation in the Communist Party, and *national security concerns*." *Id*. (emphasis added). These national security concerns are based upon the classified

Inspector General's report and other classified reports. CAR, at 2-3. Based on these classified reports, USCIS took action to put the July 7 Guidance in place in order to prevent further naturalizations without the full benefit of the enhanced background check. Should the Court find that the July 7 Guidance is a legislative rule – a fact that the government does not concede – USCIS is exempt from the notice and comment requirement due to the impracticality of it. *See Jifry*, 370 F.3d at 1179. In order to avoid any further national security concerns, USCIS implemented the July 7 Guidance. *Id.* (finding that the "legitimate concern over the threat of further terrorist acts involving aircraft in the aftermath of September 11, 2001" provided the agencies with "good cause" to not offer advance public participation).

USCIS's July 7 Guidance does not violate the APA's general notice and comment requirement as it is an interpretative rule, not a legislative rule. Even if the Court were to determine that the Guidance is a legislative rule, it falls within the exception to notice and comment in 5 U.S.C. § 553(b)(3)(B). Thus, the Court should grant Defendants' motion for summary judgment on this issue.

### 2. Defendants USCIS did not violate 5 U.S.C. § 552(a).

The Court should also reject Plaintiffs' assertions that DHS Defendants failed to comply with the publication requirement of 5 U.S.C. § 552, which requires publication in the Federal Register of all "rules of procedure and statements of general policy or interpretations of general applicability formulated and adopted by the agency." *See* ECF No. 61,  at ¶¶ 167-168 (*generally citing* 5 U.S.C. § 552(a)); ECF No. 177, at 32-33.

Under the Freedom of Information Act ("FOIA"), agencies are required to "state and currently publish in the Federal Register for the guidance of the public . . . substantive rules of general applicability adopted as authorized by law, and statements of general policy or

interpretations of general applicability formulated and adopted by the agency." 5 U.S.C. § 552(a)(1)(D). However, to make out a claim under that statute, Plaintiffs must show that they were "adversely affected" by an unpublished policy that should have been published, and that they did not have actual notice of the content of that policy. *See Alliance for Cannabis Therapeutics v. Drug Enforcement Admin.*, 15 F.3d 1131, 1136 (D.C. Cir. 1994); *Massachusetts Mfg. Extension P'ship v. Locke*, 723 F. Supp. 2d 27, 42 (D.D.C. 2010). Courts have refused to invalidate agency enforcement actions where the agency failed to publish internal guidelines or policies and the challengers could not show they were adversely affected by nonpublication. *See e.g. New York v. Lyng*, 829 F.2d 346, 354 (2d Cir. 1987); *Nguyen v. United States*, 824 F.2d 697, 700-702 (9th Cir. 1987) (finding that a person seeking relief from unpublished statements must show that the statements affect their "substantive rights"). Plaintiffs' claims fail for two reasons.

First, 8 U.S.C. §1446(b) and 8 C.F.R. §§ 335.1 and 335.2 put Plaintiffs on notice that USCIS conducts background checks for naturalization applicants, and the checks required by USCIS's July 7, 2017 policy do not deviate from the plain meaning of the relevant statutes or regulations. Second, USCIS's decision to require DoD background checks for MAVNI recruits does not change Plaintiffs' legal duties or substantive rights, as USCIS has not changed the requirements for submitting a Form N-400 application or the eligibility criteria for naturalization, but rather has made an internal decision affecting how much information is available to it for evaluating whether an applicant meets those criteria. Therefore, Plaintiffs have failed to show that USCIS failed to publish a "*substantive* rule" or that they were adversely affected in any cognizable legal sense by USCIS's internal guidance.

Plaintiffs argue, without support, that USCIS cannot cite to national security as a valid basis to issue the July 7 Guidance. ECF No. 177, at 32. However, the national security exemption

at 5 U.S.C. § 552(b)(1)(A) exempts USCIS from such requirements given the classified nature of the 2017 Inspector General Report and the 2017 Defense Intelligence Agency Report. *Campbell v. U.S. Dep't of Justice*, 231 F. Supp. 2d 1, 10 (D.D.C. 2002) (noting that the "national security exemption to FOIA allows the withholding of information specifically, authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy.") (internal quotation marks omitted); *see also* ECF No. 44, at 24 (citing § 552(b)). Plaintiffs claim that the DHS Defendants have a "regular practice of publishing policies or notices which, unlike the MSSD Policy, actually implicate national security." ECF No. 177, at 41. However, they give only a single example of this alleged "regular practice," and in that case, the notice of proposed rulemaking was required by the Privacy Act because DHS was amending the information it exempts from Privacy Act protections. This example has no bearing on whether USCIS's July 7 Guidance is exempt from the APA publication requirement pursuant to 5 U.S.C. § 552(b)(1)(A), and the Court should ignore any suggestion of such.

