# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KUSUMA NIO, *et al.*, | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 17-0998 (ESH)** |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs are a class of foreign nationals serving in the United States Army's Selected Reserve of the Ready Reserve who enlisted through the Military Accessions Vital to the National Interest ("MAVNI") program. The MAVNI program provides an expedited path to citizenship to foreign nationals who are legally present in the United States, possess critical foreign-language or medical skills, and serve honorably during designated periods of hostilities. The question before the Court is whether the U.S. Department of Homeland Security ("DHS") and its sub-agency U.S. Citizenship and Immigration Services ("USCIS") acted lawfully when they instituted a policy on July 7, 2017, declining to naturalize MAVNI applicants until the applicant has been determined suitable for service by the U.S. Department of Defense ("DOD") and the U.S. Army. Because USCIS's purported reasons for waiting for these military suitability adjudications do not comport with the evidence before the Court, it concludes that the challenged portion of USCIS's policy is arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2) ("APA"). The Court will therefore vacate that portion of the policy and grant partial summary judgment to plaintiffs.

# BACKGROUND

## I.    FACTUAL BACKGROUND

### A.  Origins of the MAVNI Program

#### 1.  DOD Eligibility and Enlistment Requirements

Much of the factual and procedural background relevant to the parties' cross-motions for summary judgment has been set forth in the Court's other opinions in this case and in a related case, *Kirwa v. DOD*, Civ. No. 17-1793.[1]  However, certain information is necessary to understand the question before the Court.

Generally, enlistees in the Armed Forces must be United States citizens or legal permanent residents.  *See* 10 U.S.C. § 504(b)(1).  However, through the MAVNI program, which was first authorized in 2008 and began operating in 2009, non-citizens who are not permanent residents but are lawfully present in the United States may enlist if they have critical foreign language skills or specialized medical training.  *See id.* § 504(b)(2); *see also Nio PI Op.*, 270 F. Supp. 3d at 53.  By statute, non-citizens who serve honorably during designated periods of hostilities are afforded an expedited path to citizenship:

> Any person who, while an alien or a noncitizen national of the United States, has served honorably as a member of the Selected Reserve of the Ready Reserve or in an active-duty status in the military, air, or naval forces of the United States [during a designated period of hostilities], and who, if separated from such service, was separated under honorable conditions, may be naturalized as provided in this section[.]

---

[1] *See Nio v. DHS*, 270 F. Supp. 3d 49 (D.D.C. 2017) (denying preliminary injunction) ("*Nio PI Op.*"); *Nio v. DHS*, 323 F.R.D. 28 (D.D.C. 2017) (granting motion for class certification) ("*Nio Class Cert. Op.*"); *Kirwa v. DOD*, 285 F. Supp. 3d 257 (D.D.C. 2018) (denying in part defendants' motion to dismiss or in the alternative for summary judgment); *Kirwa v. DOD*, 285 F. Supp. 3d 21 (D.D.C. 2017) (granting preliminary injunction).

8 U.S.C. § 1440(a).[2]  Since September 11, 2001, a designated period of hostilities has existed.

*See* Exec. Order No. 13269, *Expedited Naturalization of Aliens and Noncitizen Nationals*

*Serving in an Active-Duty Status During the War on Terrorism*, 67 Fed. Reg. 45,287 (July 3,

2002).  Over the course of the MAVNI program, more than 10,000 recruits have joined the

Armed Forces and have become naturalized as United States citizens.  *See Nio PI Op.*, 270 F.

Supp. 3d at 55.

All soldiers, including MAVNIs, must meet general enlistment standards in order to

serve.  DOD and the individual services of the U.S. Armed Forces, including the Army, impose

requirements ranging from basic eligibility criteria such as age and physical fitness to more

subjective assessments relating to personal character and conduct.  *See generally* Dept. of

Defense Instruction ("DODI") 1304.26, *Qualification Standards for Enlistment, Appointment,*

*and Induction* (Pls.' Appx. 8 *et seq.*) (setting forth eligibility criteria for those serving in the

military).[3]

Since its inception, the MAVNI program has raised national-security concerns within

DOD, and as a result, DOD has sought to strengthen the security screening requirements for

---

[2] Section 1440 eases the path to citizenship, as compared with the path for a typical
naturalization applicant, by allowing service members to be naturalized "regardless of age,"
subjecting them to no "period of residence" or physical presence requirement prior to applying
for naturalization, and waiving any filing or naturalization fee.  8 U.S.C. § 1440(b)(1), (2), (4).

[3] The operative administrative record ("USCIS AR") was compiled by USCIS and consists of the
record before the agency at the time of the July 7 Guidance.  (*See* Index of Administrative
Record, Nov. 9, 2018 (ECF No. 216-1).)  Plaintiffs also compiled appendices that may be cited
for necessary background or factual rebuttal.  (*See* Index of Plaintiffs' Appendix, Nov. 9, 2018
(ECF No. 216-2) ("Pls.' Appx.").)  Additionally, relevant to a DOD policy at issue in the related
*Kirwa* litigation, DOD compiled a separate administrative record which contains useful
background information.  (*See* Certification of the Index of the Administrative Record, Nov. 17,
2017 (ECF No. 81) ("DOD AR").)  The administrative record and extra-record evidence relevant
to this case are discussed in more detail in Section III.B.

MAVNI enlistees.  *See NIO PI Op.*, 270 F. Supp. 3d at 53-54.  (*See also* Decl. of Stephanie P. Miller ¶¶ 12-17, July 7, 2017 (ECF No. 19-7) ("7/7/17 Miller Decl.").)  In February 2010, James Clapper, then Under Secretary of Defense for Intelligence, issued a memo expressing concern that MAVNI enlistees serving on active duty had not undergone sufficient "counterintelligence-focused screening" and recommending "immediate steps" to correct the oversight.  (DOD Memorandum for Under Secretary of Defense for Personnel and Readiness:  Military Accessions Vital to the National Interest Personnel (MAVNI), Feb. 17, 2010 (DOD AR 151).)  Later that year, DOD imposed enhanced security screening for all current and future MAVNI soldiers, including a "Single Scope Background Investigation" ("SSBI" or "Tier 5" investigation, hereinafter referred to as "Tier 5"), which is a detailed background check conducted by the U.S. Office of Personnel Management ("OPM") and is typically used to determine whether an individual may receive access to classified information.  *See Nio PI Op.*, 270 F. Supp. 3d at 54 n.4 (citing Second Decl. of Stephanie P. Miller in Response to July 19, 2017 Order of the Court at 2-4, July 28, 2017 (ECF No. 25-2) ("7/28/17 Miller Decl.")).  The new DOD policy also required the Service (*e.g.*, the Army) to institute a "comprehensive counterintelligence-focused security review ["CI Review"] and monitoring program for MAVNI recruits."  (DOD Memorandum for Secretaries of the Military Depts.:  Two-Year Extension of Military Accessions Vital to National Interest (MAVNI) Pilot Program at 1-2, Aug. 17, 2010 (Pls.' Appx. 1-2).)

From August 2010 until May 16, 2012, recruitment of new MAVNIs was delayed while these strengthened security measures were implemented.  (*See* Decl. of Stephanie Miller ¶ 6, Nov. 17, 2017 (ECF No. 39-5) ("11/17/17 Miller Decl."); DOD Memorandum: Reinstatement of Military Accessions Vital to National Interest Pilot Program at 1, May 16, 2012 (DOD AR 136).)

With subsequent reauthorizations, DOD continued to refine security screening requirements for MAVNIs. In late 2014, DOD specified that all MAVNI applicants would be subject to a "suitability determination" based on a National Intelligence Agency Check ("NIAC") name search,[4] Tier 5, and CI Review, including an issue-oriented CI interview and/or polygraph "as needed to resolve any foreign influence or foreign preference concerns." (DOD Memorandum: Two-Year Extension of Military Accessions Vital to the National Interest (MAVNI) Pilot Program Implementation Policy at 6, Dec. 19, 2014 (USCIS AR 215).) The 2014 DOD memo provided that "[f]ailure to obtain a favorable NIAC, [Tier 5,] or CI-focused security review will render the applicant ineligible for enlistment or continued military service" and such a result would lead to immediate separation from the military. (*Id.*)

In 2015, DOD promulgated regulations governing "enlistment, appointment, and induction criteria" for the Armed Forces, including a new provision that "an applicant will be considered ineligible" to enlist if he or she "[r]eceives an unfavorable final determination by the DoD Consolidated Adjudication Facility ['CAF'] on a completed National Agency Check with Law and Credit (NACLC) or higher-level investigation [*i.e.*, Tier 5], which is adjudicated to the National Security Standards. . . ." 32 C.F.R. § 66.6(b)(8)(iv); *Qualification Standards for Enlistment, Appointment, and Induction*, 80 Fed. Reg. 16,269-01, 16,273 (Mar. 27, 2015); *see also* DODI 1304.26, Encl. 3, § 2(h)(6) (Pls.' Appx. 18) (same requirement).[5] The regulation thus

---

[4] The NIAC includes "at a minimum a name check" of several federal databases including CIA, FBI, and the counterintelligence-focused PORTICO system. (DOD Memorandum: Military Accessions Vital to the National Interest Pilot Program Extension, Sept. 30, 2016 (USCIS AR 238).)