Because the Plaintiffs cannot establish that they have been adversely affected by the July 7 Guidance or that the national security exemption at 5 U.S.C. § 552(b)(1)(A) does not apply, the Court should grant summary judgment in Defendants' favor.

**D.      Plaintiffs have not established a Constitutional violation.**

Plaintiffs argue that because Congress did not specify that persons seeking naturalization under 8 U.S.C. § 1440 must complete enhanced background checks, the Defendants have committed a constitutional violation under the "Uniform Rule of Naturalization" clause. ECF No. 61, at ¶¶ 180-184, ECF No. 177, at 34-40. Plaintiffs lack standing to assert a violation of this clause. Moreover, the argument is illogical and incorrect.

Article I, Section 8 of the Constitution establishes that "Congress shall have power . . . To establish a uniform Rule of Naturalization." This Constitutional mandate empowers Congress to define "the processes through which citizenship is acquired or lost," to determine "the criteria by which citizenship is judged," and to fix "the consequences citizenship or noncitizenship entail." *Davis v. District Director, INS*, 481 F. Supp. 1178, 1183–84 n. 8 (D.D.C. 1979) (citation omitted). Alexander Hamilton explained that the word "uniform" in the Naturalization Clause confers upon Congress the "exclusive jurisdiction" to regulate within that area, "because if each State had power to prescribe a distinct rule, there could not be a uniform rule." The Federalist No. 32, at 199 (Hamilton) (Clinton Rossiter ed., 1961).[16]

Because the Naturalization Clause is an affirmative grant of authority to Congress, and does not confer any rights on private individuals, there is no private right of action under it, and therefore, Plaintiffs lack standing to assert such a claim. *Flores v. City of Baldwin Park*, No. 14-cv-9290, 2015 WL 756877, *3 (C.D. Cal. Feb. 23, 2015); *see Cazarez-Gutierrez v. Ashcroft*, 382 F.3d 905, 912 (9th Cir. 2004). The Clause vests in Congress the power to "establish an uniform Rule of Naturalization," a grant that has been "read broadly to mean federal control over the status

---

[16] Congress passed the first "uniform Rule of Naturalization" in March 1790. *See* Naturalization Act of 1790, 1 Stat. 103, Mar. 26, 1790. In 1795, Congress claimed exclusive authority over naturalization by establishing new conditions—"and not otherwise"—for aliens "to become a citizen of the United States, or any of them." *See* Naturalization Act of 1795, 1 Stat. 414, Jan. 29, 1795. This claim was confirmed by the Supreme Court in *Chirac v. Lessee of Chirac*, 15 U.S. (2 Wheat.) 259, 269 (1817), where Chief Justice Marshall explained that "the power of naturalization is exclusively in congress," notwithstanding any state laws to the contrary. *See also Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948) ("The Federal Government has broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization. Under the Constitution the states are granted no such powers[.]" (internal citation omitted)); *United States v. Wong Kim Ark*, 169 U.S. 649, 701 (1898) ("The power, granted to Congress by the Constitution, to establish an uniform rule of naturalization, was long ago adjudged by this court to be vested exclusively in Congress." (internal quotation marks omitted)).