[5] Although the regulation suggests that some MAVNIs could be subject to a NACLC (now known as a "Tier 3" investigation) rather than the more demanding Tier 5 investigation, DOD's position is that all MAVNIs are subject to the higher-level Tier 5 investigation. *See Kirwa*, 285 F. Supp. 3d at 30.

imposed an additional step—a "final determination" as to the soldier's suitability for military service—in addition to the DOD investigations required under the 2014 DOD memo. 32 C.F.R. § 66.6(b)(8)(iv). (*See also* Tr. of Proceedings at 18:7-20:17, Mar. 20, 2019 (ECF No. 245) ("3/20/19 Tr.") (Christopher Arendt of DOD describing the process formalized by the regulation).) On September 30, 2016, DOD again addressed investigation and vetting requirements for MAVNIs, as discussed in more detail *infra* at Section I.B.

## 2. USCIS Processing of Naturalization Applications

Separate from the DOD requirements, MAVNIs who wish to naturalize must apply to USCIS for citizenship, and USCIS must "conduct examinations" of all applicants. 8 U.S.C. § 1446(b); *see also* 8 C.F.R. § 332.1(a) (designating USCIS officers "to conduct the examination for naturalization required under" the Immigration and Nationality Act or "INA"). Regulations specify that USCIS must review FBI criminal background checks, *see* 8 C.F.R. § 335.2(b), and for naturalization applicants with military service, USCIS also requests from DOD name check queries of DOD's Defense Clearance Investigative Index ("DCII") to see if the applicant has a criminal record on his or her military record. *See* 12 USCIS Policy Manual, pt. I, ch. 6, § A, https://www.uscis.gov/policy-manual ("USCIS Policy Manual"). Following these checks, an applicant is scheduled for a naturalization interview by a USCIS officer, *see* 8 C.F.R. § 335.2, and USCIS must adjudicate the application within 120 days of the interview. 8 U.S.C. § 1447(b).

An applicant will not be approved for naturalization unless USCIS determines that she or he is "a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States." 8 U.S.C. § 1427(a). The applicant "bears the burden of demonstrating that, during the statutorily

prescribed period, he or she has been and continues to be a person of good moral character."  8 C.F.R. § 316.10(a)(1).  For MAVNI applicants, the relevant statutory period is one year.  8 C.F.R. § 329.2(d).[6]  USCIS makes this good moral character determination "on a case-by-case basis."  8 C.F.R. § 316.10(a)(2).  Certain criminal and immoral acts are explicitly disqualifying, but otherwise USCIS has discretion to evaluate the applicant's character in the context of "the standards of the average citizen in the community of residence."  *Id.*

In 2003, § 1440 was amended to specify that a soldier's service in the Selected Reserve of the Ready Reserve ("SRRR" or the "Reserves") is qualifying; the soldier need not have served in active duty.  *See* National Defense Authorization Act for Fiscal Year 2004, § 1702, P.L. No. 108-136, 117 Stat. 1392 (Nov. 24, 2003).  In fact, at all times relevant to this litigation, the USCIS Policy Manual provided that "[o]ne day of qualifying service is sufficient in establishing eligibility" for the statutory honorable-service requirement.  *Kirwa*, 285 F. Supp. 3d at 28 (quoting 12 USCIS Policy Manual, pt. I, ch. 3, § A).  Further, under § 1440, to naturalize a MAVNI must have "served honorably" during a designated period of hostilities; if the soldier is no longer serving, she or he must have been "separated under honorable conditions."  8 U.S.C. § 1440(a).  When a MAVNI soldier submits to USCIS his or her naturalization application, known as Form N-400, he or she must also submit a certification of honorable service from DOD, known as Form N-426.  Form N-426 "is the means by which DoD certifies whether an applicant for citizenship is serving honorably, and if no longer serving, whether they were

---

[6] Earlier conduct can also be used to demonstrate an applicant's lack of good moral character, if the applicant cannot show that he or she has changed.  *See* 8 C.F.R. § 316.10(a)(2) ("[USCIS] may take into consideration . . . conduct and acts at any time prior to that period, if the conduct of the applicant during the statutory period does not reflect that there has been reform of character from an earlier period if the earlier conduct and acts appear relevant to a determination of the applicant's present moral character.").

separated under honorable conditions." (7/7/17 Miller Decl. ¶ 6.) *See also* 12 USCIS Policy Manual, pt. I, ch. 5, § A ("The Request for Certification of Military or Naval Service confirms whether the applicant served honorably in an active duty status or in the Selected Reserve of the Ready Reserve."). USCIS's long-standing interpretation of the honorable-service requirement under § 1440 is that any applicant who is no longer serving must have been separated under "honorable" or "general under honorable" conditions, and that a neutral "uncharacterized" separation is not sufficient. *See* 12 USCIS Policy Manual, pt. I, ch. 3, § B. (*See also* 3/20/19 Tr. at 14:1-23.)

Prior to July 2017, information USCIS received from DOD about an applicant was routinely limited to the DCII DOD database check. (*See* 3/20/19 Tr. at 5:4-8 (to the Court's question, what information did USCIS receive from DOD other than the DCII index check, DOD's counsel responded, "none. There was no formal routine process").) In the past, MAVNI naturalization applicants generally were processed quickly. Indeed, the MAVNI enlistment contract from 2016 indicated that an enlistee could expect to get to Basic Training within 180 days of enlistment. (*See* Certificate and Acknowledgement, U.S. Army Reserve, Service Requirements and Methods of Fulfillment at 3, § IV(8)(c), Armed Forces of the United States (ECF No. 23-2) (enlistment contract of one of the named plaintiffs).) Under an initiative to expedite processing of applications of enlistees at Basic Training, USCIS also adjudicated the applications of and naturalized MAVNIs by the end of the 10-week Basic Training course. *See Nio PI Op.*, 270 F. Supp. 3d at 55. Overall, as of May 2017, the average USCIS processing time for military naturalization applications (including those filed by MAVNIs) was approximately four months from start to finish. *See id.* at 56, *see also Kirwa*, 285 F. Supp. 3d at 31 (describing the MAVNI path to citizenship before September 2016). (*See also* Decl. of Daniel Renaud ¶ 5,

July 28, 2017 (USCIS AR 258-59) ("7/28/17 Renaud Decl.") (summarizing military application processing times).)

## B. DOD's Sept. 30, 2016 Memorandum

When it reauthorized the program on September 30, 2016, DOD again imposed enhanced "eligibility requirements" for MAVNIs, including extensive background investigations. (*See* DOD Memorandum: Military Accessions Vital to the National Interest Pilot Program Extension, Sept. 30, 2016 (USCIS AR 233-41) ("Sept. 30 Memo").)[7] The Sept. 30 Memo made shipment to Basic Training contingent on (1) completion of these enhanced background investigations and (2) a determination by DOD and the Army that the soldier is suitable for military service.

Pursuant to this new policy, a MAVNI's security screening must include three specific investigative steps: (1) the NIAC database check, (2) the Tier 5 background investigation by OPM, and (3) the CI Review, including interviews and polygraphs as necessary. (*See id.* at USCIS AR 238.) Each of these investigations (collectively, the "DOD investigatory phase") generates a report summarizing its findings. (*See, e.g.*, Pls.' Mem. in Supp. of Pls.' Mot. for Partial Summ. J. & in Opp'n to Defs.' Cross Mot. for Summ. J. at 18, Dec. 21, 2018 (ECF No. 227) ("Pls.' Opp'n & Reply") (reproducing an excerpt of a DOD document referring to the CI Review report).)

The Sept. 30 Memo provides that, after the DOD investigatory phase is complete, and before shipping to Basic Training, the soldier must still await a determination by his or her service (*e.g.*, the Army) that he or she is suitable for military service. This "military suitability determination" has two steps, which together are referred to by plaintiffs as the "adjudicatory

---

[7] The MAVNI program stopped accepting new recruits in June 2016. (*See* Tr. of TRO/Prelim. Injunction Hearing at 43:7-9, Oct. 27, 2017 (ECF No. 75).)

phase" of DOD's vetting process.  First, based on the DOD investigation results, DOD's Central

Adjudication Facility ("DOD CAF") makes a recommendation (in later documents referred to as

a "military service suitability recommendation" or "MSSR") to the Army.  (*See* Sept. 30 Memo

at USCIS AR 238.)  Neither DOD CAF nor the Army conducts any additional investigation of

the applicant, but rather they rely on the information gathered during the DOD investigatory

phase and consider whether any derogatory findings can be "mitigated" by information from the

investigations or provided by the applicant.  To make this MSSR recommendation, DOD CAF

assesses the applicant using as its criteria 13 National Security Adjudicative Guidelines.  (*See id.*;

*see also* DOD Memorandum:  Implementation of Adjudicative Guidelines for Determining

Eligibility for Access to Classified Information (Dec. 29, 2005), Aug. 30, 2016 (Pls.' Appx. 93 *et

seq.*) (the "Adjudicative Guidelines").)  The Adjudicative Guidelines provide detailed criteria for

evaluating an individual's background, including how certain information may be mitigable, and

are generally used to determine whether an individual may access classified information or hold

a national security position.  The Adjudicative Guidelines include criteria such as allegiance to

the United States, Foreign Influence, Foreign Preference, Personal Conduct, and Criminal

Conduct, as well as guidance for determining whether certain conduct or information about an

applicant should be disqualifying or can be mitigated.  (*See generally* Adjudicative Guidelines at

Pls.' Appx. 98-121 (describing the criteria for each of the Adjudicative Guidelines).)