of aliens, not just criteria for citizenship." *Korab v. Fink*, 797 F.3d 572, 580 (9th Cir. 2014). As the Ninth Circuit explained, the uniformity principle of the Naturalization Clause "was a response to the tensions that arose from the intersection of the Articles of Confederation's Comity Clause and the states' divergent naturalization laws, which allowed an alien ineligible for citizenship in one state to move to another state, obtain citizenship, and return to the original state as a citizen" with all appurtenant privileges and immunities. *Id.* at 581; *see also Gibbons v. Ogden*, 22 U.S. 1, 15 (1824) ("The true reason why the power of establishing an uniform rule of naturalization is exclusive, must be, that a person becoming a citizen in one State, would thereby become a citizen of another, perhaps even contrary to its laws, and the power thus exercised would operate beyond the limits of the State."). The Constitution's Naturalization Clause concerns the proper allocation of power as between Congress and the States; it is not a rights-giving provision. Not all constitutional provisions lend themselves to a private right of action at all, and a plaintiff seeking to vindicate a constitutional guarantee must satisfy essentially the same zone-of-interests test that applies to statutory claims.  *See Wash. Alliance of Tech. Workers v. DHS*, 249 F. Supp. 3d 524, 550 (D.D.C. 2017) (inquiry considers whether the plaintiff's grievance falls within the "zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit" (citations omitted)), *appeal docketed*, No. 17-5110 (D.C. Cir. May 22, 2017).[17] Therefore, Plaintiffs lack standing to raise a claim under Article I, Section 8, Clause 4 of the Constitution.[18]

---

[17] Defendants incorporate the arguments in *Kirwa*, distinguishing *Wagafe v. Trump*, No. C17-0094-RAJ, 2017 WL 2671254 (W.D. Wash. June 21, 2017), as an unreliable non-precedential decision.  *See Kirwa*, 1:17-cv-01793, ECF No. 72.

[18] *But see Kirwa v. United States Department of Defense.*, 285 F. Supp. 3d 257, 273 (D.D.C. 2018); *see also Jafarzadeh v. Nielsen*, --F. Supp. 3d --, 16-1385-DJB, 2018 WL 3732130 (D.D.C. Aug. 6, 2018); *Wagafe v. Trump*, No. C17-0094-RAJ, 2017 WL 2671254, at *7 (W.D. Wash. June 21, 2017).

Even assuming that Plaintiffs do have standing to bring a claim under the Naturalization Clause, Plaintiffs cannot demonstrate that a violation of the Clause has occurred in this case. Congress has enacted a statutory framework that carefully delineates when and how an alien may naturalize as a member of the military.  8 U.S.C. § 1440(a).  Congress has expressly delegated to the Secretary of Homeland Security the broad authority to administer the provisions of the INA with the force of law, and to establish regulations of this purpose.  8 U.S.C. § 1103; *see also U.S. ex. rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950). This delegation includes, in the Secretary's discretion and pursuant to 8 U.S.C. § 1446, requiring MAVNI recruits who are applying for naturalization under Section 1440 to complete DoD background checks because USCIS has determined that these background checks are pertinent to the Congressionally-mandated investigation of the MAVNI applicant's eligibility for naturalization.

USCIS has determined that DoD's background checks may be a valuable source of information that directly relates to eligibility for naturalization, and has discretion to require the results of such checks before MAVNI recruits' applications for naturalization may be adjudicated. *See* USCIS CAR at 7, *see also* Memorandum Opinion, ECF No. 44, at 20-21 (citing *Entergy Corp. v. Riverkeeper, Inc*., 556 U.S. 208, 218 (2009) (noting that agency action is permissible if it represents a "reasonable interpretation of the statute – not necessarily the only possible interpretation, nor even the interpretation deemed most reasonable by the courts"); and *Thomas Jefferson Univ. v. Shalala*, 512 U.S. at 517–18 (upholding application of a broad regulation because it did not conflict with the regulation's plain language)).

Plaintiffs continually argue that "[t]o be denied [clearance] on unspecified grounds in no way implies disloyalty or any other repugnant characteristic," (ECF No. 177, at 19, 24, 31, 39) as well as noting that "foreign ties" should not be a barrier to naturalization (ECF No. 177, at 12, 13,

43

18, 19, 39). Yet, Plaintiffs forget that USCIS looks to the reasons for an adverse MSSD rather than the fact of an adverse MSSD in determining good moral character and attachment to the U.S. Constitution. ECF No. 128-1, at ¶ 5. Thus, USCIS can review a negative MSSD based on "foreign ties," which according to the Adjudicative Guidelines is based upon the undue influence of foreign contacts and interests (ECF No. 39-1, at 5-8), and analyze whether the applicant demonstrates the requisite attachment to the U.S. Constitution.  USCIS's analysis of foreign influence or preference is the same for any applicant for naturalization, regardless of the basis for naturalization.