Second, once DOD CAF has rendered the MSSR, it is provided to the Army for its

review.  The Army reviews the recommendation and, if it is not favorable, it also reviews the

underlying investigatory results to determine if the "derogatory information" on which the

unfavorable MSSR was based can be mitigated.  (*See* Sept. 30 Memo at USCIS AR 238 ("If

derogatory information was revealed, the DoD CAF will provide information to the accessing

service via the Case Adjudication Tracking System.").) The service then renders a final "military suitability determination" (commonly referred to as a "military service suitability determination" or "MSSD") based on DOD CAF's recommendation and on the service's own needs: "The accessing service will use this information to then render the final military suitability determination in accordance with DoDI 1304.26 and any service specific policies." (*Id.*; *see also id.* at USCIS AR 234, 239, 241 (additional references to the "suitability determination" for MAVNIs).) It is the MSSD that determines whether a MAVNI may attend Basic Training and then proceed to active duty. If a MAVNI is found suitable for service, he or she ships to Basic Training; if found unsuitable he or she is promptly separated, or discharged, from the military. (*See id.* at USCIS AR 241 (flow chart depicting separation immediately after "NON FAVORABLE Military Suitability Determination").)

As a result of the Sept. 30 Memo, MAVNIs have had to wait significantly longer between their dates of enlistment and dates for shipment to Basic Training. In response to this situation, in October and November 2016 the Army began placing MAVNIs in the Army's Delayed Training Program ("DTP"), where they would remain enlisted and continue to drill as reservists while awaiting shipment to Basic Training. (*See* Decl. of Daniel Renaud ¶ 21, July 7, 2017 (USCIS AR 249) ("7/7/17 Renaud Decl."); 7/28/17 Miller Decl. at 6.) Soldiers drilling in DTP are categorized by the Army as "entry level" because they are reservists who have not yet attended Basic Training. *See* Enlisted Administrative Separations, Army National Guard and Reserve, Army Reg. 135–178, Glossary § II. If a soldier is discharged from entry-level status, the discharge is not characterized as honorable or other than honorable, but rather by the neutral "uncharacterized" classification. *See id.* § 2–11(a).

Generally, a soldier could remain in DTP for up to two years, after which he or she must

attend Basic Training or face discharge.  (*See* 7/28/17 Miller Decl. at 10 (quoting National

Defense Authorization Act for Fiscal Year 1993, § 1115(c), P.L. No. 102-484 (Oct. 23, 1992)).)

Because it was taking so long to become eligible for Basic Training under the new requirements,

some MAVNIs exceeded this two-year limit on DTP enlistment and faced discharge.  (*See id.*)

To alleviate this problem, DOD "determined that in this instance the [2-year] limitation may be

waived if movement to training remains impracticable," and extended the 2-year DTP timeout

deadline by an additional year to permit MAVNIs to remain enlisted while they waited for the

results of the DOD investigatory phase and their MSSDs.  (*See* DOD Memorandum:  Waiver of

Minimum Training Requirements for Certain Military Accessions Vital to the National Interest

(MAVNI), Jul. 27, 2017 (ECF No. 26 at 4) (enlarging the DTP timeout deadline to 36 months).)

Another byproduct of the delay was that by early 2017, approximately 500 MAVNIs

drilling in DTP sought and received signed N-426s and submitted naturalization applications

before having started Basic Training.  *See Kirwa*, 285 F. Supp. 3d at 31 (citing 10/18/2017 Tr. at

21-22).  These individuals had not completed their DOD background investigations.  (*See* 7/7/17

Renaud Decl. ¶ 21 (USCIS AR 249).)  According to Daniel Renaud, USCIS Associate Director,

Field Operations Directorate, "[p]rior to the September 30, 2016 memo, USCIS had received

few, if any, applications from MAVNI recruits who were drilling in the DTP.  Instead, the

recruits usually attended Basic Training soon after enlisting in the Army and waited until they

attended Basic Training to apply for naturalization."  (*Id.*)

Against this backdrop, on May 19, 2017, DOD issued an "Action Memo" addressed to

the Secretary of Defense, identifying four primary "MAVNI Risk Groups," along with mitigation

plans for addressing the risks identified with each group.  (DOD Action Memo:  Military

Accessions Vital to the National Interest (MAVNI) Pilot Program at 2, May19, 2017 (Pls.' Appx.

7) ("DOD May 2017 Action Memo").)  Of relevance to the plaintiffs in this case, DOD identified as "Group 3" the approximately 2,400 MAVNIs drilling in DTP whose Tier 5 investigations had not been completed, including the approximately 500 MAVNIs who had received their Form N-426s and applied for naturalization.  (*Id.*)  The Action Memo recommended that all DTP MAVNIs be discharged using Secretarial plenary authority, "[e]xcept for individual cases deemed vital to the national interest."  (*Id.*)[8]

### C.  USCIS's July 7, 2017 Guidance

As far back as 2016 and into 2017, DOD was communicating to USCIS its growing concerns about the MAVNI program, through both discussions and written materials provided on an ad-hoc basis.  (*See* Decl. of Daniel M. Renaud ¶¶ 3-4, Mar. 5, 2018 (USCIS AR 2-3) ("3/5/18 Renaud Decl.").)  According to Stephanie Miller, Director of DOD's Accession Policy Directorate, DOD senior leaders informed USCIS officials in April 2017 that DOD "was concerned about the naturalization of individuals whose [Tier 5] background investigation and DoD counterintelligence security review has not yet been completed."  (Miller 7/7/17 Decl. ¶ 18.)  Based on these concerns, according to Ms. Miller, DOD and USCIS "jointly determined that it was in the best interest of the United States to ensure that the naturalization decision of USCIS was informed by the outcome of [these completed reviews]" and "mutually agreed that USCIS would slow down the Form N-400 adjudications of the MAVNI pilot program applicants."  (*Id.*)  On April 13, 2017, USCIS "issued a written hold" on these soldiers' naturalization applications.  (7/7/2017 Renaud Decl. ¶ 25 (USCIS AR 250-51).)

In early May 2017, USCIS learned from DOD about two cases where a MAVNI soldier

---

[8] DOD would later inform the Court that DOD's May 19, 2017 Action Memo was an "internal, pre-decisional, and deliberative document," and its recommendations as to discharging Group 3 MAVNIs were not adopted.  (7/28/17 Miller Decl. at 8-9.)

had "naturalized before his or her DoD background checks revealed derogatory information that USCIS would have considered, had it known about the information, in determining whether the individual was eligible to naturalize." (3/5/18 Renaud Decl. ¶ 3 (USCIS AR 2) (referencing ad-hoc conversations and emails between DOD and USCIS personnel included at USCIS AR 11-13).) USCIS learned from DOD of these two cases during a field visit in May 2017 to Fort Jackson, a military base used by the Army for Basic Training. Follow-up emails between USCIS and DOD personnel who participated in this visit indicate that approximately 21 MAVNI soldiers were already in Basic Training although their Tier 5 investigations were still pending. (*See* USCIS AR 11-13.) The emails also indicate that two MAVNIS who had already naturalized were "chaptered out unfavorably"—*i.e.*, discharged after being determined ineligible to enlist, one for "bad conduct" and one for "failure to adapt." (USCIS AR 12-13.) On the same day as the DOD May 2017 Action Memo, USCIS sent another email to the field to clarify that its April 13 written hold on MAVNI N-400 applications affected only DTP MAVNIs who had not yet shipped to Basic Training. (*See* 7/7/17 Renaud Decl. ¶ 25 (USCIS AR 250-51); *see also* USCIS Email, MAVNI Hold, May 19, 2017 (ECF No. 23-1 at 10-11).)

Meanwhile, DOD's Office of the Inspector General ("OIG") was investigating the MAVNI program, including national security concerns related to soldiers' potential foreign ties or loyalty to the United States. In June 2017, OIG issued a classified report (the "OIG classified report") detailing its findings and highlighting these national security concerns. (*See* 3/5/18 Renaud Decl. ¶ 4 (USCIS AR 2-3); Memo, DHS USCIS MAVNI Program, July 3, 2017 (USCIS AR 7) ("July 3 DHS Memo").) Then, on July 3, 2017, DHS issued a one-page memo for the Secretary of Homeland Security, titled "DHS USCIS MAVNI Program," referring to the OIG classified report and other concerns about the processing of MAVNI naturalization applications.

(*See* July 3 DHS Memo (USCIS AR 7).) The July 3 DHS Memo stressed "security concerns regarding MAVNI recruits, informed by a classified DOD Inspector General report," and stated that "USCIS views additional background checks at the naturalization stage as necessary and appropriate in accordance with its general authority to conduct background checks on naturalization applicants." (*Id.*)

On July 7, 2017, Mr. Renaud sent an email containing the USCIS "Guidance" that is the gravamen of this litigation. The email is just over one page and instructs that a MAVNI naturalization applicant may not proceed to interview until "all enhanced DoD security checks are completed." (*See* Email from Daniel M. Renaud, Updated MAVNI N-400 Guidance, July 7, 2017 (USCIS AR 4-5) ("July 7 Guidance").)[9] The July 7 Guidance makes clear that the enhanced security checks referred to are those required under the Sept. 30 Memo:

> USCIS must ensure that each MAVNI naturalization applicant demonstrates good moral character and attachment to the U.S. Constitution as required by the INA and 8 CFR. In order to do so, each applicant must receive proper DoD vetting and clearance in alignment with the September 30, 2016 MAVNI extension authorization and restrictions. Consequently, USCIS will not proceed to interview, approve, or oath any currently pending or future MAVNI naturalization applicants applying for naturalization under INA § 329 [codified at 8 U.S.C. § 1440], regardless of their active duty or reserve service, until all enhanced DoD security checks are completed.

(July 7 Guidance at 2 (USCIS AR 5).)