Thus, in requiring the enhanced background checks, USCIS is complying with the uniform rule of naturalization that Congress created, which allows the agency to conduct a background investigation.  *See* 8 U.S.C. § 1446(a); *De Canas v. Bica*, 424 U.S. 351, 354–55 (1976) (the "power to regulate immigration is unquestionably exclusively a federal power."); *Kleindienst v. Mandel*, 408 U.S. 753, 765–66 (1972) (Substantial precedent has established that Congress has plenary power to govern immigration issues). Simply awaiting for the results of these enhanced background checks does not mean that USCIS or DoD has attempted to impose naturalization eligibility criteria not specified by Congress. As a result, Plaintiffs' request that this Court grant equitable relief on their constitutional theory must fail. *See INS v. Pangilinan*, 486 U.S. 875, 883-84 (Courts do not have equitable authority to disregard those requirements, and Congress has not otherwise given the courts equitable power to confer citizenship even if the statutory requirements are not met). *Id*. In requiring the completion of enhanced background checks, which are used to ensure that a MAVNI applicant meets the requirements of good moral character and attachment to the U.S. Constitution, USCIS has not violated the Naturalization Clause, as the soldiers must meet the same eligibility requirements as any other applicant seeking citizenship. For this reason, the Court should grant the Defendants summary judgment on this issue.

44

**E.     DoD's October 13, 2017 policy is lawful.**[19]

DoD's October 13 policy is lawful and is supported by the DoD CAR. This CAR establishes that DoD reviews of the MAVNI program revealed weaknesses in the military accessions vetting process, and the existence of counter-intelligence, security, and insider-threat concerns within the program, including recruits engaging in criminal activity before entering onto active-duty status, as well as other counter-intelligence and security concerns.

In February 2010, for instance, DoD noted its "concerns" that "personnel on active duty under [the MAVNI Program] did not undergo counterintelligence-focused screening as of their security vetting process…[which] creates unacceptable vulnerability that could have serious impact of the safety and security personnel, equipment, and operations." DoD CAR at 0151. In August of 2010, DoD established provisions designed to strengthen the MAVNI program and mitigate potential counterintelligence and security concerns, including the initiation a of Tier 5 investigation and counterintelligence-focused security review for all MAVNI applicants. DOD CAR at 0138-0143. In 2016, in light of serious national security concerns, DoD added new requirements, including a National Intelligence Agency Check and an issue-oriented interview and/or polygraph. DOD CAR 0125-133. A MAVNI enlistee who fails to satisfy one of these

---

[19] This Court has already addressed the issue of whether it is within DoD's discretion to decide "whether or when to certify honorable service" in *Kirwa*, 1:17-cv-01793, ECF No. 60, at 7-8. Defendants incorporate by reference all filings in *Kirwa* to assert that the decision of whether and when to de-certify a Form N-426 is committed to agency discretion by law.  *See e.g., Kirwa,* 1:17-cv-01793, ECF Nos. 20, 39, 39-1.  Additionally, in *Kirwa*, the Court determined that DoD has a duty "to certify From N-426s if the enlistee's service would qualify as honorable based on an enlistee's service record as it existed in the day he submitted the [Form] N-426." *Kirwa*, 1:17-cv-01793, ECF No. 60, at 9, 10. Defendants continue to assert and preserve for possible appeal that the DoD October 13 policy to revoke Form N-426s if an enlistee has not completed all required DoD background checks (Section III of DoD's October 13, 2017, policy) is not contrary to law or in excess of DoD's statutory authority under 8 U.S.C. § 1440, and therefore, incorporate by reference all of the United States' filings in *Kirwa* on this point. *See e.g., Kirwa*, ECF Nos. 20, 39, 39-1.

security screens may be subject to discharge from the Armed Forces under other than honorable circumstances. *Id.* On October 13, 2017, DoD noted that although it "has taken direct actions to mitigate security risks to mission presented by the previous practices vetting Service Members accessed under the [MAVNI] Pilot Program. . . continued progress depends on consistent, sustained, and responsive approach." CAR 0001. Thus, relying on this information, and on two classified reports, DoD issued a Memorandum for Secretaries of the Military Departments, titled "Certification of Honorable Service for Members of the Selected Reserve of the Ready Reserve and Members of the Active Components of the Military or Naval Forces for Purposes of Naturalization." DoD CAR 0004-0007. DoD determined that in order to rectify the newly identified security risks, it would recall and de-certify the Form N-426 for service members who had submitted a completed naturalization application, but had not completed all applicable screening and suitability requirements. DoD CAR 0007. Once the background checks were completed, the military would subsequently certify a new Form N-426, which the service member could then submit in support of his or her naturalization application. *Id.*