The July 7 Guidance constituted a major change in USCIS policy. For the prior seventeen years, USCIS had basically relied on an FBI background check and a DCII index check to vet MAVNI applicants, but had not required extensive and lengthy DOD background investigations or an MSSD adjudication prior to considering a MAVNI's naturalization

---

[9] Mr. Renaud subsequently described the July 7 Guidance as "final agency guidance." *Nio PI Op.*, 270 F. Supp. 3d at 56 (quoting 7/17/17 Renaud Decl. ¶¶ 3-4). Defendants acknowledge that it constitutes a final agency action. (*See* Defs.' Opp'n & Cross Mot. at 19 n.11.)

application.  *See Nio PI Op.*, 270 F. Supp. 3d at 65.

The July 7 Guidance briefly explains its motivations.  First, it summarizes DOD and USCIS concerns over the prior year and a half, especially "circumstances and instances" of MAVNI enlistees becoming naturalized "before a DoD background check revealed derogatory information suggesting that [the applicant] lacked good moral character or attachment to the U.S. Constitution."  (July 7 Guidance (USCIS AR 5) (noting that investigations had subsequently identified such conduct as "immigration fraud, criminal acts, aggravated felonies, active membership and participation in the Communist Party, and national security concerns"); *see also* 7/7/17 Renaud Decl. ¶ 17 (USCIS AR 248) (noting the same concerns); 3/5/18 Renaud Decl. ¶¶ 3-4 (USCIS AR 2) (noting the same concerns and citing the OIG classified report and "other classified documents").)  The July 7 Guidance explained:  "USCIS has determined that the completion of DOD background checks is relevant to a MAVNI recruit's eligibility for naturalization. . . .  USCIS must ensure that each MAVNI naturalization applicant demonstrates good moral character and attachment to the U.S. Constitution as required by the INA and 8 CFR."  (July 7 Guidance at 1-2 (USCIS AR 4-5).)

## II.     MAVNI-RELATED LITIGATION

### A.  *Nio v. DHS*

This action was filed on May 24, 2017, before the July 7 Guidance was issued.  (*See* Compl., May 24, 2017 (ECF No. 1).)  Plaintiffs initially alleged that USCIS and DOD were unlawfully delaying the processing of MAVNI naturalization applications due to improper interference in the process by DOD.  Plaintiffs sought a preliminary injunction, asking the Court to enjoin DOD from interfering and USCIS from delaying the processing of MAVNI naturalization applications.  (Pls.' Mot. for Prelim. Injunction at 1, June 28, 2017 (ECF No. 17).)

Shortly thereafter, USCIS issued the July 7 Guidance and plaintiffs sought to challenge it as part of this litigation. The Court ordered plaintiffs to amend their complaint and revise their request for preliminary relief. (*See* Order, July 19, 2017 (ECF No. 24).) Plaintiffs then amended their complaint to challenge the July 7 Guidance as unlawful. (1st Am. Compl., Aug. 4, 2017 (ECF No. 27).) They complained that DOD had unlawfully interfered in the naturalization process and USCIS had allowed DOD to do so by agreeing to wait until the "enhanced" checks were "complete" before processing naturalization applications. Plaintiffs also moved for class certification. (Pls.' Mot. to Certify Class, Aug. 11, 2017 (ECF No. 30).) The Court certified the class and appointed class counsel. The class is defined as

> all persons who have (i) enlisted in the Selected Reserve through the MAVNI program prior to October 13, 2017; (ii) served honorably with a Selected Reserve unit through participation in at least one qualifying drill period or served in an active-duty status; (iii) submitted N-400 Applications for Naturalization; (iv) been issued Form N-426s certifying honorable service as a member of the Selected Reserve or in active-duty status; and (v) have had the processing or final adjudication of their naturalization applications (including naturalization itself) withheld or delayed because of (a) a final USCIS processing hold for MAVNIs, (b) a DOD N-426 policy review, (c) a DOD N-426 recall/decertification policy, (d) enhanced DOD security screenings, (e) a DOD CAF adjudication, (f) a national security determination, and/or (g) military service suitability vetting determination[.]

(Order at 1-2, Oct. 27, 2017 (ECF No. 72).)

The Court denied plaintiffs' motion for a preliminary injunction, finding that although plaintiffs had shown irreparable harm, they had not shown that they were likely to succeed on the merits of their claims. *See Nio PI Op.*, 270 F. Supp. 3d at 62-65. Having reviewed *in camera* the OIG classified report and other classified documents from the Defense Intelligence Agency, the Court found that plaintiffs were unlikely to succeed on their claim that the July 7 Guidance was arbitrary and capricious in light of the national security concerns that had informed it. At

the time, plaintiffs did not clearly distinguish between the two separate components of DOD's review—the DOD investigatory phase from which DOD might learn "derogatory information" about an applicant, and the "military suitability determinations" (DOD's MSSR and the Army's MSSD) based on that information. The Court found that, while the adoption of the July 7 Guidance constituted a "dramatic change in DHS/USCIS policy," the new policy was a "respon[se] to present national security concerns" and the need to gather information relevant to those concerns was likely within the discretion of USCIS. *Nio PI Op.*, 270 F. Supp. 3d at 65. Plaintiffs subsequently filed a second amended complaint, which is now the operative complaint. (2d Am. Compl., Oct. 20, 2017 (ECF No. 61).)

The plaintiff class sues DHS, USCIS, DOD, and the Secretary of Homeland Security, Director of USCIS, and Secretary of Defense in their official capacities. (*See id.* at 1.) In Count I of the complaint plaintiffs seek declaratory relief that defendants' actions are unlawful. (*See id.* at 47-50.) In Count II plaintiffs seek injunctive relief including, *inter alia*, a permanent injunction setting aside the July 7 Guidance, requiring priority processing of class members' naturalization applications, and preventing DOD from interfering in the naturalization process. (*Id.* at 50-53.) Count III alleges numerous APA violations including, *inter alia*, violation of 5 U.S.C. § 706(1) because USCIS has unreasonably delayed the processing of naturalization applications and violations of § 706(2) because the July 7 Guidance is arbitrary and capricious and contrary to law. (*Id.* at 54-62.) Count IV seeks mandamus relief to compel USCIS to process plaintiffs' naturalization applications. (*Id.* at 62-63.) Count V alleges violation of the U.S. Constitution's "Uniform Rule of Naturalization" clause. (*Id.* at 63-64.)

### B. *Kirwa v. DOD*

In the related case *Kirwa v. DOD*, the plaintiff class consists of MAVNI reservists who have not received a certified Form N-426 from the Army and therefore cannot yet apply for naturalization. They challenged a DOD policy issued on October 13, 2017, which would delay certification of a Form N-426 until a MAVNI's "applicable screening and suitability requirements" had been completed. *Kirwa*, 285 F. Supp. 3d 257, 264 (D.D.C. 2018) (quoting DOD Guidance of Oct. 13, 2017). Previously, DOD had certified reservists' honorable service after one qualifying day of drilling, including for those whose background investigations were not yet complete and/or who had not yet shipped to Basic Training. *See id.* at 263. The Court certified the class and preliminarily enjoined the policy. *See Kirwa*, 285 F. Supp. 3d 21 (D.D.C. 2017). Shortly thereafter, the Court denied DOD's motion to dismiss. *See Kirwa*, 285 F. Supp. 3d 257 (D.D.C. 2018). As a result of the Court's order requiring that DOD certify honorable service for MAVNIs once they had completed at least one day of drilling with the Reserves, more than 1,600 MAVNI N-426 requests have been granted as of May 22, 2019. (*See* Defs.' Status Report at 1, May 22, 2019 (*Kirwa*, Civ. No. 17-1793, ECF No. 155).) Once a *Kirwa* class member receives his or her N-426 and applies to USCIS for naturalization, he or she becomes a member of the *Nio* class.

### C. *Calixto v. U.S. Army*

In another case pending before the Court, *Calixto v. U.S. Dept. of Army*, Civ. No. 18-1551, a putative class of MAVNI soldiers, which partially overlaps with those in the *Nio* class, allege, *inter alia*, that in discharging them the Army violated Army and DOD regulations, as well as the soldiers' procedural due process rights. (*See* 2d Am. Compl., Jan. 2, 2019 (*Calixto*, Civ. No. 18-1551, ECF No. 61).) Plaintiffs' motion for class certification in *Calixto* is pending.

(Pls.' Mot. to Certify Class, Jan. 2, 2019 (*Calixto*, Civ. No. 18-1551, ECF No. 62).) The proposed class is divided into two sub-classes: those challenging their discharges based on an unsuitable MSSD, and those challenging discharges based on other reasons.