In creating the October 13 policy, the DoD "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *PPL Wallingford Energy LLC v. Fed. Energy Regulatory Comm'n*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). In articulating the reason for its action, DoD "provided a rational connection between the facts found and the choice made." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 90 (D.C. Cir. 2010). Specifically, in a memo issued the same day, DoD noted the security risks of the MAVNI program and that continued progress required additional vetting of MAVNI service members. DoD CAR 0001. Additionally, past DoD documents intended that an honorable service determination be based upon a military service suitability determination. *See*

46

U.S. Army Reserve, Enlisted Military Accessions Vital to the National Interest (MAVNI) Information Paper 3–4 (2014) (ECF No. 20-4) ("DO NOT MAIL YOUR CITIZENSHIP PACKET BEFORE YOU SHIP TO BCT. . . .). Thus, the Form N-426 policy is based on sound judgment after a careful review and analysis of relevant factors implicating, among other things, national security concerns, and it is not contrary to law or arbitrary and capricious. *Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 422 (1983) (noting that under the 706(2) standard, the court "need not find that the [agency's] construction is the only reasonable one, or even that it is the result [the court] would have reached had the question arisen in the first instance in judicial proceedings") (internal citation and quotations omitted).[20]

## V.    CONCLUSION

The Court should deny Plaintiffs' motion for summary judgment, dissolve the preliminary injunction, and grant summary judgment in favor of Defendants.

Dated: September 14, 2018            Respectfully Submitted,


                                     JOSEPH H. HUNT
                                     Assistant Attorney General
                                     Civil Division


                                     WILLIAM C. PEACHEY
                                     Director, Office of Immigration Litigation

---

[20] Defendants assert that the Form N-426 policy constitutes a legally permissible effort by DoD to set criteria for honorable service certifications in the future and does not violate retroactivity principles. However, in granting Plaintiffs' preliminary injunction request (ECF No. 74), the Court relied on its decision in *Kirwa* to conclude that DoD's N-426 policy is impermissibly retroactive. *See* ECF No. 74 (citing *Kirwa*, 2017 WL 4862763, at *13-14). Additionally, on January 11, 2018, this Court also concluded that the "October 13th Guidance retroactively changes standards and procedures to MAVNIs who enlisted prior to October 13, 2017." *See Kirwa*, 1:17-cv-01793, ECF No. 60, at 15-18. Thus, Defendants incorporate by reference all filings in *Kirwa* in support of their argument that the Form N-426 policy does not violate retroactivity principles. *See*, *e.g.*, *Kirwa*, ECF Nos. 20, 39, 39-1.

COLIN A. KISOR
Deputy Director

C. FREDERICK SHEFFIELD
Trial Attorney

By: */s/ Elianis N. Perez*
ELIANIS N. PEREZ
Assistant Director
U.S. Department of Justice, Civil Division
Office of Immigration Litigation –
District Court Section
P.O. Box 868, Washington, DC 20044
Telephone: 202-616-9124
Facsimile: 202-305-7000
Email: elianis.perez@usdoj.gov

ATTORNEYS FOR DEFENDANTS

## <u>CERTIFICATE OF SERVICE</u>
Civil Action No. 1:17-00998-ESH

I HEREBY CERTIFY that on this **14th day of September, 2018**, a true copy of the

foregoing was filed with the Clerk of the Court using the CM/ECF system which sent notification

of such filing via e-mail to the following:

Douglas W. Baruch
FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
801 17th Street, NW
Washington, DC 20006
(202) 639-7052
(202) 639-7003 (fax)
Douglas.baruch@friedfrank.com

ATTORNEY FOR PLAINTIFFS


        */s/ Elianis N. Perez*
        Elianis N. Perez
        Assistant Director
        United States Department of Justice
        ATTORNEY FOR DEFENDANTS