Since the filing of the *Calixto* litigation, DOD has instituted a process for the review of unsuitable MSSDs and discharges based on unsuitable MSSDs. Under the new process, soldiers who receive a "non-recommend" MSSR are to receive written notice thereof and then have 30 days to submit "matters which may refute, correct, explain, extenuate, mitigate, or update the unfavorable information." (DOD Memorandum: Resume Separation Actions Pertaining to Members of the Delayed Entry Program (DEP) and Delayed Training Program (DTP) Recruited Through the Military Accessions Vital to National Interest (MAVNI) Pilot Program at 2, Oct. 26, 2018 (*Calixto*, Civ. No. 18-cv-1551, ECF No. 50-1) ("Oct. 26 DOD Memo").) The Service must take this mitigating information into account in rendering the final MSSD within 90 days of the original MSSR. (*See id.*) This new process will lengthen the time between DOD's recommendation (the MSSR) and the Army's final determination (the MSSD), and in turn, it will further delay USCIS's consideration of a MAVNI's naturalization application. This is particularly true since to date only a handful of notices have been sent to the over 500 *Nio* class members who have received a non-recommend MSSR. (*See* Ex. B, Suppl. to Defs.' May 6, 2019 Report, May 9, 2019 (ECF No. 248-2).)[10]

---

[10] Other courts have recently enjoined other aspects of the government's treatment of MAVNIs and other foreign-born soldiers. After a bench trial in late 2018, a district court in Washington State held that naturalized citizens who had enlisted through the MAVNI program had been unconstitutionally discriminated against because they had been subjected to NIAC checks and continuous monitoring for national security concerns on the basis of national origin, even after becoming citizens. *See Tiwari v. Mattis*, 2019 WL 397160 (W.D. Wash. Jan. 31, 2019). A court in California granted class certification and preliminarily enjoined another DOD policy, which required that lawful permanent residents serving in the Armed Forces complete their background

## III.   PROCEDURAL POSTURE

On March 14, 2018, plaintiffs moved to file a third amended complaint based on what they characterized as ongoing violations by defendants.  (*See* Mem. of Points and Auth. in Supp. of Pls.' Mot. for Leave to File 3d Am. Compl., Mar. 14, 2018 (ECF No. 115).)  Plaintiffs sought, *inter alia*, to challenge defendants' interpretation of the July 7 Guidance as requiring that USCIS wait not only for the completion of the DOD investigatory phase, but also for the final MSSD (hereinafter referred to as the "MSSD Requirement").[11]  (*Id.* at 5.)  The Court denied leave to amend the complaint but informed the parties that it would "consider plaintiffs' allegations regarding USCIS's waiting for the results of the MSSD to be part of the second amended complaint," since their complaint challenged the entirety of the July 7 Guidance.  (Order at 1, Apr. 12, 2018 (ECF No. 135).)  The Court directed defendants to supplement the administrative record to address "the legality of USCIS waiting on MSSD/NSD determinations from DOD before naturalizing enlistees."  (*Id.*)

### A.  *Nio* Status Reports

As required by the Court, defendants periodically provide status reports on the progress of *Nio* class members' naturalization applications.  As of defendants' most recent report dated May 6, 2019, there were approximately 2,000 current and former class members, of whom more than 1,200 have naturalized and are no longer members of the class.  (*See* Defs.' Updated Report, May 6, 2019 (ECF No. 247) ("Defs.' May 6 Report").)  Of the approximately 750 remaining

---

checks and suitability determinations before shipping to Basic Training.  *See Kuang v. DOD*, 340 F. Supp. 3d 873 (N.D. Cal. 2018).

[11] This Opinion uses the term "MSSD Requirement" to refer to USCIS's waiting for the completion of the MSSD.  This litigation does not challenge the fact that DOD subjects enlistees to either the various DOD investigatory steps or to the Army's requirement of an MSSD in order to determine eligibility to serve.

class members, some 160 have received a suitable MSSD. (*See id.*) Almost all of the 550 remaining class members are still waiting for their final MSSDs. Of these, more than 500 have already received a "non-recommend" MSSR from DOD CAF. (*See id.*) Approximately 40 still have pending MSSRs, approximately half of whom were previously discharged due to an unsuitable MSSD but have now been offered reinstatement pursuant to the Oct. 26 DOD Memo. (*See id.*) With few, if any, exceptions, the vast majority of these remaining class members have not gone to Basic Training and are still in "entry level" status while they drill with their reserve units and wait for their MSSDs. (*See* 3/20/19 Tr. at 109:12-16; *id.* at 51:10-19.)

## B. The Administrative Record

USCIS compiled the administrative record for the July 7 Guidance in early March 2018 and included a declaration by Mr. Renaud describing the contents of the record and summarizing USCIS's reasons for the July 7 Guidance. (*See* Index of Administrative Record, Mar. 1, 2018 (ECF No. 111); 3/5/18 Renaud Decl. (USCIS AR 1-3).) The record also contains emails and extensive attachments documenting the specific cases of concern that DOD had raised to USCIS during the first half of 2017 (USCIS AR 8-209); the December 19, 2014 DOD memo reauthorizing the MAVNI program (USCIS AR 210-32); the July 3 DHS Memo (USCIS AR 7); and the July 7 Guidance (USCIS AR 4-6). The record was subsequently amended at plaintiffs' request and by order of the Court to include the Sept. 30 Memo (USCIS AR 233-41) and Mr. Renaud's declarations of July 7, 2017 and July 28, 2017, which were written at the time of or shortly after the July 7 Guidance. (*See* USCIS AR 242-86.)

Earlier in this litigation, the Court reviewed the June 2017 OIG classified report and other classified documents. *See Nio PI Op.*, 270 F. Supp. 3d at 64. Defendants did not submit any classified materials as part of the administrative record, for Mr. Renaud did not consult these

classified documents when issuing the July 7 Guidance. Rather, the record indicates that Mr. Renaud and others at USCIS relied on what DOD told them regarding their concerns about the MAVNI population. (*See* 3/5/18 Renaud Decl. ¶ 4 (USCIS AR 2-3); July 3 DHS Memo (USCIS AR 7) (referencing "security concerns regarding MAVNI recruits, informed by a classified DOD Inspector General report").)

This litigation, as well as the *Kirwa* case, has generated an extensive record beyond the *Nio* administrative record. As explained above, the Court has ordered ongoing reporting on the status of the *Nio* class and their class representatives. Additional declarations and other documents have been filed either at the request of the Court or by the parties to support their pleadings at various stages of the litigation. Two declarations by Ms. Miller of DOD are particularly useful in providing background information critical to understanding the programs at issue, although they are not part of the administrative record. (*See* 7/7/17 Miller Decl.; 7/28/17 Miller Decl.) The Court has held that these declarations may be cited in rebuttal or for necessary background information, but not as justification for the July 7 Guidance. (*See* Order at 1, Nov. 15, 2018 (ECF No. 217).) Documents in Plaintiffs' Appendix and the DOD Administrative Record also may be cited for these limited purposes. (*See id.*)

Of course, the Court is not limited to the administrative record in conducting its legal analysis. While the Court must assess the rationality of USCIS's MSSD Requirement based on the administrative record, it must take into account relevant legal authority, including statutes, regulations, and agency authority such as DODIs, Army Regulations, and the USCIS Policy Manual.

### C. Pleadings Before the Court

Before the Court are the parties' cross-motions for summary judgment. Plaintiffs filed a motion for partial summary judgment on August 13, 2018. (*See* Pls.' Mot. for Partial Summ. J., Aug. 13, 2018 (ECF No. 177) ("Pls.' Mot. for Summ. J.").)[12] DOD has now completed the DOD investigatory phase for essentially all class members. (*See id.* at 16 (citing Arendt Decl. ¶ 5 (ECF No. 128-2); Defs.' July 20, 2018 Status Report (ECF No. 170)).) Therefore, according to plaintiffs, although they originally attacked the entire July 7 Guidance, now any challenge to the portion regarding the DOD investigatory phase is moot. (*See* Pls.' Mot. for Summ. J. at 6.) What remains of plaintiffs' claim as to the July 7 Guidance is their challenge to the MSSD Requirement, which the Court previously indicated could be considered as part of the second amended complaint and, if appropriate, it could be addressed separately. (*See* Order at 2, Apr. 12, 2018.)

Plaintiffs raise a host of arguments challenging the MSSD Requirement. First, they argue that it violates the APA, 5 U.S.C. § 706(2), in various ways. They argue that it is not in accordance with law because it oversteps USCIS's statutory authority to conduct examinations of applicants, improperly outsourcing to DOD the investigation and assessment of these applicants. They also argue that the MSSD Requirement is arbitrary and capricious in violation of § 706(2)

---

[12] The motion is for partial summary judgment because the Court deferred briefing on plaintiffs' claim against DHS/USCIS of unreasonable delay under 5 U.S.C. § 706(1). (*See* Pls.' Mot. for Summ. J. at 34 n.3; *see also* 2d Am. Compl. at 54-55 (naming DHS/USCIS, but not DOD, as defendants in this claim).) Any analysis of whether USCIS is unreasonably delaying the processing of MAVNI naturalization applications had to be deferred until the Court could decide the timing of when that obligation is triggered. (*See* Order at 1, June 20, 2018 (ECF No. 159) (setting briefing schedule and ordering the parties to exclude arguments about plaintiffs' unreasonable delay claim); Tr. of Status Conference at 59:11-16, June 20, 2018 (ECF No. 161) ("6/20/18 Tr.") (explaining that the Court's analysis of plaintiffs' arbitrary-and-capricious claim would need to occur before consideration of unreasonable delay).)

because the administrative record does not support the decision to wait for DOD and the Army to make their suitability decisions about applicants, and because USCIS failed to consider important factors, such as the attendant harms that class members will suffer while awaiting the lengthy completion of the MSSD Requirement before USCIS will adjudicate a MAVNI's naturalization application. Next, plaintiffs argue that the MSSD Requirement violates the APA's publication and notice-and-comment requirements, 5 U.S.C. §§ 552, 553. Plaintiffs also argue that the MSSD Requirement has been applied retroactively to class members whose naturalization applications should have already been progressing before July 7, 2017. Finally, plaintiffs argue that the July 7 Guidance violates the Naturalization Clause of the Constitution by effectively delegating immigration decisions to DOD and substituting DOD standards for those imposed by Congress.

Defendants filed an opposition and cross-moved for summary judgment. (*See* Defs.' Opp'n to Pls.' Mot. for Partial Summ. J. & Cross Mot. for Summ. J., Nov. 30, 2018 (ECF No. 219) ("Defs.' Opp'n & Cross Mot.").) They argue that USCIS was within its power to issue the July 7 Guidance, and that the MSSD Requirement is lawful. Defendants rely on two primary rationales to justify the MSSD Requirement. First, they argue that waiting until the Army renders the MSSD allows USCIS to collect "adverse information that *may* be relevant to an applicant's eligibility for naturalization under the statutory requirements imposed by Congress." (*Id.* at 20-21.) Second, they claim that the information DOD learns during its process may implicate national-security concerns.

Plaintiffs filed an opposition and reply on December 21, 2018. (*See* Pls.' Opp'n & Reply.) Defendants filed a reply on February 15, 2019. (*See* Defs.' Reply in Supp. of Cross Mot. for Summ. J., Feb. 15, 2019 (ECF No. 237) ("Defs.' Reply").) A hearing was held on

March 20, 2019.  (*See* 3/20/19 Tr.)

As explained herein, the Court concludes that the MSSD Requirement is arbitrary and capricious because USCIS's explanation for it runs counter to the evidence.  While defendants' stated need for more information about naturalization applicants could well justify waiting for completion of the DOD investigatory phase, that information is essentially irrelevant as long as the MSSD Requirement remains in effect.  For, as is clear from the record, USCIS considers an applicant's MSSD determinative of his or her eligibility to naturalize under § 1440, and therefore, it has no need to review the information from the DOD investigatory phase.  Because the Court finds that the MSSD Requirement is arbitrary and capricious, and it will vacate that portion of the July 7 Guidance, the Court need not address the many additional claims raised by plaintiffs.

## ANALYSIS

### I.      LEGAL STANDARDS

Under the APA, a reviewing court must hold unlawful and set aside a final agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The arbitrary-and-capricious standard "obligates the agency to examine all relevant factors and record evidence, and to articulate a reasoned explanation for its decision." *Am. Wild Horse Preservation Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983)).  A rule is arbitrary and capricious if the agency

> (1) "has relied on factors which Congress has not intended it to consider," (2) "entirely failed to consider an important aspect of the problem," (3) "offered an explanation for its decision that runs counter to the evidence before the agency," or (4) [offers an explanation that] "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*United States Sugar Corp. v. EPA*, 830 F.3d 579, 606 (D.C. Cir. 2016) (quoting *State Farm*, 463

U.S. at 43).  The agency "must examine the relevant data and articulate a satisfactory explanation

for its action including a rational connection between the facts found and the choice made."

*Encino Motorcars, LLC, v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (quoting *State Farm*, 463 U.S.

at 43).  The agency's explanation must be "sufficient to enable us to conclude that the [agency's

action] was the product of reasoned decisionmaking."  *Owner-Operator Indep. Drivers Ass'n,*

*Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 203 (D.C. Cir. 2007) (quoting *State*

*Farm*, 463 U.S. at 52).

A court must not substitute its judgment for the agency's, but its review nonetheless

"must go beyond the agency's procedures to include the substantive reasonableness of its

decision," and in so doing the court must make a "'thorough, probing, in-depth review' to

determine if the agency has considered the relevant factors or committed a clear error of

judgment."  *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1098 (D.C. Cir. 1996)

(quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-16 (1971)).

In evaluating agency action under the APA, "the focal point for judicial review should be

the administrative record already in existence, not some new record made initially in the

reviewing court."  *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam).  Courts have, however,

recognized limited exceptions to this restriction.  One occurs where "there was such a failure to

explain administrative action as to frustrate effective judicial review."  *Id.* at 142-43.  In such

cases a court may obtain "additional explanation of the reasons for the agency decision as may

prove necessary," *id.* at 143, but they "should contain no new rationalizations."  *Envtl. Def.*

*Fund, Inc. v. Costle*, 657 F.2d 275, 285 (D.C. Cir. 1981) (citing *Bunker Hill Co. v. EPA*, 572

F.2d 1286, 1292 (9th Cir. 1977)).  A reviewing court should "consider evidence relevant to the

substantive merits of the agency action only for background information . . . or for the limited purposes of ascertaining whether the agency considered all the relevant factors or fully explicated its course of conduct or grounds for decision." *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980).

Post-decisional information may also be considered in certain cases. Thus, the D.C. Circuit has held that events that transpired after the challenged action may be considered if they "bear upon the issues before [the court]." *Amoco Oil Co. v. EPA*, 501 F.2d 722, 729 (D.C. Cir. 1974). In *Amoco Oil*, Congressional testimony that post-dated the agency action was admitted because it bore "directly on the plausibility of certain predictions made by the [agency] in promulgating the [challenged regulations]." *Id.* at 729 n.10. Specifically, the Circuit found that the agency's reliance on a prediction that certain converters would be in "general use" nationwide in car manufacturing had been "dramatically vindicated by subsequent testimony" of industry executives indicating that the regulated companies planned to "make extensive, nationwide use of converters in the 1975 model year." *Id.* at 738. The Court explained, "[r]ule-making is necessarily forward-looking, and by the time judicial review is secured events may have progressed sufficiently to indicate the truth or falsity of agency predictions. We do not think a court need blind itself to such events. . . ." *Id.* at 729 n.10. The Tenth Circuit also has found that "new data" may be considered if it is "pertinent to show the validity of" the agency action. *Am. Petroleum Inst. v. EPA*, 540 F.2d 1023, 1034 (10th Cir. 1976) (citing *Amoco Oil Co.*, 501 F.2d at 729 n. 10); *see also Ass'n of Pac. Fisheries v. EPA*, 615 F.2d 794, 812 (9th Cir. 1980) (noting that post-decisional data may be considered if it illuminates the original decision or shows "that the Agency proceeded upon assumptions that were entirely fictional or utterly without scientific support").

## II. ANALYSIS

### A. The July 7 Guidance

#### 1. The MSSD Requirement

The Court finds that the July 7 Guidance explicitly incorporates by reference the Sept. 30 Memo screening requirements, including the DOD and Army adjudicatory phase that culminates in the MSSD. Although plaintiffs argue that the July 7 Guidance does not "mention[]" the MSSD as a precondition for USCIS to process a naturalization application (*see* Pls.' Opp'n & Reply at 8-9), it is clear from the July 7 Guidance that its directive to wait "until all enhanced DoD security checks are completed" means to wait for the final MSSD. (July 7 Guidance at 2 (USCIS AR 5).) Contrary to their present position, plaintiffs previously recognized that the July 7 Guidance explicitly incorporated the Sept. 30 Memo and its refinements:

> [T]he July 7 Policy itself expressly references the September 2016 DoD Memo. In fact, the Policy states that it is being enacted in order to bring USCIS policy "in alignment with" the September 2016 DoD Memo: "[E]ach applicant must receive proper DoD vetting and clearance in alignment with the September 30, 2016 MAVNI extension authorization and restrictions." As such, it must be the case that the "vetting and clearance" described in the September 2016 DoD Memo is a factor relevant to the July 7 Policy.

(Pls.' Mem. of Pts. & Auths. in Support of Pls.' Mot. Re. Defs.' Certified Admin. Record for the July 7 Policy at 6, Apr. 10, 2018 (ECF No. 133) (citations omitted).) In turn, the Sept. 30 Memo clearly describes both the DOD investigatory phase and the MSSD Requirement, as it imposes "Security and Suitability Screening Requirements" which include the DOD investigatory phase and a "Military Suitability Determination" by the Service based on a recommendation by DOD CAF. (*See* Sept. 30 Memo at USCIS AR 238.)

The Court rejects defendants' argument that the Court cannot consider the MSSD Requirement alone, but instead must "consider the legality of the Guidance as a whole." (Defs.'

Opp'n & Cross Mot. at 19 n.11.)  Courts may "'set aside' only the part of a rule found to be invalid" because "[i]t would . . . exceed the statutory scope of review for a court to set aside an entire rule where only a part is invalid. . . ."  *See Catholic Soc. Serv. v. Shalala*, 12 F.3d 1123, 1128 (D.C. Cir. 1994) (quoting 5 U.S.C. § 706(2)).  The DOD investigatory phase and the MSSD Requirement are both contemplated by the July 7 Guidance, but they are clearly distinct phases of the process.  The DOD investigatory phase involves investigation and information-gathering, while the MSSR and MSSD processes involve, to borrow defense counsel's characterization, "synthesizing" that information for the specific purpose of assessing military suitability.  (3/20/19 Tr. at 27:12.)  The reasons that may justify USCIS's waiting for the DOD investigatory phase do not necessarily support the MSSD Requirement.  Waiting for the MSSD also considerably lengthens the time before USCIS can address naturalization applications.[13] Furthermore, as plaintiffs argue, their original challenge to the DOD investigatory phase is now moot, given that "the vast majority of class members" have completed the DOD investigatory phase.  (Defs.' Opp'n & Cross Mot. at 19 n.11; *see also* Defs.' Reply at 2 n.3.)  The Court will therefore review the reasonableness of the MSSD Requirement alone and treat the challenge to the DOD investigatory phase as moot.

## 2.  Defendants' Position Regarding the July 7 Guidance

Defendants argue that the purpose of the MSSD Requirement is to help USCIS gather relevant information from DOD about applicants—to "wait until [DOD's process is] over. . . . What USCIS knows is that the process generates information.  And it is information that could [] potentially be useful."  (3/20/19 Tr. at 30:24-31:8.)  They assert that the MSSD Requirement

---

[13] This time lapse between the conclusion of the DOD investigatory phase and the MSSD is likely to be lengthened even more for those MAVNIs who challenge their "non-recommend" MSSRs pursuant to the Oct. 26 DOD Memo adopted in the *Calixto* litigation.

ensures that USCIS "may review any information that may have emerged throughout the *entire* DoD process." (Defs.' Reply at 9.) According to defendants, waiting for this information helps USCIS meet its statutory obligation to "ensur[e] that these applicants possess the requisite good moral character and attachment to the Constitution necessary to naturalize." (Defs.' Opp'n & Cross Mot. at 35 (citing USCIS AR 2-7).)

Defendants insist that USCIS needs this information even if an applicant receives an unsuitable MSSD and will therefore be deemed ineligible by virtue of the characterization of his or her discharge. They deny that "USCIS mechanically treats adverse MSSDs based on 'unmitigable derogatory information' as an automatic disqualifier without analyzing the underlying information itself." (Defs.' Reply at 13 n.11.) According to defendants, "USCIS did not issue the July 7 Guidance for the purpose of learning how MAVNI recruits who are separated would be discharged," so "[t]he import of an 'uncharacterized' discharge is not at issue in this case." (Defs.' Reply at 14.) But, as explained *infra*, their position is at odds with the administrative record, the statutory and regulatory framework, and the statements of representatives of USCIS.

### 3. The Army's Position Regarding Uncharacterized Discharge

Central to the question before the Court is an understanding of the concept of uncharacterized discharge and its importance to MAVNI enlistment in the Army and to MAVNIs' naturalization applications.

Essentially, all *Nio* class members who have not yet received a final MSSD are drilling in DTP awaiting shipment to Basic Training. (*See* 3/20/19 Tr. at 38:15-18.)[14] Pursuant to Army

---

[14] It is possible that a *de minimis* number of class members have attended Basic Training (*see* 3/20/19 Tr. at 51:16-19), but given the mandate of the Sept. 30 Memo, the vast majority of current class members are reservists in DTP and by definition in entry-level status.

Regulations, the Army categorizes these soldiers as "entry level" because they are reservists who have not yet attended Basic Training. (*See* Army Reg. 135–178 Glossary § II (defining "[e]ntry level status").) By default, any entry-level discharge of a MAVNI reservist is labeled as "uncharacterized." (*See id.* § 2–11(a).) Defendants view an entry-level, uncharacterized discharge as a neutral classification, neither honorable nor dishonorable. (*See* 6/20/18 Tr. at 41:9-16 (ECF No. 161).) For most administrative purposes, DOD treats an uncharacterized discharge as honorable or general. *See* DODI 1332.14, *Enlisted Administrative Separations*, Encl. 4, § 3c(1)(c) (Pls.' Appx. 60) ("[For] administrative matters . . . that require a characterization as honorable or general, an entry-level separation will be treated as the required characterization."). Those with an uncharacterized discharge also are not necessarily barred from receiving certain veterans' benefits. *See* 38 C.F.R. § 3.12(k)(1) (eligibility for pension and other benefits is barred by a dishonorable discharge, but entry-level uncharacterized separations "shall be considered under conditions other than dishonorable").

As soon as a soldier's MSSD is issued, if the soldier is found unsuitable for service for any reason, he or she is discharged promptly, and the discharge will be "uncharacterized" by virtue of the soldier's entry-level status. For instance, the Sept. 30 Memo indicates that discharge should be initiated immediately after an individual receives an unsuitable MSSD. (*See* Sept. 30 Memo at USCIS AR 241; *see also* Oct. 26 DOD Memo at 2 (providing that when a DTP soldier is to be separated on the basis of "an unfavorable MSSD or NSD, the Army Reserve Command "will initiate administrative separation proceedings"); Defs.' Status Report, Feb. 8, 2019 (ECF No. 234) (indicating that, of the 24 class members who had been discharged due to an unsuitable MSSD, 22 were effectively discharged within a month or less of the MSSD date).)

### 4. USCIS's Position Regarding Uncharacterized Discharge

Regardless of whether a soldier has received an N-426 certification of honorable service from the Army, USCIS's interpretation of § 1440 is that a MAVNI who is no longer serving is only eligible to naturalize if the Army discharged him or her under honorable or general under honorable conditions. According to USCIS, "an uncharacterized discharge . . . [is] not honorable and it's not general under honorable. And the way USCIS views 1440 is that you have to fall into one of those first two categories." (3/20/19 Tr. at 13:7-12.) Defendants explained the same interpretation to the Court shortly after the issuance of the July 7 Guidance: "An uncharacterized discharge . . . means that the individual would no longer be eligible to become a naturalized citizen under the MAVNI program." *Nio PI Op.*, 270 F. Supp. 3d at 54 (citing 8/23/17 Tr. at 24-25). Indeed, as USCIS counsel explained at the Court's March 20, 2019 hearing, this interpretation has been in the USCIS Policy Manual since at least 2008. (*See* 3/20/19 Tr. at 13:25-15:2.) *See also* 12 USCIS Policy Manual, pt. I, ch. 3, § B ("Both 'Honorable' and 'General-Under Honorable Conditions' discharge types qualify as honorable service for immigration purposes. Other discharge types, such as 'Other Than Honorable,' do not qualify as honorable service.").

Defendants nonetheless acknowledge that there are significant differences between the standards for USCIS naturalization adjudications and the DOD/Army standards for military suitability. For example, defendants acknowledge that "some factors considered at the [DOD] CAF may be less relevant in the naturalization context (e.g., financial considerations)." (Defs.' Opp'n & Cross Mot. at 28; *see also* Pls.' Mot. for Partial Summ. J. at 11-13 ¶¶ 7-14.) The 13 Adjudicative Guidelines, on which the DOD and Army suitability decisions are based, require consideration of behavior that could make an individual vulnerable to coercion in the context of

handling classified information—for example, two of the 13 Adjudicative Guidelines are "Use of Information Technology Systems" and "Financial Considerations"—but may be less relevant to a USCIS assessment of the individual's moral character. (*See* Adjudicative Guidelines at 1-3 (Pls.' Appx. 95-97).) Moreover, in rendering an assessment under the Adjudicative Guidelines, any doubts "will be resolved in favor of the national security." (*Id.* at 2 (Pls.' Appx. 96).) By contrast, in assessing good moral character USCIS has discretion to evaluate the applicant's character in the context of "the standards of the average citizen in the community of residence." 8 C.F.R. § 316.10(a)(2).

DOD also recognizes these distinctions. As Ms. Miller, Director of DOD's Accession Policy Directorate, explained in another MAVNI case, these different standards would be expected to result in at least some individuals being found "unsuitable" for service, but still eligible to naturalize under the USCIS requirements:

> When we screen someone for the purpose of suitability and security, we're screening at a fairly high threshold. So an individual who may have a known or unknown relative that works for a foreign defense department or foreign intelligence agency, the individual themselves may have no malicious intent towards the United States or to the government; but we cannot mitigate the fact that they have a direct relative working for a foreign intelligence agency. So, therefore, the individual may not be suitable to hold a national security position [*i.e.*, to serve as a soldier].

> But ultimately that may not mean that the individual is not suitable to ultimately become a United States citizen. And we have tried very hard to make that distinguishing factor with our colleagues at Department of Homeland Security and USCIS. So they may not be able to serve [or continue serving] in the military, but that may not bear on [USCIS's] final determination as to whether that individual should be naturalized.

(Trial Testimony of Stephanie Miller at 152-53, Nov. 28, 2018 (*Tiwari v. Mattis*, No. C17-00242-TSZ (W.D. Wash.)), Ex. 8 to Pls.' Notice, Mar. 24, 2019 (ECF No. 244-8).)

In practice, however, USCIS is making no such independent assessment, because it treats

an unsuitable MSSD as determinative for purposes of naturalization.  The Sept. 30 Memo

mandates that any MAVNI who does not yet have a final MSSD from DOD cannot ship to Basic

Training and therefore must remain in DTP and thus in an entry-level status.  Any of these

MAVNIs whose MSSD is unsuitable will be discharged promptly, and that discharge will be

uncharacterized.  *See* Army Reg. 135–178 § 2–11(a).  USCIS will consider him or her

automatically ineligible to naturalize.  There is no need to proceed with the application, and no

need to review the underlying information from the DOD investigatory phase.  Meanwhile, any

class member found suitable will proceed to the naturalization process without USCIS

considering the results of the DOD investigatory phase, because USCIS does not review the

underlying information of those found suitable for service.  (*See* Defs.' Opp'n & Cross Mot. at

28.)

Defendants note that the MSSD Requirement allows USCIS to "avoid[] having to deploy

its resources to review DoD background check information . . . where the MSSD is favorable.

Rather, it can reserve its resources for the fewer cases in which the MSSD is *unfavorable*. . . ."

(*Id.*)  However, this contention is belied by the fact that the information is of no consequence

because USCIS deems any applicant with an uncharacterized discharge to be ineligible for

naturalization under § 1440.  According to defendants, if MAVNIs receive from the Army

"honorable discharges or general discharges then they will be eligible for naturalization.  If they

get uncharacterized discharges, the government thinks they won't. . . . The government thinks

that an uncharacterized discharge would not be sufficient to naturalize under 1440."  (Tr. of

Motions Hearing at 38:1-25, Oct. 3, 2018 (ECF No. 197) ("10/3/18 Tr.").)  *See also Nio PI Op.*,

270 F. Supp. 3d at 54 (citing Tr. of Status Conf. Hearing Cont'd Oral Argument on Prelim.

Injunction Mot. at 24:16-25:24, Aug. 23, 2017 (ECF No. 37) ("8/23/17 Tr."))  Defendants also

admit that USCIS "need[s] to find out how [MAVNIs have] been discharged" because an applicant's uncharacterized discharge "trigger[s]" the statutory honorable-service requirement. (3/20/19 Tr. at 50:3-6.)[15]

The July 7 Guidance cites as justifications the fact that DOD's background checks can reveal information relevant to good moral character, attachment to the Constitution, and national security. (*See* July 7 Guidance at 1-2 (USCIS AR 4-5).) These justifications may well support USCIS waiting until the end of the DOD investigatory phase, when any such information would be discovered. They do not, however, justify the MSSD Requirement. We know, for instance, that USCIS understood the benefits of knowing an applicant's MSSD and resulting discharge characterization. In a sworn declaration the same day as the July 7 Guidance, its author highlighted the fact that a naturalization applicant would be "ineligible for naturalization" under § 1440 if he or she received a "discharge from the Armed Forces under other than honorable conditions." (7/7/17 Renaud Decl. ¶ 18 (USCIS AR 248).) The usefulness of this information is also acknowledged by defendants in their pleadings, where they recognize that waiting for the MSSD is "reasonable because an applicant who receives an unfavorable MSSD is subject to discharge, and characterization of discharge has a clear bearing on naturalization eligibility under 8 U.S.C. § 1440(a)." (Defs.' Reply at 14.)

As noted, the DOD investigatory phase may generate information relevant to good moral

---

[15] Plaintiffs argue strenuously that USCIS's interpretation of § 1440 is unlawful because by statute and DODI an entry-level uncharacterized discharge must be treated as honorable for these purposes. *See* 10 U.S.C. § 12685 ("A member of a reserve component who is separated for cause . . . is entitled to a discharge under honorable conditions."); DODI 1332.14, Encl. 4, § 3c(1)(c) (Pls.' Appx. 60) ("With respect to administrative matters outside this instruction that require a characterization as honorable or general, an entry-level separation will be treated as the required characterization."). Whether USCIS's position is legally correct is not before the Court, but rather the issue here is whether the MSSD Requirement is arbitrary and capricious in violation of the APA.

character, attachment to the Constitution, and national security. And, as defendants point out, the administrative record contains references to MAVNIs about whom the DOD investigatory phase revealed "derogatory information that USCIS would have considered" had the MAVNIs not already been naturalized. (3/5/18 Renaud Decl. ¶ 3 (USCIS AR 2).)[16] However, any such information would be revealed during the DOD investigatory phase. The MSSD Requirement results in USCIS receiving no new derogatory information, and thus defendants' need for information bears no "rational connection" to the MSSD Requirement. *Encino Motorcars*, 136 S. Ct. at 2125 (quoting *State Farm*, 463 U.S. at 43). Indeed, the only relevant information revealed to USCIS is, in the case of an unsuitable MSSD, that the applicant will inevitably and imminently receive an uncharacterized discharge.

Waiting for the MSSD does not ensure that USCIS receives relevant information; it obviates USCIS's need for that information. An unfavorable MSSD is determinative: because it results in an uncharacterized discharge, USCIS will reject the application as automatically ineligible. This has been USCIS's practice since at least 2008, when the USCIS Policy Manual was adopted. (*See* 3/20/19 Tr. at 14:22-23.) In a representative case from 2010, a federal court in Indiana reviewed USCIS's denial of a naturalization application under § 1440 because the MAVNI's entry-level discharge was uncharacterized. *See, e.g.*, *Oyebade v. Lee*, 2010 WL

---

[16] While the Court need not reach the lawfulness of USCIS waiting for the DOD investigatory phase because that issue is moot, *see supra* Section II.A.1, the Court recognizes the principle that courts should not second-guess the executive regarding matters of national security. *See Nio PI Op.*, 270 F. Supp. 3d at 65 (citing *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1861 (2017) ("National-security policy is the prerogative of the Congress and President."); *see also Doe 2 v. Shanahan*, 755 F. App'x 19, 24-25 (D.C. Cir. 2019) (collecting cases recognizing the deference courts owe to the executive in military and national-security decision-making). The Court similarly recognizes the limited scope of its review in matters of immigration policy. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2418-19 (2018). However, any information that could bear on national security is collected before the MSSR/MSSD process and thus cannot justify the MSSD Requirement.

2927207 at *1, *5 (S.D. Ind. 2010).  The *Oyebade* court noted that the applicant's uncharacterized discharge denoted a wholly "neutral" classification and the USCIS denial was based on the agency's long-standing interpretation of that neutrality as insufficient to satisfy the honorable-service requirement under § 1440.  *See id.*

This approach continues to be followed today.  Plaintiffs have filed a written decision by USCIS denying a MAVNI soldier's N-400 application for naturalization.  (USCIS Decision, Feb. 14, 2019, Ex. 1 to Pls.' Notice, Mar. 24, 2019 (ECF No. 244-1).)[17]  The USCIS decision explains that the denial is based on the applicant's "uncharacterized" entry-level discharge from the military, which renders the applicant ineligible under § 1440.  (*See id.*)  It does not include any discussion of other statutory factors such as good moral character.

In point of fact, the MSSD Requirement allows USCIS to learn the characterization of the applicant's discharge in contravention of the principle recognized in some cases that USCIS may not delay the processing of naturalization applications so it can wait to see if an applicant becomes disqualified.  *See, e.g.*, *Al Karim v. Holder*, 2010 WL 1254840 at *3 (D. Colo. Mar. 29, 2010) (holding that adjudication of an immigration benefit may not be delayed to see whether the applicant's "classification . . . *may* change at some indeterminate point in the future"); *see also Jaa v. INS*, 779 F.2d 569, 572 (9th Cir. 1986) (suggesting that deliberate delay by the government, in order to see if the applicant became ineligible for an immigrant visa, could be impermissible).

As a result of USCIS's reading of the honorable-service requirement under § 1440, there is no need for USCIS to conduct its own investigations of eligible applicants, as required by 8

---

[17] Plaintiffs offered the USCIS decision as rebuttal evidence to counter defendants' contention that the underlying information from the DOD investigatory phase is relevant even when USCIS knows the applicant has received an uncharacterized discharge.  (*See* 3/20/19 Tr. at 110:6-12.)

U.S.C. § 1446(b), or to independently assess applicants' good moral character or attachment to the Constitution. In effect, DOD's and the Army's decisions as to whether a class member is suitable for service operate as a proxy for USCIS. Given this reality, defendants' argument that an applicant's uncharacterized discharge is irrelevant to this case rings hollow. Defendants' justifications for the MSSD Requirement are also belied by the fact that USCIS learns no new information about naturalization applicants except the resulting MSSD and, if it is unsuitable, that the applicant will receive an uncharacterized discharge. The Court therefore finds that the MSSD Requirement is arbitrary and capricious in violation of § 706(2)(A).

### B. Relief

The Court will vacate the MSSD Requirement only and it need not reach the validity of the remainder of the July 7 Guidance (*i.e.*, the DOD investigatory phase), to which any challenge is moot. The Court rejects plaintiffs' argument that the entire July 7 Guidance must be invalidated. Under the APA, a reviewing court may hold unlawful and set aside an "agency action," 5 U.S.C. § 706(2)(A), and the definition of agency action "includes the *whole or a part of* an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act. . . ." 5 U.S.C. § 551(13) (emphasis added). The D.C. Circuit has held that courts may reject only "the part of a rule found to be invalid" because "[i]t would . . . exceed the statutory scope of review for a court to set aside an entire rule where only a part is invalid, and where the remaining portion may sensibly be given independent life." *Catholic Soc. Serv. v. Shalala*, 12 F.3d 1123, 1128 (D.C. Cir. 1994); *see also Wilmina Shipping AS v. DHS*, 75 F. Supp. 3d 163, 172-73 (D.D.C. 2014) (finding that a portion of a challenged agency action was severable).

The Court also rejects defendants' argument that the Court should not vacate the MSSD Requirement. (*See* Defs.' Reply at 15 n.13.) The APA provides that an agency action that is

arbitrary and capricious shall be "set aside." 5 U.S.C. § 706(2)(A). Generally, when a court finds that a challenged action is arbitrary and capricious, the remedy is vacatur. It is true that in certain circumstances courts have discretion to remand to the agency for reconsideration or further explanation. For example, a court may decline to vacate a rule if doing so would be highly disruptive, *see N. Air Cargo v. United States Postal Serv.*, 674 F.3d 852, 860-61 (D.C. Cir. 2012); *Allied-Signal, Inc. v. United States Nuclear Regulatory Com'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993), or where the prevailing party's interests would not be served. *See, e.g.*, *Envtl. Def. Fund, Inc. v. EPA*, 898 F.2d 183, 190 (D.C. Cir. 1990) (declining to vacate because "to do so would at least temporarily defeat petitioner's purpose").

That is not the case here. The DOD investigatory phase is complete for members of the class, so USCIS can proceed to process their naturalization applications. And if the MSSD Requirement remains in effect class members certainly will suffer harm, since their applications may not be evaluated by USCIS based on the standards that govern naturalization, as opposed to suitability for military service. The Court will therefore vacate the MSSD Requirement.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for partial summary judgment will be granted in part and defendants' cross-motion will be denied. Summary judgment will be entered for plaintiffs as to their argument that the MSSD Requirement is arbitrary and capricious in violation of 5 U.S.C. § 706(2). The MSSD Requirement will be vacated. A separate order incorporates the Court's conclusion and sets this matter down for a status conference.

_Ellen S. Huvelle_
_____
ELLEN SEGAL HUVELLE
United States District Judge

Date: May 22, 2019